ASKIA WASHINGTON #69032-066
FEDERAL DETENTION CENTER - BOX 562
PHILADELPHIA, PA. 19105

CRIMINAL DOCKET # 13-171-2

MARCH 12, 2014

HON: JOEL H. SLOMSKY, U.S.D.J.
UNITED STATES DISTRICT COURTHOUSE
601 MARKET STREET
PHILADELPHIA, PA. 19105

RE: REGARDING SUBMISSION OF LEGAL DOCUMENTS AND CASELAW IN SUPPORT OF
    MOTION FOR SELECTIVE PROSECUTION AND RACIAL PROFILING IN A.T.F. STINGS.

DEAR JUDGE SLOMSKY:

        PLEASE FIND ENCLOSED A COPY OF ALL THE LEGAL DOCUMENTS AND CASELAWS
WHICH I HAVE ASKED MY ATTORNEY TO USE TO SUPPORT OUR MOTION FOR RACIAL
PROFILING AN SELECTIVE PROSECUTION IN "PHONY STASH HOUSE DRUG STINGS"
WHICH HAVE BEEN CONDUCTED BY THE A.T.F. AND PHILADELPHIA UNITED STATES
ATTORNEY'S OFFICE IN THE STATE OF PENNSYLVANIA.

        I ASK THAT THE COURT PLACED SUCH ON MY DOCKET SHEET AND REVIEW SUCH
IN CONNECTION WITH MY PENDING AND FUTURE MOTION TO DISMISS INDICTMENT FOR
SELECTIVE PROSECUTION, AND RACIAL PROFILING.

        PLEASE ACKNOWLEDGE RECEIPT OF THESE DOCUMENT'S AND CASELAW WITH
NOTICE THAT THEY HAVE BEEN PLACED ON MY DOCKET SHEET IN SUPPORT OF FUTURE
LITIGATION IN THIS MATTER.

                                RESPECTFULLY SUBMITTED,

                                ASKIA WASHINGTON #69032-066

RECEIVED
MAR 14 2014

EXHIBIT "A"

*(handwritten left margin:)*

MacARTHUR JUStice
CENTER - Northwestern
University School of Law
375 E. Chicago Ave.
Chicago, IL 60611
Phone - (312) 503-1271
Racial Profiling case
Request.

---

\* Case Name - Abraham
BROWN

\* ASK What the decision
Was on the Racial
Profiling case heard
on Feb. 26, 2014 \*

← ASK them to mail a
copy of the Opinion \*

\* ASK for LAW - CLERK
for Judge Castillo \*

---

*(newspaper article:)*

**USA TODAY**
FRIDAY, AUGUST 2, 2013

# NATION

# Do ATF stings target minorities?

### Red flag raised by judge in Chicago

**Brad Heath**
@bradheath
USA TODAY



Targets of a sting sit in the back seat of a car in a still shot from an ATF video. A judge wrote that feds have used such stings to lock up at least 26 people in the Chicago area and that all were black or Hispanic.

Controversial federal sting operations that lure in suspects with the promise of a huge payoff for robbing a fake drug stash house may be unfairly targeting racial minorities, the chief federal judge in Chicago said in a decision this week.

U.S. District Court Judge Ruben Castillo said in an order filed late Wednesday that there is a strong showing of potential bias in the robbery stings, which are run by the U.S. Bureau of Alcohol, Tobacco, Firearms and Explosives. He wrote that since 2011, federal agents have used such stings to lock up at least 26 people in the Chicago area and that all of them were either black or Hispanic.

The order comes a month after a USA TODAY investigation found that the ATF has quietly made fictional stash-house robberies a central feature of its effort to target violent crime, more than quadrupling the number of stings it conducted over the past decade. Although the stings are meant to target some of the nation's most dangerous criminals, they have routinely ensnared small-time crooks who jumped at the chance to score hundreds of thousands of dollars worth of drugs.

Nationwide, the ATF has locked up more than 1,000 people in stash-house operations over the past decade. Still, the tactic has been widely criticized by federal judges and remains so controversial that some federal prosecutors refuse to allow it.

Castillo's two-page order instructed the government to turn over a list of all the people it had charged in stash-house cases in northern Illinois, as well as confidential ATF documents that outline how agents are supposed to conduct the operations, including any guidelines for selecting appropriate targets.

The order came in a case in which five men are charged with plotting to rob a non-existent drug stash house. As in most of the ATF's other operations, an informant introduced the men to an undercover agent posing as a disgruntled courier who would help them steal 15 to 20 kilograms of cocaine. Agents arrested them in August 2012 when they showed up allegedly to commit the robbery.

Depending on what the records reveal, Castillo's decision could arm defense lawyers to argue that he should throw out the case altogether on the grounds that the government selectively prosecuted racial minorities. They could raise more questions about a brand of undercover operation that has already drawn widespread criticism from federal courts for tactics that skirt the boundaries of entrapment.

Spokesmen for the U.S. Attorney's office in Chicago and the ATF declined to comment on the order or the allegation that the government had engaged in racial profiling. Prosecutors have denied that charge in court filings.

Defense lawyers said the stings require special scrutiny because of the latitude agents have to select their targets. "These are unique cases in that they exist only when the government creates the fiction that becomes the crime," two public defenders wrote in a filing last week.

---

*(handwritten bottom:)*

Hon: Ruben Castillo, U.S.D.J.
Attention: LAW CLERK to ↰

Everett McKinley Dirksen United States
Courthouse - 219 South Dearborn Street, 20th. Flr.
Chicago, IL 60604

EXHIBIT-"B"

EXHIBIT-"B"   June 28, 2013

USA TODAY INVESTIGATION

# ENTRAPMENT?



# Drug stings like this one have snared 1,000 would-be criminals.

But are these faked drug stashes by the feds 'good law enforcement' or government gone too far?

**Brad Heath**
@bradheath
USA TODAY

**ROMEOVILLE, ILL.** The three men in the back seat were supposed to be ready for battle.

They were waiting for a phone call that would launch a daring and dangerous crime, sending them charging through the front door of a Mexican drug ring's stash house to steal 50 pounds or more of cocaine from three armed guards. Their plan was to disguise themselves as police officers, tie up the guards, and slip away with a half-million dollars' worth of drugs. If tying them up didn't work, they'd kill them all.

Only the small army of federal agents watching them knew that it was all a lie.

There was no house. No drugs.

The only things waiting for them when the call came were a team of camouflaged federal agents with rifles and stun grenades, and the promise of a long prison sentence for a plot to steal and resell non-existent cocaine.

The U.S. Bureau of Alcohol, Tobacco, Firearms, and Explosives, the





**Source ATF**
FRANK POMPA, USA TODAY

agency in charge of enforcing the nation's gun laws, has locked up more than 1,000 people by enticing them to rob drug stash houses that did not exist. The ploy has quietly become a key part of the ATF's crime-fighting arsenal, but also a controversial one: The stings are so aggressive and costly that some prosecutors have refused to allow them. They skirt the boundaries of entrapment, and in the past decade they have left at least seven suspects dead.

The ATF has more than quadrupled its use of such drug-house operations since 2003, and officials say it intends to conduct even more as it seeks to lock up the "trigger pullers" who menace some of the most dangerous parts of inner-city America. Yet the vast scale of that effort has so far remained unknown outside the U.S. Justice Department.

To gauge its extent, USA TODAY reviewed thousands of pages of court records and agency files, plus hours of undercover recordings. Those records — many of which had never been made public — tell the story of how an ATF strategy meant to target

▶ STORY CONTINUES ON 4A

Exhibit - "C"

1st. ORDER OF Bias

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

United States of America          )
                                  )
          Plaintiff,              )
                                  )
     v.                           )     No. 12 CR 632
                                  )
Abraham Brown, et al.,            )
                                  )
          Defendants.             )

## ORDER

This Court is mindful of the limited nature of judicial review of executive department decisions. The Court is also aware that history has shown a continuing difficult intersection between the issue of race and the enforcement of our nation's criminal laws. With these two abiding principles in mind, after careful review of the parties' briefs, this Court has concluded that it must grant the defendants' motion for discovery on the sensitive issue of potential racial profiling and selective prosecution.

The Court concludes that the defendants have made a strong showing of potential bias in the history of the prosecution of so called "phony drug stash house rip off cases." Unlike the typical historical, alleged violation of federal law, these unique cases are generated by the targeted use of confidential information to create potential robberies of phony drug stash houses.

The defendants' motion has specifically identified 17 phony stash house rip off cases, including this one that the U.S. Attorney's Office has prosecuted since 2006. The defendants' data shows that the overwhelming targets of these investigations were African Americans. In fact, since 2011, 19 African Americans and 7 Latino defendants have been charged in these cases. According to the defense, none of the defendants during this time period, were non-



## Office of the Attorney General
### Washington, D. C. 20530

May 19, 2010

MEMORANDUM TO ALL FEDERAL PROSECUTORS

From:    Eric H. Holder, Jr.
          Attorney General

Subject:    Department Policy on Charging and Sentencing

The reasoned exercise of prosecutorial discretion is essential to the fair, effective, and even-handed administration of the federal criminal laws. Decisions about whether to initiate charges, what charges and enhancements to pursue, when to accept a negotiated plea, and how to advocate at sentencing, are among the most fundamental duties of federal prosecutors. For nearly three decades, the Principles of Federal Prosecution, as reflected in Title 9 of the U.S. Attorneys' Manual, Chapter 27, have guided federal prosecutors in the discharge of these duties in particular and in their responsibility to seek justice in the enforcement of the federal criminal laws in general. The purpose of this memorandum is to reaffirm the guidance provided by those Principles.

Persons who commit similar crimes and have similar culpability should, to the extent possible, be treated similarly. Unwarranted disparities may result from disregard for this fundamental principle. They can also result, however, from a failure to analyze carefully and distinguish the specific facts and circumstances of each particular case. Indeed, equal justice depends on individualized justice, and smart law enforcement demands it. Accordingly, decisions regarding charging, plea agreements, and advocacy at sentencing must be made on the merits of each case, taking into account an individualized assessment of the defendant's conduct and criminal history and the circumstances relating to commission of the offense (including the impact of the crime on victims), the needs of the communities we serve, and federal resources and priorities. Prosecutors must always be mindful of our duty to ensure that these decisions are made without unwarranted consideration of such factors as race, gender, ethnicity, or sexual orientation.

Charging Decisions: Charging decisions should be informed by reason and by the general purposes of criminal law enforcement: punishment, public safety, deterrence, and rehabilitation. These decisions should also reflect the priorities of the Department and of each district. Charges should ordinarily be brought if there is probable cause to believe that a person has committed a federal offense and there is sufficient admissible evidence to obtain and sustain a conviction, unless "no substantial Federal interest" would be served, the person is subject to

"effective prosecution" elsewhere, or there is "an adequate non-criminal alternative to prosecution" [USAM 9-27.200 et seq.].

Moreover, in accordance with long-standing principle, a federal prosecutor should ordinarily charge "the most serious offense that is consistent with the nature of the defendant's conduct, and that is likely to result in a sustainable conviction" [USAM 9-27.300]. This determination, however, must always be made in the context of "an individualized assessment of the extent to which particular charges fit the specific circumstances of the case, are consistent with the purpose of the Federal criminal code, and maximize the impact of Federal resources on crime" [USAM 9-27.300]. In all cases, the charges should fairly represent the defendant's criminal conduct, and due consideration should be given to the defendant's substantial assistance in an investigation or prosecution. As a general matter, the decision whether to seek a statutory sentencing enhancement should be guided by these same principles.

All charging decisions must be reviewed by a supervisory attorney. All but the most routine indictments should be accompanied by a prosecution memorandum that identifies the charging options supported by the evidence and the law and explains the charging decision therein. Each office shall promulgate written guidance describing its internal indictment review process.[1] 

Plea Agreements: Plea agreements should reflect the totality of a defendant's conduct. These agreements are governed by the same fundamental principle as charging decisions: prosecutors should seek a plea to the most serious offense that is consistent with the nature of the defendant's conduct and likely to result in a sustainable conviction, informed by an individualized assessment of the specific facts and circumstances of each particular case. Charges should not be filed simply to exert leverage to induce a plea, nor should charges be abandoned to arrive at a plea bargain that does not reflect the seriousness of the defendant's conduct. All plea agreements should be consistent with the Principles of Federal Prosecution and must be reviewed by a supervisory attorney. Each office shall promulgate written guidance regarding the standard elements required in its plea agreements, including the waivers of a defendant's rights. 

Advocacy at Sentencing: As the Supreme Court has recognized, Congress has identified the factors for courts to consider when imposing sentences pursuant to 18 U.S.C. §3553. Consistent with the statute and with the advisory sentencing guidelines as the touchstone, prosecutors should seek sentences that reflect the seriousness of the offense, promote respect for the law, provide just punishment, afford deterrence, protect the public, and offer defendants an opportunity for effective rehabilitation. In the typical case, the appropriate balance among these purposes will continue to be reflected by the applicable guidelines range, and prosecutors should generally continue to advocate for a sentence within that range. The advisory guidelines remain important in furthering the goal of national uniformity throughout the federal system. But consistent with the Principles of Federal Prosecution and given the advisory

---

[1] This memorandum has no impact on the guidance provided in the September 22, 2003 memorandum and elsewhere regarding "fast-track" programs. In those districts where an approved "fast-track" program has been established, charging decisions and disposition of charges must comply with the Department's requirements for that program.

EXHIBIT — "H"

**U.S. Department of Justice**

Executive Office for United States Attorneys

---

Communications and Law Enforcement Coordination Staff   *Bicentennial Building, Room 7600*   *(202) 252-5490*
*600 E Street NW*
*Washington, DC 20530*

SEP 1 8 2013

Anthony D. Dickey
#21201-050
Federal Detention Center
P O Box 562
Philadelphia,  PA 19105-0562

Dear Mr. Dickey:

        This responds to your letter dated July 05, 2013, to the Attorney General.  Your letter was forwarded to the Executive Office for United States Attorneys for response.

        It appears the issues you have raised can be addressed by the attached document, which contains information on common requests for assistance.  We hope this is helpful in addressing your concerns.

                        Sincerely,

                        David Ausiello
                        Assistant Director
                        Communications and Law Enforcement
                        Coordination Staff

Enclosure

Exhibit - "H"

# UNITED STATES DISTRICT COURT
# NORTHERN DISTRICT OF ILLINOIS
# EASTERN DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | ) | |
| | ) | No. 12 CR 632 |
| v. | ) | |
| | ) | Judge Ruben Castillo |
| ABRAHAM BROWN | ) | |

## DEFENDANTS' MEMORANDUM IN SUPPORT OF MOTION TO COMPEL AND IN OPPOSITION TO THE U.S. ATTORNEY'S OFFICE MOTION FOR RECONSIDERATION OF ORDER GRANTING DISCOVERY ON THE ISSUE OF RACIAL PROFILING/SELECTIVE PROSECUTION

### Introduction

The U.S. Attorney's Office has moved this Court to reconsider its Order of July 31, 2013 providing limited discovery on "the sensitive issue of potential racial profiling and selective prosecution." *See* Order, Dkt. 153. The Court found that the defense had identified 17 phony stash house ripoff cases that had been brought since 2006 and that "defendants' data shows that the overwhelming targets of these investigations were African Americans." *Id.*

The Court also found that based on the cases that the defense had found that since 2011, 19 African American and 7 Latino defendants have been charged in these cases and that the showing made by the defense was sufficient to support limited discovery including (1) "a list by case name, number and race of each defendant in all phony stash house ripoff cases brought by the U.S. Attorney's Offices in this district from 2006 to the present;" (2) "[a]ll [d]ocuments containing instructions given from 2006

to the present by any supervisors employed by the U.S. Attorney for the Northern

District of Illinois about the responsibilities of AUSA's to ensure that defendants in

cases brought by the Office of the U.S. Attorney for the Northern District of Illinois have

not been targeted due to their race, color, ancestry or national origin and specifically

that those persons who are defendants in phony stash house cases in which the Bureau

of Alcohol, Tobacco and Firearms ('ATF') was the investigatory agency have not been

targeted due to their race, color, ancestry or national origin and that such prosecutions

have not been brought with discriminatory intent on the basis of the defendants' race,

color, ancestry or national origin;" and (3) ATF instructions that "summarize[] how to

investigate and prosecute phony stash house ripoff cases, including any guidelines for

selecting appropriate targets for those cases . . . " Dkt. 153 at pp. 1-2.

In response, the U.S. Attorney's Office has filed a motion to reconsider and

attached various documents including a document purporting to be a response to the

first item ordered to be produced by the Court (adding seven cases that had not been

found by the defense) but one that lists all defendants as either Black or White on the

basis that it cannot determine which defendants are Latino or Hispanic. *See*

Government's Motion for Reconsideration Regarding Discovery Order ("Gov't

Reconsideration Motion"), Dkt. 154; Exhibits in Support, Dkt. #154-1. The government

has also produced portions of the United States Attorney's Manual making it clear that

2

persons are not to be targeted on the basis of race, color, ancestry or national origin but

the government has produced nothing even remotely connected to the specific items to

be produced in the second set of items the Court required the U.S. Attorney's Office to

provide to the defense. *See* Dkt. 154-1, Ex. B. Finally, the U.S. Attorney's Office has

indicated that even though information regarding the ATF's selection criteria or modus

operandi s not discoverable, it will produce a document *in camera* that it claims is

responsive to the third set of documents the Court ordered to be produced. Dkt. #154 at

13. The failure of the U.S. Attorney's Office to comply with the Court's order is

addressed in a motion to compel and later in this memorandum.

The U.S. Attorney's Office's motion to reconsider is a rehashing of arguments

already made to this Court with some minor added twists. It has made no arguments

that should cause this Court to even re-consider its Order. In reality the positions it has

taken only underscore the need for scrutiny.

### Argument

I. **The Government's Chart of the Cases and Defendants in Phony Stash House Ripoff Cases Since 2006, Once Corrected for Its Failure to Identify Latino Defendants, Shows a Stark Picture of Racial Profiling that Has Gotten Worse Over Time**

In the defense's original motion for discovery regarding racial profiling/selective

prosecution in phony stash house ripoff cases in this courthouse since 2006, the defense

identified 17 cases including this one, providing information that showed disparities

3

based on race and national origin and ancestry as referenced above. Defendants'
Motion for Discovery on the Issue of Racial Profiling/Selective Prosecution ("Def.
Motion for Discovery"), Dkt. 123 at ¶¶4-6[1].

The U.S. Attorney's Office has now discovered another eight cases. Dkt. 154-1,
Ex. A. But, remarkably, the chart produced only identifies defendants as Black or White.
Defendants with names like Benitez, Davila, and DeJesus, are white, not Latino,
according to the U.S. Attorney's Office. Rather than accepting responsibility to learn the
actual ethnic identity of less than 100 defendants, the U.S. Attorney's Office blames the
ATF for not keeping information based on race, color, ancestry, or national origin and
the U.S. Marshal's Service and the Bureau of Prisons for not having a Latino or Hispanic
designation in their statistical data bases. Gov't Reconsideration Motion, Dkt. 154 at 9[2].

---

[1] Early on, the defense asked the U.S. Attorney's Office to note any errors in the case
and defendant information that the defense had gathered. The Assistant U.S. Attorney
responded by stating "the [defense's] discovery requests are premised on a number of factual
assertions and conclusions . . . . As an initial matter, I want to make it clear that the government
does not agree with or accept any of the factual conclusions made in your letter. Several of the
factual conclusions contained in the letter are false, and the government has made no attempt
to verify others of the factual assertions and conclusions." Def. Motion for Discovery, Dkt. 123
at ¶7 and Ex. 3 attached to that motion. The information provided by the U.S. Attorney's Office
in response to the Court's Order, once corrected to properly identify Latino defendants, shows
the accuracy of the information for the cases the defense did find.

[2] The U.S. Attorney's Office stated that "[i]n the course of its procedures for
approving and filing charges, the United States Attorney's Office does not record the
race of defendants. Therefore, in order to comply with the Court's order, the
government used the race as reported by the Bureau of Prisons and the United States
Marshall's Service for each defendant." Dkt. 154 at 9. It apparently has forgotten that
every Presentence Investigation Report indicates whether the defendant is Hispanic or
Latino, so that information could have been accessed for all defendants already found

4

In homogenizing the list of defendants to do away with the designation of Latinos, the clear effect of which was to increase the number of white defendants, the U.S. Attorney's Office appears to be seeking to reinvoke the old discredited argument of the State of Texas from 60 years ago. *See Hernandez v. State of Texas*, 347 U.S. 475, 478 (1954).[3]

The actual information is not that hard to obtain. The defense has done it by surveying defendants' attorneys and has produced an accurate chart that correctly identifies each defendant's race or ancestry or national origin. *See* Exs. 1 and 2 attached to this Memorandum. What the correct information shows is that since 2006, there have been 25 ATF phony stash house ripoff cases, 18 of which had solely Black defendants. Out of the total of 25 cases, there were 77 Black Defendants, 13 Latino defendants and 6 White defendants. From 2010, there have been 13 such cases, 9 of which had all Black defendants and out of the 13 total cases from 2010 to the present, there have been 47

------

guilty.

[3] "Throughout our history differences in race and color have defined easily identifiable groups which have at times required the aid of the courts in securing equal treatment under the laws. But community prejudices are not static, and from time to time other differences from the community norm may define other groups which need the same protection . . . the Fourteenth Amendment is not directed solely against discrimination due to a 'two-class theory' – that is, based upon differences between 'white' and Negro." *See also* Laura E. Gómez, *Looking For Race in All the Wrong Places*, 46 LSOCR 221, 225-26 (2012) ("The result has been an increasingly diverse non-White population that includes rapidly expanding numbers of Latinos and Asian Americans, in addition to African Americans and Native Americans. Models of racism, racial identity, and racialization based on White subordination of African Americans may be ill suited to describe or to explain the current racial reality."(footnote omitted)).

Black defendants, 11 Latino defendants and 1 White Defendant. *See id*[4]. During the

entire period reviewed, Black defendants have comprised 80% of the total number of

defendants with Whites all but disappearing since 2009. *See* Ex. 1-2.

**II.    The Motion to Reconsider Rehashes Arguments Already Rejected But Also
Makes Some Additional Arguments that Should Cause This Court to Continue
to Scrutinize the Actions of the ATF and U.S. Attorney's Office Regarding
Allegations of Racial Profiling**

In rehashing its previous arguments, the U.S. Attorney's Office again argues that

this case is just like *United States v. Armstrong*, 517 U.S. 456, 464-65 (1996), the case in

which the Supreme Court established a framework for what the defense needed to

show to obtain discovery regarding a defense of racial profiling/selective prosecution.

*See* Govt. Reconsideration Motion, Dkt. 154 at 2-4, 7-8. The U.S. Attorney's Office then

ignores how these phony stash house ripoff cases are quite different because, in these

cases, the ATF develops a make believe crime that will never be completed in order to

lure a group of persons to a series of taped meetings. *See id., but see* Defendants'

Supplemental Memorandum in Support of Their Motion for Discovery on the Issue of

Racial Profiling/Selective Prosecution ("Supp. Memo. in Support of Discovery Motion"),

---

[4] A total of 13 Latino defendants in these 25 cases were erroneously identified as White
in the U.S. Attorney's exhibit attached to its reconsideration motion. Dkt. 154-1, Ex. A. One
defendant identified as N/A in that motion, Cornelius Sistrunk of Case No. 13 CR 476, is in fact
Black. *Compare* Dkt. 154-1, Ex. A, at #2, with Ex. 2, Declaration of Joshua Adams, attorney for
Cornelius Sistrunk, attached to this Memorandum.

Dkt. 135, at 4-6. The government also argues that the defense has failed to meet

*Armstrong's* discriminatory effect test. Gov't Reconsideration Motion, Dkt. 154 at 4-6.

### A.   The Court Correctly Determined that These Phony Stash House Cases Differ from the Scenario Considered in *Armstrong*

Central to the argument by the U.S. Attorney's Office that the Court should

reconsider its Order is the contention that the ATF's phony stash house cases are just

like the kinds of investigations considered in *Armstrong*. A close review of what has

been said and was not said in the reconsideration motion shows that this is a specious

argument. In *Armstrong*, 517 U.S. at 458-59, the Court stated:

> For three months prior to the indictment, agents of the Federal Bureau of Alcohol, Tobacco, and Firearms and the Narcotics Division of the Inglewood, California, Police Department had infiltrated a suspected crack distribution ring by using three confidential informants. On seven separate occasions during this period, the informants had bought a total of 124.3 grams of crack from respondents and witnessed respondents carrying firearms during the sales. The agents searched the hotel room in which the sales were transacted, arrested respondents Armstrong and Hampton in the room, and found more crack and a loaded gun. The agents later arrested the other respondents as part of the ring.

The facts in that case are unlike many of these phony stash house ripoff cases in

several key ways. First, unlike in *Armstrong*, 517 U.S. at 458-59, in this case, there were

no prior robberies of drug stash houses by Mr. Brown or any of his co-defendants. *See*

Complaint, Dkt. 1. All ATF had was a report of an unrecorded conversation by the

confidential informant, a prior felon who was being paid for information, that co-

defendant Dwaine Jones was interested in a robbery. *Id.* at ¶5. In fact, as the

government acknowledges, the crime of Mr. Jones being investigated by the ATF

beforehand was *gun trafficking*, not drug stash house robbery or any other kind of

robbery. *See id; see also* Gov't Reconsideration Motion, Dkt. 154 at 4-5. Second, unlike in

*Armstrong*, 517 U.S. 456, this case centered around the creation of a fictitious crime – a

never-to-happen robbery of a non-existent stash house, a crime that was never going to

happen. That is why this Court, in entering its Order, found that "unlike the typical

historical, alleged violations of federal law, these unique cases are generated by the

targeted use of confidential information to create potential robberies of phony drug

stash houses." Dkt. 153 at 1[5].  Cases cited by the U.S. Attorney's Office in its

reconsideration motion, present very different scenarios even if they are undercover

"stings." *See, e.g.*, Dkt. 154 at 3 (citing *United States v. James*, 257 F.3d 1173, 1179 (10th

Cir. 2001)).

---

[5] *See* e.g. *U.S. v. Jackson*, 13 CR 636, Criminal Complaint, Dkt. #1 at ¶¶8-15 (no prior
criminal actions in conjunction with ATF and case began with unrecorded conversation
without any corroboration of the information provided by the informant); *U.S. v. Elias*, 13 CR
476, Criminal Complaint, Dkt. #1 at ¶¶6-14 (no prior criminal actions in conjunction with ATF
and case began with unrecorded communication between informant and one of defendants
without any corroboration of the information provided by the informant) ; *U.S. v. Paxton*, 13
CR 103, Criminal Complaint, Dkt. at ¶¶6-11 (same); *U.S. v. Davis*, 13 CR 063, Criminal
Complaint, Dkt. #1 at ¶¶5-12 (same); and  *U.S. v. Hall*, 08 CR 386, Criminal Complaint, Dkt. #1
at ¶¶8-12 (same). *See also U.S. v. Cousins*, 12 CR 865, Criminal Complaint, Dkt. 1 at ¶¶8-10
(prior robbery by one of defendants of gambling earnings of individual as reported by
informant was corroborated, but it was not a drug stash house robbery).

Indeed most of these cases, including this one, are inconsistent with ATF's asserted goal. *See* Gov't Reconsideration Motion at 7 ("What led to the instant case was ATF's mandate to investigate potential weapons violations. That gun trafficking investigations in the Northern District of Illinois could have a disproportionate impact on certain communities cannot constitute evidence of discriminatory intent, just as the remedy for such a disproportionate impact cannot be ignoring the devastating impact of gun trafficking, armed robbery, and other weapons violations."). If the asserted goal of the ATF is to investigate and eliminate gun trafficking and weapons violations, the ATF accomplished this goal once it had sufficient evidence of Dwaine Jones's firearms sales to a confidential information. The ATF did not need to hatch a fictitious robbery *of massive quantities of illegal drugs* that was never going to happen in order to further achieve its mandate.

These phony stash house ripoff cases are different than other cases, even the purchase of illegal drugs by agents and informants from dealers and the prosecution of those dealers, because those cases involve a real ongoing investigation with something more than a story from a paid informant. For these reasons, the Court was correct to not apply the *Armstrong* criteria in a rote, simplistic way.

B.    The Court Correctly Determined that in This Case Defendants had Met the Similarly Situated Criteria Enunciated in *Armstrong*

The Court correctly determined that in the circumstances of these phony stash

iB

A defendant cannot be found guilty of conspiracy if he only conspired with an undercover Agent or gov. Informant.

house cases and the presentation of the various ATF phony stash house cases in the

Northern District of Illinois was sufficient show the discriminatory effect of what the

ATF and the U.S. Attorney's Office are doing in these kinds of cases.

In *United States v. Barlow*, 310 F.3d 1007, 1011 (7th Cir. 2002), the Seventh Circuit

affirmed the denial of discovery because the defendant had not made the necessary

showing. The Court said:

> Statistical data has proven a useful tool in some high-profile state
> racial profiling cases. *See, e.g., State v. Soto*, 324 N.J.Super. 66, 734 A.2d
> 350 (1996) (statistical evidence that blacks were 4.85 times more likely
> than whites to be stopped for traffic violations established *prima facie*
> case of discriminatory effect). And although statistics alone rarely
> establish an equal protection violation, they may be sufficient to
> establish the discriminatory effect prong of the *Armstrong* test. *Chavez*,
> 251 F.3d at 640. But such statistics must be relevant and reliable, *id.*,
> and the ones Barlow provided were neither.

Here the information about the race, color, ancestry, and national origin of the

defendants in these phony stash house cases, including information provided by the

U.S. Attorney's Office (once corrected to correctly identify Latinos), is powerful proof of

discriminatory effect being suffered by minorities in these cases. *See supra*, pages 5-6,

and Exs. 1-2. The percentages of minorities, particularly Blacks, has increased recently.

*See* Ex. 1. In fact, in six cases charged after this one, all of the defendants were Black. *Id.*

In addition, courts have made it clear that these phony stash house ripoff cases are

problematic cases in their own right. *See, e.g., United States v. Lewis*, 641 F.3d 773, 777

(7th Cir. 2011).

As it has in the past, the U.S. Attorney's Office argues that the defense has failed to meet its burden of producing similarly situated persons whom were not prosecuted. Gov't Reconsideration Motion, Dkt. 154, at 3-6. There are several new twists. One is that it now there is a claim that it is not the U.S. Attorney's Office or ATF who are targeting Blacks and Latinos; it is the informants. *Id.* at 5. However, do not these informants work at the direction and control of ATF and the U.S. Attorney's Office? What authority can the U.S. Attorney's Office cite to justify allowing its informants to violate persons constitutional rights while working for the investigative agencies and prosecutors?

A related argument is a rehashing of the claim that somehow the defense has to determine ATF and the U.S. Attorney's Office's charging practices and then find the persons not charged who were being investigated. Gov't Reconsideration Motion at 6-7. But it is the U.S. Attorney's Office that continues to refuse to produce the selection criteria used to decide whom to solicit for participation in these phony stash house ripoff cases. As long as they refuse to do so, it is appropriate to consider all whites in the Northern District of Illinois as potential targets.

In this case, this Court should not parse the record as the U.S. Attorney's Office would have it do. Instead this Court should "look at all relevant factors, . . . which depends on the context of the case." *Chavez v. Illinois State Police*, 251 F.3d 612, 636 (7th

11

Cir. 2001) (quoting *Radue v. Kimberly–Clark Corp.*, 219 F.3d 612, 617 (7th Cir. 2000)).

### C.  The Defense Has Adequately Shown Discriminatory Intent Sufficient to Get Discovery

In its first two briefs seeking discovery on the issue of racial profiling, the defense

provided several strong arguments that showed discriminatory intent. Defendants'

Memorandum in Support of Their Motion for Discovery on the Issue of Racial

Profiling/Selective Prosecution, Dkt. 126 at 6-9; Def. Supp. Memo. in Support of

Discovery Motion, Dkt. 135 at 7-9. The response of the U.S. Attorney is to profess its and

the ATF's ignorance. They do not keep statistics on the race of the persons they charge.

Gov't Reconsideration Motion, Dkt. 154 at p. 9; Def. Motion for Discovery, Dkt. 123-1,

Ex. 1. It is beyond question that they have an obligation to not target persons for

criminal prosecution on the basis of race. *Oyler v. Boles*, 368 U.S. 448, 456 (1962). Instead

they have made themselves into ostriches, whose heads are buried so far in the sand

that those in positions of power and with decision-making authority lack any semblance

of information to see the grossly racial statistics in who is prosecuted in these kinds of

cases. An ostrich defense, as the government frequently says in criminal prosecutions

when the defendant claims lack of knowledge, is no defense at all. *See McGill v.*

*Duckworth*, 944 F.2d 344, 351 (7th Cir. 1991) ("Suspecting that something is true but

shutting your eyes for fear of what you will learn satisfies scienter requirements. Going

out of your way to avoid acquiring unwelcome knowledge is a species of intent.");

*Woodman v. WWOR-TV, Inc.*, 411 F.3d 69, 83-4 (2nd Cir. 2005); and *Jonasson v. Lutheran Child and Family Svcs.*, 115 F.3d 436, 438 (7th Cir.1997). In the end, that is all that ATF and U.S. Attorney's Office have to fall back on unless they want to claim that they do not have an obligation to ensure that their prosecutorial decisions are not rooted in discriminatory intent.[6]

III. **This Court Should Grant the Defense's Motion to Compel to Require the U.S. Attorney's Office to Produce Information About What Supervisors at the Office Do to Ensure that Prosecutions are Not Based on Discrimination, and Also ATF's Playbook for These Investigations, Including Its Selection Criteria and Its Monitoring of Its Informants**

The Court previously ordered the U.S. Attorney's Office to produce documents that show what actions its supervisors have taken to ensure that these phony ATF stash house ripoff cases are not targeted for investigation or prosecution on the basis of race, color, ancestry or national origin by either the ATF or the U.S. Attorney's Office. Dkt. 153 at 2. Instead the U.S. Attorney's Office has produced lots of documents from the Justice Department's United States Attorneys Manual reciting in rote form not to discriminate in bringing prosecutions. Gov't Reconsideration Motion, Dkt. 154 at 10. Of

---

[6] In the past, the defense has argued that another way to show intent is that for all cases brought since 2009, there were no white defendants. *See* Dkt. 126 at 5-6. While the last round of indictments finally produced one white defendant, the numbers are still for prosecutions brought since 2010, 47 Blacks, 11 Latinos and only 1 White Defendant. One out of almost sixty hardly changes the rationale behind the the inexorable zero of White defendants as proof of intent. *See Yick Wo v. Hopkins*,118 U.S. 356, 373-74 (1886); *Int'l Brotherhood of Teamsters v. U.S.*, 431 U.S. 324, 343, n. 23 (1977); *U.S. v. Tuitt*, 68 F. Supp. 2d 4, 6-9 (D.Mass. 1999); Note, *The "Inexorable Zero,"* 117 *Harvard Law Review* 1215 (2004).

·B

course, that is not what it was ordered to produce. This issue is not the existence of some pronouncement from Washington but what this U.S. Attorney's Office is doing to see that its staff is compiling with its Fifth Amendment Equal Protection obligations.

There is no doubt that the U.S. Attorney's Office has an obligation to follow the requirement of *Brady v. Maryland*, 373 U.S. 83 (1963), that it produce exculpatory evidence to the defense. Certainly there must be a provision in the Manual addressing that. But that does not mean that there are not problems with compliance by individual prosecutors. *See e.g., United States v. Sanchez*, No. 07 CR 149, 2009 WL 5166230 (N.D.Ill. Dec. 22, 2009). So how does this U.S. Attorney's Office ensure that the Equal Protection Clause is not violated in this district by its individual attorneys or ATF agents? Certainly by taking a look at the kinds of statistics that have been presented to this Court. But apparently neither the ATF nor the U.S. Attorney's Office keeps such information to enable their supervisors to be able to ascertain whether there might be a problem. Gov't Reconsideration Motion, Dkt. 154 at 9; Def. Motion for Discovery, Dkt. 123-1, Ex. 1. If there are no documents responsive to the second category of information this Court ordered produced, then the U.S. Attorney's Office should have to say so.

In addition, the U.S. Attorney's Office has offered to produce *in camera* "containing investigative techniques and guidance to the ATF agents in the field regarding the conduct of home invasions investigations." Gov't Reconsideration

14

Motion at 13-14. The defense does not object to a review by this Court, but notes that

the USA Today article indicated that the reporter saw the document that the

government contends does not exist. *See* Defendants' Reply in Support of Their Motion

for Discovery on the Issue of Racial Profiling/Selective Prosecution, Dkt. 148, at Ex. 6

(reproducing article). Certainly if it does exist, it should be provided to the Court.

Similarly, any changes made to any relevant documents after the charges were filed

here should be produced. While such documents may not be admissible under

Fed.R.Evid. 407 (although that should not be determined now), it still is discoverable.

The defense should be able to see the written documents ordered by this Court.

Therefore the motion to compel should be granted.

### Conclusion

For the reasons stated herein, defendants request that the government's motion

for reconsideration be denied and defendants' motion to compel be granted.

Respectfully submitted,

FEDERAL DEFENDER PROGRAM
Carol A. Brook, Executive Director

By:  /s/ Candace R. Jackson

CANDACE R. JACKSON
DANIEL J. HESLER
55 E. Monroe Street, Suite 2800
Chicago, Illinois 60603
(312) 621-8300

15

UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | ) | |
| | ) | No. 12 CR 632 |
| v. | ) | |
| | ) | Judge Ruben Castillo |
| ABRAHAM BROWN | ) | |

EXHIBITS 1 and 2

to

DEFENDANTS' MEMORANDUM IN SUPPORT OF MOTION TO COMPEL
AND IN OPPOSITION TO THE U.S. ATTORNEY'S OFFICE MOTION FOR
RECONSIDERATION OF ORDER GRANTING DISCOVERY ON THE ISSUE
OF RACIAL PROFILING/SELECTIVE PROSECUTION

# ATTACHMENT

# EXHIBIT 2

UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | ) | |
| | ) | |
| v. | ) | Judge Ruben Castillo |
| | ) | |
| ANTONIO WILLIAMS, ET AL. | ) | No. 12 CR 887 |
| | ) | |
| and | ) | |
| | ) | |
| ABRAHAM BROWN, ET AL. | ) | No. 12 CR 632 |

DECLARATION OF ATTORNEY PIYUSH CHANDRA

I, Piyush Chandra, Federal Defender Program, state the following under the

penalty perjury:

1.      I am the attorney who has represented Defendant Adrian Elias in United
States v. Elias, et al., Case No. 13 CR 476.

2.      I understand the race or ethnicity of my client, Adrian Elias, to be Hispanic,
of Mexican origin and not White.

3.      My understanding is based on my discussions with Mr. Elias.  Mr. Elias
stated that he does not consider himself to be "White."  In his experience, he has
not been viewed by others as being "White."  He considers himself to be Hispanic
of Mexican origin.


_Sept. 18, 2013_
Date

Piyush Chandra
Federal Defender Program
Attorney for Adrian Elias

### UNITED STATES DISTRICT COURT
### NORTHERN DISTRICT OF ILLINOIS
### EASTERN DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | ) | |
| | ) | |
| v. | ) | Judge Ruben Castillo |
| | ) | |
| ANTONIO WILLIAMS, ET AL. | ) | No. 12 CR 887 |
| | ) | |
| and | ) | |
| | ) | |
| ABRAHAM BROWN, ET AL. | ) | No. 12 CR 632 |

DECLARATION OF DEFENDANT _Miguel Ledesma_

I, _Miguel Ledesma_, state the following under penalty of perjury:

1.    I am one of the defendants charged in the following case:

United States v. _Elias_____, Case No. _13_ CR _476_.

2.    My racial and/or ethnic identity is Hispanic (or I prefer using the term

_Latino_____ ), not White.


_Miguel Ledesma_

Printed Name

_Miguel Ledesma by ML_

Signature

_09/13/2013_

Date

IN THE
UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | I | |
| Plaintiff, | I | |
| v. | I | Judge Ruben Castillo |
| | I | |
| ANTONIO WILLIAMS, ET AL | I | No. 12 CR 887 |
| And | I | |
| ABRAHAM BROWN, ET AL. | I | No. 12 CR 632 |
| Defendants | I | |
| | I | |

### DECLARATION OF ATTORNEY CARL P. CLAVELLI

I, Carl P. Clavelli, counsel for the defendant-appellant, Justin Davila, hereby

states under penalty of perjury, the following:

1. that he is counsel for Justin Davila in case no. 12 CR 713-1;

2. that I am of the belief that the race or ethnicity of my client, Justin Davila, is

Latino or Hispanic but not White;

3. that my belief or understanding is premised upon conversations with my client.

September 18, 2013.

Respectfully submitted,

S/ Carl P. Clavelli
Carl P. Clavelli
53 W. Jackson Blvd.
Suite 733
Chicago, IL  60604

*1*

## UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF ILLINOIS
## EASTERN DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | ) | |
| | ) | |
| v. | ) | Judge Ruben Castillo |
| | ) | |
| ANTONIO WILLIAMS, ET AL. | ) | No. 12 CR 887 |
| | ) | |
| and | ) | |
| | ) | |
| ABRAHAM BROWN, ET AL. | ) | No. 12 CR 632 |

DECLARATION OF ATTORNEY *Paul E. Paprocki*

I, *Paul E. Paprocki*, state the following under the penalty perjury:

1.    I am the attorney who has represented Defendant *Benjamin DeJesus*

in United States v. *De Jesus, et Al*, Case No. *12* CR *511*.

2.    I understand the race or ethnicity of my client, *Benjamin DeJesus*, to

be (circle or write in) Latino / Hispanic / Mexican / _____ , not White.

3.    My understanding is based on *My Conversations with*

*him and his Representations*

_____

*9/18/13*
Date

Signature

# UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF ILLINOIS
### EASTERN DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | ) | |
| | ) | |
| v. | ) | Judge Ruben Castillo |
| | ) | |
| ANTONIO WILLIAMS, ET AL. | ) | No. 12 CR 887 |
| | ) | |
| and | ) | |
| | ) | |
| ABRAHAM BROWN, ET AL. | ) | No. 12 CR 632 |

DECLARATION OF DEFENDANT _CEFARINO MALAVE_

I, _CEFARINO MALAVE_ state the following under penalty of perjury:

1.  I am one of the defendants charged in the following case:

United States v. _ANTEAU_, Case No. _12_ CR _511_.

2.  My racial and/or ethnic identity is Hispanic (or I prefer using the term

_LATINO_ ), not White.


_CEFERINO MALAVE_

Printed Name

_Ceferino Malave_

Signature

_9/18/13_

Date

# EXHIBIT A

Race of Stash House Defendants from 2006 to Present
As Provided by Government and Corrected by Defense Counsel (Page 3 of 3)

| # | Case Name | Case No. | Name and Race of Each Defendant | |
|---|---|---|---|---|
| 15 | United States v. Farella, et al. | 09 CR 087 | Frank Farella | White |
| | | | Donald Catanzaro | White |
| | | | Michael Blais | White |
| 16 | United States v. Mahan, et al. | 08 CR 720 | Tony Mahan | Black |
| | | | James McKenzie | Black |
| | | | Mario Barber | Black |
| | | | Steven Stewart | Black |
| 17 | United States v. Hall, et al. | 08 CR 386 | Shamonte Hall | Black |
| | | | Karinder Gordon | Black |
| | | | Rodney Ray | Black |
| 18 | United States v. Tanner, et al. | 07 CR 707 | Rodney Tanner | Black |
| | | | Keith Calvert | Black |
| | | | Fred Calvert | Black |
| 19 | United States v. Sidney, et al. | 07 CR 652 | Ben Sidney | Black |
| | | | Jerome Scott | Black |
| | | | Charles Lawrence | Black |
| 20 | United States v. George, et al. | 07 CR 441 | Robert George | White |
| | | | Michael Spagnola | White |
| 21 | United States v. Walker, et al. | 07 CR 270 | Hurreon Walker | Black |
| | | | Rashad Logan | Black |
| 22 | United States v. Lewis, et al. | 07 CR 007 | Scott Lewis | Black |
| | | | Vernon Williams | Black |
| | | | Lavoyce Billingsley | Black |
| 23 | United States v. Corson, et al | 06 CR 930 | Aaron Corson | White |
| | | | Marcus Corson | White |
| | | | Oscar Alvarez | Hispanic/Latino |
| 24 | United States v. Harris, et al. | 06 CR 586 | Michael Harris | Black |
| | | | Chris Blitch | Black |
| | | | Devarl Washington | Black |
| | | | Michael Carwell | Black |
| 25 | United States v. Tankey, et a. | 06 CR 50074 | Joaquin J. Tankey | Black |
| | | | James T. King | Black |
| | | | Demarlon J Lewis | Black |

**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF ILLINOIS**
**EASTERN DIVISION**

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | ) | |
| | ) | |
| v. | ) | Judge Ruben Castillo |
| | ) | |
| ANTONIO WILLIAMS, ET AL. | ) | No. 12 CR 887 |
| | ) | |
| and | ) | |
| | ) | |
| ABRAHAM BROWN, ET AL. | ) | No. 12 CR 632 |

### DECLARATION OF ATTORNEY PATRICK BLEGEN

I, Patrick Blegen, state the following under the penalty perjury:

1.     I am the attorney who represented Defendant Oscar Alvarez at trial in *United States v. Corson, et al.*, Case No. 06 CR 930.

2.     I understand the race or ethnicity of Oscar Alvarez to be Latino of Mexican descent.

3.     My understanding is based on my belief that Mr. Alvarez was born in the United States of parents from Mexico.

_7/18/13_
Date

_[signature]_
Signature

| # | Case Name | Case Number | Name and Race of Each Defendant | |
|---|-----------|-------------|-------------------------------------|--|
| 16 | United States v. Mahan, et al. | 08 CR 720 | Tony Mahan | Black |
| | | | James McKenzie | Black |
| | | | Mario Barber | Black |
| | | | Steven Stewart | Black |
| 17 | United States v. Hall, et al. | 08 CR 386 | Shamonte Hall | Black |
| | | | Karinder Gordon | Black |
| | | | Rodney Ray | Black |
| 18 | United States v. Tanner, et al. | 07 CR 707 | Rodney Tanner | Black |
| | | | Keith Calvert | Black |
| | | | Fred Calvert | Black |
| 19 | United States v. Sidney, et al. | 07 CR 652 | Ben Sidney | Black |
| | | | Jerome Scott | Black |
| | | | Charles Lawrence | Black |
| 20 | United States v. George, et al. | 07 CR 441 | Robert George | White |
| | | | Michael Spagnola | White |
| 21 | United States v. Walker, et al. | 07 CR 270 | Hurreon Walker | Black |
| | | | Rashad Logan | Black |
| 22 | United States v. Lewis, et al. | 07 CR 007 | Scott Lewis | Black |
| | | | Vernon Williams | Black |
| | | | Lavoyce Billingsley | Black |
| 23 | United States v. Corson, et al. | 06 CR 930 | Aaron Corson | White |
| | | | Marcus Corson | White |
| | | | Oscar Alvarez | White |
| 24 | United States v. Harris, et al. | 06 CR 586 | Michael Harris | Black |
| | | | Chris Blitch | Black |
| | | | Devarl Washington | Black |
| | | | Michael Carwell | Black |
| 25 | United States v. Tankey, et al. | 06 CR 50074 | Joaquin J. Tankey | Black |
| | | | James T. King | Black |
| | | | Demarlon J. Lewis | Black |

Case 1:13-cr-00222-RBK Document 69-2 Filed 02/07/14 Page 4 of 6 PageID: 767
Case 2:13-cr-00171-JHS Document 121 Filed 03/14/14 Page 35 of 129
Case: 1:12-cr-00063 Document #: 120 Filed: 10/00/13 Page 4 of 8 PageID #:420

UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | | |
|---|---|---|
| UNITED STATES, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | |
| | ) | Case No. 13-cr-63-2 |
| PAUL DAVIS, JR., et al., | ) | |
| | ) | Judge John W. Darrah |
| Defendants. | ) | |

## ORDER

Defendants move for discovery on the issues of racial profiling and selective prosecution,

contending the Government targets individuals of color as Defendants. Defendants' motions [109, 110,

111] are granted in part, as detailed below. Defendants characterize this procedure as a "hypothetical

ripoff of a phony, non-existent stash house," which they describe as follows:

> In essence, the governmental agents consistently present simple elements of the offense.
> Using an informant and as in this case, an undercover agent, the government creates a
> tantalizing, hypothetical and pretend crime: The informant and or undercover agent know
> the location of a stash house filled with drugs in sufficient quantities to trigger high
> mandatory minimum sentences. A few armed guards watch over the stash house and the
> informant or undercover agent have access to the drugs because they are either couriers or
> purchasers. The informant and/or undercover agent recruit individuals, almost exclusively
> of color, to commit an armed robbery of the stash house, leading the would be robbers to
> believe that the proceeds of the robbery will be divided among the participants.

(Defs.' Mot. at 2.) The Government opposes this motion.

It is clear that the Government retains broad discretion with respect to its determinations relating to

prosecution. *See United States v. Scott*, 631 F.3d 401, 406 (7th Cir. 2011). An equally significant

consideration, however, is the force of the Equal Protection Clause to avoid intentionally discriminatory

application of the law. In consideration of these issues, Defendants' motion for discovery on the issues of

potential racial profiling and selective prosecution is granted.

Case 1:13-cr-00222-RBK  Document 69-2  Filed 02/07/14  Page 5 of 6 PageID: 768
Case 2:13-cr-00171-JHS  Document 121  Filed 03/14/14  Page 36 of 129
Case: 1:12-cr-00063 Document #: 120 Filed: 10/00/13 Page 2 of 6 PageID #:730

"Rule 16(a)(1)(c) authorizes defendants to examine Government documents material to the preparation of their defense against the Government's case in chief, but not to the preparation of selective prosecution claims." *United States v. Armstrong*, 517 U.S. 454, 463 (1996). Defendants have submitted data from twenty cases they contend involve racial profiling and selective prosecution in this regard and other pertinent information. Contrary to the Government's contention, Defendants have made a threshold showing that the Government declined to prosecute similarly situated suspects of other races. *Armstrong*, 517 U.S. at 470. An examination of the limited information available to Defendants indicates that since 2006, the prosecution in this District has brought at least twenty purported phony stash house cases, with the overwhelming majority of the defendants named being individuals of color. In light of this information, it is necessary to permit Defendants discovery on the following issues, to the extent such materials have not previously been provided:

(1) A list by case name and number of each phony stash house rip off case brought by the U.S. Attorney's Office for the Northern District of Illinois in which ATF alone or in conjunction with the FBI was the federal investigatory agency from 2006 to the present. With respect to each case, the Government shall provide the race of each defendant investigated and prosecuted.

(2) For each case identified in response to (1) above, a statement regarding prior criminal contact that the federal agency responsible for the investigation had with each defendant prior to initiating the operation. If all such information for a particular case is contained in the criminal complaint, a reference to the complaint is sufficient.

(3) The statutory or regulatory authority for the ATF and the FBI to instigate and/or pursue phony staff house ripoff cases involving illegal drugs or any decision by any federal agency, the Justice Department or the White House to authorize ATF and the FBI to pursue such cases in the Northern District of Illinois.

(4) All national and Chicago Field Office ATF and FBI manuals, circulars, field notes, correspondence or any other material which discuss phony stash house ripoffs, including protocols and/or directions to agents and to confidential informants regarding how to conduct such operations, how to determine which persons to pursue as potential targets or ultimate defendants, how to ensure that the targets do not seek to quit or leave before an arrest can be made and how to ensure that agents are not targeting persons for such operations on the basis of their race, color, ancestry or national origin.

(5) All documents that contain information on how supervisors and managers of the Chicago area ATF and FBI were to ensure and/or did ensure or check that its agents did not target persons on the basis of their race, color, ancestry, or national origin for the phony stash house ripoffs and what actions the Chicago area ATF and FBI supervisors and managers operating in the Northern District of Illinois took to determine whether agents were not targeting persons for such operations on the basis of their race, color, ancestry, or national origin.

(6) The factual basis for the decision to pursue or initiate an investigation against each of the individuals listed as defendants in each case cited in Paragraph 7 of Defendants' Motion for Discovery and in response to each case produced pursuant to the request contained in Paragraph (1) above.

(7) All documents containing instructions given during the tenure of Patrick Fitzgerald or Gary Shapiro as the U.S. Attorney for the Northern District of Illinois about the responsibilities of prosecutors to ensure that defendants in cases brought by the Office of the U.S. Attorney for the Northern District of Illinois are not targeted due to their race, color, ancestry, or national origin. Specifically, materials that demonstrate that the individuals charged as defendants in phony stash house cases in which ATF alone or in conjunction with the FBI was the investigatory agency have not been targeted due to their race, color, ancestry, or national origin, and that such prosecutions have not been brought with any discriminatory intent on the basis of the defendant's race, color, ancestry, or national origin.

(8) All documents that contain information about all actions taken during the tenure of Patrick Fitzgerald or Gary Shapiro as the U.S. Attorney for the Northern District of Illinois about the responsibilities of prosecutors to ensure that defendants in cases brought by the Office of the U.S. Attorney for the Northern District of Illinois have not been targeted due to their race, color, ancestry, or national origin and, specifically, that those persons who are defendants in phony stash house cases in which ATF alone or in conjunction with the FBI was the investigatory agency have not been targeted due to their race, color, ancestry or national origin and that such prosecutions have not been brought with any discriminatory intent on the basis of the defendant's race, color, ancestry, or national origin.

Any documents responsive to this order should be provided to defense counsel, subject to any applicable

protective order, on or before December 31, 2013.

Date: 10/30/2013

United States District Court Judge

Philly Case                                    Exhibit — "J"

# IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | : | |
| | : | |
| V. | : | CRIMINAL NO. 12-418-1 |
| | : | |
| ROBERT LAMAR WHITFIELD | : | |

## MOTION FOR HEARING AND FOR DISCOVERY ON THE ISSUE OF RACIAL PROFILING/SELECTIVE PROSECUTION

NOW COMES the Defendant Robert Lamar Whitfield by his attorney, J. Michael Farrell, Esquire, and moves this Court for a hearing and for an order compelling the Government to provide certain discovery described below.

The Defendant seeks this information in order to pursue a motion to dismiss the Indictment on the basis of his good faith belief that the Philadelphia District Office of the Bureau of Alcohol, Firearms and Tobacco (hereinafter referred to as "ATF"), with the complicity of the United States Attorney's Office for the Eastern District of Pennsylvania, targeted the Defendant Robert Lamar Whitfield, and co-defendants, all African-American men, for prosecution in the instant case based on their racial identity, by the deliberate practice of creating and instigating a government sponsored "sting" operation in the form of a specific type of crime, to wit: a phony robbery of a non-existent drug "stash house". Further, Defendant Whitfield requests a hearing and information via discovery to demonstrate that the instant prosecution was patterned after other prosecutions identical in all important respects to the instant case targeting persons of color as criminal defendants by the deliberate practice of creating and instigating phony robberies of non-existent drug "stash houses".

The Defendant's requests for a hearing and for discovery as stated herein are made pursuant to the Fed.R.Crim.P. 29, Fed.R.Crim.P. 16, the analogous local rules, the equal protection

component of the Due Process Clause of the Fifth Amendment, and the inherent power of the Court

to order broader discovery in appropriate cases. See *Wright and Miller*, 2 Federal Prac. and Pro.

Crim., §254, n. 15, 22, 31-3 wherein it is noted that

> The Advisory Committee Note to the 1975 amendments in part: "[t]he rule is intended to prescribe the minimum amount of discovery to which the parties are entitled. It is not intended to limit the judge's discretion to order broader discovery in appropriate cases." Courts have taken this seriously, holding that the rule does not limit their "inherent power" to order discovery that goes beyond what the rules authorizes. In addition, the constitutional compulsion of the "*Brady* rule" may require the Government to disclose matter that goes beyond Rule 16(a)(1)(E) and all other applicable rules and statutes.

In support of this Motion, the Defendant states as follows:

1. This case is another in what has become a staple practice of Government agents and

prosecutors: the creation of a phony plan to commit a robbery to obtain non-existent drugs from a

non-existent "stash house" in an urban setting. The elements are simple. As demonstrated by the

facts in the present case, the Government - using an informant and an undercover agent – instigates

the creation of a seemingly plausible conspiracy to commit a hypothetical crime – the robbery of a

residence in which a drug dealer has stored a substantial quantity of drugs.    Specifically, an

informant and undercover agent purport to have knowledge of a stash house whose location is known

to the informant and/or undercover agent wherein drugs (invariably cocaine or crack cocaine and

always in sufficient quantities to trigger statutory minimum sentences) are stored and guarded by just

a few people with guns. The informant and/or undercover agent purport to have knowledge of and

access to the residence because they are drug purchasers or couriers and therefore can set someone

up to commit an armed robbery of the stash house, obtain the drugs and divide them with the

robbers.

Using that story line, the informant and agent search for their prey: invariably, and seemingly deliberately, an African-American or Latino individual whom they believe possibly would be interested in the commission of a stash house robbery and can be persuaded to act on their phony plan. Once the targeted prey goes for the bait videotaped meetings and wired telephone conversation ensue, and ultimately arrests are made for the initial prey and persons – invariably African-Americans - drawn into the conspiracy by the targeted prey or possibly by the agent and/or the informant. The men are then charged with conspiracy to commit Hobbs Act robbery in violation of 18 U.S.C. §1951(a), drug trafficking conspiracy in violation of 21 U.S.C. §841 (alleging sufficient quantities of drugs necessary to trigger mandatory sentences or high offense scores), and weapons offenses in violation of 18 U.S.C. §1922(g) and 249(c) - notwithstanding the fact that in the present case, and all similar cases, the drugs upon which the supposed interstate commerce nexus was based never existed, and there was no stash house to be robbed.

See for example the Indictment in the present case. See also, Edna Katherine Tinto, *Undercover Policing, Overstating Culpability*, NYU Law School Working Paper No. 12-04 at p. 49-55 (2012) http://ssrn.com/abstract=2016362 which article, though not focused on targeting of defendants based on race. discusses the related law enforcement practice of "sentence manipulation" by which circumstances are deliberately created to ensure a defendant is eligible for a more severe sentence that his criminal conduct would otherwise have justified.

2. In order to determine if the ATF and the United States Attorney's Office have targeted or are targeting persons of color, principally African Americans but also Latinos, defense counsel, in consultation with other defense counsel, have attempted to identify all phony stash house robbery cases brought in the Eastern District of Pennsylvania since 2009 to determine whether the racial identities of the defendants.

RW

3. Given the information complied so far (see Paragraphs 4 and 5, *infra*), it appears that if the ATF and the United States Attorney's Office assert they are not aware that the law enforcement tactic of creating conspiracies to rob non-existent stash houses of non-existent quantities of cocaine and crack in urban environments are not targeting person of color they are, at best, burying their heads in the sand. See *McGill v. Duckworth*, 944 F.2d 344, 351 (7th Cir. 1991) ("Suspecting that something is true but shutting your eyes for fear of what you will learn satisfies scienter requirements. Going out of your way to avoid acquiring unwelcome knowledge is a species of intent."); *Woodman v. WWOR-TV, Inc.*, 411 F.3d 69, 83-4 (2nd Cir. 2005).

4. Upon information and belief, the information that is currently available to the defense regarding racial profiling and selective prosecution is as follows:

a. *United States v. Alhinde Weems and Lamar C. Smith*, Magistrate Case No. 09-583, Criminal No. 09-708 (JHS)[1], in which both defendants were African American (see the Criminal Complaint attached hereto as Exhibit "A");

b. *United States v. Charles Bryant, Brian Andrews Sr., Brian Andrews Jr., Shawn Mobley, Tito Hoskins, and Kenyon Williams*, Magistrate Case No. 12-935-M, Criminal No. 12-346 (SD), in which all defendants were African American (see the Criminal Complaint attached hereto as Exhibit "B");

c. *United States v. Robert Lamar Whitfield, Marlon Graham, Kareem Long, Najee Murray and Frank Thompson* (the instant case), Magistrate Case No. 12-1089, Criminal No. 12-418 (JS), in which all defendants are African American (see the Criminal Complaint attached hereto as Exhibit "C"); and

---

[1] The FBI was the primary investigatory agency in the case, using an ATF informant.

      d.   *United States v. Dwight Berry, Antonio Ellis, Jermau Johnston and Askia*

*Washington*, Magistrate Case No. 13-316, Criminal No. 13-171 (JHS), in which all defendants are

African American (see the Criminal Complaint attached hereto as Exhibit "D").

     5. Therefore, upon information and belief, from 2009 to the present, the ATF and the United

States Attorney's Office have brought at least four phony stash house robbery cases charging 20

individuals, all of whom are African Americans.

     6. On the face of matters, this fact presents a stark picture of a discriminatory law

enforcement practice because, in these kinds of cases, ATF and the United States Attorney's Office

were not pursuing the prosecution of persons for actual crimes an ATF investigation had uncovered.

Rather, in the aforementioned cases the informants and the ATF deliberately selected African

American persons to present with the opportunity to commit what the targets were told will be a

lucrative crime – a "tawdry" law enforcement practice in the words of the Seventh Circuit in *United*

*States v. Lewis*, 641 F.3d 773 (7th Cir. 2011). Specifically, as described by the Court in regard to the

phony stash house robbery case discussed therein:

> In what's fast becoming a rather shopworn scenario in this court, Lewis,
> Williams, and Billingsley, like a host of (apparently) unrelated defendants before
> them, <u>were convicted of conspiring to distribute cocaine that didn't exist—cocaine</u>
> <u>they planned to liberate from a fictional stash house guarded by members of an</u>
> <u>imaginary Mexican cartel.</u> The sting that ensnared the three defendants here was
> orchestrated by Bureau of Alcohol, Tobacco and Firearms ("ATF") Agent David
> Gomez in his undercover role as "Loquito." <u>We have seen versions of this sting,</u>
> <u>which appears a bit tawdry, several times. … We use the word "tawdry" because</u>
> <u>the tired sting operation seems to be directed at unsophisticated, and perhaps</u>
> <u>desperate, defendants who easily snap at the bait put out for them by Agent</u>
> <u>Gomez.</u>

<u>Id.</u> 777 (Emphasis added).

     7. The Defendant herein requests the United States Attorney's Office corroborate the

accuracy of information herein.

8. In view of the Government's deliberate targeting and solicitation of African Americans to enter into conspiracies concocted by the Government agents to commit phony stash house robberies, this Court should order an evidentiary hearing on the issue of whether the Government has not engaged in prosecutorial misconduct and enter an order to compel the Government to provide the defense information about its practices in advance of the hearing. In doing so, the Court must consider not only Fed.R.Crim.P. 16 and Fed.R.Crim.P. 29 but also its inherent power to order discovery to serve the needs of the equal protection component of the Due Process Clause of the Fifth Amendment. See *Wright and Miller*, 2 Federal Prac. and Pro. Crim., §254, n. 15, 22, 31-3. As the Supreme Court said in *United States v. Armstrong*, 517 U.S. 456, 464-65 (1996):

> Of course, a prosecutor's discretion is "subject to constitutional constraints." *United States v. Batchelder*, 442 U.S. 114, 125 (1979). One of these constraints, imposed by the equal protection component of the Due Process Clause of the Fifth Amendment, *Bolling v. Sharpe*, 347 U.S. 497, 500 (1954), is that the decision whether to prosecute may not be based on the "an unjustifiable standard such as race, religion, or other arbitrary classifications," *Oyler v. Boles*, 368 U.S. 448, 456 (1962). A defendant may demonstrate that the administration of a criminal law is "directed to exclusively against a particular class of persons... with a mind so unequal and oppressive" that the system of prosecution amounts to "a practical denial" of equal protection of the law. *Yick Wo v. Hopkins*, 118 U.S. 356, 373 (1886).

9. The inherent powers of the Court in the context of the instant case authorize the discovery sought below despite the decisions in *Armstrong* and *United States v. Barlow*, 310 F.3d 1007, 1010-12 (7th Cir. 2002) because this case is substantially different than those and other selective prosecution cases and the discovery being sought may well impact the Government's burden under *Brady v. Maryland*, 373 U.S. 83 (1963). See for example *United States v. Gilbert*, 75 F.Supp.2d 12, 15 (D.Mass 1999) ("Of course, if the Government is aware that race was considered in any way in its decision to seek the death penalty, that information, in the Court's opinion, would have to be

divulged pursuant to *Brady v. Maryland*). See also *United States v. Tuitt*, 68 F.Supp.2d 4, 6-9 (D.Mass. 1999) and *United States v. Jones*, 159 F.3d 969 (6th Cir. 1998).

10. The Defendant herein requests that the Court order an evidentiary hearing and order the Government to produce in advance information specifically listed below. The defense acknowledges that the Court's discovery order may not impinge on the Government's legitimate rights under Fed.R.Crim.P. 16(a)(2) ("this rule does not authorize the discovery or inspection of reports, memoranda, or other internal government documents made by an attorney for the government or other government agent in connection with investigating or prosecuting the case. Nor does this rule authorize the discovery or inspection of statements made by prospective government witnesses except as provided in 18 U.S.C. §3500). However, in the event that any internal government documents contain any evidence of targeting of African American individuals in connection with the instigation of conspiracies to commit phony stash house robberies the Court should order the Government to disclose said documents to the Court for *in camera* by the Court, and that the Court either disclose the information to Defendant under the authority of *Brady v. Maryland,* or, if the Court decides that the documents or information need not be disclosed to the defense, that the Court preserve the information under seal for purposes of appellate review.

The discovery sought is:

a. A list by case name, number and the race of each defendant of all phony stash house robbery cases brought by the United States Attorney's Office for the Eastern District of Pennsylvania from 2006 to the present based on investigations conducted by ATF or any other federal law enforcement agency, and any documents that show that the information stated in paragraph 4a.-d *supra.* is incorrect.

b. For each such case listed in response to section "a" above, a statement of prior criminal contact that the federal agency responsible for the investigation had with each defendant prior to initiating the phony stash house robbery.   (If all such information for a particular case is contained in the criminal complaint, provision of a copy of the complaint would be a sufficient response).

c. The statutory or regulatory authority for ATF or any other federal law enforcement agency to instigate and/or pursue phony stash house robbery cases involving any illegal drugs (e.g. heroin, cocaine, crack, ecstacy, methamphetamine, etc.), or any decision by any federal agency, the Justice Department or the White House to authorize ATF or any other federal law enforcement agency to pursue such cases in the Eastern District of Pennsylvania.

d. All national and Philadelphia Field Office ATF manuals, circulars, field notes, correspondence or any other material which discuss "stings", "reverse stings", "phony stash house ripoffs or robberies" or entrapment operations, including protocols and/or directions to agents and to confidential informants regarding how to conduct such operations, how to determine which persons to pursue as potential targets or ultimate defendants, how to ensure that the targets do not seek to quit or leave before an arrest can be made, and how to ensure that the agents are not targeting persons for such operations on the basis of their race, color, ancestry or national origin.

e. All documents that contain information on whether and how supervisors and managers of the Philadelphia Area ATF and other federal law enforcement agencies involved in phony stash house robbery cases sought to determine whether or not its agents and informants were targeting persons on the basis of their race, color, ancestry or national origin for these phony stash house robbery cases, and what actions did the Philadelphia Area ATF (i.e, operating in the Eastern District of Pennsylvania) or other federal law enforcement agency supervisors and managers took to

ensure that agents and/or informants were not targeting persons for such operations on the basis of their race, color, ancestry or national origin.

f. The number of confidential informants that the Philadelphia Area ATF has used each year from 2006 to the present and the number of those confidential informants who had access to non-African American or persons of non-African descent who could be targeted for a phony stash house robbery cases.

g. The factual basis in each case cited in paragraph 4 and cases produced in response to the above and the cases produced in response to paragraph 10a regarding decisions made to pursue or initiate an investigation against any of the individuals listed as defendants in these cases.

h. All documents containing instructions given during the time Michael Levy or Zane David Memeger have been the United States Attorney for the Eastern District of Pennsylvania about the responsibilities of Assistant United States Attorneys to ensure that defendants in cases brought by the Office of the United States Attorney for the Eastern District of Pennsylvania have not been targeted due to their race, color, ancestry or national origin and specifically that those persons who are defendants in phony stash house cases in which ATF was the investigatory agency have not been targeted due to their race, color, ancestry or national origin and that such prosecutions have not been brought with any discriminatory intent on the basis of the defendant's race, color, ancestry or national origin.

i. All documents that contain information about all actions taken during the time Michael Levy or Zane David Memeger have been the United States Attorney for the Eastern District of Pennsylvania about the responsibilities of the Assistant United States Attorney for the Eastern District of Pennsylvania to ensure and/or check to determine that defendants in cases brought by the Office of the United States Attorney for the Eastern District of Pennsylvania have not been targeted

RW

due to their race, color, ancestry or national origin and specifically that those persons who are defendants in phony stash house cases in which ATF was the investigatory agency have been targeted due to their race, color, ancestry or national origin and that such prosecutions have not been brought with any discriminatory intent on the basis of the defendant's race, color, ancestry or national origin.

WHEREFORE, for the foregoing reasons, Defendant Robert Lamar Whitfield requests this Court order a hearing and order the Government to produce in advance the information sought in paragraphs 10 a.-i.

Respectfully submitted,

J. MICHAEL FARRELL, ESQUIRE
Attorney for Defendant
718 Arch Street - Suite 402N
Philadelphia, PA 19106
(215) 925-1105
Attorney for Defendant
Robert Lamar Whitfield

Dated: 10/25/13

(NO CORROBORATION)

## IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA** | : | |
| **Plaintiff** | : | |
| **v.** | : | |
| | : | **NO.: 2:12-CR-418-6** |
| | : | |
| **KENNETH PARNELL** | : | |
| **Defendant** | : | |

## O R D E R

AND NOW, this _____ day of _____, 2013, it is hereby

**ORDERED** and **DECREED** that defendant, Kenneth Parnell's Motion to Join Motion of Co-

Defendant Robert Whitfield's Motion for Hearing and Discovery on the Issue of Racial

Profiling/Selective Prosecution and that the Court consider the additional two examples of

alleged racial bias and selective prosecution proffered by Defendant Parnell is **GRANTED**.

BY THE COURT:

_____
J.

A

Case 1:13-cr-00222-RBK Document 69-3 Filed 02/07/14 Page 2 of 22 PageID: 771
Case 2:13-cr-00171-JHS Document 121 Filed 03/14/14 Page 49 of 129
Case 2:12-cr-00418-JS Document 311 Filed 10/25/13 Page 2 of 4

## IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| UNITED STATES OF AMERICA | : |
| | : |
| v. | : |
| | : NO.: 2:12-CR-418-6 |
| | : |
| KENNETH PARNELL | : |
| Defendant | : |

## MOTION OF KENNETH PARNELL TO JOIN MOTION OF CO-DEFENDANT ROBERT WHITFIELD'S MOTION FOR HEARING AND DISCOVERY ON THE ISSUE OF RACIAL PROFILING/SELECTIVE PROSECUTION AND FOR THE COURT TO CONSIDER TWO ADDITIONAL ALLEGED EXAMPLES OF RACIAL BIAS AND SELECTIVE PROSECUTION PROFFERED BY DEFENDANT PARNELL

The defendant respectfully requests the Court to grant Defendant Kenneth Parnell's

Motion to Join Motion of Co-Defendant Robert Whitfield's Motion for Hearing and Discovery

on the Issue of Racial Profiling/Selective Prosecution and in support thereof avers as follows:

1.      On May 22, 2013, the Jury found the defendant guilty of Counts 1-5 of the

Indictment (Conspiracy to Commit Robbery which interfered with Interstate Commerce 18

U.S.C. § 1951, the Attempt to do so under the same section, Conspiracy to Possess with the

Intent to Distribute and attempted Possession with the Intent to Distribute 5 Kilograms or more

of cocaine pursuant to 21 U.S.C. § 846 and 21 U.S.C. 841(b)(1)(A) and Carrying a Firearm

During and in Relation to a Crime of Violence pursuant to 18 U.S.C. 924(c)).

2.      Thereafter, the issue of racial profiling and selective prosecution was brought

before the Court and the Court deferred the sentencings in this matter and gave the defendants

until October 25, 2013 to research the issue of racial profiling and selective prosecution and to

file appropriate motions with the Court.

B

Case 1:13-cr-00222-RBK Document 69-3 Filed 02/07/14 Page 3 of 22 PageID: 772
Case 2:13-cr-00171-JHS Document 121 Filed 03/14/14 Page 50 of 129
Case 2:12-cr-00418-JS Document 311 Filed 10/25/13 Page 3 of 4

3.    On October 25, 2013, Defendant Robert Whitfiled filed a Motion for Hearing and

Discovery on the Issue of Racial Profiling/Selective Prosecution.

4.    In Defendant Whitfield's Motion for Hearing and Discovery on the Issue of

Racial Profiling/Selective Prosecution at paragraph 4, Defendant Whitfield lists cases that he

believes are examples of racial profiling and selective prosecution.

5.    Defendant Parnell has engaged into his own investigation and in addition to those

cases cited by Defendant Whitfield has found two other examples of what he believes are racial

profiling and selective prosecution. They are:

      a.    USA v. Abdul Johnson and Karim Williams, Magistrate Case No.: 12-
          1244, Criminal No.: 12-514(CMR) (Complaint attached hereto as Exhibit
          "A") and

      b.    USA v. Clifton McLean and Leroy Winston, Magistrate Case No.: 13-969,
          Criminal No.: 13-487(RK) (Complaint attached hereto as Exhibit "B").

6.    Defendant Parnell requests that he be allowed to join in Defendant Whitfield's

Motion for Hearing and Discovery on the Issue of Racial Profiling/Selective Prosecution.

7.    Defendant Parnell further requests that the Court consider the additional two

examples of alleged racial bias and selective prosecution described in paragraph 5 above when

considering Defendant Whitfield's motion and any answer by the government thereto.

**WHEREFORE**, the defendant respectfully requests this Honorable Court grant his

Motion to Join Robert Whitfield's Motion for Hearing and Discovery on the Issue of Racial

Profiling/Selective Prosecution and that the Court consider the additional two examples of

alleged racial bias and selective prosecution proffered by Defendant Parnell.

                 Respectfully submitted,
                 **DRANOFF AND PATRIZIO, P.C.**

                    spp8973

        BY:    _____
                 STEPHEN P. PATRIZIO, ESQUIRE



Case 1:13-cr-00222-RBK   Document 69-3   Filed 02/07/14   Page 4 of 22 PageID: 773
Case 2:13-cr-00171-JHS   Document 121   Filed 03/14/14   Page 51 of 129
Case 2:12-cr-00418-JS   Document 311   Filed 10/25/13   Page 4 of 4

## CERTIFICATE OF SERVICE

STEPHEN P. PATRIZIO, ESQUIRE, hereby certifies that a true and correct copy of the

within MOTION was duly served upon the following via email through the Court's electronic

filing system.

> Virginia Pratter, Assistant United States Attorney
> Jeanine Linehan, Assistant United States Attorney
> 615 Chestnut Street
> Suite 1250
> Philadelphia, PA 19106
> virginia.pratter@usdoj.gov
> jeanine.linehan@usdoj.gov

spp8973

DATE:___10-25-13___

STEPHEN P. PATRIZIO, ESQUIRE
Attorney for Defendant, Kenneth Parnell

D

Case 1:13-cr-00222-RBK   Document 69-3   Filed 02/07/14   Page 5 of 22 PageID: 774
Case 2:13-cr-001P1-JHS   Document 121   Filed 03/14/14   Page 52 of 129
Case 2:12-cr-00418-JS   Document 311-1   Filed 10/25/13   Page 1 of 7
Case 2:12-cr-0051E-RMR   Document 1   Filed 08/23/12   Page 4 of 7

AO 91 (Rev. 11/82)

| United States District Court | DISTRICT<br>Eastern District of Pennsylvania |
|---|---|

| | |
|---|---|
| UNITED STATES OF AMERICA<br>v.<br>ABDUL JOHNSON a/k/a "DUL"<br>KARIM WILLIAMS | DOCKET NO |
| | MAGISTRATE'S CASE NO<br><br>12-1244 |

Complaint for violation of Title 18, United States Code, §§ 1951 and 924(c)(1) and (2), and Title 21, United States Code  § 846

| NAME OF JUDGE OR MAGISTRATE<br>Honorable DAVID R. STRAWBRIDGE | OFFICIAL TITLE<br>U.S. Magistrate Judge | LOCATION<br>Philadelphia, PA |
|---|---|---|

| DATE OF OFFENSE<br>August 23, 2012 | PLACE OF OFFENSE<br>Philadelphia, Pennsylvania | ADDRESS OF ACCUSED (if known) |
|---|---|---|

COMPLAINANT'S STATEMENT OF FACTS CONSTITUTING THE OFFENSE OR VIOLATION:

One:  From on or about January, 2012, through on or about August 23, 2012, in Philadelphia, in the Eastern District of Pennsylvania, defendants ABDUL JOHNSON and KARIM WILLIAMS, obstructed, delayed and affected commerce and the movement of articles and commodities in commerce, and attempted to do so, by robbery, in that, defendants unlawfully attempted to take and obtain, and aid and abet the unlawful taking and obtaining of, approximately 10 kilograms of cocaine, a Schedule II controlled substance, from the person or in the presence of another and against their will, by means of actual and threatened force, violence, and fear of injury, immediate and future to his person and property in his possession, that is, by committing a home invasion armed robbery. In violation of Title 18, United States Code, Sections 1951(a) and 2

Two:  On or about August 23, 2012, in Philadelphia, in the Eastern District of Pennsylvania, defendants ABDUL JOHNSON and KARIM WILLIAMS, knowingly used and carried a firearm, and aided and abetted the use and carrying of a firearm, that is: a Yugoslavian AK 7.62x39 assault rifle, SNR648423, loaded with 2 live rounds of ammunition, during and in relation to a crime of violence and drug trafficking crime for which the defendants may be prosecuted in a court of the United States, that is, possession with the intent to distribute a controlled substance in violation of 21 U.S.C. 841(a)(1), and attempted commission of a Hobbs Act Robbery, in violation of 18 U.S.C. 1951(a). In violation of Title 18, United States Code, Sections 924(c)(1) and 2

Three:  On or about August 23, 2012, in Philadelphia, in the Eastern District of Pennsylvania, defendants ABDUL JOHNSON and KAREEM WILLIAMS, conspired with each other, and knowingly attempted, to possess with the intent to distribute more than 5 kilograms of cocaine, a Schedule II controlled substance, in violation of Title 21, United States Code, Section 846.

BASIS OF COMPLAINANT'S CHARGE AGAINST THE ACCUSED:

SEE AFFIDAVIT ATTACHED HERETO

MATERIAL WITNESSES IN RELATION TO THIS CHARGE:

| Being duly sworn, I declare that the foregoing is true and correct to the best of my knowledge | SIGNATURE OF COMPLAINANT (OFFICIAL TITLE)<br>Gerard Gallagher<br><br>OFFICIAL TITLE<br>Special Agent, ATF |
|---|---|

| Sworn to before me and subscribed in my presence<br>SIGNATURE OF JUDGE/MAGISTRATE<br>Honorable DAVID R. STRAWBRIDGE, United States Magistrate Judge | DATE<br>8-23-12 |
|---|---|



Case 1:13-cr-00222-RBK   Document 69-3   Filed 02/07/14   Page 6 of 22 PageID: 775
Case 2:23-cr-00171-JHS   Document 121   Filed 03/14/14   Page 53 of 129
Case 2:12-cr-00418-JS   Document 311-1   Filed 10/25/13   Page 2 of 7
Case 2:12-cr-00514-CMR   Document 1   Filed 08/23/12   Page 2 of 7

## AFFIDAVIT IN SUPPORT OF CRIMINAL COMPLAINT
## AND ARREST WARRANT

I, Gerard Gallagher, Special Agent, Bureau of Alcohol, Tobacco, Firearms and Explosives (hereinafter referred to as "ATF"), being duly sworn, state as follows:

1. I am employed as a Special Agent with ATF and have been so employed for 11 years. I am currently assigned to the ATF Violent Crime Task Force. The information contained in this affidavit is based on my personal knowledge, information provided to me by other law enforcement personnel and recorded conversations. This affidavit is submitted for the limited purpose of securing a criminal complaint charging Abdul JOHNSON and Karim WILLIAMS, with violations of Title 21, United States Code, Section 846 (conspiracy to possess with intent to distribute cocaine), Title 18, United States Code, Sections 1951 (attempt and conspiracy to commit robbery which interferes with interstate commerce), 2 (aiding and abetting), 924 (c) (using and carrying a firearm during and in relation to a drug trafficking crime and a crime of violence).

2. The information contained in this affidavit is based upon my personal observations and investigation, on information relayed to me by other special agents or other law enforcement officers working with me, as well as official reports of investigation from law enforcement agencies. Because this application is being submitted for the limited purpose of establishing probable cause to support a criminal complaint and arrest warrant, I have not included every fact known to me concerning this investigation. I have submitted only those facts and circumstances which I believe are necessary to establish probable cause for the issuance of the criminal complaint.

3. In January 2012, a confidential source (hereinafter referred to as "CI") began to provide me reliable information that led to my investigation of Abdul JOHNSON and other individuals involved in violent crime. Since that time, the CI has been a registered confidential

Case 1:13-cr-00222-RBK   Document 69-3   Filed 02/07/14   Page 7 of 22 PageID: 776
Case 2:13-cr-00171-JHS   Document 121   Filed 03/14/14   Page 54 of 129
Case 2:12-cr-00418-JS   Document 311-1   Filed 10/25/13   Page 3 of 7
Case 2:12-cr-00514-CMR   Document 1   Filed 08/23/12   Page 3 of 7

informant with ATF. The CI has provided me with information over the last two years that has been corroborated by, among other things, police reports, DMV records, housing records, consensually recorded telephone calls, and police interviews. The CI's information has proven reliable throughout this and several other investigations. In 2008, the CI was convicted, in the Eastern District of Pennsylvania, of being a felon in possession of a firearm, and sentenced to 30 months imprisonment. Upon completion of that sentence, the CI began cooperating with ATF. The CI's cooperation has been voluntary. Aware of the CI's criminal history, I have taken steps to corroborate the information the CI provided. The meetings between the CI, the targets and the Undercover Agent (hereinafter UC) set forth in this affidavit were recorded. I have reviewed those recordings and they corroborate the information the CI provided about JOHNSON and his associates. In addition, I have corroborated the information provided through physical surveillance.

4.    In and around June 2012, the CI reported to me that a person known to the CI as "Dul," later identified as Abdul JOHNSON, was involved in the planning of home invasion robberies. The CI stated that JOHNSON approached the CI because JOHNSON believed that the CI knew of drug dealers to target for home invasion robberies.

5.    On July 5, 2012, the CI introduced the UC to JOHNSON in a restaurant in Bala Cynwd, Pennsylvania, under a ruse with the UC posing as a person seeking assistance in arranging a robbery of up to 10 kilograms of cocaine. JOHNSON enthusiastically expressed his interest and willingness to recruit his cousin to participate in the robbery. JOHNSON, however did not identify his cousin at that time. JOHNSON assured the UC that he and his associates had experience committing home invasion robberies, including one that netted three kilograms of cocaine. JOHNSON stated that he had a firearm to use during the robbery. JOHNSON asked the UC, "What if I have to put these dudes down?" JOHNSON confirmed that he was ready to do the robbery by

-2-

Case 1:13-cr-00223-RBK Document 69-3 Filed 02/07/14 Page 8 of 22 PageID: 777
Case 2:13-cr-00223-RBK Document 121 Filed 03/14/14 Page 55 of 129
Case 2:12-cr-00418-JS Document 311-1 Filed 10/25/13 Page 4 of 7
Case 2:12-cr-00514-CMR Document 1 Filed 08/23/12 Page 4 of 7

stating that he was an an "automatic go."

6. On August 10, 2012, the UC and the CI met with JOHNSON and JOHNSON's cousin, C.J., (not charged in this complaint) a/k/a "Black" in a restaurant parking lot on City Line Avenue in Philadelphia, Pennsylvania. Abdul JOHNSON identified C.J., as his cousin who was going to assist him in committing the home invasion robbery. The UC advised Abdul JOHNSON and C.J. that there would be at least one male subject, and possibly a second, inside the house armed with guns guarding the cocaine. Both Abdul JOHNSON and C.J. expressed their willingness to participate in the planning and execution of the robbery. Abdul JOHNSON and C.J. also agreed to assist the UC in selling his share of the stolen cocaine in Philadelphia after the robbery. C.J. described his plan to put the first individual they encountered at the robbery location "on ice, " which according to the UC meant to kill him so he would not create a problem. Abdul JOHNSON proposed the idea of wearing a suit and acting like a detective during the robbery. Abdul JOHNSON also stated that he may "shoot the guy inside in the face just because."

7. On or about August 21, 2012, the CI called Abdul JOHNSON on his cellular phone to inform that the cocaine would be ready for pick-up at a location that would be determined on August 23, 2012.

8. On or about August 22, 2012, the CI and the UC met with Abdul JOHNSON, Karim WILLIAMS, and FNU LNU in front of 321 North 62nd Street in Philadelphia, to further discuss the robbery. At that meeting, the UC explained the details of the cocaine stash house that he had previously discussed with Abdul JOHNSON. The UC reiterated that the stash location contained at least 10 kilograms of cocaine and that at least one of the individuals guarding the cocaine at the stash location would be armed with a firearm. Both Karim WILLIAMS and FNU LNU asked the UC questions about the location. Abdul JOHNSON, Karim WILLIAMS and FNU LNU also

-3-

H

Case 1:13-cr-00222-RBK   Document 69-3   Filed 02/07/14   Page 9 of 22 PageID: 778
Case 2:13-cr-00171-JHS   Document 121   Filed 03/14/14   Page 56 of 129
Case 2:12-cr-00418-JS   Document 311-1   Filed 10/25/13   Page 5 of 7
Case 2:12-cr-00514-CMR   Document 1   Filed 08/23/12   Page 5 of 7

discussed if they would shoot everyone inside of the house or merely tie them up.

9.      Based on my experience and training, I know that an attempt or conspiracy to violate the Hobbs Act, 18 U.S.C. § 1951, satisfies the requirement that it "affects interstate commerce" if the object of the attempt - in this case the theft of cocaine - would satisfy the interstate commerce requirement, if the conspiracy or attempt were to succeed. See United States v. Jannotti, 673 F. 2d 578, 591-592 (3d Cir. 1982). I also know that cocaine affects interstate and foreign commerce. See 21 U.S.C. § 801(3).

10.      On August 23, 2012, at approximately 8:00 a.m., at the UC's direction, the CI drove in an ATF controlled vehicle equipped with audio and video recording devices to pick JOHNSON and WILLIAMS up at each of their residences. When JOHNSON got into the car driven by the CI, he brought with him an AK-47 assault rifle that he placed into the trunk of the car. During the ride to meet the UC, JOHNSON and WILLIAMS stopped at several of their associate's residences to attempt to obtain a second gun for the robbery. JOHNSON, at WILLIAM's direction, also went into an Advance Auto Parts store in West Philadelphia to purchase tape to use to restrain the robbery victims. When JOHNSON returned to the car with the tape, WILLIAMS sent JOHNSON back into the store to purchase gloves.

11.      On August 23, 2012, at approximately 8:42 a.m., Abdul JOHNSON and Karim WILLIAMS met with the UC and the CI in a parking lot in Southwest Philadelphia, Pennsylvania, in the Eastern District of Pennsylvania. The UC directed JOHNSON and WILLIAMS to a mini-van to be used during the robbery. JOHNSON loaded the AK-47 into the mini-van.

12.      At approximately 8:54 a.m., ATF Special Agents arrested JOHNSON and WILLIAMS. After the two defendants were arrested, ATF Special Agents recovered a Yugoslavian AK 7.62x39 assault rifle, SNR648423 AK-47, loaded with two live rounds of ammunition, in a

Case 1:13-cr-00222-RBK   Document 69-3   Filed 02/07/14   Page 10 of 22 PageID: 779
Case 2:13-cr-00172-JMS   Document 121   Filed 03/14/14   Page 57 of 129
Case 2:12-cr-00418-JS   Document 311-1   Filed 10/25/13   Page 6 of 7
Case 2:12-cr-00514-CMR   Document 1   Filed 08/23/12   Page 6 of 7

black bag from the mini-van where JOHNSON had placed it. In addition, ATF Special Agents recovered two pairs of work gloves, one pair found near JOHNSON that had dropped from his hands when arrested, and the other pair in WILLIAMS' rear pants pocket. The tape JOHNSON purchased prior to meeting the UC was recovered from the center console of the car JOHNSON and WILLIAMS traveled in to meet the UC.

13.     Based upon these facts, I assert there is probable cause to believe that Abdul JOHNSON and Karim WILLIAMS:

(a)     have conspired and attempted to commit a Hobbs Act Robbery, in violation of 18 U.S.C. § 1951 and 2;

(b)     have conspired and attempted to possess more than 5 kilograms of cocaine with intent to distribute, in violation of 21 U.S.C. §§ 846, 841(b)(1)(A); and,

(c)     have used and carried, and have aided and abetted the use and carrying, of firearms during and in relation to a crime of violence (a violation of 18 U.S.C. § 1951) and a drug trafficking crime (a violation of 21 U.S.C. § 846), for which they may be prosecuted in a Court of the United States, in violation of 18 U.S.C. § 924(c).

J

Accordingly. I respectfully request that a warrant for the arrest of Abdul JOHNSON and

Karim WILLIAMS be issued by this Court.

Gerard Gallagher
Special Agent
Bureau of Alcohol. Tobacco, Firearms and Explosives

Sworn to and subscribed before me
this 23rd day of August 2012

HONORABLE DAVID R. STRAWBRIDGE
UNITED STATES MAGISTRATE JUDGE

-6-

K

Case 1:13-cr-00222-RBK   Document 69-3   Filed 02/07/14   Page 13 of 22 PageID: 782
Case 2:13-cr-00171-JHS   Document 121   Filed 03/14/14   Page 60 of 129
Case 2:12-cr-00418-JS   Document 311-2   Filed 10/25/13   Page 1 of 9
Case 2:13-cr-00487-RBK   Document 3   Filed 08/14/13   Page 1 of 9

AO 91 Rev 1/82  (11/83) Philadelphia, Pa.   **CRIMINAL COMPLAINT**

| **United States District Court** | DISTRICT Eastern District of Pennsylvania |
|---|---|

| UNITED STATES OF AMERICA v. CLIFTON MCLEAN a/k/a "Little Clif" LEROY WINSTON | DOCKET NO |
|---|---|
| | MAGISTRATE'S CASE NO |

Complaint for violation of Title 18 United States Code §§ 1951 and 924(c)(1) and (2)

| NAME OF JUDGE OR MAGISTRATE Honorable CAROL S. WELLS | OFFICIAL TITLE Chief, U.S. Magistrate | LOCATION Philadelphia, PA |
|---|---|---|

| DATE OF OFFENSE August 14, 2013 | PLACE OF OFFENSE Philadelphia, Pennsylvania | ADDRESS OF ACCUSED (if known) |
|---|---|---|

COMPLAINANT'S STATEMENT OF FACTS CONSTITUTING THE OFFENSE OR VIOLATION

One:  From in or around June 2013, to August 14, 2013, in Philadelphia, in the Eastern District of Pennsylvania, defendants Clifton MCLEAN, and Leroy WINSTON, obstructed, delayed and affected commerce and the movement of articles and commodities in commerce, and attempted to do so, by robbery, in that, defendants unlawfully attempted to take and obtain, and aid and abet the unlawful taking and obtaining of, approximately 8 kilograms of cocaine, a Schedule II controlled substance, from the person or in the presence of another and against his will, by means of actual and threatened force, violence, and fear of injury, immediate and future to his person and property in his possession, that is, by committing a home invasion armed robbery. In violation of Title 18, United States Code, Sections 1951(a) and 2

Two:  On or about August 14, 2013, in Philadelphia, in the Eastern District of Pennsylvania, defendants Clifton MCLEAN, and Leroy WINSTON, knowingly used and carried a firearm, and aided and abetted the use and carrying of a firearm, that is: a AMT Model  Backup II, .380 caliber, loaded with four live rounds of ammunition, serial number R10561; and, a Taurus Model Millennium PT 140 Pro, .40 caliber, loaded with six rounds of ammunition, and an obliterated serial number, during and in relation to a crime of violence and drug trafficking crime for which the defendants  may be prosecuted in a court of the United States, that is, possession with the intent to distribute a controlled substance in violation of 21 U.S.C. 841(a)(1), and attempted commission of a  Hobbs Act Robbery, in violation of 18 U.S.C. 1951(a)  In violation of Title 18, United States Code, Sections 924(c)(1) and 2.

BASIS OF COMPLAINANT'S CHARGE AGAINST THE ACCUSED

SEE AFFIDAVIT ATTACHED HERETO.

MATERIAL WITNESSES IN RELATION AGAINST THE ACCUSED

| Being duly sworn, I declare that the foregoing is true and correct to the best of my knowledge. | SIGNATURE OF COMPLAINANT (official title) Sarah O'Reilly |
|---|---|
| | OFFICIAL TITLE Special Agent, ATF |

| Sworn to before me and subscribed in my presence. SIGNATURE OF MAGISTRATE [1] Honorable CAROL S. WELLS, Chief, United States Magistrate Judge | DATE 8/14/2013 |
|---|---|

1) See Federal Rules of Criminal Procedure rules 3 and 54

1

Case 1:13-cr-00222-RBK Document 69-3 Filed 02/07/14 Page 14 of 22 PageID: 783

Case 2:12-cr-00418-JS Document 311-2 Filed 10/25/13 Page 2 of 9
Case 2:13-cr-00487-RK Document 1 Filed 08/14/13 Page 2 of 9

12 1671

## AFFIDAVIT IN SUPPORT OF CRIMINAL COMPLAINT
## AND ARREST WARRANT

I, Sarah O'Reilly, Special Agent, Bureau of Alcohol, Tobacco, Firearms and Explosives (hereinafter referred to as "ATF"), being duly sworn, state as follows:

1.      I am employed as a Special Agent with ATF and have been so employed since 2008. I am currently assigned to the ATF Violent Crime Task Force. The information contained in this affidavit is based on my personal knowledge, information provided to me by other law enforcement personnel and recorded conversations. This affidavit is submitted for the limited purpose of securing a criminal complaint charging Clifton MCLEAN and Leroy WINSTON, with violations of Title 21, United States Code, Section 846 (conspiracy to possess with intent to distribute cocaine), Title 18, United States Code, Sections 1951 (attempt and conspiracy to commit robbery which interferes with interstate commerce), 2 (aiding and abetting), 924 (c) (using and carrying a firearm during and in relation to a drug trafficking crime and a crime of violence)..

2.      The information contained in this affidavit is based upon my personal observations and investigation, on information relayed to me by other special agents or other law enforcement officers working with me, as well as official reports of investigation from law enforcement agencies. Because this application is being submitted for the limited purpose of establishing probable cause to support a criminal complaint and arrest warrant, I have not included every fact known to me concerning this investigation. I have submitted only those facts and circumstances which I believe are necessary to establish probable cause for the issuance of the criminal complaint.

3.      In June 2013, a confidential source (hereinafter referred to as "CI") began to provide me with information that led to my investigation of MCLEAN. The CI has been a registered confidential informant with ATF since in or around January 2012 and has proven to be reliable in

-1-

m

Case 1:13-cr-00212-RBK Document 69-3 Filed 02/07/14 Page 15 of 22 PageID: 784
Case 2:13-cr-00487-RK Document 1 Filed 03/30/14 Page 62 of 129
Case 2:12-cr-00418-JS Document 311-2 Filed 10/25/13 Page 3 of 9
Case 2:13-cr-00487-RK Document 1 Filed 08/14/13 Page 3 of 9

approximately 3 other investigations. In 2008, the CI was convicted, in the Eastern District of Pennsylvania, of being a felon in possession of a firearm, and sentenced to 30 months imprisonment. The CI's cooperation has been voluntary. Aware of the CI's criminal history, I have taken steps to corroborate the information the CI provided.

4. Since June 2013, the CI has provided me with information that has been corroborated by, among other things, police reports, DMV records, and consensually recorded telephone calls. The meetings and phone calls referenced in paragraphs 6 through 16, set forth below in this affidavit, between the CI, the targets, and the Undercover Agent (hereinafter referred to as "UC") were recorded. I have reviewed those recordings and they corroborate the information the CI provided about MCLEAN. In addition, I have corroborated the information provided through physical surveillance.

5. In and around June 2013, the CI reported to me that a person known to the CI as "Little Clif," later identified as MCLEAN, who the CI has known for approximately seven years, approached the CI a year prior, in June 2012, and asked the CI if he/she had any drugs for MCLEAN to sell. Recently, in June 2013, MCLEAN approached the CI again, while the CI was getting out of his car in the area of 63rd Street in Philadelphia, Pennsylvania. MCLEAN was driving with two unidentified passengers. MCLEAN told the CI that MCLEAN was "trying to get into something" and asked if the CI had anything "we can take." The CI responded by asking MCLEAN "What was he into?" to which MCLEAN replied "Whatever." MCLEAN said he had a "team ready." The CI understood MCLEAN's statements to mean that he was interested in committing a robbery and that MCLEAN was referring to narcotics when he stated "anything we can take." The CI told MCLEAN that the CI would let him know if he had "anything," referring to a potential robbery for MCLEAN.

-2-

Case 1:13-cr-00222-RBK Document 69-3 Filed 02/07/14 Page 16 of 22 PageID: 785
Case 2:13-cr-00171-JHS Document 121 Filed 03/14/14 Page 63 of 129
Case 2:12-cr-00418-JS Document 311-2 Filed 10/25/13 Page 4 of 9
Case 2:13-cr-00487-RK Document 1 Filed 08/14/13 Page 4 of 9

6.      On June 19, 2013, the CI met with MCLEAN in a restaurant parking lot on City Avenue in Philadelphia, Pennsylvania. During this meeting, MCLEAN stated that he had a team ready to commit the robbery. MCLEAN stated that he had two firearms and that another individual had a third firearm to be used. MCLEAN told the CI he was currently selling "dope," (believed to be a reference to heroin) and that MCLEAN also sold "coke" in Harrisburg, and the "hood" (referring to his neighborhood in Philadelphia). The CI told MCLEAN that the CI would advise MCLEAN when the CI's "folks" "came down," that is, when the CI's drug connection traveled to Philadelphia.

7.      On or about June 28, 2013, MCLEAN called the CI on the CI's cellular phone to ask the CI about the robbery. During this conversation, MCLEAN stated, "What's up with that thing?" and "I'm ready," which the CI understood to mean that MCLEAN was prepared to commit the robbery of the drug dealer that they had discussed previously.

8.      On July 22, 2013, MCLEAN sent a text message to the CI asking "Was sup" with a request that the CI call MCLEAN. During their phone conversation, MCLEAN stated that he was "starving," which the CI understood to be a reference to MCLEAN's eagerness to commit the robbery.

9.      On July 31, 2013, the CI called MCLEAN and informed him that the CI's "folks" would be in Philadelphia the following day, referring to the UC posing as a drug courier, and asked MCLEAN if he wanted to meet with his/her "folks" to discuss a potential robbery. MCLEAN agreed to meet with the UC the next day at a restaurant parking lot in Philadelphia.

10.     On August 1, 2013, the CI and the UC met with MCLEAN in the pre-arranged meeting location. The UC described the details of the purported stash house that would contain approximately 8 to 9 kilograms of cocaine and asked MCLEAN if this was something that he and

crew could do, to which MCLEAN replied, "yeah, you ready now? " and "so what we gotta do?" During the conversation, MCLEAN stated that he and one other, referring to to the unidentified male that remained seated in the car that MCLEAN had used to arrive at the meeting, would commit the robbery. MCLEAN described a plan in which they would stay in a hotel the night before the robbery, so that they could get to the stash house quickly. MCLEAN further stated "if you [UC] ain't the first person [entering the stash house], we'll already be up there." MCLEAN then informed the UC that he [UC] should enter the house prior to the robbery to be able to provide MCLEAN with information via text messages regarding the number of occupants inside the house to be robbed. MCLEAN also added that once inside the stash house location, he and his accomplice would restrain the UC and the other people present. MCLEAN reiterated that he and his accomplice were "ready now."

11.     On August 8, 2013, the UC and the CI met with MCLEAN. The UC informed MCLEAN that the anticipated cocaine shipment would arrive in Philadelphia sometime during the following week (August 12-16). The UC stated that at least three individuals would be inside of the stash house during the proposed robbery and further noted that he [UC] would not be able to assist MCLEAN and his accomplices. MCLEAN replied "like how you figure this. If I put the gun to you and you tell Rock[1] to lay on the ground, what he,.Rock gonna do?" The UC requested that MCLEAN confer with his associates to confirm that they were still "good," that is, willing to commit the home invasion robbery. The UC requested that MCLEAN advise him if MCLEAN and his accomplices did not intend to commit the robbery the following week so that the UC could find others who would commit the robbery. MCLEAN confirmed with the UC that the cocaine shipment would arrive next week and stated "we good." Later that evening, at my direction the CI called MCLEAN. The CI

---

[1] The CI is known to MCLEAN as "Rock."

told MCLEAN that his "folks," that is, the UC, was not sure if MCLEAN was serious about committing the future home invasion robbery because MCLEAN had not brought his accomplice(s) to meet with the UC as MCLEAN stated he would prior to the meeting. MCLEAN responded by saying, "nigga I came every time you called me...like what do you want me to do?" Later in the conversation, he stated, "say no more, I'll bring a whole fucking team" and "let's go, I'm ready to go." The CI asked MCLEAN if MCLEAN and his team would be willing to meet with him the UC the following day so they could talk about the commission of the home invasion robbery. MCLEAN agreed to meet the UC with MCLEAN's accomplice(s) the next day.

12.     On August 9, 2013, the CI called MCLEAN to set up a meeting between MCLEAN, MCLEAN's accomplice(s), the CI and the UC. MCLEAN stated that he was available to meet and would call his "man" to see if he was also available. A couple minutes later, MCLEAN sent two text messages to the CI which read, "Won't be able to get everybody together till at least 6" and "But real shit we on go aint no question." During another conversation that night, MCLEAN agreed to meet the CI and the UC later that evening when his "man" was available.

13.     On August 9, 2013, at approximately 6:15 p.m., the UC and the CI met with MCLEAN for a third time. MCLEAN brought an unknown male, later identified as Leroy WINSTON, with him to the meeting, and indicated that this person would commit the robbery with MCLEAN. MCLEAN and WINSTON listened as the UC described the details of the house that would contain at least 8 or 9 "bricks," (kilograms of cocaine). The UC informed them that there would be three individuals in the house with the cocaine and each of the men would be "strapped," meaning armed with a firearm. WINSTON asked the UC, "How long beforehand are you going to

know the house?"[2] The UC revealed that the house was in Philadelphia and MCLEAN replied, "Oh my God, you just made it 10 times easier. I thought we had to go to fucking New York." Later, MCLEAN added, "We was going to New York, it doesn't matter." The UC explained that the men inside the stash location were "shooters" and would shoot if they got the chance. MCLEAN, replied, "for what? it ain't they shit [cocaine]...what the fuck they dying for?...and if they is, then they just dying." WINSTON added, "that shits gotta be a surprise for them...that's the only way you're gonna get them...you gotta catch them off guard...when you get the address, we can rush up there." MCLEAN then said, "as soon as you get that call, we'll be there." Both MCLEAN and the WINSTON stated that they would use "zip ties" to restrain the occupants of the stash location. MCLEAN added "everybody gets tied up....nobody moves."

14.    Based on my experience and training, I know that an attempt or conspiracy to violate the Hobbs Act, 18 U.S.C. § 1951, satisfies the requirement that it "affects interstate commerce" if the object of the attempt - in this case the theft of cocaine - would satisfy the interstate commerce requirement, if the conspiracy or attempt were to succeed. See United States v. Jannotti, 673 F. 2d 578, 591-592 (3d Cir. 1982). I also know that cocaine affects interstate and foreign commerce. See 21 U.S.C. § 801(3).

15.    On August 14, 2013, at approximately 7:20 a.m., at ATF's direction, the CI drove to West Philadelphia to get Clifton MCLEAN and Leroy WINSTON per their request in a conversation the prior evening August 13, 2013 and drive them to meet the UC. The CI drove MCLEAN and WINSTON to meet with the UC and the CI in a parking lot of a hotel in Southwest Philadelphia, Pennsylvania, in the Eastern District of Pennsylvania. The UC directed MCLEAN and WINSTON

_____

[2] The UC advised MCLEAN earlier that the cocaine delivery would be made at a location that would not be disclosed until the morning of the scheduled pick up.

-6-

R

to another location in Southwest Philadelphia to wait for the phone call purportedly advising them of the location to be robbed.

16.    At approximately 8:30 a.m., ATF Special Agents arrested MCLEAN and WINSTON. After the defendants were arrested, ATF Special Agents recovered  2 loaded firearms:  a AMT Model  Backup II, .380 caliber, loaded with four live rounds of ammunition, serial number R10561; and, a Taurus Model Millennium PT 140 Pro, .40 caliber, loaded with six live rounds of ammunition, and an obliterated serial number.

17.     Based upon these facts, I assert there is probable cause to believe that Clifton MCLEAN and Leroy WINSTON:

(a)     have conspired and attempted to commit a Hobbs Act Robbery, in violation of 18 U.S.C. § 1951 and 2;

(b)     have conspired and attempted to possess more than 5 kilograms of cocaine with intent to distribute, in violation of 21 U.S.C. §§ 846, 841(b)(1)(A); and,

(c)     have used and carried, and have aided and abetted the use and carrying, of firearms during and in relation to a crime of violence (a violation of 18 U.S.C. § 1951) and a drug trafficking crime (a violation of 21 U.S.C. § 846), for which they may be prosecuted in a Court of the United States, in violation of 18 U.S.C. § 924(c).

Accordingly, I respectfully request that a warrant for the arrest of Clifton MCLEAN and Leroy WINSTON be issued by this Court.


_____
Sarah O'Reilly
Special Agent
Bureau of Alcohol, Tobacco, Firearms and Explosives


Sworn to and subscribed before me
this 14th day of August 2013

_____
HONORABLE CAROL S. WELLS
CHIEF, UNITED STATES MAGISTRATE JUDGE


-8-

Limited Discovery                    Exhibit - "G"

## IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ILLINOIS
## EASTERN DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| | ) | |
| | ) | No. 11 CR 148-1 |
| v. | ) | |
| | ) | |
| | ) | Judge Amy J. St. Eve |
| WILLIAM ALEXANDER | ) | |
| | ) | |

### MEMORANDUM OPINION AND ORDER

AMY J. ST. EVE, District Court Judge:

Before the Court is Defendant William Alexander's Motion for Discovery on Racial

Profiling. (R. 118, Mot.) The Court denies Alexander's motion to a large extent, but grants

limited discovery, as explained below, of the Bureau of Alcohol, Tobacco, Firearms and

Explosives' ("ATF") manual regarding the identification of targets in its stash-house robbery

sting operations.[1]

### BACKGROUND

On March 22, 2011, the grand jury returned a four-count indictment charging Alexander

and his two co-defendants with conspiring and attempting to knowingly and intentionally possess

five kilograms or more of cocaine with intent to distribute in violation of 21 U.S.C. §§ 841(a)(1),

846, and knowingly possessing a firearm in furtherance of a drug trafficking crime in violation of

21 U.S.C. § 846 and 18 U.S.C. § 924(c)(1)(A), (2). (R. 16, Indictment at 1-3.) Special agents

with the ATF arrested Alexander and his co-defendants on February 23, 2011 as part of a stash-

house robbery sting operation. The stash house at issue was not real, and the individuals with

---

[1] Defense counsel, who is counsel of record in *United States v. Brown,* already has some of the discovery
Alexander seeks in this case, which the government filed in another case pending in the Northern District
of Illinois. *See United States v. Brown,* No. 1:12-cr-00632, R. 154 at Ex. A-D.

whom Alexander and his co-defendants agreed to commit the robbery were undercover ATF

agents.

In the present motion, Alexander seeks discovery regarding alleged racial profiling in the

investigation and prosecution of the ATF's stash-house robbery sting operations. (Mot. at 9-12.)

In support of his motion, Alexander provides the racial makeup of defendants from 17 stash-

house robbery sting cases brought in the Northern District of Illinois since 2006. (*Id.* at 4-6.)

Alexander claims that 42 of the 57 defendants in those cases are African American, 8 are Latino,

and 7 are white. (*Id.* at 6.) Alexander further claims that in the 7 cases brought since 2011, 19 of

the 26 defendants are African American, 7 are Latino, and none are white. (*Id.*) Alexander

asserts that these statistics establish that the ATF field office in Chicago and the U.S. Attorney's

Office for the Northern District of Illinois target minorities in conducting and prosecuting stash-

house robbery stings, like the one that led to Alexander and his co-defendants' arrest. (*Id.* at 1.)

Alexander argues that the Court should authorize discovery related to his purported

defenses of selective prosecution and selective enforcement under *United States v. Armstrong,*

517 U.S. 456, 116 S. Ct. 1480, 134 L. Ed. 2d 687 (1996), or Federal Rule of Criminal Procedure

16. (*Id.* at 7-8.) Specifically, Alexander requests discovery of the following seven categories of

information or documents:

    a) [A] list by case name, number, and the race of each defendant of all phony stash
       house ripoff cases brought by the U.S. Attorney's Office for the Northern District of
       Illinois in which ATF was the federal investigatory agency from 2006 to the present.

    b) For each such case listed in response: a statement of prior criminal contact that the
       federal agency responsible for the investigation had with each defendant prior to
       initiating the phony stash house ripoff sting (if all such information for a particular
       case is contained in the criminal complaint, a reference to the complaint would be a
       sufficient response).

    c) [T]he statutory or regulatory authority for ATF to be instigating and/or pursuing
       phony staff [sic] house ripoff cases involving illegal drugs instead of guns. Any any

2

WA

[sic] decision by any federal agency, the Justice Department or the White House to authorize ATF to pursue drug cases in the Northern District of Illinois.

d) All national and Chicago Field Office ATF manuals [including The Home Invasion Operations Bulletin 1st edition and The ATF Manual Order], circulars, field notes, correspondence or other material which discus "stings," "reverse stings," "phony stash house ripoffs" or entrapment operations, including protocols and/or directions to agents and to confidential informants regarding how to conduct such operations, how to determine which persons to pursue as potential targets or ultimate defendants, how to ensure that the targets do not seek to quit or leave before an arrest can be made and how to ensure that agents are not targeting persons for such operations on the basis of their race, color, ancestry or national origin.

e) All documents that contain information on how supervisors and managers of the Chicago area ATF were to ensure that its agents were not targeting persons on the basis of their race, color, ancestry or national origin for these phony stash house ripoffs and what actions the Chicago area ATF (i.e. operating in the Northern District of Illinois) supervisors and managers took to determine whether agents were not targeting persons for such operations on the basis of their race, color, ancestry or national origin.

f) All documents which discuss "predication" for stash house stings. "Predication" is used here with the meaning it has in political corruption cases—that is establishing a good faith basis that a subject is already corrupt before the government tries to corrupt him.

g) All documents containing instructions given during the time Patrick Fitzgerald or Gary Shapiro have been the U.S. Attorney for the Northern District of Illinois about the responsibilities of AUSA's [sic] to ensure that defendants in cases brought by the Office of the U.S. Attorney for the Northern District of Illinois have not been targeted due to their race, color, ancestry or national origin and specifically that those persons who are defendants in phony stash house cases in which ATF was the investigatory agency have not been targeted due to their race, color, ancestry or national origin and that such prosecutions have not been brought with any discriminatory intent on the basis of the defendant's race, color, ancestry, or national origin.

(*Id.* at 9-12.)

## LEGAL STANDARD

I. *United States v. Armstrong*

The Supreme Court considered the showing that a defendant must make to obtain

discovery on a selective prosecution claim in *United States v. Armstrong,* 517 U.S. 456, 116 S.

WA

Ct. 1480, 134 L. Ed. 2d 687 (1996). As the Supreme Court explained in *Armstrong,* the Attorney

General and United States Attorneys, as delegates of the President, retain "broad discretion" to

enforce federal criminal laws, and "in the absence of clear evidence to the contrary, courts

presume that they have properly discharged their official duties." *Id.* at 464 (internal quotations

and citations omitted). In the ordinary case, "so long as the prosecutor has probable cause to

believe that the accused committed an offense defined by statute, the decision whether or not to

prosecute, and what charge to file or bring before a grand jury, generally rests entirely in his

discretion." *Id.* (quoting *Bordenkircher v. Hayes,* 434 U.S. 357, 364, 98 S. Ct. 663, 54 L. Ed. 2d

604 (1978)).

     A prosecutor's discretion, however, must yield to constitutional constraints, including the

equal protection component of the Fifth Amendment's Due Process Clause. *Id.* (citing *Bolling v.*

*Sharpe,* 347 U.S. 497, 500, 74 S. Ct. 693, 98 L. Ed. 884 (1954)). Thus, a prosecutor must not

base a decision whether to prosecute on "an unjustifiable standard such as race, religion, or other

arbitrary classification." *Id.* (quoting *Oyler v. Boles,* 368 U.S. 448, 456, 82 S. Ct. 501, 506, 7 L.

Ed. 2d 446 (1962)). To overcome the presumption that a prosecutor has not violated equal

protection, a criminal defendant must present "clear evidence to the contrary." *Id.* at 465

(citation omitted). Specifically, "[t]he claimant must demonstrate that the federal prosecutorial

policy 'had a discriminatory effect and that it was motivated by a discriminatory purpose.'" *Id.*

To establish discriminatory effect in a race case, the defendant must show that "similarly situated

individuals of a different race were not prosecuted." *Id.*

     Furthermore, due to the onerous nature of discovery on selective prosecution claims, the

Supreme Court held that the "justifications for a rigorous standard for the elements of a

selective-prosecution claim . . . require a correspondingly rigorous standard for discovery in aid

4

WA

of such a claim." *Id.* at 468. Therefore, to obtain discovery on a selective prosecution claim, a criminal defendant must show "some evidence of both discriminatory effect and discriminatory intent." *United States v. Bass,* 536 U.S. 862, 862, 122 S. Ct. 2389, 153 L. Ed. 2d 769 (2002) (citing *Armstrong,* 517 U.S. at 465). Under *Armstrong,* the defendant's showing must include "evidence that similarly situated defendants of other races could have been prosecuted, but were not . . . ." *Armstrong,* 517 U.S. at 469. The Supreme Court decided that this threshold "adequately balances the Government's interest in vigorous prosecution and the defendant's interest in avoiding selective prosecution." *Id.* at 470.

Although *Armstrong* dealt only with a selective prosecution claim, a defendant seeking discovery on a selective enforcement claim also must make the showing *Armstrong* requires. *United States v. Barlow,* 310 F.3d 1007, 1010 (7th Cir. 2002) ("[T]he same analysis governs both [selective prosecution and selective enforcement] claims: a defendant seeking discovery on a selective enforcement claim must meet the same 'ordinary equal protection standards' that *Armstrong* outlines for selective prosecution claims." (citations omitted)). Thus, to establish discriminatory effect with respect to a selective enforcement claim, "an African American claimant must demonstrate that a law or regulation was enforced against him, but not against similarly situated individuals of other races." *Id.* (citing *Armstrong,* 517 U.S. at 465).

**II.     Federal Rule of Criminal Procedure 16**

Federal Rule of Criminal Procedure 16(a)(1)(E) states:

> Upon a defendant's request, the government must permit the defendant to inspect and to copy or photograph books, papers, documents, data, photographs, tangible objects, buildings or places, or copies or portions of any of these items, if the item is within the government's possession, custody, or control and: (i) the item is material to preparing the defense; (ii) the government intends to use the item in its case-in-chief at trial; or (iii) the item was obtained from or belongs to the defendant.

5

WA

Fed. R. Crim. P. 16(a)(1)(E). A defendant must make "at least a *prima facie* showing of materiality" to obtain discovery under Rule 16(a)(1)(e)(E)(i). *See United States v. Caputo*, 373 F.Supp.2d 789, 793–94 (N.D. Ill. 2005).

In *Armstrong*, the Supreme Court considered whether a criminal defendant may obtain discovery on a claim of selective prosecution under Rule 16(a)(1)(E), which, at the time, fell under Rule 16(a)(1)(C). *See Armstrong*, 517 U.S. at 462-63. The Supreme Court held that he or she cannot: "Rule 16(a)(1)(C) authorizes defendants to examine Government documents material to the preparation of their defense against the Government's case in chief, but not to the preparation of selective-prosecution claims." *Id.* The Court, therefore, denies Alexander's request for discovery on racial profiling insofar as Alexander bases his request on Rule 16.

## ANALYSIS

### I. Alexander Fails to Meet the *Armstrong* Standard for Discovery on His Selective Prosecution or Enforcement Claims

As explained above, to obtain discovery on his purported defenses of selective prosecution and selective enforcement, Alexander must show "some evidence of both discriminatory effect and discriminatory intent." *Bass*, 536 U.S. at 862 (citing *Armstrong*, 517 U.S. at 465); *Barlow*, 310 F.3d at 1010 (applying *Armstrong* to selective enforcement claims). The only evidence Alexander presents of discriminatory effect or discriminatory intent is the racial makeup of defendants from 17 stash-house robbery sting cases brought in the Northern District of Illinois since 2006. This evidence fails to fulfill either prong of the *Armstrong* test.

#### A. Discriminatory Effect

With respect to the discriminatory effect prong, Alexander's evidence fails to show that "similarly situated defendants of other races could have been prosecuted [or arrested], but were not . . . ." *Armstrong*, 517 U.S. at 469. In *Armstrong*, the criminal defendant attempted to show

6

WA

discriminatory effect through an affidavit of a paralegal in the Office of the Federal Public Defender alleging that all defendants in similar cases that the public defender's office closed in 1991 were African American. *See id.* at 459. The paralegal attached to the affidavit a "study" listing the 24 defendants, their race, the charges brought against them, and the status of each case. *Id.* The Supreme Court held that this "study" did not constitute evidence of discriminatory effect because it "failed to identify individuals who were not black and could have been prosecuted for the offenses for which respondents were charged, but were not so prosecuted." *Id.* at 470.

In *Chavez v. Illinois State Police,* 251 F.3d 612 (7th Cir. 2001), the Seventh Circuit clarified that *Armstrong* did not entirely foreclose the use of statistics to show discriminatory effect. *Id.* at 638 ("While few opinions directly acknowledge that statistics may be used to prove discriminatory effect, the Court repeatedly relied on statistics to do just that."). The Seventh Circuit reaffirmed, however, that "[t]he statistics proffered must address the crucial question of whether one class is being treated differently from another class that is otherwise similarly situated." *Id.* "[R]aw statistics regarding overall charges say nothing about charges brought against *similarly situated defendants.*" *Bass,* 536 U.S. at 862; *see also Barlow,* 310 F.3d at 1009-10 ("Dr. Lamberth's data tells us nothing about the behavior of the white travelers in Union Station; we therefore have no basis for concluding that any of these white travelers [that law enforcement did not stop] were similarly situated to Barlow."); *United States v. Hayes,* 236 F.3d 891, 895-96 (7th Cir. 2001) ("Hayes has failed to identify a single defendant of another race who met the guidelines of Operation Triggerlock but was not federally prosecuted . . . .").

Alexander's analysis of the 17 cases he studied shows that approximately 75% of the defendants prosecuted in those cases are African American. The data he offers, however, says

7

nothing about whether the ATF or the United States Attorney chose not to conduct or prosecute stash-house robbery sting cases for similarly situated individuals of another race. The Supreme Court and the Seventh Circuit have repeatedly found that this type of evidence fails to fulfill the discriminatory effect prong of the *Armstrong* test. *See Armstrong,* 517 U.S. at 465; *Bass,* 536 U.S. at 862; *Barlow,* 310 F.3d at 1009-10; *Hayes,* 236 F.3d at 895-96.

Moreover, the Court rejects Alexander's argument that because ATF agents control who they approach about a phony stash-house robbery, "the pool of similarly situated whites [in this case] is the entire adult white population of the Northern District of Illinois." (*See* R. 119, Def. Mem. at 5.) There is no support in the case law for such a broad interpretation of who constitutes a "similarly situated" individual. Indeed, the Seventh Circuit's analyses in *Barlow* and *Hayes*—and common sense—counsel against such a broad interpretation. In *Barlow,* two undercover DEA agents questioned and searched two African American individuals in Union Station. *See* 310 F.3d at 1009-10. The Seventh Circuit identified the group of similarly situated individuals as "whites engaging in the same behavior as Barlow—*i.e.,* looking nervously over their shoulders"—not as all white individuals in Union Station. *See id.* at 1012. Similarly in *Hayes,* which dealt with alleged racial profiling in federal enforcement of firearms offenses, the Seventh Circuit identified "similarly situated" individuals as "persons of another race *who fell within the Operation Triggerlock guidelines* [who] were not federally prosecuted." *See* 236 F.3d at 895-96 (emphasis added). Thus, here, Alexander must show that the ATF chose not to conduct stash-house robbery sting operations to ensnare members of another race who fell within the ATF's guidelines regarding who those operations may target. Alexander has failed to do so.

The Court, though, is sympathetic to Alexander's argument that "[i]t is difficult to identify similarly situated whites who have not been targeted absent information about what

8

WA

selection criteria the informants and [the] ATF have been using." (Def. Mem. at 5.)  Therefore,
the Court will allow limited discovery of the ATF's policies and procedures regarding the
selection criteria for targets of phony stash-house robbery cases in place at the time of
Alexander's arrest.  The government has submitted *ex parte* a six-page excerpt of an ATF
manual that includes some provisions related to the identification of targets for this type of sting
operation.  The Court reviewed the document *in camera* and has identified certain sections that
the government should disclose to defense counsel, subject to the protective order entered in this
case.  The government shall provide a redacted copy of the document to defense counsel,
consistent with the Court's directive, by December 12, 2013.  The government shall redact <u>all
but the following sections</u> of that document:

    i.    Section 12(a)(1) on pages A-30 to A-31;

    ii.    Section 12(b) and subsections (1)-(5) on pages A-31 to A-32; and

    iii.    Section 12(f)(1) on page A-34, except for the front half of the hyphenated word in the
        first and sixth lines of the subsection.

    The Court denies the remainder of Alexander's discovery requests because he has failed
to make a credible showing of discriminatory effect.  *See, e.g., Armstrong,* 517 U.S. at 465.

**B.**    **Discriminatory Intent**

    Alexander's motion for discovery on racial profiling also fails under the discriminatory
intent prong of the *Armstrong* test.  To establish discriminatory intent, Alexander must show that
"the decisionmakers in [his] case acted with discriminatory purpose." *Chavez,* 251 F.3d at 645.
"'Discriminatory purpose' implies more than . . . intent as awareness of consequences.  It implies
that the decisionmaker . . . selected or reaffirmed a particular course of action at least in part
'because of' its adverse effects upon an identifiable group.'" *Id.* (citations omitted).  In *Chavez,*
the Seventh Circuit found that the statistics offered to show that officers intentionally

WA

discriminated against Hispanics in stopping and detaining motorists may not serve as the "sole

proof" of discrimination. *Id.* at 647-48. Rather, a claimant must present "sufficient non-

statistical evidence to demonstrate discriminatory intent." *Id.*

Alexander fails to meet this requirement. The only evidence Alexander offers to show

discrimination is the analysis of the racial makeup of defendants in the 17 stash-house robbery

cases he studied. (*See* Mot. at 4-6.) Under *Chavez,* even if this analysis sufficed as evidence of

discriminatory effect—which, as explained above, it does not—it fails to show discriminatory

intent.

Alexander argues that, in addition to the statistics he provided, he can prove

discriminatory intent (1) by showing that the ATF or the U.S. Attorney's Office acted like "an

ostrich burying its head in the sand to avoid seeing the obvious," (2) under a *Monell* theory, by

showing "a widespread ATF practice condoned by the U.S. Att[orney's] Office to target persons

of color, principally African Americans, as the prospective defendants in phony stash-house

ripoff cases," or (3) by showing that "race was considered in making the decision to prosecute or

recommend prosecution by ATF." (Def. Mem. at 5-7.) The Court disagrees. Alexander does

not cite a single case in which a court allowed discovery on selective prosecution or selective

enforcement claims based on a showing of alleged discriminatory intent under any of these

theories.

Even if Alexander could rely on these theories to fulfill the discriminatory intent prong of

the *Armstrong* test—a dubious premise considering the demanding standard the Supreme Court

imposed in *Armstrong* as well as the policy considerations underlying that standard—Alexander

fails to make a "credible showing" of discriminatory intent under any of his theories. The only

evidence Alexander offers of ATF special agents or the U.S. Attorney intentionally shielding

10

WA

itself from knowledge of discrimination is that the ATF keeps no statistics about the race of

defendants targeted in its stash-house robbery stings. (*See* Mot. at 5-6.) The ATF's failure to

keep statistics on the race of defendants hardly suggests discriminatory intent. Alexander,

moreover, offers no evidence to support his assertion that the ATF has a widespread practice of

targeting minorities in its stash-house robbery stings or that the ATF or the U.S. Attorney

considered Alexander's race in deciding to pursue this case. (*See id.* at 7.) Alexander, therefore,

fails to provide evidence of discriminatory intent.

Accordingly, the Court denies Alexander's request for discovery on racial profiling, with

the limited exception noted in Part I.A, *supra*.[2]

## II.     The Court Rejects Alexander's Request for Discovery under *Brady v. Maryland*

Alexander argues that the Court should order the discovery he requests under *Brady v.*

*Maryland,* 373 U.S. 83, 83 S. Ct. 1194, 10 L. Ed. 2d 215 (1963), "if race was considered in

making the decision to prosecute or recommend prosecution by the ATF." (Def. Mem. at 7.)

Under *Brady* and its progeny, the government has an affirmative duty "to disclose evidence

materially favorable to the accused." *Bielanski v. County of Kane,* 550 F.3d 632, 643 (7th Cir.

2008) (quoting *Youngblood v. West Virginia,* 547 U.S. 867 869, 126 S. Ct. 2188, 165 L. Ed. 2d

269 (2006)). This duty extends to exculpatory evidence as well as impeachment evidence.

*Mosley v. City of Chicago,* 614 F.3d 391, 397 (7th Cir. 2010) (citing *Youngblood,* 547 U.S. at

869, 126 S. Ct. 2188, 165 L. Ed. 2d 269). *Brady,* however, does not "entitle a criminal defendant

to embark upon an unwarranted fishing expedition through government files, nor does it mandate

that a trial judge conduct an *in camera* inspection of the government's files in every case."

*United States v. Phillips,* 854 F.2d 273, 278 (7th Cir. 1988); *United States v. Mitchell,* 178 F.3d

---

[2] Additionally, some of the categories of information or documents Alexander requests have no relevance
to his claim of racial profiling. The Court denies Alexander's request for documents in categories (c) and
(f) for this additional reason.

904, 908-09 (7th Cir. 1999). "Such matters are committed to the sound discretion of the trial judge." *Phillips,* 854 F.2d at 278.

Alexander has offered no evidence that the ATF or the government considered his race in deciding to investigate and prosecute this action. The Court, therefore, declines to order the discovery Alexander requests under *Brady,* especially where doing so would allow Alexander to "engage[] in the type of fishing expedition rejected by the Supreme Court" in *Armstrong. See Hayes,* 236 F.3d at 896; *see also, e.g., United States v. Wolff,* No. 11-719 (FSH), 2013 WL 646204, at *6-7 (D.N.J. Feb. 20, 2013) (denying discovery under *Brady* where the defendant's allegations regarding the materials sought "[did] not rise above the level of mere speculation about materials in the government's files" (quotations and citation omitted)); *United States v. Caputo,* 373 F. Supp. 2d 789, 794-95 (N.D. Ill. 2005) (denying discovery under *Brady* because "it is unknown whether any of the requested documents contain exculpatory or impeachment evidence that is material to either the issue of guilt or punishment").

## CONCLUSION

For the reasons explained above, the Court denies Alexander's motion for discovery on alleged racial profiling in large part. The Court, however, will allow limited discovery of portions of the ATF manual in place at the time of Alexander's arrest regarding the selection criteria for targets of phony stash-house robbery cases, which the government submitted to the Court *ex parte* for an *in camera* review. The government shall provide a copy of the document

12

WA

submitted to the Court (redacted per the Court's instructions in Part I.A., *supra*) to defense

counsel, subject to the protective order in this case, by December 12, 2013.

**DATED:  December 10, 2013**

ENTERED

AMY J. ST. EVE
U.S. District Court Judge

13

W A

IN THE UNITED STATES DISTRICT COURT

FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | : | |
| v. | : | **CRIMINAL NO. 12-418** |
| ROBERT LAMAR WHITFIELD, et al. | : | |

GOVERNMENT'S SUPPLEMENTAL RESPONSE TO
DEFENDANTS' MOTION FOR HEARING AND FOR DISCOVERY ON
THE ISSUE OF RACIAL PROFILING/SELECTIVE PROSECUTION

The government, by and through its attorneys, Zane David Memeger, United States Attorney, and V. Paige Pratter, Assistant United States Attorney, submits this supplemental response to the defendants' Motion for Hearing and for Discovery on the Issue of Racial Profiling/Selective Prosecution. The parties' motion is meritless, and should be denied.

## I.   INTRODUCTION

This Court held a hearing on the defendants' post-trial motions on January 10, 2014. During the hearing, the Court requested supplemental briefing on the defense discovery motion. Specifically, the Court asked the parties to discuss the reasoning of Judge Amy J. St. Eve, from the Northern District of Illinois, in United States v. Alexander, 11-CR-148 (N.D. Ill. Dec. 10, 2013), in which that court applied to a "sting" case the standard articulated by the Supreme Court in United States v. Armstrong, 517 U.S. 456 (1996), ruled that the defendants failed to meet that standard, but nevertheless ordered discovery of agency policies and procedures.

The government agrees that, of course, the Armstrong standard applies, and that these defendants, like the Alexander defendants, have failed to meet it. The government does not agree, however, with the Northern District of Illinois court's ruling ordering discovery. That court's ruling is not precedential in the Third Circuit (or indeed any circuit), is based on dictum

in a single Seventh Circuit opinion which, in any case, does not apply here, and is incorrect.

## II.    ARGUMENT

In <u>United States v. Armstrong</u>, 517 U.S. 456, the Supreme Court set out the showing a defendant must make to obtain discovery on a selective prosecution claim. Specifically, a defendant must make a "credible showing" that "similarly situated individuals of a different race were not prosecuted." <u>Id.</u> at 465. The standard for a selective prosecution claim "is a demanding one," and "the showing necessary to obtain discovery should itself be a significant barrier to the litigation of insubstantial claims." <u>Id.</u> at 463-64. The powerful policy reasons that require this demanding standard do not permit its evasion, loosening, or attenuation.

The government has broad prosecutorial discretion, and courts are properly reluctant to subject particular exercises of that discretion to scrutiny. The reasons are that prosecutorial discretion is a core element of the Executive's power under Article II; courts are ill-equipped to evaluate the many factors that affect the decision to prosecute; judicial inquiry into a prosecutor's decisions can chill law enforcement; and judicial scrutiny of charging decisions diverts a criminal proceeding from its central purpose: determining whether the defendant is guilty of the charges against him. <u>Wayte v. United States</u>, 470 U.S. 598, 607 (1985). The defense here has inadequately, not to say improperly, invoked this Court's authority to order discovery when, but only when, the showing required by <u>Armstrong</u> has been made in good faith.

There can be no question that the <u>Armstrong</u> standard, as articulated by the Supreme Court and uniformly enforced by the circuit courts of appeal and district courts, applies to ATF "sting" cases. Nothing in the Supreme Court's language or legal reasoning in <u>Armstrong</u>, or in any other case law of which the government is aware, supports a contention that the <u>Armstrong</u> standard should not apply to cases such as this. Nor can there be any question

2

that the defendants have failed to meet the Armstrong standard.   Indeed, defense counsel admitted at the January 10, 2014 hearing that they have failed to make any showing that "similarly situated individuals of a different race were not prosecuted." Id. at 465.  Whitfield's counsel acknowledged that press interest begat this speculative litigation.

The only question is whether this Court, despite the abject failure of the defense to meet its initial burden, should consider the approach devised by Judge St. Eve in Alexander. The answer unquestionably is "no."

Judge St. Eve correctly held that the Armstrong standard applies to ATF "sting" cases, and correctly found that Alexander – who had provided statistical information on cases prosecuting predominately racial minorities – failed to meet that standard because he provided no evidence of similarly situated non-minorities who were not prosecuted.  Judge St. Eve specifically rejected an argument the Whitfield defendants raised during oral argument – that "because ATF agents control who they approach about a phony stash-house robbery, the pool of similarly situated whites [in this case] is the entire adult white population of the [district]." Alexander, 11-CR-148, Mem. Op. Dec. 10, 2013 at 8.  Judge St. Eve correctly held that "[t]here is no support in the case law for such a broad interpretation of who constitutes a 'similarly situated' individual." Id.

Nevertheless, Judge St. Eve ordered limited disclosure of portions of an ATF manual because she "[was] sympathetic to Alexander's argument that '[i]t is difficult to identify similarly situated whites who have not been targeted absent information about what selection criteria the informants and [the] ATF have been using." Id. at 8-9.  This ruling is not supported by the Supreme Court's Armstrong decision or its progeny.  This is a "difficulty" Armstrong meant to be felt and enforced.  The Supreme Court's standard in Armstrong is binary:  if a

defendant meets the standard, then the defendant is entitled to the discovery the court deems appropriate under the circumstances, but if a defendant fails to meet the standard, the defendant is not entitled to any discovery at all. See Armstrong, 517 U.S. at 465.

In contrast, the district court in Alexander appears to employ a sliding scale of its own making, which is contrary to the Supreme Court's Armstrong standard. Judge St. Eve relied on the Seventh Circuit's decision in United States v. Hayes, 236 F.3d 891 (7th Cir. 2001). See Alexander, 11-CR-148, Mem. Op. Dec. 10, 2013 at 8. In Hayes, however, the Seventh Circuit upheld the district court's rejection of Hayes's request for discovery on his selective prosecution claim, after he argued that African-Americans were disproportionately charged in federal firearms possession cases. Hayes, 236 F.3d at 894-96.

Hayes was charged as part of a specific prosecutorial initiative, "Operation Triggerlock," and while opposing Hayes' request for relief, the government voluntarily provided defense counsel "Operation Triggerlock" guidelines, guidelines not for any law enforcement agency's investigative strategies and tactics -- the disclosure of which would compromise the effectiveness of law enforcement and imperil the safety of agents and human sources -- but only guidelines for the adoption for federal prosecution of cases which could be brought in either state or federal court. Id. Neither the district court nor the Seventh Circuit in Hayes ordered the government to disclose the Operation Triggerlock guidelines; indeed both courts denied the defendant's discovery request. Id. No justiciable issue was presented in Hayes of whether discovery of the guidelines could be compelled.

In denying discovery, however, the Seventh Circuit observed that "similarly situated" individuals would be "persons of another race who fell within the Operation Triggerlock guidelines" but "were not federally prosecuted." Id. at 895. In using the Operation

4

Triggerlock guidelines to describe "similarly situated" individuals, the Seventh Circuit was simply characterizing information the government had already provided. Id. at 895.    There is no basis, therefore, to read the Seventh Circuit's Hayes decision to require disclosure of law enforcement materials to assist a defendant in meeting the Armstrong standard.  The district court in Alexander thus went too far when it relied on Hayes to support ordering such discovery in that case.

To interpret the Seventh Circuit's language in Hayes as intended to require disclosure of agency guidelines would be directly contrary to Armstrong, which places the burden on the defendant seeking discovery. Armstrong, 517 U.S. at 465. Furthermore, there is no Third Circuit case law employing the Seventh Circuit's dictum in Hayes, so there is no precedent binding upon this Court even remotely suggesting that the disclosure of agency "operational guidelines" is necessary for determining who is a "similarly situated" person for purposes of the Armstrong analysis.

Illustrating the fatuity of the defense demand for discovery before they begin to try to supply a possible basis for that discovery, the defendants in this case do not need a manual of internal agency policies to understand who would be "similarly situated" for purposes of meeting the Armstrong standard.  In Whitfield, the trial evidence showed that the agents investigated individuals identified through a confidential informant -- and then through Whitfield himself -- who had committed, or were interested in committing, an armed robbery of a drug stash house.  As the informant "chose" Whitfield, so Whitfield chose his confederates based solely on their ability and willingness to aid him in the armed robbery of a stash house. Accordingly, "similarly situated" individuals would be non-minorities, of whom ATF was aware through a confidential informant, who had committed, or were interested in committing, an

5

RLW

armed robbery of a drug stash house.

The defendants were arrested as part of a "sting" operation by the Bureau of Alcohol, Tobacco, Firearms and Explosives, as they attempted to commit the home invasion robbery of a drug stash house. The defendants have not identified a single person of a different race who engaged in conduct similar to theirs and whom the government has not prosecuted. The government presented evidence in this case explaining why the defendants were suspected of involvement in similar activity, including how defendant Whitfield came forward and volunteered to participate of his own volition. The defendants have not identified anyone of a different race who was similarly known to the government and predisposed, whom the government did not target for prosecution.

Thus, their showing is even less than that the Supreme Court found insufficient to allow discovery in Armstrong. In Armstrong, as here, the authorities used confidential informants to investigate crime. Specifically, three confidential informants infiltrated a suspected crack distribution ring, leading to numerous drug transactions charged in the case. The defendants then sought discovery or dismissal of the indictment, asserting that they were selected for federal prosecution because they are black. In support of their motion, the defendants offered an affidavit describing a study finding that in every one of the 24 federal cocaine prosecutions in the district closed during the preceding year, the defendant was black. 517 U.S. at 458-59.

The Supreme Court rejected the request for discovery, given the absence of any showing that "similarly situated individuals of a different race were not prosecuted." Id. at 465. The same result is compelled here, where the defendants have not shown that any similarly situated person of a different race was not prosecuted. The defendants offered only an anecdotal list of six cases – filed over five years, and including the instant case – in which the defendants

claim the government charged African-American defendants after using a "sting" technique. This is far less than the evidence submitted to the district court in <u>Armstrong</u>, which the Supreme Court deemed insufficient to merit discovery.

Therefore, the Supreme Court's mandate barring judicial intrusion into prosecutorial records – whether manuals, or case files, or anything else – must be observed. Barring the showing required by <u>Armstrong</u>, it is impermissible to "divert prosecutors' resources and . . . disclose the Government's prosecutorial strategy." <u>Id.</u> at 468.

Any difficult for the defendants to meet the <u>Armstrong</u> standard is a consequence of the standard and should not influence this Court's decision. The defense cannot justify discovery beyond that permitted by <u>Armstrong</u> by complaining of the impossibility of supporting offensive and baseless claims. The standard is intended to be difficult to meet in any context; indeed, the rigor of the standard is central to the Supreme Court's rationale, and is in no way more onerous in the "sting" context.[1] The Supreme Court based its <u>Armstrong</u> decision on the "presumption of regularity" afforded to prosecutorial decisions. <u>Armstrong</u>, 517 U.S. at 464. Prosecutorial decision-making is a core executive function, and accordingly, the courts are "properly hesitant to examine" such decisions. <u>Id.</u> at 465. In this light, the Supreme Court developed and imposes a "rigorous standard" for proving a selective prosecution claim, and required and imposes "a correspondingly rigorous standard for discovery in aid of such a

---

[1] In fact, the standard is so difficult to meet that no one has met it yet in any context. <u>See, e.g.</u>, <u>United States v. Bass</u>, 536 U.S. 862 (2002) (unanimously rejecting request for discovery regarding racial bias in the death penalty decision-making process, relying on the <u>Armstrong</u> opinion and the absence of any showing of discrimination in particular cases); <u>United States v. Hedaithy</u>, 392 F.3d 580, 607-08 (3d Cir. 2004) (district court properly declined discovery regarding the government's decision to charge a group of Arab-Americans with offenses related to cheating on a standardized exam, where the defendants made no showing that similarly situated persons were not prosecuted); <u>United States v. Abuhouran</u>, 161 F.3d 206, 216 (3d Cir. 1998) (rejecting the proposition that a court may examine, absent proof of constitutional wrongdoing, the government's decision not to file a 5K motion, as the information the government would need to produce "is precisely the sort of confidential information concerning ongoing investigations that the government convincingly asserts it should not have to give up."); <u>United States v. Berrigan</u>, 482 F.2d 171, 180-81 (3d Cir. 1973) (rejecting request for government files on prosecution of this and similar cases, citing "a long accepted intolerance toward judicial inquisition into the process whereby prosecutorial decisions are formulated.").

RLW

claim[.]"  Id. at 468.  The Supreme Court intended this standard to "be a significant barrier to the litigation of insubstantial claims."  Id. at 463-64.  A less substantial claim than the press-induced impugning of this just prosecution cannot be imagined.

Judicial deference to executive decisions stems from "an assessment of the relative competence of prosecutors and courts" to evaluate such factors as "the strength of the case," the "deterrence value" of a prosecution, and "the Government's enforcement priorities," as well as from "a concern not to unnecessarily impair the performance of a core executive constitutional function."  Id.  "Examining the basis of a prosecution delays the criminal proceeding, threatens to chill law enforcement by subjecting the prosecutor's motives and decisionmaking to outside inquiry, and may undermine prosecutorial effectiveness by revealing the Government's enforcement policy."  Id.  The defense here has supplied no basis at all to postpone imposition of the sentences the defendants' crimes warrant.

## III.    CONCLUSION

For the foregoing reasons, the government respectfully requests that the Court decline to follow the lead of the Illinois district court in United States v. Alexander, 11-CR-148 (N.D. Ill. Dec. 10, 2013), and deny the defendants' request for discovery on their meritless selective prosecution claim.

Respectfully submitted,

ZANE DAVID MEMEGER
United States Attorney

_____/s/_____
V. PAIGE PRATTER
Assistant United States Attorney

8

## CERTIFICATE OF SERVICE

I certify that a true and correct copy of the foregoing was served by electronic

mail transmission to:

**J. MICHAEL FARRELL**
718 ARCH ST., SUITE 402N
PHILADELPHIA, PA 19106
215-925-1105
Email: mike@farrelltrial.com

**COLEY O. REYNOLDS**
1420 WALNUT ST STE 318
PHILADELPHIA, PA 19102
267-239-8808
Email: cor@coleyreynoldslaw.com

**RAYMOND D. ROBERTS**
1333 RACE ST 2ND FL
PHILADELPHIA, PA 19107
267-535-3831
Email: rayknee@aol.com

**LAURENCE A. NARCISI , III**
1910 LAND TITLE BUILDING
PHILADELPHIA, PA 19110
215-972-8087
Fax: 215-972-1545
Email: laurencenarcisi@verizon.net

**STEPHEN P. PATRIZIO**
2 PENN CENTER 1205
1500 JOHN F. KENNEDY BLVD.
PHILADELPHIA, PA 19102
215-569-2121
Email: SPatrizio@Dpesq.com

___/s/ V. Paige Pratter_____
V. PAIGE PRATTER
Assistant United States Attorney

Date:   January 26, 2014

RLW

EXHIBIT - "A"

**U.S. Department of Justice**
**Civil Rights Division**

# GUIDANCE REGARDING THE
# USE OF RACE BY FEDERAL LAW
# ENFORCEMENT AGENCIES



June 2003

## INTRODUCTION AND EXECUTIVE SUMMARY

In his February 27, 2001, Address to a Joint Session of Congress, President George W. Bush declared that racial profiling is "wrong and we will end it in America." He directed the Attorney General to review the use by Federal law enforcement authorities of race as a factor in conducting stops, searches and other law enforcement investigative procedures. The Attorney General, in turn, instructed the Civil Rights Division to develop guidance for Federal officials to ensure an end to racial profiling in law enforcement.

"Racial profiling" at its core concerns the invidious use of race or ethnicity as a criterion in conducting stops, searches and other law enforcement investigative procedures. It is premised on the erroneous assumption that any particular individual of one race or ethnicity is more likely to engage in misconduct than any particular individual of another race or ethnicity.

Racial profiling in law enforcement is not merely wrong, but also ineffective. Race-based assumptions in law enforcement perpetuate negative racial stereotypes that are harmful to our rich and diverse democracy, and materially impair our efforts to maintain a fair and just society.[1]

The use of race as the basis for law enforcement decision-making clearly has a terrible cost, both to the individuals who suffer invidious discrimination and to the Nation, whose goal of "liberty and justice for all" recedes with every act of such discrimination. For this reason, this guidance in many cases imposes more restrictions on the consideration of race and ethnicity in Federal law enforcement than the Constitution requires.[2] This guidance prohibits racial profiling in law enforcement practices without hindering the important work of our Nation's public safety officials, particularly the intensified anti-terrorism efforts precipitated by the events of September 11, 2001.

---

[1] *See United States v. Montero-Camargo*, 208 F.3d 1122, 1135 (9th Cir. 2000) ("Stops based on race or ethnic appearance send the underlying message to all our citizens that those who are not white are judged by the color of their skin alone.").

[2] This guidance is intended only to improve the internal management of the executive branch. It is not intended to, and does not, create any right, benefit, trust, or responsibility, whether substantive or procedural, enforceable at law or equity by a party against the United States, its departments, agencies, instrumentalities, entities, officers, employees, or agents, or any person, nor does it create any right of review in an administrative, judicial or any other proceeding.

1

**I. Traditional Law Enforcement Activities.** Two standards in combination should guide use by Federal law enforcement authorities of race or ethnicity in law enforcement activities:

- In making routine or spontaneous law enforcement decisions, such as ordinary traffic stops, Federal law enforcement officers may not use race or ethnicity to any degree, except that officers may rely on race and ethnicity in a specific suspect description. This prohibition applies even where the use of race or ethnicity might otherwise be lawful.

- In conducting activities in connection with a specific investigation, Federal law enforcement officers may consider race and ethnicity only to the extent that there is trustworthy information, relevant to the locality or time frame, that links persons of a particular race or ethnicity to an identified criminal incident, scheme, or organization. This standard applies even where the use of race or ethnicity might otherwise be lawful.

**II. National Security and Border Integrity.** The above standards do not affect current Federal policy with respect to law enforcement activities and other efforts to defend and safeguard against threats to national security or the integrity of the Nation's borders,[3] to which the following applies:

- In investigating or preventing threats to national security or other catastrophic events (including the performance of duties related to air transportation security), or in enforcing laws protecting the integrity of the Nation's borders, Federal law enforcement officers may not consider race or ethnicity except to the extent permitted by the Constitution and laws of the United States.

Any questions arising under these standards should be directed to the Department of Justice.

---

[3] This guidance document does not apply to U.S. military, intelligence, protective or diplomatic activities conducted consistent with the Constitution and applicable Federal law.

2

## THE CONSTITUTIONAL FRAMEWORK

"[T]he Constitution prohibits selective enforcement of the law based on considerations such as race." *Whren v. United States*, 517 U.S. 806, 813 (1996). Thus, for example, the decision of federal prosecutors "whether to prosecute may not be based on 'an unjustifiable standard such as race, religion, or other arbitrary classification.'"[4] *United States v. Armstrong*, 517 U.S. 456, 464 (1996) (quoting *Oyler v. Boles*, 368 U.S. 448, 456 (1962)). The same is true of Federal law enforcement officers. Federal courts repeatedly have held that any general policy of "utiliz[ing] impermissible racial classifications in determining whom to stop, detain, and search" would violate the Equal Protection Clause. *Chavez v. Illinois State Police*, 251 F.3d 612, 635 (7th Cir. 2001). As the Sixth Circuit has explained, "[i]f law enforcement adopts a policy, employs a practice, or in a given situation takes steps to initiate an investigation of a citizen based solely upon that citizen's race, without more, then a violation of the Equal Protection Clause has occurred." *United States v. Avery*, 137 F.3d 343, 355 (6th Cir. 1997). "A person cannot become the target of a police investigation solely on the basis of skin color. Such selective law enforcement is forbidden." *Id.* at 354.

As the Supreme Court has held, this constitutional prohibition against selective enforcement of the law based on race "draw[s] on 'ordinary equal protection standards.'" *Armstrong*, 517 U.S. at 465 (quoting *Wayte v. United States*, 470 U.S. 598, 608 (1985)). Thus, impermissible selective enforcement based on race occurs when the challenged policy has "'a discriminatory effect and . . . was motivated by a discriminatory purpose.'" *Id.* (quoting *Wayte*, 470 U.S. at 608).[5] Put simply, "to the extent that race is used as a proxy for criminality, "a racial stereotype requiring strict scrutiny is in operation." *Cf. Bush v. Vera*, 517 U.S. at 968 (plurality).

## I.   GUIDANCE FOR FEDERAL OFFICIALS ENGAGED IN LAW ENFORCEMENT ACTIVITIES

### A.   Routine or Spontaneous Activities in Domestic Law Enforcement

**In making routine or spontaneous law enforcement decisions, such as ordinary traffic stops, Federal law enforcement officers may not use race or ethnicity to any degree, except that officers may rely on race and ethnicity in a specific suspect description. This prohibition**

---

[4] These same principles do not necessarily apply to classifications based on alienage. For example, Congress, in the exercise of its broad powers over immigration, has enacted a number of provisions that apply only to aliens, and enforcement of such provisions properly entails consideration of a person's alien status.

[5] Invidious discrimination is not necessarily present whenever there is a "disproportion" between the racial composition of the pool of persons prosecuted and the general public at large; rather, the focus must be the pool of "*similarly situated* individuals of a different race [who] were not prosecuted." *Armstrong*, 517 U.S. at 465 (emphasis added). "[R]acial disproportions in the level of prosecutions for a particular crime may be unobjectionable if they merely reflect racial disproportions in the commission of that crime." *Bush v. Vera*, 517 U.S. 952, 968 (1996) (plurality).

3

applies even where the use of race or ethnicity might otherwise be lawful.

Federal law enforcement agencies and officers sometimes engage in law enforcement activities, such as traffic and foot patrols, that generally do not involve either the ongoing investigation of specific criminal activities or the prevention of catastrophic events or harm to the national security. Rather, their activities are typified by spontaneous action in response to the activities of individuals whom they happen to encounter in the course of their patrols and about whom they have no information other than their observations. These general enforcement responsibilities should be carried out without *any* consideration of race or ethnicity.

- *Example*: While parked by the side of the George Washington Parkway, a Park Police Officer notices that nearly all vehicles on the road are exceeding the posted speed limit. Although each such vehicle is committing an infraction that would legally justify a stop, the officer may not use race or ethnicity as a factor in deciding which motorists to pull over. Likewise, the officer may not use race or ethnicity in deciding which detained motorists to ask to consent to a search of their vehicles.

Some have argued that overall discrepancies in certain crime rates among racial groups could justify using race as a factor in general traffic enforcement activities and would produce a greater number of arrests for non-traffic offenses (*e.g.*, narcotics trafficking). We emphatically reject this view. The President has made clear his concern that racial profiling is morally wrong and inconsistent with our core values and principles of fairness and justice. Even if there were overall statistical evidence of differential rates of commission of certain offenses among particular races, the affirmative use of such generalized notions by federal law enforcement officers in routine, spontaneous law enforcement activities is tantamount to stereotyping. It casts a pall of suspicion over every member of certain racial and ethnic groups without regard to the specific circumstances of a particular investigation or crime, and it offends the dignity of the individual improperly targeted. Whatever the motivation, it is patently unacceptable and thus prohibited under this guidance for Federal law enforcement officers to act on the belief that race or ethnicity signals a higher risk of criminality. This is the core of "racial profiling" and it must not occur.

The situation is different when an officer has specific information, based on trustworthy sources, to "be on the lookout" for specific individuals identified at least in part by race or ethnicity. In such circumstances, the officer is not acting based on a generalized assumption about persons of different races; rather, the officer is helping locate specific individuals previously identified as involved in crime.

- *Example*: While parked by the side of the George Washington Parkway, a Park Police Officer receives an "All Points Bulletin" to be on the look-out for a fleeing bank robbery suspect, a man of a particular race and particular hair color in his 30s driving a blue automobile. The Officer may use this description, including the race of the particular suspect, in deciding which speeding motorists to pull over.

4

B.   **Law Enforcement Activities Related to Specific Investigations**

**In conducting activities in connection with a specific investigation, Federal law enforcement officers may consider race and ethnicity only to the extent that there is trustworthy information, relevant to the locality or time frame, that links persons of a particular race or ethnicity to an identified criminal incident, scheme, or organization. This standard applies even where the use of race or ethnicity might otherwise be lawful.**

As noted above, there are circumstances in which law enforcement activities relating to particular identified criminal incidents, schemes or enterprises may involve consideration of personal identifying characteristics of potential suspects, including age, sex, ethnicity or race. Common sense dictates that when a victim describes the assailant as being of a particular race, authorities may properly limit their search for suspects to persons of that race. Similarly, in conducting an ongoing investigation into a specific criminal organization whose membership has been identified as being overwhelmingly of one ethnicity, law enforcement should not be expected to disregard such facts in pursuing investigative leads into the organization's activities.

Reliance upon generalized stereotypes is absolutely forbidden. Rather, use of race or ethnicity is permitted only when the officer is pursuing a specific lead concerning the identifying characteristics of persons involved in an *identified* criminal activity. The rationale underlying this concept carefully limits its reach. In order to qualify as a legitimate investigative lead, the following must be true:

- The information must be relevant to the locality or time frame of the criminal activity;
- The information must be trustworthy;
- The information concerning identifying characteristics must be tied to a particular criminal incident, a particular criminal scheme, or a particular criminal organization.

The following policy statements more fully explain these principles.

1.   *Authorities May Never Rely on Generalized Stereotypes, But May Rely Only on Specific Race- or Ethnicity-Based Information*

This standard categorically bars the use of generalized assumptions based on race.

- *Example*: In the course of investigating an auto theft in a federal park, law enforcement authorities could not properly choose to target individuals of a particular race as suspects, based on a generalized assumption that those individuals are more likely to commit crimes.

This bar extends to the use of race-neutral pretexts as an excuse to target minorities. Federal law enforcement may not use such pretexts. This prohibition extends to the use of other, facially race-

5

neutral factors as a proxy for overtly targeting persons of a certain race or ethnicity. This concern arises most frequently when aggressive law enforcement efforts are focused on "high crime areas." The issue is ultimately one of motivation and evidence; certain seemingly race-based efforts, if properly supported by reliable, empirical data, are in fact race-neutral.

- *Example*: In connection with a new initiative to increase drug arrests, local authorities begin aggressively enforcing speeding, traffic, and other public area laws in a neighborhood predominantly occupied by people of a single race. The choice of neighborhood was not based on the number of 911 calls, number of arrests, or other pertinent reporting data specific to that area, but only on the general assumption that more drug-related crime occurs in that neighborhood because of its racial composition. This effort would be improper because it is based on generalized stereotypes.

- *Example:* Authorities seeking to increase drug arrests use tracking software to plot out where, if anywhere, drug arrests are concentrated in a particular city, and discover that the clear majority of drug arrests occur in particular precincts that happen to be neighborhoods predominantly occupied by people of a single race. So long as they are not motivated by racial animus, authorities can properly decide to enforce all laws aggressively in that area, including less serious quality of life ordinances, as a means of increasing drug-related arrests. *See, e.g., United States v. Montero-Camargo*, 208 F.3d 1122, 1138 (9th Cir. 2000) ("We must be particularly careful to ensure that a 'high crime' area factor is not used with respect to entire neighborhoods or communities in which members of minority groups regularly go about their daily business, but is limited to specific, circumscribed locations where particular crimes occur with unusual regularity.").

By contrast, where authorities are investigating a crime and have received *specific information* that the suspect is of a certain race (*e.g.*, direct observations by the victim or other witnesses), authorities may reasonably use that information, even if it is the only descriptive information available. In such an instance, it is the victim or other witness making the racial classification, and federal authorities may use reliable incident-specific identifying information to apprehend criminal suspects. Agencies and departments, however, must use caution in the rare instance in which a suspect's race is the only available information. Although the use of that information may not be unconstitutional, broad targeting of discrete racial or ethnic groups always raises serious fairness concerns.

- *Example*: The victim of an assault at a local university describes her assailant as a young male of a particular race with a cut on his right hand. The investigation focuses on whether any students at the university fit the victim's description. Here investigators are properly relying on a description given by the victim, part of which included the assailant's race. Although the ensuing investigation affects students of a particular

6

race, that investigation is not undertaken with a discriminatory purpose. Thus use of race as a factor in the investigation, in this instance, is permissible.

### 2. *The Information Must be Relevant to the Locality or Time Frame*

Any information concerning the race of persons who may be involved in specific criminal activities must be locally or temporally relevant.

- *Example*: DEA issues an intelligence report that indicates that a drug ring whose members are known to be predominantly of a particular race or ethnicity is trafficking drugs in Charleston, SC. An agent operating in Los Angeles reads this intelligence report. In the absence of information establishing that this intelligence is also applicable in Southern California, the agent may not use ethnicity as a factor in making local law enforcement decisions about individuals who are of the particular race or ethnicity that is predominant in the Charleston drug ring.

### 3. *The Information Must be Trustworthy*

Where the information concerning potential criminal activity is unreliable or is too generalized and unspecific, use of racial descriptions is prohibited.

- *Example*: ATF special agents receive an uncorroborated anonymous tip that a male of a particular race will purchase an illegal firearm at a Greyhound bus terminal in a racially diverse North Philadelphia neighborhood. Although agents surveilling the location are free to monitor the movements of whomever they choose, the agents are prohibited from using the tip information, without more, to target any males of that race in the bus terminal. *Cf. Morgan v. Woessner*, 997 F.2d 1244, 1254 (9th Cir. 1993) (finding no reasonable basis for suspicion where tip "made all black men suspect"). The information is neither sufficiently reliable nor sufficiently specific.

### 4. *Race- or Ethnicity-Based Information Must Always be Specific to Particular Suspects or Incidents, or Ongoing Criminal Activities, Schemes, or Enterprises*

These standards contemplate the appropriate use of both "suspect-specific" and "incident-specific" information. As noted above, where a crime has occurred and authorities have eyewitness accounts including the race, ethnicity, or other distinguishing characteristics of the perpetrator, that information may be used. Federal authorities may also use reliable, locally relevant information linking persons of a certain race or ethnicity to a particular incident, unlawful scheme, or ongoing criminal enterprise – even absent a description of any particular individual suspect. In certain cases, the circumstances surrounding an incident or ongoing criminal activity will point strongly to a perpetrator of a certain race, even though authorities lack an eyewitness account

7

- ***Example***: The FBI is investigating the murder of a known gang member and has information that the shooter is a member of a rival gang. The FBI knows that the members of the rival gang are exclusively members of a certain ethnicity. This information, however, is not suspect-specific because there is no description of the particular assailant. But because authorities have reliable, locally relevant information linking a rival group with a distinctive ethnic character to the murder, Federal law enforcement officers could properly consider ethnicity in conjunction with other appropriate factors in the course of conducting their investigation. Agents could properly decide to focus on persons dressed in a manner consistent with gang activity, but ignore persons dressed in that manner who do not appear to be members of that particular ethnicity.

It is critical, however, that there be reliable information that ties persons of a particular description to a specific criminal incident, ongoing criminal activity, or particular criminal organization. Otherwise, any use of race runs the risk of descending into reliance upon prohibited generalized stereotypes.

- ***Example***: While investigating a car theft ring that dismantles cars and ships the parts for sale in other states, the FBI is informed by local authorities that it is common knowledge locally that most car thefts in that area are committed by individuals of a particular race. In this example, although the source (local police) is trustworthy, and the information potentially verifiable with reference to arrest statistics, there is no particular incident- or scheme- specific information linking individuals of that race to the particular interstate ring the FBI is investigating. Thus, without more, agents could not use ethnicity as a factor in making law enforcement decisions in this investigation.

Note that these standards allow the use of reliable identifying information about planned future crimes. Where federal authorities receive a credible tip from a reliable informant regarding a planned crime that has not yet occurred, authorities may use this information under the same restrictions applying to information obtained regarding a past incident. A prohibition on the use of reliable prospective information would severely hamper law enforcement efforts by essentially compelling authorities to wait for crimes to occur, instead of taking pro-active measures to prevent crimes from happening.

- ***Example***: While investigating a specific drug trafficking operation, DEA special agents learn that a particular methamphetamine distribution ring is manufacturing the drug in California, and plans to have couriers pick up shipments at the Sacramento, California airport and drive the drugs back to Oklahoma for distribution. The agents also receive trustworthy information that the distribution ring has specifically chosen to hire older couples of a particular race to act as the couriers. DEA agents may properly target older couples of that particular race driving vehicles with indicia such as Oklahoma plates near the Sacramento airport.

8

## II. GUIDANCE FOR FEDERAL OFFICIALS ENGAGED IN LAW ENFORCEMENT ACTIVITIES INVOLVING THREATS TO NATIONAL SECURITY OR THE INTEGRITY OF THE NATION'S BORDERS

> In investigating or preventing threats to national security or other catastrophic events (including the performance of duties related to air transportation security), or in enforcing laws protecting the integrity of the Nation's borders, Federal law enforcement officers may not consider race or ethnicity except to the extent permitted by the Constitution and laws of the United States.

Since the terrorist attacks on September 11, 2001, the President has emphasized that federal law enforcement personnel must use every legitimate tool to prevent future attacks, protect our Nation's borders, and deter those who would cause devastating harm to our Nation and its people through the use of biological or chemical weapons, other weapons of mass destruction, suicide hijackings, or any other means. "It is 'obvious and unarguable' that no governmental interest is more compelling than the security of the Nation." *Haig v. Agee*, 453 U.S. 280, 307 (1981) (quoting *Aptheker v. Secretary of State*, 378 U.S. 500, 509 (1964)).

The Constitution prohibits consideration of race or ethnicity in law enforcement decisions in all but the most exceptional instances. Given the incalculably high stakes involved in such investigations, however, Federal law enforcement officers who are protecting national security or preventing catastrophic events (as well as airport security screeners) may consider race, ethnicity, and other relevant factors to the extent permitted by our laws and the Constitution. Similarly, because enforcement of the laws protecting the Nation's borders may necessarily involve a consideration of a person's alienage in certain circumstances, the use of race or ethnicity in such circumstances is properly governed by existing statutory and constitutional standards. *See, e.g., United States v. Brignoni-Ponce*, 422 U.S. 873, 886-87 (1975).[6] This policy will honor the rule of law and promote vigorous protection of our national security.

As the Supreme Court has stated, all racial classifications by a governmental actor are subject to the "strictest judicial scrutiny." *Adarand Constructors, Inc. v. Peña*, 515 U.S. 200, 224-25 (1995). The application of strict scrutiny is of necessity a fact-intensive process. *Id.* at 236. Thus, the legality of particular, race-sensitive actions taken by Federal law enforcement officials in the context of national security and border integrity will depend to a large extent on the circumstances at hand. In absolutely no event, however, may Federal officials assert a national security or border integrity rationale as a mere pretext for invidious discrimination. Indeed, the very purpose of the strict scrutiny test is to "smoke out" illegitimate use of race, *Adarand*, 515 U.S. at 226 (quoting *Richmond v. J.A.*

---

[6] Moreover, as in the traditional law enforcement context described in the second standard, *supra*, officials involved in homeland security may take into account specific, credible information about the descriptive characteristics of persons who are affiliated with identified organizations that are actively engaged in threatening the national security.

*Croson Co.*, 488 U.S. 469, 493 (1989)), and law enforcement strategies not actually premised on *bona fide* national security or border integrity interests therefore will not stand.

In sum, constitutional provisions limiting government action on the basis of race are wide-ranging and provide substantial protections at every step of the investigative and judicial process. Accordingly, and as illustrated below, when addressing matters of national security, border integrity, or the possible catastrophic loss of life, existing legal and constitutional standards are an appropriate guide for Federal law enforcement officers.

- *Example*: The FBI receives reliable information that persons affiliated with a foreign ethnic insurgent group intend to use suicide bombers to assassinate that country's president and his entire entourage during an official visit to the United States. Federal law enforcement may appropriately focus investigative attention on identifying members of that ethnic insurgent group who may be present and active in the United States and who, based on other available information, might conceivably be involved in planning some such attack during the state visit.

- *Example*: U.S. intelligence sources report that terrorists from a particular ethnic group are planning to use commercial jetliners as weapons by hijacking them at an airport in California during the next week. Before allowing men of that ethnic group to board commercial airplanes in California airports during the next week, Transportation Security Administration personnel, and other federal and state authorities, may subject them to heightened scrutiny.

Because terrorist organizations might aim to engage in unexpected acts of catastrophic violence in any available part of the country (indeed, in multiple places simultaneously, if possible), there can be no expectation that the information must be specific to a particular locale or even to a particular identified scheme.

Of course, as in the example below, reliance solely upon generalized stereotypes is forbidden.

- *Example*: At the security entrance to a Federal courthouse, a man who appears to be of a particular ethnicity properly submits his briefcase for x-ray screening and passes through the metal detector. The inspection of the briefcase reveals nothing amiss, the man does not activate the metal detector, and there is nothing suspicious about his activities or appearance. In the absence of any threat warning, the federal security screener may not order the man to undergo a further inspection solely because he appears to be of a particular ethnicity.

10

**FOR PUBLICATION**

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

| | |
|---|---|
| UNITED STATES OF AMERICA,<br>*Plaintiff-Appellee,*<br><br>v.<br><br>JORGE CORTES,<br>*Defendant-Appellant.* | No. 12-50137<br><br>D.C. No.<br>3:10-cr-03617-BEN-1<br><br>OPINION |

Appeal from the United States District Court
for the Southern District of California
Roger T. Benitez, District Judge, Presiding

Argued and Submitted
June 5, 2013—Pasadena, California

Filed October 9, 2013

Before: Sidney R. Thomas, Barry G. Silverman,
and Raymond C. Fisher, Circuit Judges.

Opinion by Judge Silverman

The panel rejected the defendant's argument that Hobbs Act robbery or extortion is limited to the stealing of lawful property and excludes contraband such as illegal drugs.

---

## COUNSEL

Gary P. Burcham (argued), Burcham & Zugman, San Diego, California, for Defendant-Appellant.

Laura E. Duffy, United States Attorney for the Southern District of California, Bruce R. Castetter, Assistant United States Attorney, Chief, Appellate Section, Criminal Division, and Timothy D. Coughlin (argued), Assistant United States Attorney, San Diego, California, for Plaintiff-Appellee.

---

## OPINION

SILVERMAN, Circuit Judge:

Defendant-Appellant Jorge Cortes was arrested in an undercover reverse sting operation executed by the Bureau of Alcohol, Tobacco, Firearms and Explosives. ATF agents fabricated a scheme to steal 100 kilograms of cocaine from a stash house and arrested the conspirators before the home invasion occurred. Cortes was ultimately convicted of conspiracy to possess with intent to distribute 5 kilograms or more of cocaine in violation of 21 U.S.C. §§ 841(a)(1) and 846 (Count 1), conspiracy to affect commerce by robbery and extortion, in violation of the Hobbs Act, 18 U.S.C. § 1951(a) (Count 2), and possession of a firearm in furtherance of a crime of violence and aiding and abetting, in violation of 18 U.S.C. § 924(c)(1)(A)(i) and 18 U.S.C. § 2 (Count 3).

plausibility of the scheme: "It's more likely a hundred kilograms of cocaine wouldn't be in a stash house in a small town in Iowa as opposed to San Diego." According to Zayas, ATF targeted the juvenile because the confidential informant led them to believe that the juvenile "was involved with individuals involved in this type of crime." The juvenile informed Zayas that he had an associate with a crew who could pull off the robbery and had done jobs like this before.

Zayas met that associate, Cortes, the following day, August 24, 2010. He reiterated the details of the stash house, including the quantity of drugs inside, underscoring that the house would only contain drugs, not money. Cortes announced that the drugs would be split half and half between Zayas and his group. Zayas told Cortes that he was motivated to steal the cocaine, because he believed his boss was not paying him enough and had been sleeping with his wife.

The next day, Zayas met up with Cortes and other individuals who had been assembled for the job. There were ten people present, plus the confidential informant. Cortes described the plan and introduced Zayas to the other individuals, so they would know not to hurt him during the robbery. Cortes instructed Zayas not to speak to the crew members. Zayas nevertheless informed them that the house contained 100 kilograms of cocaine, and Cortes scolded him for speaking to the rest of the crew against his wishes. They drove to and assembled in a garage, the staging area for the robbery. Zayas pretended to receive a call from the stash house, at which point a tactical team created a distraction using flash-bangs and arrested the entire crew, including Cortes.

government has the burden of proving beyond a reasonable doubt that the Defendant Jorge Cortes was not entrapped. The government must prove either, one, that the Defendant Jorge Cortes was predisposed to commit the crime before being contacted by a government agency; or two, that Defendant Jorge Cortes was not induced by the government agents to commit the crime.

When a person independent of and before government contact is predisposed to commit the crime, it is not entrapment, even if government agents merely provide an opportunity to commit the crime.

In determining whether the defendant was predisposed to commit the crime before being approached by government agents, you may consider the following: one, whether the defendant demonstrated reluctance to commit the offense; two, the defendant's character and reputation; three, whether the government agents initially suggested the criminal activity; four, whether the defendant engaged in the criminal activity for profit; and five, the nature of the government's inducement or persuasion. *However, the amount of drugs or the profit that would be derived from their sale does not constitute an inducement supporting entrapment.*

In determining whether Defendant Jorge Cortes was induced by government agents to

in the evidence'" and the instruction is "supported by law." *United States v. Doe*, 705 F.3d 1134, 1144 (9th Cir. 2013) (quoting *United States v. Burt*, 410 F.3d 1100, 1103 (9th Cir. 2005)). "When there is a 'question whether the district court's instructions adequately presented the defendant's theory of the case,' the 'district court's denial of a proposed jury instruction' is reviewed de novo." *United States v. Mincoff*, 574 F.3d 1186, 1192 (9th Cir. 2009) (citation omitted); *see also United States v. Chao Fan Xu*, 706 F.3d 965, 988 (9th Cir. 2013) ("Whether the instructions, taken as a whole, adequately cover the defense theory is a question of law reviewed *de novo*."); *United States v. Castagana*, 604 F.3d 1160, 1163 n.2 (9th Cir. 2010) ("We review de novo the denial of a jury instruction based on a question of law."). "The denial of a defendant's jury instruction due to an inadequate factual basis is reviewed for an abuse of discretion." *Chao Fan Xu*, 703 F.3d at 988.

"An error in criminal jury instructions requires reversal unless there is no reasonable possibility that the error materially affected the verdict or, in other words, that the error was harmless beyond a reasonable doubt." *United States v. Pierre*, 254 F.3d 872, 877 (9th Cir. 2001) (citation, quotation marks, and alteration omitted). Where the error is the wholesale failure to give an instruction, we must reverse if the evidence supports giving the instruction: "[a] criminal defendant is entitled to jury instructions related to a defense theory so long as there is 'any foundation in the evidence.'" *Doe*, 705 F.3d at 1144 (quoting *Burt*, 410 F.3d at 1103); *see also United States v. Washington*, 819 F.2d 221, 225 (9th Cir. 1987) ("[A] defendant is entitled to an instruction concerning his theory of the case if the theory is legally sound and evidence in the case makes it applicable, even if the evidence

*plus* something else—typically, excessive pressure by the government upon the defendant or the government's taking advantage of an alternative, non-criminal type of motive." *United States v. Poehlman*, 217 F.3d 692, 701 (9th Cir. 2000) (citation and quotation marks omitted).

As to the second requirement, the defense of entrapment fails "[i]f the defendant is predisposed to commit the crime." *United States v. Smith*, 802 F.2d 1119, 1124 (9th Cir. 1986). We have identified five factors to determine whether a defendant was predisposed:

> [T]he character or reputation of the defendant, including any prior criminal record; whether the suggestion of the criminal activity was initially made by the Government; whether the defendant was engaged in the criminal activity for profit; whether the defendant evidenced reluctance to commit the offense, overcome only by repeated Government inducement or persuasion; and the nature of the inducement or persuasion supplied by the Government.

*United States v. Busby*, 780 F.2d 804, 807 (9th Cir. 1986) (citation omitted). "Although none of these factors is controlling, the defendant's reluctance to engage in criminal activity is the most important." *Id.*

Here, the court granted Cortes's request to instruct the jury on the entrapment defense. However, the court modified the model Ninth Circuit instruction to eliminate the drugs or any profit from the sale of those drugs as a potential basis for the inducement. In 2011, we said in *Spentz* that defendants

JC

entrapment instruction be given, the defendant, a prospective cocaine buyer, offered to negotiate the sale of heroin to undercover DEA informants. *Id.* at 177–78. He arranged the delivery of heroin to undercover DEA agents and was arrested and convicted for distribution. *Id.* At trial, the defendant argued the DEA's undercover informant, Correa, entrapped him, and he was induced to commit the crime in an attempt to recoup money he had previously loaned Correa. *Id.* at 178. According to Sotelo, Correa had strung him along, promising him that he was working a variety of jobs in order to pay him back. *Id.* The government's informant engaged in repeated entreaties, *id.* at 180–81, and, according to the defendant, finally overcame his resistance:

> Sotelo also contends that Correa later approached him with the story that he had some friends who were big Colombian sellers. Correa allegedly asked Sotelo to pose as a purchaser of drugs. Sotelo testified that he initially refused, but ultimately relented when informed that it was the only way to get his money back.

*Id.* at 178. Sotelo claimed that Correa wanted to stage a fake drug transaction so he could pocket a $25,000 advance commission and use that to repay him. *Id.* at 180. Granted, the alleged motivation was to profit from the drug transaction, but other factors distinguish this from *Spentz*, including: (1) repeated pressure by a government agent or informant that overcame alleged resistance; (2) a series of proposals made by the informant; and (3) a non-criminal motivation of reimbursement, such that the typical criminal motivation (obtaining the drugs) was not the sole basis for the claimed impermissible inducement. We concluded that the

It is not entrapment if a person is tempted into committing a crime *solely* on the hope of obtaining ill-gotten gain; that is often the motive to commit a crime. However, in deciding whether a law enforcement officer *induced* the defendant to commit the crime, the jury may consider all of the factors that shed light on how the officers supposedly persuaded or pressured the defendant to commit the crime.[1]

Accordingly, we **REVERSE and REMAND** for a retrial on Count 1.

## 2. Sentencing Entrapment

Cortes next argues that the district court erred in refusing to instruct the jury on sentencing entrapment, which is a separate affirmative defense to the quantity element of the drug charge under 21 U.S.C. § 841. "Sentencing entrapment occurs where 'a defendant, although predisposed to commit a minor or lesser offense, is entrapped in committing a greater offense subject to greater punishment.'" *United States v.*

---

[1] As this suggested instruction makes clear, we do not believe that *Spentz* excludes from consideration the proceeds of a crime. Cortes, however, appears to argue that the district court's *Spentz*-modified entrapment instruction violated the Due Process Clause. We review this vague contention for plain error because it was raised for the first time on appeal. *United States v. Davenport*, 519 F.3d 940, 943 (9th Cir. 2008). We will affirm unless "(1) there has been an error in the proceedings below; (2) that error was plain; (3) it affected substantial rights; and (4) it seriously affected the fairness, integrity, or public reputation of judicial proceedings." *Id.* There was no plain due process error. *United States v. Olano*, 507 U.S. 725, 734 (1993).

"[s]entencing entrapment or 'sentence factor manipulation' occurs when 'a defendant, although predisposed to commit a minor or lesser offense, is entrapped in committing a greater offense subject to greater punishment.'" 38 F.3d at 1106 (quoting *United States v. Stuart*, 923 F.2d 607, 614 (8th Cir. 1991)).    Following *Apprendi*, however, "sentencing entrapment" is a bit of a misnomer, since the drug quantity is an element of the offense, not a sentencing enhancement or factor. A jury must decide whether the defendant would have sold, bought, or robbed that quantity but for the government manipulation or pressure.[2]

The Sentencing Guidelines contain guidance for the judge on "sentencing entrapment" but these instructions come into play only insofar as the Guidelines calculations are concerned, not as to substantive statutory elements that must be tried to a jury or in a bench trial.  In drug offense cases under 21 U.S.C. § 841, the drug quantity is an element of the offense that must be tried to the jury, but if the jury rejects the sentencing entrapment defense, the now-advisory Guidelines will nevertheless allow the court in its discretion to factor in governmental manipulation in its calculation of the applicable sentencing range.  Application Note 12 to United States Sentencing Guidelines Manual (2011) § 2D1.1 addresses governmental manipulation of the *quantity* of drugs involved in a reverse sting operation in which the defendant is either the seller or buyer:

---

[2] The government argues that *United States v. Carranza*, 289 F.3d 634 (9th Cir. 2002), stands for the proposition that sentencing entrapment is not an affirmative defense that must be submitted to the jury, but that case is wholly inapposite. *Carranza* merely held that the prosecution does not have to prove that the defendant *knew* of the type and quantity of the controlled substance and noted that *Apprendi* did not change that longstanding rule. *Id.* at 643–44.

JC

In this case, Cortes proposed the following sentencing entrapment instructions that tracked Application Notes 12 and 14:

> If the government fails to prove beyond a reasonable doubt that Mr. Cortes was reasonably capable of purchasing 5 or more kilograms of cocaine, then you cannot return a finding that the applicable quantity of cocaine . . . was 5 or more kilograms.

> If you find that the government agents set a price for the controlled substance that was substantially below the market value of the controlled substance, thereby leading to Mr. Cortes' agreement to acquire 5 or more kilograms of cocaine when his available resources would not have allowed him to purchase 5 or more kilograms of cocaine except for the artificially low price set by the government agents, then you cannot return a finding that the applicable quantity of cocaine . . . was 5 or more kilograms.

However, these proposed instructions were clearly inapposite: Cortes was not accused of purchasing drugs but of conspiring to *steal* drugs.

The court denied Cortes's request for a sentencing entrapment instruction. Confronted with the novel application of this defense in the context of a fictitious drug stash house reverse sting, the court did not yet have the benefit of *United States v. Yuman-Hernandez*, 712 F.3d 471 (9th Cir. 2013), which was decided over a year after Cortes's

> fictitious stash house robberies, the defendant
> need only show a lack of intent *or* lack of
> capability to deal in the quantity of drugs
> charged.

*Id.* at 474–75 (footnote omitted). Not only does sentencing entrapment provide a defendant with a partial defense when the complete defense of entrapment fails, but the test is satisfied in the fictitious stash house context with either a lack of capability *or* a lack of intent. In the wake of *Yuman-Hernandez*, we now know that when sentencing entrapment is raised in this context, a proper instruction will ask the jury to decide whether the defendant had the capability *and* the intent to deal in that fabricated quantity of drugs.[3]

A criminal defendant is entitled to present his sentencing entrapment defense to the jury if the success of that defense would result in a lower statutory sentencing range. That is, if there is some foundation in the evidence that he would be subject to a lesser statutory minimum or maximum sentence if his sentencing entrapment defense were to succeed, then he is entitled to a jury instruction on that defense. The statutory range for the charged offense in this case, conspiracy to possess with intent to distribute 5 kilograms or more of cocaine, is 10 years to life imprisonment.   21 U.S.C. § 841(b)(1)(A). The middle quantity range, from 500 grams to just shy of 5 kilograms of cocaine, exposes a defendant to a mandatory minimum of 5 years and a statutory maximum

---

[3] We note that a market-value sentencing entrapment instruction based on Application Note 14 above likely would not make much sense here since this was not a drug transaction but a conspiracy to take the drugs by force. There is no evidence that Zayas or anyone else informed Cortes of the price or value of the cocaine.

JC

> dissenting). Facts that increase the mandatory
> minimum sentence are therefore elements and
> must be submitted to the jury and found
> beyond a reasonable doubt.

*Alleyne*, 133 S. Ct. at 2158. Accordingly, we hold that sentencing entrapment must be tried to a jury where the defendant's argument and the evidence raise the possibility of changing the applicable statutory maximum or minimum sentences.

The record demonstrates that Cortes introduced evidence supporting a sentencing entrapment *defense* under the standard for reverse stings involving a drug stash house robbery scheme. Under *Yuman-Hernandez*, he need only establish either "a lack of intent *or* lack of capability to deal in the quantity of drugs charged." 712 F.3d at 475. Additionally, under *Briggs*, the sentencing entrapment defense can also succeed if he shows the government "inflate[d] the amount of drugs supposedly in the house" in order to "obtain a greater sentence for the defendant." 623 F.3d at 729. At trial, Agent Zayas testified that the 100 kilogram amount was selected to make the set-up believable for the geographic area in which the reverse sting was to occur, not to ratchet up the defendants' sentencing exposure. The factfinder could discredit that testimony and conclude that the drug quantity was set at an "arbitrarily high level" in order to maximize punishment.

However, the sentencing entrapment defense needs to be presented to the *jury* only if that reduction would affect Cortes's mandatory minimum or statutory maximum sentence. *See Alleyne*, 133 S. Ct. at 2155; *Apprendi*, 530 U.S. at 489. Therefore, there must be evidence from which the jury

Jc

the *charged* quantity of the controlled substance, which is at least 5 kilograms. You must also decide whether the government inflated the quantity of drugs to make Cortes's punishment more severe. Finally, if you find that Defendant Cortes was specifically entrapped as to the quantity of drugs involved, you must decide what quantity was *not* a result of that entrapment.

You will be asked to answer the following questions:

(1) Did Defendant Cortes lack the intent to steal that *quantity* of the controlled substance? If yes, what *quantity* did he have the intent to steal?

(2) Did Defendant Cortes lack the capability to steal that *quantity* of the controlled substance? If yes, what *quantity* did he have the capability to steal?

(3) Did the government's agents inflate the quantity of drugs in the scheme to make Defendant Cortes's punishment more severe? If yes, what *quantity* was not inflated?

If the jury answers any of those three questions in the affirmative, the district court shall sentence the defendant under the appropriate statutory provision for the quantity the jury found did not stem from sentencing entrapment.

**3. Hobbs Act**

detective was convicted of obtaining money under false pretenses after falsely telling a man that he had a warrant for his arrest, which prompted the man to give him a gold watch and diamond ring. *Id.* at 471. The court reversed the conviction, reasoning that the law was not meant "to protect those who, for unworthy or illegal purposes, part with their goods." *Id.* at 472–73 (citation omitted).

But this rule applied only to larceny by false pretenses, not to robbery. New York's highest court later recognized that "the rule as to larceny by false pretense and by trick or device" announced in *McCord* differed from "the common-law rule that stealing property from a thief is the same as stealing from the true owner." *People v. Tompkins*, 79 N.E. 326, 327 (N.Y. 1906) (citation omitted). Indeed, in defining "personal property" under the larceny statutes, the Field Code cited to, *inter alia*, *Commonwealth v. Rourke*, 64 Mass. 397 (1852), which held that money acquired by the illegal sale of liquor may be the subject of larceny. 4 Commissioners of the Code, Proposed Penal Code of the State of New York § 584 (1865) (reprint 1998).

Other state laws were in accord. Though the California Supreme Court once held that the robbery of liquor during Prohibition was not punishable, *People v. Spencer*, 201 P. 130, 131 (Cal. 1921), that decision was overruled less than nine years later, *People v. Odenwald*, 285 P. 406, 407 (Cal. Ct. App.), *cert. denied*, 286 P. 161 (Cal. 1930), and well before the Hobbs Act was enacted in 1946. The California Supreme Court recognized that California had been "the only jurisdiction" to adhere to the rule that robbery of contraband was not subject to penal sanction, and since *Spencer*'s overruling, "the rule is universal that by prohibiting possession of an item, the government does not license

JC

1, which earned Cortes a 180-month term (his longest, consecutive term), his total sentence may well change after any retrial and resentencing. Therefore, Cortes's appeal of his 20-year sentence is moot at this juncture.

## IV. Conclusion

We **REVERSE and REMAND** for a new trial on Count 1. The balance of the judgment is **AFFIRMED**.

# Judge: ATF stings may be targeting minorities

**Brad Heath, USA TODAY**   *6:23 p.m. EDT August 1, 2013*

*The chief federal judge in Chicago says controversial ATF stings that lure suspects with the promise of a huge payday from a fake drug robbery may be unfairly targeting minorities.*



*(Photo: Scott Eisen, AP)*

**SHARE**   377   CONNECT   (https://twitter.com/intent/tweet?url=http://usat.ly/1edXp9P&text=Judge:%20ATF%20stin   **48 TWEET**

Controversial federal sting operations that lure in suspects with the promise of a huge payoff for robbing a fake drug stash house may be unfairly targeting racial minorities, the chief federal judge in Chicago said this week.

U.S. District Court Judge Ruben Castillo said in an order filed late Wednesday (http://www.documentcloud.org/documents/745790-discovery-order.html) that there is "a strong showing of potential bias" in the robbery stings, which are run by the U.S. Bureau of Alcohol, Tobacco, Firearms and Explosives. He noted that, since 2011, federal agents have used such stings to lock up at least 26 people in the Chicago area and that all of them were either black or Hispanic.

The order comes a month after a USA TODAY investigation (http://www.usatoday.com/story/news/nation/2013/06/27/atf-stash-houses-sting-usa-today-investigation/2457109/) found that the ATF has quietly made fictional stash-house robberies a central feature of its effort to target violent crime, more than quadrupling the number of stings it conducted over the past decade. Although the stings are meant to target some of the nation's most dangerous criminals, they have routinely ensnared small-time crooks who jumped at the chance to score hundreds of thousands of dollars worth of drugs.

**INVESTIGATION: ATF uses fake drugs, big bucks to snare suspects (http://www.usatoday.com/story/news/nation/2013/06/27/atf-stash-houses-sting-usa-today-investigation/2457109/)**

Nationwide, the ATF has locked up more than 1,000 people in stash-house operations over the past decade. Still, the tactic has been widely criticized by federal judges and remains so controversial that some federal prosecutors refuse to allow it.

Castillo's two-page order instructed the government to turn over a list of all the people it had charged in stash-house cases in northern Illinois, as well as confidential ATF documents that outline how agents are supposed to conduct the operations, including any guidelines for selecting appropriate targets.

Castillo's order came in a case in which five men are charged with plotting to rob a non-existent drug stash house. As in most of the ATF's other operations, an informant introduced the men to an undercover agent posing as a disgruntled courier who would help them steal 15 to 20 kilograms of cocaine. Agents arrested them in August 2012 when they showed up allegedly to commit the robbery.

Depending on what the records reveal, Castillo's decision could arm defense lawyers to argue that he should throw out the case altogether on the grounds that the government selectively prosecuted racial minorities. They could raise more questions about a brand of undercover operation that has already drawn widespread criticism from federal courts for tactics that skirt the boundaries of entrapment.



Case 2:13-cr-00171-JHS   Document 121   Filed 03/14/14   Page 119 of 129

Spokesmen for the U.S. Attorney's office in Chicago and the ATF declined to comment on the order or the allegation that officials had profiled racial minorities. Prosecutors have said in court papers that there has been no evidence of "discriminatory effect or discriminatory intent" behind the stash-house operations.

Defense lawyers urged Castillo to scrutinize the ATF operations because, unlike cases in which police investigate crimes that have happened, the stings give law enforcement wide latitude to select their targets. "These are unique cases in that they exist only when the government creates the fiction that becomes the crime," public defenders Candace Jackson and Denise Hesler wrote in a July 22 court filing (http://www.documentcloud.org/documents/745987-reply.html).

Castillo, the first Hispanic to serve as chief judge in Chicago, said in the order that "history has shown a continuing difficult intersection between the issue of race and the enforcement of our nation's criminal laws."

Follow reporter @bradheath (http://twitter.com/bradheath) on Twitter

**SHARE**

377
**CONNECT**

48
**TWEET**
(https://twitter.com/intent/tweet?url=http://usat.ly/1edXp9P&text=Judge:%20ATF%20stings%20may%20be%20targeting%



**USA NOW**



Best Opening Ceremonies moments ever
| USA NOW

Log In    Hot Topics       [SEARCH]                          Like {39k}    Follow



# newser
### READ LESS KNOW MORE

Get covered.
**Click here to enroll.**
HealthCare go

2014 OLYMPICS | VIDEO | POLITICS | MONEY | HEALTH | TECH | US | WORLD | GREAT FINDS | OPINION | SCIENCE | CELEBRITY | SUPERLATIVES | MORE

**MORE CRIME & COURTS STORIES»**



Woman Arrested After
Racking Up $980 Cab Bill



**Cops: Aunt Stole Baby
After Faking Pregnancy**



**Pet Shop Owner Jailed in
Arson Case; 27 Pups Saved**

**Man Arrested Climbing
White House Fence**



This Old Quilt Could Be
Key to 25-Year-Old
Cold Case Murder

## ATF's Favorite New Tool: Iffy Drug Stings

'USA TODAY' FINDS THAT QUESTIONABLE STRATEGY HAS LOCKED UP MORE THAN 1K IN DECADE

By John Johnson, Newser Staff
Posted Jun 28, 2013 8:03 AM CDT

Go to
Grid

**STORY**    COMMENTS (43)

Embed this Story



File photo of an ATF agent.  (AP Photo/Kevin P. Casey)

(NEWSER) – The good news from a crime-fighting perspective is that the ATF has locked up more than 1,000 criminals—often with sentences spanning more than a decade—who were caught trying to rob drug houses over the past decade. The questionable news? Those drug houses didn't actually exist. All the arrests came in sting operations, and *USA Today* weighs in with an investigative piece questioning whether the increasingly popular tactic is worth it. Judges and even some prosecutors have begun raising objections that the stings go too far into the gray zone of entrapment. Undercover agents approach potential sting targets with the idea, and critics say the lure of a big payday tilts desperate, low-level criminals into a high-stakes crime they otherwise wouldn't commit.

While the sting strategy is widely known when it comes to terror suspects, the scope of its use by the Justice Department in going after would-be drug-house robbers has gone largely under the radar. Two quotes help tell story:

13    1    1    0

Share

**MY TAKE ON THIS STORY**   CLICK BELOW TO VOTE

| 3% | 7% | **50%** |
|---|---|---|
| ☐ HILARIOUS | ☐ DEPRESSING | ☐ SCARY |
| 12% | 4% | 25% |
| ☐ INTRIGUING | ☐ BRILLIANT | ☐ RIDICULOUS |

To report an error on this story, notify our editors.

- **Judge:** It's a "disreputable tactic" that creates "an increased risk of entrapment because of the potential for the extensive use of inducements and unrealistic temptations to encourage the suspects' criminal conduct," wrote a judge on the Seventh Circuit Court of Appeals in Chicago.

- **ATF official:** "Are we supposed to wait for him to commit a [obscenity] murder before we start to target him as a bad guy?" asks an ATF supervisor defending the idea of going after so-far nonviolent criminals. "Are we going to sit back and say, well, this guy doesn't have a bad record? OK, so you know, throw him back out there, let him kill somebody, then when he gets a bad record, then we're going to put him in jail?"

Click for the full story, which points out that use of the stings has more than quadrupled since 2003.



**Probiotics - Warning
Shocking! Here's What
Happened When We Tested
The Top Probiotics...**
Keybiotics.com



**Shocking Video Went VIRAL
in Days...
Middle Class to be Crushed by
Obamacare Taxes...**
MoneyMapPress.com



**Public Trenton Arrest
Records**
Access Trenton arrest
records! Step 1) Enter a...
Instant Checkmate

USA Today (Source Grid »)

Crime & Courts · US

crime · ATF · drug dealing · sting operations

## MOST POPULAR STORIES

[ **By Views** ]   By Comments



1.    **Cops: Aunt Stole Baby After
Faking Pregnancy**



2.    **Pilot Tricked Ukraine Hijacker**



3.    **Mystery Disease Strikes Just
One Family on the Planet**



4.    **Historic Find in Europe:
Human Footprints 800K Years
Old**



5.    **5 Big Lakes That Are
Disappearing**



6.    **Target Hack Began With ...
Refrigeration Contractor?**



7.    **Baby Who Vanished From
Home Found Alive**



8.    **Woody Allen: 'Of Course, I
Did Not Molest Dylan'**

# ATF uses fake drugs, big bucks to snare suspects

## TARGETING TRIGGER PULLERS

The U.S. Bureau of Alcohol, Tobacco, Firearms and Explosives has locked up more than 1,000 people using controversial sting operations that entice suspects to rob nonexistent drug stash houses. See how the stings work and who they target.

Brad Heath, John Hillkirk, Shannon Green, Keith Carter, Ben Dorger, Emaun Kashfipour, Cara Richardson, Tory Hargro, and Jerry Mosemak, USA TODAY

Brad Heath, USA TODAY    *11:26 a.m. EDT June 28, 2013*

*ATF stings that promise loads of easy money snared 1,000 would-be criminals, a USA TODAY investigation finds. These fake drug stashes have led to hard time, begging the question: Is this 'good law enforcement' or has the government gone too far?*



**SHARE**
2923
CONNECT

(Photo: USA TODAY)

**272**
TWEET
(https://twitter.com/intent/tweet?url=http://usat.ly/16CBs28&text=ATF%20uses%20fake%

ROMEOVILLE, Ill. — The three men in the back seat were supposed to be ready for battle.

They were waiting for a phone call that would launch a daring and dangerous crime, sending them charging through the front door of a Mexican drug ring's stash house to steal 50 pounds or more of cocaine from three armed guards. Their plan was to disguise themselves as police officers, tie up the guards, and slip away with a half-million dollars worth of drugs. If tying them up didn't work, they'd kill them all.

Only the small army of federal agents watching them knew that it was all a lie.

There was no house. No drugs.

And the only things waiting for them when the call came were a team of camouflaged federal agents with rifles and stun grenades, and the promise of a long prison sentence for a plot to steal and re-sell non-existent cocaine.



William Alexander, center, and two other suspects go over the details of a planned stash house robbery. Alexander doesn't know that the stash house doesn't exist and that he and his accomplices will soon be arrested as part of an ATF sting.(Photo: ATF)

The U.S. Bureau of Alcohol, Tobacco, Firearms and Explosives, the agency in charge of enforcing the nation's gun laws, has locked up more than 1,000 people by enticing them to rob drug stash houses that did not exist. The ploy has quietly become a key part of the ATF's crime-fighting arsenal, but also a controversial one: The stings are so aggressive and costly that some prosecutors have refused to allow them. They skirt the boundaries of entrapment, and in the past decade they have left at least seven suspects dead.

The ATF has more than quadrupled its use of such drug house operations since 2003, and officials say it intends to conduct even more as it seeks to lock up the "trigger pullers" who menace some of the most dangerous parts of inner-city America. Yet the vast scale of that effort has so far remained unknown outside the U.S. Justice Department.

To gauge its extent, USA TODAY reviewed thousands of pages of court records and agency files, plus hours of undercover recordings. Those records — many of which had never been made public — tell the story of how an ATF strategy meant to target armed and violent criminals has regularly used risky and expensive undercover stings to ensnare low-level crooks who jump at the bait of a criminal windfall.

In many cases, the records show the ATF accomplished precisely what it set out to do, arresting men outfitted with heavy weapons and body armor (http://www.documentcloud.org/documents/689815-chapa-luis-1-complaint.html#document/p4/a107033), and linked to repeated, and sometimes bloody (http://www.documentcloud.org/documents/675544-kemey-us-sentencing-memo.html#document/p4/a107034), crimes. In the process, however, the agency also scooped up small-time drug dealers and even people with no criminal records at all, including Army Rangers (http://www.documentcloud.org/documents/675509-lopez-carlos-complaint.html#document/p3/a107035). It has offered would-be robbers the chance to score millions of dollars of cocaine for a few hours of work. In at least one case, the ATF had to supply its supposed armed robbers with a gun.

The stings are the latest and perhaps clearest reflection of a broad shift by federal law enforcement away from solving crimes in favor of investigating people the government thinks are criminals. Such tactics are common in law enforcement's efforts to prevent terrorist attacks, but they are also becoming a staple of its fight against everyday street crime.

Critics, among them federal judges, say the ATF's operations are flawed. In an opinion last year (http://www.ib7.uscourts.gov/documents/10-3725op.pdf), Judge Richard Posner of the Seventh Circuit Court of Appeals in Chicago dismissed the drug-house stings as a "disreputable tactic" that creates "an increased risk of entrapment because of the potential for the extensive use of inducements and unrealistic temptations to encourage the suspects' criminal conduct."

The stings work like this: When agents identify someone they suspect is ripping off drug dealers, they send in an undercover operative posing as a disgruntled courier or security guard to pitch the idea of stealing a shipment from his bosses. The potential score is almost always more than 5 kilograms of cocaine — enough drugs to fetch hundreds of thousands of dollars on the street, or to trigger sentences of 10 years or more in prison.

When the target shows up ready to commit the robbery, he and anyone else he brings with him are arrested and charged with a raft of federal crimes, the most serious of which is conspiring to sell the non-existent cocaine.

The arrests don't come cheap. A single case can go on for months and require dozens of federal agents and local police officers.

Former ATF supervisor David Chipman, who left the agency last year, said the public deserves to know more about how the ATF is using its resources. "There are huge benefits, and there are huge downsides," he said. "Do you want police to solve crimes, or do you want them to go out and prevent crimes that haven't occurred yet? What are the things you're willing to do so that your kid doesn't get shot?"

## A CRACK DEALER AND A BIG SCORE

William Alexander boasted that he was exactly the type of armed and dangerous criminal the ATF is after. He was an experienced drug robber, he told an undercover agent, and a chief of Chicago's notorious Four Corner Hustlers, who commanded 17 blocks on the city's west side and had men ready to kill at his command.

Alexander was 32 years old the afternoon in January 2011 when he first slid into the passenger seat of an undercover ATF agent's pickup in a 7-Eleven parking lot in Woodridge, Ill., one of the middle-class suburbs that sprawl out west of Chicago. Alexander, 5 feet tall, introduced himself as "Little." He was, by then, a career crack dealer and recent cosmetology school dropout, though he was also out of jail and off parole for the first time in his adult life.

And while his record was long, it hardly identified him as dangerous.

Most of the people the ATF arrested in drug-house stings last year — about 80% — already had criminal records that included at least two felony convictions before the agency targeted them. But 13% had never before been found guilty of a serious crime, and even some of those with long rap sheets had not been charged with anything that would mark them as violent.

ATF officials reject the idea that they should focus only on people with violent records. "Are we supposed to wait for him to commit a (obscenity) murder before we start to target him as a bad guy?" said Charlie Smith, the head of ATF's Special Operations Division, which is responsible for approving each sting. "Are we going to sit back and say, well, this guy doesn't have a bad record? OK, so you know, throw him back out there, let him kill somebody, then when he gets a bad record, then we're going to put him in jail?"

For all the times Alexander was arrested — court records list dozens — police never found him with a gun, and he was charged with a violent crime only once, after his girlfriend, Demonisha Winters, accused him of domestic battery. The charge was dropped a few weeks later, and Winters said in an interview that Alexander never hit her.

What he did do was sell crack, though seldom more than a gram or two at a time. When Alexander was 18, police in Kokomo, Ind., caught him trying to flush two baggies of crack (http://www.documentcloud.org/documents/717634-kokomo-arrest.html#document/p3/a107295) down an apartment toilet. Four years after that, Chicago police arrested him with a half-gram. The next year, they caught him with 10 baggies of crack. Two years later, they caught him carrying a gram of crack and a half-gram of heroin, worth about $40, according to police reports and court files.

The ATF was about to offer him something much bigger.



William Alexander, who told ATF agents he was a chief in Chicago's notorious Four Corner Hustlers gang, was arrested in an ATF sting. If convicted, he faces at least 25 years in prison.(Photo: ATF)

The undercover agent, Andrew Karceski, introduced himself as Joe. He pulled his truck around the corner, cut the engine and flipped a switch to show Alexander a hidden compartment, called a "trap," commonly used for running drugs. "They promise you one thing, and they (obscenity), they make all the money, and I take all the (obscenity) risk," he said in an exchange captured on a blurry hidden-camera video.

"They haven't paid me in two months now, and that's (obscenity)," he said. "It's just got to a point where I got to feed my kids, too, you know what I'm saying?"

"You're (obscenity) right," Alexander replied.

Then the agent laid out the basics of his proposal: Once a month, he said, his bosses had him pick up a load of cocaine from a house in the suburbs. They used a different house every time, always with two or three men inside, always armed. But the payoff would be big: "I know there's going to be (obscenity) in there. I know that," he said, a reference to drugs. "How much I can't guarantee, but I know there's going to be big (obscenity) in there. I've never seen cash, but I don't know."

Alexander said it wouldn't be a problem. "I got guys I could just say, 'Go in there and shoot everybody.' I got guys that I'll say they're smart enough to know go in there and lay everybody down without hurting anybody. I know (obscenity) that will get it done," he said.

"We'll plan it right," he promised. "We've got enough time."

### 'I CALL THIS GOOD LAW ENFORCEMENT'

The ATF's drug-house stings began in Miami in the early 1990s. Drug cartels were moving huge quantities of cocaine through South Florida, creating rich targets for criminals brazen enough to try to poach the shipments. The robberies were turning into shootouts — or, worse, attacks on innocent people when the robbers got the wrong address — and ATF agents wanted a way to stop them. At first, agents actually set up fake drug houses (http://www.documentcloud.org/documents/681527-wilson-reginald-trial-3-29-12.html#document/p21/a107039), loaded with fake cocaine. When that led to car chases and shootings (http://www.documentcloud.org/documents/681527-wilson-reginald-trial-3-29-12.html#document/p22/a107038) in residential neighborhoods, they adopted a fictional approach instead.

The stings proliferated over the past decade. Last year, the ATF said it arrested 208 people in drug-house operations, compared with 41 a decade earlier. Most of the operations took place in Miami, Chicago, Phoenix and a few other cities, though court records show the ATF has conducted them in at least 22 states.

At the same time, the ATF dispatched agents around the country to teach the technique to other local and federal police agencies, including the U.S. Border Patrol.

As drug-house operations became more common, the agency issued a confidential order laying down the ground rules for conducting them. Officials instructed agents to make sure Justice Department lawyers would be willing to prosecute "home invasion" cases, and told them to try other techniques first, including executing search warrants. Most of the rules covered the tactical details of safely arresting the suspects.

## ATF STASH HOUSE STINGS

USA TODAY identified more than 600 people prosecuted as a result of controversial ATF operations in which agents offered them the chance to rob nonexistent drug stash houses.



Sources: USA TODAY research    Credits: Brad Heath, Lisa Tucker, Juan Thomassie

The undated manual, a copy of which was obtained by USA TODAY, included no guidelines for selecting appropriate targets. ATF spokesman Mike Campbell said the agency has since updated the rules; ATF would not provide a copy. He said the agency's tactics have been approved by ATF lawyers and federal prosecutors; each operation must also be reviewed by field supervisors and senior officials in Washington who can shut it down if it's clear to them the targets aren't armed robbers.

"We lay out the scenario. So if they're not career robbers, I'm not for that," said Richard Marianos, an assistant ATF director who supervised some of the investigations when he led the agency's Washington field office.

Distinguishing drug robbers from loudmouths isn't easy. Drug dealers seldom report robberies to the police, so few of the robberies are investigated, let alone solved. Agents rely instead on scraps of intelligence gathered from informants (usually other criminals), convicts, 911 calls, neighborhood complaints and local police to identify and target robbery crews.

A year after the ATF arrested Alexander's crew, for example, one of its informants arranged a meeting at a Baltimore train station with two men whom city police believed to be "armed drug traffickers (http://www.documentcloud.org/documents/675593-barnes-corey-complaint.html#document/p4/a107040)." One of them, Edward Ellis, had been convicted a decade earlier of armed robbery; the other, Corey Barnes, had been convicted only of street-level drug sales. The informant told them they could score up to 15 kilograms (http://www.documentcloud.org/documents/675593-barnes-corey-complaint.html#document/p6/a107042) of cocaine (easily worth more than $300,000).

"You can't beat free money," Ellis replied, according to court records (http://www.documentcloud.org/documents/675593-barnes-corey-complaint.html#document/p5/a107043).

The informant warned them that the guards would be armed, but Ellis said they would be ready (http://www.documentcloud.org/documents/675593-barnes-corey-complaint.html#document/p5/a107045). "We got some artillery; it's just making sure you got the right artillery for the job," he said. "We ain't coming with just two handguns when a (obscenity) need more than that." But when it was time for the robbery two weeks later, none of the would-be robbers could find a car. They paid a friend to drive them. Two had pistols; a third man showed up armed with a pellet gun, according to court records (http://www.documentcloud.org/documents/675593-barnes-corey-complaint.html#document/p10/a107044).

Ellis was sentenced in April to eight years and four months in federal prison. His lawyer, Tamara Theiss, told the judge that as the case unfolded, it had become clear that the men had to go out and find weapons to use during the robbery, suggesting that if they were robbers, they were not actually armed until after the ATF approached them. "This was simply an overwhelming temptation," she said, involving "a great deal of money … in a relatively easy way." The ATF's stings "are intended to ensnare the worst of the worst, the most dangerous people in society. It's clear that they ensnared someone very different," she said.

U.S. District Court Judge James Bredar cut her off.

"In our society, what we say is the touchstone of culpability is what's in your mind, what did you intend to do," he told Ellis. People who kill by accident generally aren't punished; people who plan to kill but don't are. "No actual crime was committed, nor could it have been," but Ellis nonetheless "demonstrated a propensity to commit a very serious offense," Bredar said.

"This is a city where violence is rampant and the government is bound to undertake operations like this to find and stop those who are predisposed to this," said Bredar. "I call this good law enforcement."

### A HALF-MILLION DOLLARS OF COCAINE

Alexander met the undercover agent again in early February 2011, climbing into the passenger seat of the agent's pickup in the parking lot of his apartment complex.

He had a plan: When the agent went inside to pick up his regular shipment of cocaine, Alexander and his crew would follow close behind him, guns drawn. They could tie up the guards, Alexander said. Or they could start shooting. "If you want us to get rid of 'em, (obscenity) get rid of them, too," he said. "It's whatever. ... You just said as long as we get in and get out we good, right?"

Right, the agent said — especially if they got to the house early, before other couriers had a chance to pick up their own shipments. "When I get there early, there's a stack. There's 20 — 20, 30 40 (kilos). There's a ton if I'm first," he said.

But to get it, the agent reminded him, they'd have to get past two or three armed men. "You were saying revolver, man," the agent said, turning the conversation back to the guns the robbers would need. "You get on anything else? You were talking you're trying to get something a little better than that. ... Find anything?"



William Alexander and his two accomplices were arrested with a single gun, a five-shot revolver that an ATF report concluded had been manufactured before 1918. The gun was unloaded; agents found ammunition in a van in which the suspects were transported after they were arrested, but the bullets were the wrong size for the gun. *(Photo: ATF)*

Alexander paused. "Tools? Nah," he said, referring to guns. But it wouldn't be a problem. A friend of his would be coming down to meet them in a few minutes, and he had the guns they needed, Alexander said. But he seemed more interested in talking about the money.

Alexander predicted he could unload 1-kilogram bricks of cocaine quickly for $20,000 to $22,000, putting the value of the heist at between $400,000 and $880,000. He said he could make even more by cooking it into crack and selling it on the street.

Alexander looked around and wondered what was taking his friend so long to show up. What happens if the police roll through and see them talking, he asked.

"Nothing against the law about talking," the agent said.

### DOES IT GO TOO FAR?

Federal courts have largely approved of the ATF stings, though some have also expressed unease.

A little more than three months after agents first approached Alexander, for example, a federal appeals court in Chicago called the stings "tawdry," saying the ploy "seems to be directed at unsophisticated, and perhaps desperate, defendants who easily snap at the bait." The judges faulted agents for violating their own rules about recording meetings, but ultimately rejected the idea that the stings amount to entrapment.

Entrapment is a narrow concept. The government can't pressure an innocent person to commit a crime. But it can — and routinely does — offer people who are predisposed to crime the opportunity to commit one. Police agencies have been conducting sting operations for decades to ensnare child abusers, drug dealers, even congressmen, though the drug-house stings rely more heavily on fiction than most.

"It wears me out when you hear people sit there and say, 'Well, you created the dope,' " Smith, ATF's special operations chief, said. "Yeah, you know what? In this scenario, we did. And thank God we did. Because you know what? Now because of the fact that we did create this, my home, the home next door to me ... isn't going to get their door kicked in looking for drugs that may have existed or maybe didn't exist because they had the wrong address. So when are we going to start sitting back and realizing, hey, if these guys have an opportunity and we can knock that off before it gets to that, it's better for us."

Still, the combination of the fictional nature of the crimes and the government's reliance on confidential informants to help entice prospective robbers has caused problems.

In one case, an ATF informant named David Villamonte testified (http://www.documentcloud.org/documents/690980-slowden-cassio-166-transcript.html#document/p20/a107046) that he targeted a Florida man named Cassio Slowden for a drug-house sting after parking next to him at a gas station and chatting about prison tattoos. "By his demeanor, I could tell he was young, and that he was involved in the elements," Villamonte said. When Slowden told him he had some marijuana to sell, Villamonte concluded he must have stolen it (http://www.documentcloud.org/documents/690980-slowden-cassio-166-transcript.html#document/p57/a107047). Slowden's lawyer argued that he had been entrapped; a jury acquitted him (http://www.documentcloud.org/documents/690979-slowden-cassio-154-judgment) of federal drug and weapons charges last year.

Another informant, Victor Bugarin, testified that he spoke to a suspected San Diego drug robber named Thomas Johnson only a few times before enticing him to participate in a 30-kilogram cocaine heist. Confronted with phone records showing he'd been making repeated phone calls to Johnson over more than four months, the informant admitted that his story (http://www.documentcloud.org/documents/717172-johnson-thomas-pages-from-tdj-vol-iv.html#document/p46/a107050) was "apparently not" true. Johnson said he went through with the robbery plan only because Bugarin said he needed the money to keep from being evicted. A jury last year acquitted him of all but one charge; the remaining count is on appeal.

The ATF's Marianos said such conduct is not allowed. "We have many of these cases where we've stood down and said we're not going to do this because this informant is way off the playbook here," he said. Other cases were abandoned because supervisors thought the targets were inappropriate, he said.

Acquittals are uncommon. USA TODAY was able to track 512 completed prosecutions; among those, juries acquitted 22 people, because jurors either thought that they had been entrapped or weren't convinced that they had been involved enough to be part of the conspiracy. At least 89 other prosecutions are still pending in federal court.

## 'I WAS SUPPOSED TO BE PREPARED, MAN'

The day before Alexander was to commit the robbery, the ATF agent pulled into the parking lot of his apartment building to go over the plan one more time.

Alexander asked him to come upstairs while he and a friend smoked marijuana. The agent declined. Then Alexander asked for a ride to a store so they could pick up some police costumes. Later, the agent said. Did they have the pistols all lined up, he asked? "Ah, yeah," Alexander replied and bit at his fingernails. "I'm gonna get on top of that today, though."

"I'm saying, man, if it's gonna be half-assed, let's just blow it off and not (obscenity) do it and wait," the agent said. "This is a one-time deal, dude."

Another man, Hugh Midderhoff, 18, sat in the back seat, wrapped in a checkered jacket and big black hat. Like Alexander, he had a criminal record, including an arrest for possessing his neighbor's stolen television (http://www.documentcloud.org/documents/717635-woodridge-charges.html#document/p1/a107294), but none of the charges were related to guns. "Hey, we can get another banger," he said to the agent. "That ain't going to be (obscenity)."

The agent told them he would know the next day where to pick up his drug shipment. They would meet again at lunchtime so they could be ready when the call came.

Nine minutes before noon the next day, Alexander called to say he still did not have enough guns. He was going to meet a friend to "grab the extra utensils," he said.

A half-hour later, Alexander called again. He couldn't get any more guns. He was supposed to be prepared, man. He'd been waiting for this day all this time," he said. But he was undeterred. "I'm willing to go, man. I'll do it."



The agent was quiet for a minute. "Let me call you right back, man, and see what I can come up with," he said.

He called back a few minutes later. His cousin had another pistol they could borrow, the agent said. "He got one of those things," the agent said. "He could give it to you guys, and he'll just be in the car as you guys do your thing."



The robbery was on.

### 'POLICE. POLICE.'

The agent and another officer posing as his cousin picked Alexander up outside his apartment. Midderhoff and another accomplice, Devin Saunders, joined him. Saunders packed a revolver into a locked compartment in the back of the agents' pickup truck, next to the pistol that the ATF supplied, and the suspects piled into the back seat. Saunders pulled on a mask and gloves.

The agents drove them 6 miles to a parking lot in a tiny forest preserve sandwiched between warehouses and trucking companies where they said they could wait for the call that would tell them the location of the stash house. On the way, they went over the plan one last time; the agents confirmed that everyone knew what they were getting into, exchanges captured by a camera hidden on the dashboard.

When they got to the preserve, one of the agents said he needed to make sure his car was locked and disappeared. A minute later, the other answered his phone and climbed out into the parking lot to take the call.

Alexander sat in the back seat, talking on a cellphone with a girlfriend who was trying to follow them in a taxi. A few seconds later, he saw something and lowered the phone. "Police," he said softly and pointed out the window. "Police." Then came the boom of a pair of stun grenades that shook the truck as a team of agents in camouflage and olive body armor rushed toward them, rifles raised. "Out of the car," one yelled, as agents yanked the three men one at a time onto the asphalt. The process took less than 30 seconds.



William Alexander, left, and Devin Saunders put their hands up as a team of heavily armed ATF agents surrounds them at the conclusion of a sting operation.*(Photo: ATF)*

Those seconds are the most dangerous and costly step of a drug-house sting.

They are dangerous because, if everything goes the way agents expect, they will be confronting a crew of heavily armed men amped up to commit an especially violent crime. To deal with that risk, the ATF steers the takedowns to remote places such as forest preserves or warehouses where it's easier to take suspects by surprise and where stray bullets won't endanger the public. Then it assembles a small army of federal agents and local police officers. Smith said he recalled one pre-arrest briefing with 170 officers.

Court records show ATF agents and local police officers working with them have shot at least 13 people during takedowns in drug-house stings since 2004, killing at least seven of them. Six were killed by local police officers conducting sting operations as part of an ATF task force. Most came after suspects fired at police or tried to run them down with cars.

Four months after Alexander was arrested, a Miami-Dade Police Department SWAT team shot and killed four members of a robbery crew after they showed up at a house they thought was packed with marijuana. One of the dead was the police informant who arranged the phony robbery. "He did it out of his own good, and he got killed for it," his brother, Rudy Betancourt, said. "He planned his funeral."

### THE 15-YEAR MARK

By the time agents had Alexander in handcuffs, the ATF had spent more than a month investigating him. It was clear by then the agents weren't the only ones who had been lying.

Despite his promises of a police-style raid, Alexander and the others had brought no police uniforms or handcuffs. And despite his boasts that he was a gang chief who had men ready to kill at his command, he and his accomplices had managed to come up with only a single gun, a rusted five-shot revolver with a broken handle, old enough that an ATF report (http://www.documentcloud.org/documents/717171-gun-report.html#document/p3/a107049) concluded it had been made sometime before World War I. The report confirmed the gun could have been lethal with the right kind of ammunition, but the men didn't have that, either. The six bullets they brought were the wrong size and, when loaded, would slide harmlessly out the front.

In court, though, none of that matters.

The drug-house stings are engineered to produce long prison sentences, and they typically do precisely that.

Using court records, USA TODAY identified 484 people convicted as a result of the stings, though there are almost certainly others. Two-thirds were sent to prison for more than a decade, a sentence longer than some states impose for shootings or robberies. At least 106 are serving 20-year sentences, and nine are serving life.

It's the drugs — though non-existent — that make that possible because federal law usually imposes tougher mandatory sentences for drugs than for guns. The more drugs the agents say are likely to be in the stash house, the longer the targets' sentence is likely to be. Conspiring to distribute 5 kilograms of cocaine usually carries a mandatory 10-year sentence — or 20 years if the target has already been convicted of a drug crime.

That fact has not escaped judges' notice. The ATF's stings give agents "virtually unfettered ability to inflate the amount of drugs supposedly in the house and thereby obtain a greater sentence," a federal appeals court in California said in 2010 (http://cdn.ca9.uscourts.gov/datastore/opinions/2013/04/08/11-50219.pdf). "The ease with which the government can manipulate these factors makes us wary." Still, most courts have said tough federal sentencing laws leave them powerless to grant shorter prison terms.

To the ATF, long sentences are the point. Fifteen years "is the mark," Smith said.

"You get the guy, you get him with a gun, and you can lock him up for 18 months for the gun. All you did was give this guy street creds," Smith said. "When you go in there and you stamp him out with a 15-to-life sentence, you make an impact in that community."

That emphasis has led to another significant shift for ATF. Over the past decade, the total number of people prosecuted in weapons cases as a result of its investigations has dropped by about 28%, according to records compiled by Syracuse University's Transactional Records Access Clearinghouse. The number of people charged by the agency with drug offenses jumped 26%. Prosecutors typically classify cases based on the charges likely to produce the longest sentence.

The ATF and federal prosecutors declined to comment on Alexander's case.

Unless he strikes a deal with prosecutors, Alexander is facing a minimum of 25 years in federal prison — and maybe more, based on the quantity of drugs he planned to steal and his long rap sheet. Saunders, whose participation in the plot lasted only a few hours, was sentenced to seven years and nine months in prison. He signed on, he said in an e-mail to USA TODAY, because "the money was tempting." Midderhoff has agreed to plead guilty and cooperate with the government; he won't be sentenced until Alexander's case is resolved. His lawyer, James Young, declined to comment.

Alexander's lawyer, Michael Falconer, said he wouldn't be opposed to the drug-house stings if he thought the ATF could make sure they were aimed only at people who were already ripping off drug dealers. "But on some level," he said, "it's Orwellian that they have to create crime to prevent crime."



*Contributing: Lisa Tucker in McLean, Va.*

Follow @bradheath (http://twitter.com/bradheath) on Twitter.

**SHARE**    2923    **CONNECT**

**272**    TWEET    (https://twitter.com/intent/tweet?url=http://usat.ly/16CBs28&text=ATF%20uses%20fake%20drugs,%20big%20bucks%20to

Try brain training tested by dozens of researchers

lumosity    Start Training →