13-CR-171-2


DEFENDANT'S EXHIBIT
1

**U.S. Department of Justice**
**Civil Rights Division**

# GUIDANCE REGARDING THE USE OF RACE BY FEDERAL LAW ENFORCEMENT AGENCIES



## June 2003

## INTRODUCTION AND EXECUTIVE SUMMARY



In his February 27, 2001, Address to a Joint Session of Congress, President George W. Bush declared that racial profiling is "wrong and we will end it in America." He directed the Attorney General to review the use by Federal law enforcement authorities of race as a factor in conducting stops, searches and other law enforcement investigative procedures. The Attorney General, in turn, instructed the Civil Rights Division to develop guidance for Federal officials to ensure an end to racial profiling in law enforcement.

"Racial profiling" at its core concerns the invidious use of race or ethnicity as a criterion in conducting stops, searches and other law enforcement investigative procedures. It is premised on the erroneous assumption that any particular individual of one race or ethnicity is more likely to engage in misconduct than any particular individual of another race or ethnicity.

Racial profiling in law enforcement is not merely wrong, but also ineffective. Race-based assumptions in law enforcement perpetuate negative racial stereotypes that are harmful to our rich and diverse democracy, and materially impair our efforts to maintain a fair and just society.[1]

The use of race as the basis for law enforcement decision-making clearly has a terrible cost, both to the individuals who suffer invidious discrimination and to the Nation, whose goal of "liberty and justice for all" recedes with every act of such discrimination. For this reason, this guidance in many cases imposes more restrictions on the consideration of race and ethnicity in Federal law enforcement than the Constitution requires.[2] This guidance prohibits racial profiling in law enforcement practices without hindering the important work of our Nation's public safety officials, particularly the intensified anti-terrorism efforts precipitated by the events of September 11, 2001.

---

[1] *See United States v. Montero-Camargo*, 208 F.3d 1122, 1135 (9th Cir. 2000) ("Stops based on race or ethnic appearance send the underlying message to all our citizens that those who are not white are judged by the color of their skin alone.").

[2] This guidance is intended only to improve the internal management of the executive branch. It is not intended to, and does not, create any right, benefit, trust, or responsibility, whether substantive or procedural, enforceable at law or equity by a party against the United States, its departments, agencies, instrumentalities, entities, officers, employees, or agents, or any person, nor does it create any right of review in an administrative, judicial or any other proceeding.

**I. Traditional Law Enforcement Activities.** Two standards in combination should guide use by Federal law enforcement authorities of race or ethnicity in law enforcement activities:

- In making routine or spontaneous law enforcement decisions, such as ordinary traffic stops, Federal law enforcement officers may not use race or ethnicity to any degree, except that officers may rely on race and ethnicity in a specific suspect description. This prohibition applies even where the use of race or ethnicity might otherwise be lawful.

- In conducting activities in connection with a specific investigation, Federal law enforcement officers may consider race and ethnicity only to the extent that there is trustworthy information, relevant to the locality or time frame, that links persons of a particular race or ethnicity to an identified criminal incident, scheme, or organization. This standard applies even where the use of race or ethnicity might otherwise be lawful.

**II. National Security and Border Integrity.** The above standards do not affect current Federal policy with respect to law enforcement activities and other efforts to defend and safeguard against threats to national security or the integrity of the Nation's borders,[3] to which the following applies:

- In investigating or preventing threats to national security or other catastrophic events (including the performance of duties related to air transportation security), or in enforcing laws protecting the integrity of the Nation's borders, Federal law enforcement officers may not consider race or ethnicity except to the extent permitted by the Constitution and laws of the United States.

Any questions arising under these standards should be directed to the Department of Justice.

---

[3] This guidance document does not apply to U.S. military, intelligence, protective or diplomatic activities conducted consistent with the Constitution and applicable Federal law.

2

## THE CONSTITUTIONAL FRAMEWORK

"[T]he Constitution prohibits selective enforcement of the law based on considerations such as race." *Whren v. United States*, 517 U.S. 806, 813 (1996). Thus, for example, the decision of federal prosecutors "whether to prosecute may not be based on 'an unjustifiable standard such as race, religion, or other arbitrary classification.'"[4] *United States v. Armstrong*, 517 U.S. 456, 464 (1996) (quoting *Oyler v. Boles*, 368 U.S. 448, 456 (1962)). The same is true of Federal law enforcement officers. Federal courts repeatedly have held that any general policy of "utiliz[ing] impermissible racial classifications in determining whom to stop, detain, and search" would violate the Equal Protection Clause. *Chavez v. Illinois State Police*, 251 F.3d 612, 635 (7th Cir. 2001). As the Sixth Circuit has explained, "[i]f law enforcement adopts a policy, employs a practice, or in a given situation takes steps to initiate an investigation of a citizen based solely upon that citizen's race, without more, then a violation of the Equal Protection Clause has occurred." *United States v. Avery*, 137 F.3d 343, 355 (6th Cir. 1997). "A person cannot become the target of a police investigation solely on the basis of skin color. Such selective law enforcement is forbidden." *Id.* at 354.

As the Supreme Court has held, this constitutional prohibition against selective enforcement of the law based on race "draw[s] on 'ordinary equal protection standards.'" *Armstrong*, 517 U.S. at 465 (quoting *Wayte v. United States*, 470 U.S. 598, 608 (1985)). Thus, impermissible selective enforcement based on race occurs when the challenged policy has "'a discriminatory effect and . . . was motivated by a discriminatory purpose.'" *Id.* (quoting *Wayte*, 470 U.S. at 608).[5] Put simply, "to the extent that race is used as a proxy" for criminality, "a racial stereotype requiring strict scrutiny is in operation." *Cf. Bush v. Vera*, 517 U.S. at 968 (plurality).

## I.   GUIDANCE FOR FEDERAL OFFICIALS ENGAGED IN LAW ENFORCEMENT ACTIVITIES

### A.   Routine or Spontaneous Activities in Domestic Law Enforcement

**In making routine or spontaneous law enforcement decisions, such as ordinary traffic stops, Federal law enforcement officers may not use race or ethnicity to any degree, except that officers may rely on race and ethnicity in a specific suspect description. This prohibition**

---

[4] These same principles do not necessarily apply to classifications based on alienage. For example, Congress, in the exercise of its broad powers over immigration, has enacted a number of provisions that apply only to aliens, and enforcement of such provisions properly entails consideration of a person's alien status.

[5] Invidious discrimination is not necessarily present whenever there is a "disproportion" between the racial composition of the pool of persons prosecuted and the general public at large; rather, the focus must be the pool of *similarly situated* individuals of a different race [who] were not prosecuted." *Armstrong*, 517 U.S. at 465 (emphasis added). "[R]acial disproportions in the level of prosecutions for a particular crime may be unobjectionable if they merely reflect racial disproportions in the commission of that crime." *Bush v. Vera*, 517 U.S. 952, 968 (1996) (plurality).

**applies even where the use of race or ethnicity might otherwise be lawful.**

Federal law enforcement agencies and officers sometimes engage in law enforcement activities, such as traffic and foot patrols, that generally do not involve either the ongoing investigation of specific criminal activities or the prevention of catastrophic events or harm to the national security. Rather, their activities are typified by spontaneous action in response to the activities of individuals whom they happen to encounter in the course of their patrols and about whom they have no information other than their observations. These general enforcement responsibilities should be carried out without *any* consideration of race or ethnicity.

- *Example*: While parked by the side of the George Washington Parkway, a Park Police Officer notices that nearly all vehicles on the road are exceeding the posted speed limit. Although each such vehicle is committing an infraction that would legally justify a stop, the officer may not use race or ethnicity as a factor in deciding which motorists to pull over. Likewise, the officer may not use race or ethnicity in deciding which detained motorists to ask to consent to a search of their vehicles.

Some have argued that overall discrepancies in certain crime rates among racial groups could justify using race as a factor in general traffic enforcement activities and would produce a greater number of arrests for non-traffic offenses (*e.g.*, narcotics trafficking). We emphatically reject this view. The President has made clear his concern that racial profiling is morally wrong and inconsistent with our core values and principles of fairness and justice. Even if there were overall statistical evidence of differential rates of commission of certain offenses among particular races, the affirmative use of such generalized notions by federal law enforcement officers in routine, spontaneous law enforcement activities is tantamount to stereotyping. It casts a pall of suspicion over every member of certain racial and ethnic groups without regard to the specific circumstances of a particular investigation or crime, and it offends the dignity of the individual improperly targeted. Whatever the motivation, it is patently unacceptable and thus prohibited under this guidance for Federal law enforcement officers to act on the belief that race or ethnicity signals a higher risk of criminality. This is the core of "racial profiling" and it must not occur.

The situation is different when an officer has specific information, based on trustworthy sources, to "be on the lookout" for specific individuals identified at least in part by race or ethnicity. In such circumstances, the officer is not acting based on a generalized assumption about persons of different races; rather, the officer is helping locate specific individuals previously identified as involved in crime.

- *Example*: While parked by the side of the George Washington Parkway, a Park Police Officer receives an "All Points Bulletin" to be on the look-out for a fleeing bank robbery suspect, a man of a particular race and particular hair color in his 30s driving a blue automobile. The Officer may use this description, including the race of the particular suspect, in deciding which speeding motorists to pull over.

4

**B.** **Law Enforcement Activities Related to Specific Investigations**

In conducting activities in connection with a specific investigation, Federal law enforcement officers may consider race and ethnicity only to the extent that there is trustworthy information, relevant to the locality or time frame, that links persons of a particular race or ethnicity to an identified criminal incident, scheme, or organization. This standard applies even where the use of race or ethnicity might otherwise be lawful.

As noted above, there are circumstances in which law enforcement activities relating to particular identified criminal incidents, schemes or enterprises may involve consideration of personal identifying characteristics of potential suspects, including age, sex, ethnicity or race. Common sense dictates that when a victim describes the assailant as being of a particular race, authorities may properly limit their search for suspects to persons of that race. Similarly, in conducting an ongoing investigation into a specific criminal organization whose membership has been identified as being overwhelmingly of one ethnicity, law enforcement should not be expected to disregard such facts in pursuing investigative leads into the organization's activities.

Reliance upon generalized stereotypes is absolutely forbidden. Rather, use of race or ethnicity is permitted only when the officer is pursuing a specific lead concerning the identifying characteristics of persons involved in an *identified* criminal activity. The rationale underlying this concept carefully limits its reach. In order to qualify as a legitimate investigative lead, the following must be true:

- The information must be relevant to the locality or time frame of the criminal activity;
- The information must be trustworthy;
- The information concerning identifying characteristics must be tied to a particular criminal incident, a particular criminal scheme, or a particular criminal organization.

The following policy statements more fully explain these principles.

1. *Authorities May Never Rely on Generalized Stereotypes, But May Rely Only on Specific Race- or Ethnicity-Based Information*

This standard categorically bars the use of generalized assumptions based on race.

- *Example*: In the course of investigating an auto theft in a federal park, law enforcement authorities could not properly choose to target individuals of a particular race as suspects, based on a generalized assumption that those individuals are more likely to commit crimes.

This bar extends to the use of race-neutral pretexts as an excuse to target minorities. Federal law enforcement may not use such pretexts. This prohibition extends to the use of other, facially race-

neutral factors as a proxy for overtly targeting persons of a certain race or ethnicity. This concern arises most frequently when aggressive law enforcement efforts are focused on "high crime areas." The issue is ultimately one of motivation and evidence; certain seemingly race-based efforts, if properly supported by reliable, empirical data, are in fact race-neutral.

- ***Example***: In connection with a new initiative to increase drug arrests, local authorities begin aggressively enforcing speeding, traffic, and other public area laws in a neighborhood predominantly occupied by people of a single race. The choice of neighborhood was not based on the number of 911 calls, number of arrests, or other pertinent reporting data specific to that area, but only on the general assumption that more drug-related crime occurs in that neighborhood because of its racial composition. This effort would be improper because it is based on generalized stereotypes.

- ***Example:*** Authorities seeking to increase drug arrests use tracking software to plot out where, if anywhere, drug arrests are concentrated in a particular city, and discover that the clear majority of drug arrests occur in particular precincts that happen to be neighborhoods predominantly occupied by people of a single race. So long as they are not motivated by racial animus, authorities can properly decide to enforce all laws aggressively in that area, including less serious quality of life ordinances, as a means of increasing drug-related arrests. *See, e.g., United States v. Montero-Camargo*, 208 F.3d 1122, 1138 (9th Cir. 2000) ("We must be particularly careful to ensure that a 'high crime' area factor is not used with respect to entire neighborhoods or communities in which members of minority groups regularly go about their daily business, but is limited to specific, circumscribed locations where particular crimes occur with unusual regularity.").

By contrast, where authorities are investigating a crime and have received *specific information* that the suspect is of a certain race (*e.g.*, direct observations by the victim or other witnesses), authorities may reasonably use that information, even if it is the only descriptive information available. In such an instance, it is the victim or other witness making the racial classification, and federal authorities may use reliable incident-specific identifying information to apprehend criminal suspects. Agencies and departments, however, must use caution in the rare instance in which a suspect's race is the only available information. Although the use of that information may not be unconstitutional, broad targeting of discrete racial or ethnic groups always raises serious fairness concerns.

- ***Example***: The victim of an assault at a local university describes her assailant as a young male of a particular race with a cut on his right hand. The investigation focuses on whether any students at the university fit the victim's description. Here investigators are properly relying on a description given by the victim, part of which included the assailant's race. Although the ensuing investigation affects students of a particular

6

race, that investigation is not undertaken with a discriminatory purpose. Thus use of race as a factor in the investigation, in this instance, is permissible.

### 2.    The Information Must be Relevant to the Locality or Time Frame

Any information concerning the race of persons who may be involved in specific criminal activities must be locally or temporally relevant.

- *Example:*  DEA issues an intelligence report that indicates that a drug ring whose members are known to be predominantly of a particular race or ethnicity is trafficking drugs in Charleston, SC. An agent operating in Los Angeles reads this intelligence report. In the absence of information establishing that this intelligence is also applicable in Southern California, the agent may not use ethnicity as a factor in making local law enforcement decisions about individuals who are of the particular race or ethnicity that is predominant in the Charleston drug ring.

### 3.    The Information Must be Trustworthy

Where the information concerning potential criminal activity is unreliable or is too generalized and unspecific, use of racial descriptions is prohibited.

- *Example:*  ATF special agents receive an uncorroborated anonymous tip that a male of a particular race will purchase an illegal firearm at a Greyhound bus terminal in a racially diverse North Philadelphia neighborhood. Although agents surveilling the location are free to monitor the movements of whomever they choose, the agents are prohibited from using the tip information, without more, to target any males of that race in the bus terminal. *Cf. Morgan v. Woessner,* 997 F.2d 1244, 1254 (9th Cir. 1993) (finding no reasonable basis for suspicion where tip "made all black men suspect"). The information is neither sufficiently reliable nor sufficiently specific.

### 4.    Race- or Ethnicity-Based Information Must Always be Specific to Particular Suspects or Incidents, or Ongoing Criminal Activities, Schemes, or Enterprises

These standards contemplate the appropriate use of both "suspect-specific" and "incident-specific" information. As noted above, where a crime has occurred and authorities have eyewitness accounts including the race, ethnicity, or other distinguishing characteristics of the perpetrator, that information may be used. Federal authorities may also use reliable, locally relevant information linking persons of a certain race or ethnicity to a particular incident, unlawful scheme, or ongoing criminal enterprise – even absent a description of any particular individual suspect. In certain cases, the circumstances surrounding an incident or ongoing criminal activity will point strongly to a perpetrator of a certain race, even though authorities lack an eyewitness account

7

- *Example*: The FBI is investigating the murder of a known gang member and has information that the shooter is a member of a rival gang. The FBI knows that the members of the rival gang are exclusively members of a certain ethnicity. This information, however, is not suspect-specific because there is no description of the particular assailant. But because authorities have reliable, locally relevant information linking a rival group with a distinctive ethnic character to the murder, Federal law enforcement officers could properly consider ethnicity in conjunction with other appropriate factors in the course of conducting their investigation. Agents could properly decide to focus on persons dressed in a manner consistent with gang activity, but ignore persons dressed in that manner who do not appear to be members of that particular ethnicity.

It is critical, however, that there be reliable information that ties persons of a particular description to a specific criminal incident, ongoing criminal activity, or particular criminal organization. Otherwise, any use of race runs the risk of descending into reliance upon prohibited generalized stereotypes.

- *Example*: While investigating a car theft ring that dismantles cars and ships the parts for sale in other states, the FBI is informed by local authorities that it is common knowledge locally that most car thefts in that area are committed by individuals of a particular race. In this example, although the source (local police) is trustworthy, and the information potentially verifiable with reference to arrest statistics, there is no particular incident- or scheme- specific information linking individuals of that race to the particular interstate ring the FBI is investigating. Thus, without more, agents could not use ethnicity as a factor in making law enforcement decisions in this investigation.

Note that these standards allow the use of reliable identifying information about planned future crimes. Where federal authorities receive a credible tip from a reliable informant regarding a planned crime that has not yet occurred, authorities may use this information under the same restrictions applying to information obtained regarding a past incident. A prohibition on the use of reliable prospective information would severely hamper law enforcement efforts by essentially compelling authorities to wait for crimes to occur, instead of taking pro-active measures to prevent crimes from happening.

- *Example*: While investigating a specific drug trafficking operation, DEA special agents learn that a particular methamphetamine distribution ring is manufacturing the drug in California, and plans to have couriers pick up shipments at the Sacramento, California airport and drive the drugs back to Oklahoma for distribution. The agents also receive trustworthy information that the distribution ring has specifically chosen to hire older couples of a particular race to act as the couriers. DEA agents may properly target older couples of that particular race driving vehicles with indicia such as Oklahoma plates near the Sacramento airport.

8

## II.    GUIDANCE FOR FEDERAL OFFICIALS ENGAGED IN LAW ENFORCEMENT ACTIVITIES INVOLVING THREATS TO NATIONAL SECURITY OR THE INTEGRITY OF THE NATION'S BORDERS

> In investigating or preventing threats to national security or other catastrophic events (including the performance of duties related to air transportation security), or in enforcing laws protecting the integrity of the Nation's borders, Federal law enforcement officers may not consider race or ethnicity except to the extent permitted by the Constitution and laws of the United States.

Since the terrorist attacks on September 11, 2001, the President has emphasized that federal law enforcement personnel must use every legitimate tool to prevent future attacks, protect our Nation's borders, and deter those who would cause devastating harm to our Nation and its people through the use of biological or chemical weapons, other weapons of mass destruction, suicide hijackings, or any other means. "It is 'obvious and unarguable' that no governmental interest is more compelling than the security of the Nation." *Haig v. Agee*, 453 U.S. 280, 307 (1981) (quoting *Aptheker v. Secretary of State*, 378 U.S. 500, 509 (1964)).

The Constitution prohibits consideration of race or ethnicity in law enforcement decisions in all but the most exceptional instances.  Given the incalculably high stakes involved in such investigations, however, Federal law enforcement officers who are protecting national security or preventing catastrophic events (as well as airport security screeners) may consider race, ethnicity, and other relevant factors to the extent permitted by our laws and the Constitution.  Similarly, because enforcement of the laws protecting the Nation's borders may necessarily involve a consideration of a person's alienage in certain circumstances, the use of race or ethnicity in such circumstances is properly governed by existing statutory and constitutional standards.  *See, e.g., United States v. Brignoni-Ponce*, 422 U.S. 873, 886-87 (1975).[6]  This policy will honor the rule of law and promote vigorous protection of our national security.

As the Supreme Court has stated, all racial classifications by a governmental actor are subject to the "strictest judicial scrutiny." *Adarand Constructors, Inc. v. Peña*, 515 U.S. 200, 224-25 (1995). The application of strict scrutiny is of necessity a fact-intensive process.  *Id.* at 236.  Thus, the legality of particular, race-sensitive actions taken by Federal law enforcement officials in the context of national security and border integrity will depend to a large extent on the circumstances at hand.  In absolutely no event, however, may Federal officials assert a national security or border integrity rationale as a mere pretext for invidious discrimination.  Indeed, the very purpose of the strict scrutiny test is to "smoke out" illegitimate use of race, *Adarand*, 515 U.S. at 226 (quoting *Richmond v. J.A.*

---

[6]    Moreover, as in the traditional law enforcement context described in the second standard, *supra*, officials involved in homeland security may take into account specific, credible information about the descriptive characteristics of persons who are affiliated with identified organizations that are actively engaged in threatening the national security.

*Croson Co.*, 488 U.S. 469, 493 (1989)), and law enforcement strategies not actually premised on *bona fide* national security or border integrity interests therefore will not stand.

In sum, constitutional provisions limiting government action on the basis of race are wide-ranging and provide substantial protections at every step of the investigative and judicial process. Accordingly, and as illustrated below, when addressing matters of national security, border integrity, or the possible catastrophic loss of life, existing legal and constitutional standards are an appropriate guide for Federal law enforcement officers.

- *Example*: The FBI receives reliable information that persons affiliated with a foreign ethnic insurgent group intend to use suicide bombers to assassinate that country's president and his entire entourage during an official visit to the United States. Federal law enforcement may appropriately focus investigative attention on identifying members of that ethnic insurgent group who may be present and active in the United States and who, based on other available information, might conceivably be involved in planning some such attack during the state visit.

- *Example*: U.S. intelligence sources report that terrorists from a particular ethnic group are planning to use commercial jetliners as weapons by hijacking them at an airport in California during the next week. Before allowing men of that ethnic group to board commercial airplanes in California airports during the next week, Transportation Security Administration personnel, and other federal and state authorities, may subject them to heightened scrutiny.

Because terrorist organizations might aim to engage in unexpected acts of catastrophic violence in any available part of the country (indeed, in multiple places simultaneously, if possible), there can be no expectation that the information must be specific to a particular locale or even to a particular identified scheme.

Of course, as in the example below, reliance solely upon generalized stereotypes is forbidden.

- *Example*: At the security entrance to a Federal courthouse, a man who appears to be of a particular ethnicity properly submits his briefcase for x-ray screening and passes through the metal detector. The inspection of the briefcase reveals nothing amiss, the man does not activate the metal detector, and there is nothing suspicious about his activities or appearance. In the absence of any threat warning, the federal security screener may not order the man to undergo a further inspection solely because he appears to be of a particular ethnicity.

10



DEFENDANT'S EXHIBIT 2

Population #'s are from the 2010 Census.

① Percentage % Variation is from people listing – "mixed".
② Using an average of five arrests per operation.
③ Using the laws of Random Probability.

## "STASH HOUSE OPERATIONS"

| Population: | USA ① | Camden County | Camden City |
|---|---|---|---|
| Total | 308,000,000 | 513,000 | 77,000 |
| African-American | 42,020,743 | 100,035 - 19.5% | 39,000 - 51% |
| White | 223,553,265 | 336,015 - 65.5% | 13,000 - 17% |
| Other | 50,477,594 | 76,950 - 15% | 25,000 - 32% |
| → * minorities | 92,498,337 - 30% | 176,985 - 34.5% | 64,000 - 83% |
| * Whites to minorities | 2.5-to-1 | 2-to-1 | 1.5 |

* Crime-#'s from "USA"-Today, June 28th, 2013-August 2, 2013
* From 2003 to 2013 - there has been "250" "Drug stash House
Operations" with over 1,000 arrests Nationwide.

| | "NATIONWIDE" | CAMDEN CITY |
|---|---|---|
| Minorities Arrested: | > 1,000 | 50 ② |
| Whites Arrested: | 8 | 0 |
| % of minorities: | 99% - Arrested | 100% - Arrested |

* Increase In Probability of a Successful arrest of a minority target:
Camden City vs. National - 270% ↗ Increase

* > 9100 to 1 - Odds of a 100% minority arrest Rate in Camden City.

Note: *   If you was to walk the streets of Camden blindfolded
And grab 50 people Randomly, the odds of them all being
minority (ies) would be - 9100 to 1. You would have to do it
9100 times to get 50 minorities. Meaning that it would always
be whites in the pool.