UNITED STATES DISTRICT COURT

DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | :: | CRIMINAL NO# CR-13-171-2 |
| RESPONDENT | :: | |
| v. | :: | |
| | :: | NOTICE OF MOTION FOR DEFENDANT |
| ASKIA WASHINGTON #69032-066 | :: | TO SUBSTITUTE THE RECORD WITH |
| DEFENDANT | :: | NEW INFORMATION SUPPORTING |
| | :: | SELECTIVE ENFORCEMENT AND |
| | :: | AND FURTHER DISCOVERY. |

TO: SALVATORE L. ASTOLFI, A.U.S.A.
UNITED STATES ATTORNEY'S OFFICE
PHILADELPHIA, PENNSYLVANIA

HON: JOEL H. SLOMSKY - U.S.D.J.
UNITED STATES DISTRICT COURTHOUSE
600 MARKET STREET
PHILADELPHIA, PENNSYLVANIA 19106

GENTLEMEN:

PLEASE TAKE NOTICE, THAT AT A HEARING, ON A DATE AND AT A TIME

TO BE SET BY THE COURT, THE DFEENDANT, ASKIA WASHINGTON #69032-066 ,

SHALL MOVE BEFORE THE HONORABLE JOEL H. SLOMSKY UNITED STATES DISTRICT

JUDGE, AT THE UNITED STATES DISTRICT COURTHOUSE, 600 MARKET STREET,

PHILADELPHIA, PENNSYLVANIA 19106 - FOR AN ORDER GRANTING DEFENDANT THE

RIGHT TO SUBSTITUTE THE RECORD WITH NEW INFORMATION SUPPORTING SELECTIVE

PROSECUTION AN SELECTIVE ENFORCEMENT IN "DRUG STASH HOUSE STINGS" CONDUCTED

BY THE ALCOHOL, TOBACCO, AND FIREARM AGENCY (A.T.F.).

RESPECTFULLY SUBMITTED,

ASKIA WASHINGTON #69032-066
FEDERAL DETENTION CENTER - BOX 562
PHILADELPHIA, PA. 19105

DATED: JUNE 19, 2014 /:

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY THAT A COPY OF THE FOREGOING <u>MOTION TO SUPPLEMENT THE</u>

<u>RECORD (SELECTIVE ENFORCE-</u> WAS SERVED BY FIRST CLASS MAIL UPON THE CLERK
<u>MENT</u>

AND UPON THE GOVERNMENT, ASSISTANT UNITED STATES ATTORNEY - <u>S. ASTOLFI, A.U.S.A.</u>

ON ___JUNE 19, 2014_____ .  *DEFENDANT HAS NOT SERVED THE U.S. ATTORNEY.

REQUESTS THAT THE CLERK FILE SUCH BY ELECTRONIC MAIL DUE TO INDIGENCY*

       1) UNITED STATES CLERK OF DISTRICT COURT
          UNITED STATES DISTRICT COURT HOUSE
          600 MARKET STREET
          PHILADELPHIA, PENNSYLVANIA 19106

          CARE OF:  <u>HON: JOEL H. SLOMSKY, U.S.D.J.</u>

                           RESPECTFULLY/SUBMITTED,

                           ASKIA WASHINGTON #69032-066
                         **FEDERAL DETENTION CENTER**
                              **BOX - 562**
                        **PHILADELPHIA, PENNSYLVANIA**
                               **19105**

DATED:  <u>JUNE 19, 2014</u>____ /

# ATTACHMENT

EXHIBIT - "A"

## POPULATION #'S ARE FROM THE 2010 CENSUS

(1) PERCENTAGE % VARIATION IS FROM PEOPLE LISTING - "MIXED".
(2) USING AN AVERAGE OF FIVE ARRESTS PER. OPERATION.
(3) USING THE LAWS OF RANDOM PROBABILITY.

### "STASH HOUSE OPERATIONS"

| POPULATION: | USA | CAMDEN COUNTY | CAMDEN CITY |
|---|---|---|---|
| TOTAL POPULATION | 308,000,000 | 513,000 | 77,000 |
| AFRICAN-AMERICAN | 42,020,743 | 100,035 - 19.5% | 39,000 - 51% |
| WHITE | 223,553,265 | 336,015 - 65.5% | 13,000 - 17% |
| OTHER | 50,477,594 | 76,985 - 15% | 25,000 - 32% |
| *MINORITIES - | 92,498,337 - 30% | 176,985 - 34.5% | 64,000 - 83% |
| *WHITES TO MINORITIES - | 25 TO 1 | 2 TO 1 | 1.5 |

*CRIME - #'S FROM "USA TODAY", JUNE 28TH. - 2013 & AUGUST 2, 2013.

*FROM 2003 TO 2013 - THERE HAS BEEN  (250)  "DRUG STASH HOUSE OPERATIONS"
WITH OVER 1,000 ARRESTS NATIONWIDE.

| | "NATION WIDE" | "CAMDEN CITY" |
|---|---|---|
| *MINORITIES ARRESTED: | 1,000 | 50 |
| *WHITES ARRESTED: | 8 | 0 |

*PERCENTAGE OF MINORITIES ARRESTED:

99%                         100%

*INCREASE IN PROBABILITY OF A SUCCESSFUL ARREST OF A MINORITY TARGET:

*CAMDEN CITY VS. NATIONAL - 270% INCREASE

*THE ODDS OF A 100% MINORITY ARREST RATE IN CAMDEN CITY IS - 9100 TO 1 .

NOTE:
     *IF YOU WAS TO WALK THE STREETS OF CAMDEN BLINDFOLDED AND GRAB 50 PEOPLE
RANDOMLY, THE ODDS OF THEM ALL BEING MINORITIES WOULD BE - 9100 TO 1. YOU
WOULD HAVE TO DO IT 9100 TIMES TO GET 50 MINORITIES. MEANING THAT IT WOULD
BE WHITES IN THE POOL.*

ANTHONY D. DICKEY #21201-050
FEDERAL DETENTION CENTER - BOX 562
PHILADELPHIA, PA. 19105

EXHIBIT - "B"

CRIMINAL DOCKET #13-222 (RBK)

MARCH 24, 2014

HONORABLE ROBERT B. KUGLER, U.S.D.J.
UNITED STATES DISTRICT COURTHOUSE
MITCHELL COHEN COURTHOUSE
CAMDEN, NEW JERSEY 08103

"LAW ON SIMILAR-SITUATED
DEFENDANT STANDARD"

MR. IRA SLOVIN - U.S. ATTORNEY

UNITED STATES ATTORNEY'S OFFICE

**REPLY BRIEF IN RESPONSE TO GOVERNMENT'S BRIEF
IN OPPOSITION TO MOTION FOR DISCOVERY IN CLAIM
OF SELECTIVE PROSECUTION AND RACIAL PROFILING**

THE UNITED STATES GOVERNMENT ATTEMPTS TO PRECLUDE THE COURT FROM
DRAWING ANY INFERENCE OF INTENTIONAL RACE DISCRIMINATION FROM THE SUBMITTED
LEGAL DOCUMENTS, COURT ORDERS, AND STATISTICS. BY ARGUING THE **"SHIELD OF
ARMSTRONG"** , WHICH DOES NOT PER SE PROHIBIT SUCH INFERENCES. 'ARMSTRONG'S'
SHIELD HOWEVER, ONLY ADDRESSES WHETHER THE DEFENDANT HAS CARRIED HIS BURDEN
OF PROOF ON THE MERITS OF HIS SELECTIVE PROSECUTION CLAIM. IN THIS CASE
SPECIFIC MATTER, THE COURT NEED ONLY DETERMINE WHETHER DICKEY HAS SHOWN
"SOME EVIDENCE" TENDING TO SHOW THE EXISTENCE OF DISCRIMINATORY INTENT
SUFFIICIENT TO WARRANT DISCOVERY. **JONES, 159 F.3D AT 978.** ARMSTRONG WILL
CERTAINLY PRECLUDE DICKEY'S SELECTIVE PROSECUTION CLAIM IF AT THE END OF
DISCOVERY, HE FAILS TO SHOW ANY ADDITIONAL EVIDENCE THAT THE A.T.F. AND
UNITED STATES ATTORNEY'S OFFICE INTENTIONALLY DISCRIMINATED AGAINST BLACKS
AND LATINOS. ARMSTRONG, HOWEVER DOES NOT POSE ANY BAR TO DICKEY AT THIS
STAGE OF THE LITIGATION.

THE UNITED STATE GOVERNMENT'S FAILURE TO ALLOW THE COURT TO REVIEW
THE REQUESTED DOCUMENTS IN-CAMERA PROHIBITS THE COURT FROM REVIEWING THE
NECESSARY DISCOVERY EVIDENCE AND DETERMINING WHETHER SUCH CAN BE CLAIMED
PRIVILEGED BY THE GOVERNMENT. IT IS THE GOVERNMENT WHO HAS CAUSED THE
RECORD TO BE INSUFFICIENTLY DEVELOPED TO ALLOW THE COURT TO ASSESS THE
MERITS OF THE UNITED STATES ARGUMENTS RELATING TO THE CONTENTS OF THE
REQUESTED DOCUMENTS.

DICKEY HAS MADE OUT A PRIMA FACIE SHOWING THAT HE HAS BEEN SINGLED
OUT FOR PROSECUTION BUT OTHERS SIMILARLY SITUATED OF A DIFFERENT RACE WERE
NOT PROSECUTED. SECOND, HE HAS DEMONSTRATED THAT THE DISCRIMINATORY
SELECTION OF HIM FOR PROSECUTION IS INVIDIOUS AND IN BAD FAITH, IN THAT IT

(1)

RESTS ON SUCH IMPERMISSIBLE CONSIDERATIONS AS RACE, RELIGION, OR THE
DESIRE TO PREVENT HIS EXERCISE OF HIS CONSTITUTIONAL RIGHTS. SEE -
**HUNTER V. ERICKSON**, 21 **L. ED 2D** 616 (1969)(**"OFFICIAL DISTINCTION BASED
ON RACE PLACES BURDENS ON RACIAL MINORITIES WITHIN GOVERNMENTAL PROCESS'),
MCLAUGHLIN V. FLORIDA**, 13 **L. ED** 222 (1964)(**"RACIAL CLASSIFICATIONS BEAR A
FAR HEAVIER BURDEN OF JUSTIFICATION THAN OTHER CLASSIFICATIONS").**

THE SURVEY SHOWS A STATISTICAL DISPARITY AT THE CHARGING STAGE,
THEREFORE, THE UNITED STATES ASSERTION THAT DICKEY HAS FAILED TO SHOW A
DISCRIMINATORY EFFECT ON SIMILARLY SITUATED BLACKS AND LATINOS IS SIMPLY
WRONG. THE GOVERNMENT IS ALWAYS WELCOMED TO EXPLAIN ANY NON-DISCRIMINATORY
REASON FOR THE GLARING DISCREPANCIES, BUT DEFENDANT IS NOT REQUIRED TO
ADDRESS ANY OF THEM AT THIS PRE-DISCOVERY STAGE.

THE RACIAL DISPARITIES ARE CLEAR. VIEWING THE TOTALITY OF DICKEY'S
EVIDENCE THIS COURT SHOULD FIND THAT THE STATISTICAL DISPARITIES COMBINED
WITH THE OTHER DOCUMENTS, ORDERS, ETC., ARE AT THE LEAST, SOME EVIDENCE
TENDING TO SHOW THAT "PHONY DRUG STASH HOUSE ROBBERIES" HAVE A DISCRIMINATORY
EFFECT ON BLACKS AND LATINOS WARRANTING DISCOVERY.

WITH REGARD TO DISCRIMINATORY INTENT, DICKEY SUBMITS THAT HE HAS
PRESENTED "SOME EVIDENCE" TENDING TO SHOW THAT THE A.T.F. AND UNITED STATE'S
ATTORNEYS OFFICE IN CAMDEN AND ELSEWHERE CONSIDERED THE DEFENDANT(S) RACE
WHEN DETERMINING WHETHER AND WHO TO CHARGE WITH "PHONY STASH HOUSE ROBBERY".
THE RACIAL DISPARITIES IDENTIFIED BY LEGAL DOCUMENTS AND RESEARCH THAT HAS
BEEN SUBMITTED BY DICKEY SHOWS THAT IN ALL JURISDICTIONS IN WHICH SUCH CASES
WERE PROSECUTED THE SIMILAR-SITUATED WHITE RACE WERE NOT ARRESTED, INVESTIGATE
OR PROSECUTED AS THE SIMILAR-SITUATED BLACK AND LATINO RACE WERE. THEREFORE,
THEY (**STATISTICS AND LEGAL DOCUMENTS**) SUGGEST THAT A DEFENDANT'S RACE AND
GEOGRAPHICS DO PLAY A MAJOR ROLE IN THE TARGETING, INVESTIGATION, ARREST, AND
PROSECUTION OF SIMILAR-SITUATED BLACK AND LATINOS IN "PHONY STASH HOUSE
ROBBERIES.

A NUMBER OF JURIST HAVE STATED THAT THEY ARE TROUBLED BECAUSE RACE
MAY BE SYSTEMATICALLY CAUSING A "POTENTIAL BIAS" IN THE SELECTION AND
CHARGING OF MINORITIES IN THESE STINGS. IF THE SUBMITTED DOCUMENT'S STANDING
ALONE SHOWS SUFFICIENT EVIDENCE OF THE POSSIBILITY OF RACIAL ANIMUS TO
WARRANT THREE FEDERAL JUDGES TO ORDER FURTHER DISCOVERY, AND A FOURTH JUDGE
TO DISMISS THE INDICTMENT ( U.S. V. PAUL DAVIS, CASE #13-CR-63-2 , HON:
JUDGE JOHN W. DARRAH, NORTHERN DISTRICT OF ILLINOIS - 1/7/14), THIS COURT
CANNOT OR SHOULD NOT FAIRLY DENY DICKEY THE SAME OPPORTUNITY TO INVESTIGATE IF
HE HAS INTRODUCED FACTS SHOWING THAT THE GRAVE RACIAL DISPARITIES IDENTIFIED
BY OTHER DISTRICT COURT'S ARE OF A EVEN GREATER MAGNITUDE IN HIS SPECIFIC
CASE AND OTHER CASE'S IN THE THIRD CIRCUIT.

( 2 )

DICKEY CONTENDS THAT HE HAS PROVEN BOTH PRONGS OF THE ARMSTRONG TEST.
NOTWITHSTANDING, THE FACT THAT HE IS ONLY REQUIRED TO PROVE "SOME EVIDENCE".
DICKEY HAS MADE OUT A PRIMA FACIE SHOWING THAT HE HAS BEEN SINGLED OUT FOR
PROSECUTION, BUT OTHERS SIMILARLY-SITUATED OF A DIFFERENT RACE (WHITES)
WERE NOT PROSECUTED AT ALL.

SECOND, HE HAS DEMONSTRATED THAT THE DISCRIMINATORY SELECTION OF HIM
FOR PROSECUTION IS INVIDIOUS AND IN BAD FAITH, IN THAT IT RESTS ON SUCH
IMPERMISSIBLE CONSIDERATIONS AS RACE, RELIGION, OR THE DESIRE TO PREVENT HIS
EXERCISE OF HIS CONSTITUTIONAL RIGHTS.

IN MAKING THESE REQUISITE SHOWING, THE DEFENDANT HAS REBUTTED THE
PRESUMPTION THAT THE GOVERNMENT MADE ITS DECISION TO PROSECUTE IN GOOD FAITH
AND IN A NONDISCRIMINATORY MANNER. HERE DICKEY HAS PRESENTED CLEAR EVIDENCE
TO THE CONTRARY. **SEE - UNITED STATES V. CHEMICAL FOUND, INC. 71 L. ED 131
(1926).** DEFENDANT HAS PRESENTED SUFFICIENT FACTS TO CREATE A REASONABLE DOUBT
ABOUT THE CONSTITUTIONALITY OF [HIS] PROSECUTION RESULTING FROM SELECTIVE
PROSECUTION. THESE FACTS GO BEYOND MERE STATISTICAL EVDIENCE OF RACIAL
DISPARITY.

THE EQUAL PROTECTION CLAUSE "IS ESSENTIALLY A DIRECTION THAT ALL PERSONS
SIMILARLY-SITUATED SHOULD BE TREATED ALIKE". **SEE - CITY OF CLEBURNE V.
CLEBURNE LIVING CENTER, INC.**, 87 **L. ED 2D** 313 (1985), THE SUPREME COURT HAS
CLARIFIED THAT "EQUAL PROTECTION DOES NOT REQUIRE THAT ALL PERSONS BE DEALT
WITH IDENTICALLY, BUT IT DOES REQUIRE THAT A DISTINCTION MADE HAVE SOME
RELEVANCE TO THE PURPOSES FOR WHICH THE CLASSIFICATION IS MADE. **SEE - BAXSTROM
V. HERROLD**, 15 **L. ED 2D** 620 (1966); ACCORD **WALTERS V. CITY OF ST. LOUIS**, 98
**L. ED** 660 (1954); **FETTERUSSO V. STATE OF NEW YORK**, 898 **F.2D** 322 (2D CIR. 1990).

DICKEY ASKS THAT THIS COURT RECOGNIZE THAT THE GOVERNMENT'S ACTION IN
THIS INSTANT MATTER BE DEEMED A RACIAL CLASSIFICATION, AND THAT UNDER SUPREME
COURT PRECEDENT, IT IS VERY DIFFICULT TO EVER JUSTIFY IT. IN OTHER WORDS,
WERE THE REQUIREMENT'S OF STRICT SCRUTINY TO BE RELAXED IN LAW ENFORCEMENT'S
SELECTIVE PROCESS OF DEFENDANT(S) FOR PROSECUTION, IT WOULD CAUSE THEM TO BE
WEAKENED IN OTHER AREA'S IN WHICH RACIAL CLASSIFICATIONS OUGHT VIRTUALLY
NEVER TO BE COUNTENANCED. HERE THE GOVERNMENT DECIDED TO ENGAGE IN CRIME
FIGHTING BY STAGING "FICTITIOUS CRIMES". TO THAT END, THE POLICE (A.T.F.)
ENLISTED A MINORITY INFORMANT TO GO INTO MINORITY NEIGHBORHOODS AND FIND
"DRUG STASH HOUSE ROBBERS". THESE STINGS NETTED OVER ONE THOUSAND ARRESTS FOR
A.T.F. . DURING THESE INVESTIGATIONS WHICH OCCURRED OVER A THIRTEEN YEAR
PERIOD, THE A.T.F. WITHOUT ANY BASIS OF SUSPICION FOR SUSPECTING ANY INDIVIDUAL
APPROACHED EXCEPT FOR HIS RACE AND NEIGHBORHOOD, TARGETED BLACKS AND LATINOS
FOR PROSECUTION - WHILE EXCLUDING WHITES.

( 3 )

THE QUESTION THIS COURT MUST ASK ITSELF IS ..... HAVE THE DEFENDANT(S) SHOWN THE EXISTENCE OF A SIMILARLY-SITUATED NON-MINORITY GROUP WHEN CHALLENGING A LAW OR POLICY THAT CONTAINS AN EXPRESS RACIAL CLASSIFICATION? AND IF SO, ARE SUCH RACIAL CLASSIFICATIONS SUBJECT TO STRICT JUDICIAL SCRUTINY?

DICKEY SUBMITS THE FOLLOWING IN SUPPORT OF AN AFFIRMATIVE ANSWER OF YES! TO THE ABOVE QUESTION:

1. DICKEY HAS SHOWN THAT THE A.T.F. IMPOSED A UNCONSTITUTIONALLY SUSPECT CLASSIFICATION.

2. THAT SUCH SUSPECT CLASSIFICATION WAS POLICE CREATED AND ACTED UPON BY SETTING ASIDE ALL BUT THE RACIAL ELEMENTS OF THE DEFENDANT'S NEIGHBORHOOD AND RACIAL CHARACTERISTICS.

3. THAT THE SELECTIVE PROSECUTION SHOWS A DISPROPORTIONATE IMPACT UPON THE BLACK AND LATINO RACE IN "DRUG STASH HOUSE STINGS".

4. THAT STATISTICAL DATA PROVES THAT SUCH SELECTIVE PROSECUTION COULD NOT HAVE BEEN COMMITTED UNKNOWINGLY.

5. THAT THE A.T.F. AND UNITED STATES ATTORNEY DISREGARDED THE FEDERAL POLICY ON GUIDANCE AGAINST RACIAL PROFILING IN FEDERAL PROSECUTIONS.

6. THAT THE A.T.F. AND UNITED STATES ATTORNEY KNOWINGLY DISREGARDED STATISTICS AND DATA THAT INDICATED THAT BLACKS AND LATINOS WERE BEING ARRESTED, INVESTIGATED, AND PROSECUTED AT AN ALARMING RATE COMPARED TO WHITES.

OUT OF ONE THOUSAND CASES NATIONWIDE, ONLY SIX CASES INCLUDED WHITES. EQUALING A 99.4% ARREST RATE FOR MINORITIES AND A 0.6% PERCENT ARREST RATE FOR WHITES. SEE ATTACHED STATISTICS CHART - EXHIBIT "A" .

DEFENDANT SUBMITS THAT HIS SUBMITTED COMPARATORS (WHITES) ARE SIMILARLY SITUATED FOR THE PURPOSE OF MEETING HIS BURDEN UNDER THE "ARMSTRONG" CRITERIA. ALL THAT IS REQUIRED IS THAT THE SIMILARLY SITUATED INDIVIDUAL BE COMPARABLE TO DEFENDANT(S) IN ALL RELEVANT RESPECTS, BUT SUCH SIMILAR-SITUATED INDIVIDUALS DO NOT NEED TO BE IDENTICALLY SITUATED. THE FACTORS RELEVANT TO TO THE ANALYSIS ARE WHETHER:

1. WHITE SIMILAR-SITUATED DEFENDANTS ARE CAPABLE OF BEING INVESTIGATED, ARRESTED, AND PROSECUTED FOR "DRUG STASH HOUSE STINGS".

2. THE A.T.F.'S POLICY, GUIDELINES, OR SELECTION PROCEDURES WOULD APPLY TO SIMILAR-SITUATED WHITES AT THE SAME LEVEL THAT THEY APPLY TO BLACK AND LATINOS AS RELATES TO INITIATING "DRUG STASH HOUSE STINGS".

( 4 )

3. WHETHER THE A.T.F.'S LACK OF ANY GUIDELINE, POLICY, OR SELECTION PROCESS IN "DRUG STASH HOUSE STINGS" WOULD ALLOW FOR SIMILAR-SITUATED WHITES TO BE SELECTED AS TARGETS FOR SUCH STINGS AT THE SAME LEVEL THAT BLACKS AND LATINO'S ARE TARGETED.

4. THE A.T.F. AND UNITED STATES ATTORNEY FAILED TO KEEP STATISTICS AND DATA ON THE NUMBER OF BLACK AND LATINO'S INVESTIGATED, ARRESTED, AND PROSECUTED FOR "DRUG STASH HOUSE STINGS" AS REQUIRED BY THE DIRECTIVE ISSUED BY THE UNITED STATES DEPARTMENT OF JUSTICE - CIVIL RIGHTS DIVISION ON JUNE OF 2003 - TITLED "GUIDANCE REGARDING THE USE OF RACE BY FEDERAL LAW ENFORCEMENT AGENCIES".

5. THE A.T.F. AND UNITED STATES ATTORNEY KEPT RECORDS BUT IGNORED THE STATISTICS AND DATA SHOWING A DISPROPORTIONATE IMPACT OF SUCH "DRUG STASH HOUSE STINGS" ON BLACKS AND LATINOS AS OPPOSED TO WHITES.

6. THE POLICY FOR INVESTIGATING, ARRESTING, AND PROSECUTING WHITE SIMILAR-SITUATED INDIVIDUALS (METH DEALERS, WHITE SUPREMIST, MOTORCYCLE GANGS, DRUG DEALER'S, ARMED ROBBERS, ETC.) ARE DIFFERENT FROM BLACK AND LATINO DRUG STASH HOUSE ROBBERS SIMILARLY-SITUATED.

DEFENDANT SUBMITS THAT ONCE THE COURT DIRECTS THAT THE GOVERNMENT TURN OVER ADDITIONAL DISCOVERY AS REQUESTED BY DEFENDANT, THAT THE COURT WILL BE ABLE TO PROPERLY ASSESS WHETHER THE GOVERNMENT HAS ENGAGED IN IMPERMISSIBLE RACIAL PROFILING BY RACE AND DEMOGRAPHIC AREA UNDER IMPERMISSIBLE FACTORS. DEFENDANT REQUESTS A FULL HEARING IN THIS MATTER AND SUBMITS THAT HE WILL PRESENT STATISTICAL CHARTS AND FACTS SHOWING THAT SUCH RACIAL CLASSIFICATION IS INTENTIONAL AND INCAPABLE OF BEING DONE BY RANDOM SELECTION OF TARGETS.

DEFENDANT REQUESTS THAT THE COURT ORDER THE GOVERNMENT TO TURN OVER ALL DOCUMENTS WHICH DICTATE THE STATUTORY AND REGULATORY AUTHORITY FOR THE A.T.F. AND THE UNITED STATES ATTORNEY IN CAMDEN AND ELSEWHERE TO INSTIGATE AND/OR PURSUE PHONY STASH HOUSE STINGS FOR DRUGS. WHICH ALSO INCLUDES ANY MANUALS, CIRCULARS, FIELD NOTES, CORRESPONDENCE, OR MATERIALS WHICH INCLUDE PROTOCOLS AND/OR DIRECTIONS TO AGENTS AND TO CONFIDENTIAL INFORMANTS REGARDING HOW TO CONDUCT SUCH OPERATIONS, AND HOW TO DETERMINE WHICH PERSONS TO PURSUE AS POTENTIAL TARGETS OR ENSURE THAT THE TARGETS DO NOT SEEK TO QUIT OR LEAVE BEFORE AN ARREST CAN BE MADE, AND HOW TO ENSURE THAT AGENTS ARE NOT TARGETING PERSONS FOR SUCH OPERATIONS ON THE BASIS OF THEIR RACE, COLOR, ANCESTRY OR NATIONAL ORIGIN.

LASTLY, DICKEY CONTENDS THAT THE UNITED STATES ATTORNEY'S OFFICE AND A.T.F. FAILED TO IMPLEMENT AND FOLLOW POLICY, DIRECTIVES, AND GUIDANCE MANUALS WHICH INSTRUCTED THEM HOW NOT TO SELECTIVELY PROSECUTE BASED ON RACE, RELIGION, NATIONAL ORIGIN, OR POLITICAL BELIEF, AND FURTHER INSTRUCTED SUCH UNITED STATES ATTORNEY AND A.T.F. HOW TO RECOGNIZE IF SUCH LAW ENFORCEMENT AGENCY WAS UTILIZING SUCH IMPERMISSIBLE FACTORS IN THE INVESTIGATION PROCESS, ARREST PROCESS, AND PROSECUTION PROCESS.

DEFENDANT ADMITS SPECIFICALLY THAT THE UNITED STATES ATTORNEY'S OFFICE AND A.T.F. DISREGARDED COMPLIANCE WITH THE FOLLOWING DEPARTMENTAL STANDARDS AND POLICY GUIDELINES:

1. THE JUNE 2003 UNITED STATES DEPARTMENT OF OF JUSTICE - CIVIL RIGHTS DIVISION MANUAL TITLED - "GUIDANCE REGARDING THE USE OF RACE BY FEDERAL LAW ENFORCEMENT AGENCIES.

2. LAW ENFORCEMENT TARGETED INDIVIDUALS OF A PARTICULAR RACE AS SUSPECTS, BASED ON A GENERALIZED ASSUMPTION THAT THOSE INDIVIDUALS ARE MORE LIKELY TO COMMIT CRIMES. SEE PAGE FIVE, SECTION ONE OF GUIDANCE MANUAL.

3. THE INFORMATION LAW ENFORCEMENT RECEIVED WAS NOT QUESTIONED OR TESTED FOR PURPOSES OF ESTABLISHING ITS RELIABILITY. SEE PAGE SEVEN AT NUMBER 3. HERE THE INFORMANT'S INFORMATION CONCERNING POTENTIAL CRIMINAL ACTIVITY WAS UNRELIABLE AND UNCORROBORATED BECAUSE IT WAS OBTAINED FROM A THIRD SOURCE WHO ALSO HAD NOT BEEN KNOWN TO LAW ENFORCEMENT AS A RELIABLE SOURCE.

4. LAW ENFORCEMENT DISREGARDED THE MAY 19, 2010 MEMORANDUM TO ALL FEDERAL PROSECUTORS FROM UNITED STATES ATTORNEY GENERAL - ERIC HOLDER, WHICH DIRECTED AND REAFFIRMED THE GUIDANCE PROVIDED BY THE THE PRINCIPLES OF FEDERAL PROSECUTION, AS REFLECTED IN TITLE - 9 OF THE UNITED STATES ATTORNEYS' MANUAL, CHAPTER 27, WHICH STATED THAT PERSONS WHO COMMIT SIMILAR CRIMES AND HAVE SIMILAR CULPABILITY, SHOULD TO THE EXTENT POSSIBLE, BE TREATED SIMILARLY.

5. THE UNITED STATES ATTORNEY'S OFFICE IN CAMDEN, NEW JERSEY AND ELSEWHERE, FAILED TO FOLLOW THE "IMPLEMENTATION OF PRINCIPLES OF FEDERAL PROSECUTION AS OUTLINED IN THE UNITED STATES ATTORNEY'S MANUAL UNDER 9-27.130", WHICH REQUIRES EACH OFFICE TO ESTABLISH A INTERNAL OFFICE PROCEDURE TO ENSURE THAT PROSECUTORIAL DECISIONS ARE MADE AT AN APPROPRIATE LEVEL OF RESPONSIBILITY AND ARE MADE CONSISTENT WITH THE PRINCIPLES THAT ALLOW DOCUMENTED REVIEW OF PROCEDURES AND DECISIONS.

6. THE UNITED STATES ATTORNEY'S OFFICE IN
CAMDEN, NEW JERSEY AND ELSEWHERE FAILED TO
FOLLOW THE UNITED STATES ATTORNEY'S MANUAL
WHICH DICTATES UNDER 8-3.300 , THAT THE
GOVERNMENT ATTORNEYS SHALL ENFORCE 18 U.S.C.
249 IN A NEUTRAL AND OBJECTIVE MANNER SO THAT
ALL PROSECUTIONS SHALL COMPORT WITH THE
PRINCIPLES OF FEDERAL PROSECUTIONS SET FORTH
IN UNITED STATES ATTORNEY MANUAL - CHAPTER -
9-27.000. , WHICH INSTRUCTS UNITED STATES
ATTORNEY'S TO FOLLOW THE DICTATES OF
OF UNITED STATES ATTORNEY'S MANUAL - 9-27.260,
WHICH PROHIBITS ATTORNEYS FOR THE GOVERNMENT
FROM BEING INFLUENCED IN MAKING PROSECUTION
DECISIONS BY ANY SUBJECT'S RACE, RELIGION,
SEX, NATIONAL ORIGIN, ETC., ETC.

7. THE UNITED STATES ATTORNEY'S OFFICE FAILED
TO FOLLOW SECTION #249 , WHICH REQUIRES THAT
ATTORNEYS FOR THE GOVERNMENT CONSIDER WHETHER
EVIDENCE IS SUFFICIENT TO PROVE THAT A CRIMINAL
ACT IDENTIFIED BY THE STATUTE OCCURRED BECAUSE
OF THE ACTUAL OR PERCEIVED RACE, RELIGION, GENDER,
NATIONAL ORIGIN, ETC., ETC..

8. THE UNITED STATES ATTORNEY FAILED TO FOLLOW THE
PROBABLE CAUSE STANDARD AS OUTLINED IN UNITED
STATES ATTORNEY MANUAL #9-27.200 TO 9-27.220.
HERE THERE WAS NO PROBABLE CAUSE TO INITIATE ANY
FEDERAL PROSECUTION BECAUSE LAW ENFORCEMENT HAD
NOT INDEPENDENTLY CORROBORATED THE INFORMANT'S
SOURCE OF INFORMATION CONCERNING DEFENDANT'S BEING
"STASH HOUSE ROBBERS", AND U.S.A.M. - 9-27.220
CLEARLY STATES THAT .. "FAILURE TO MEET THE
MINIMAL REQUIREMENT OF PROBABLE CAUSE IS AN
ABSOLUTE BAR TO INITIATING A FEDERAL PROSECUTION".
HERE THE DEFENDANT'S IDENTITY WAS NOT KNOWN UNTIL
THEIR ARREST AND THE A.T.F. MADE NO EFFORT TO
CONFIRM THEIR INFORMANT'S THIRD PARTY INFORMATION
THAT SOMEONE TOLD HIM (THE INFORMANT) THAT THE
DEFENDANT(S) WERE "DRUG STASH HOUSE ROBBERS".

DEFENDANT, ANTHONY DICKEY - PRO SE, NOW ASKS THAT THE COURT UPON ITS
REVIEW OF THE HEREIN MENTIONED FACTS ALLOW DEFENDANT TO PURSUE FURTHER
DISCOVERY IN THIS MATTER IN ORDER THAT THE SELECTIVE PROSECUTION AND THE
SELECTIVE INFORCEMENT OF THE LAW BY A.T.F. AND THE UNITED STATES ATTORNEY'S
MAY BE BROUGHT TO THE SURFACE AND EXPOSED FOR WHAT IT REALLY IS.

NO MAN'S LIBERTY IS DISPENSABLE. NO HUMAN BEING MAY BE TRADED FOR ANOTHER. OUR SYSTEM CHERISHES EACH INDIVIDUAL. WE HAVE FOUGHT WARS OVER THIS PRINCIPLE. WE ARE STILL FIGHTING THOSE WARS.

THE FEDERAL GOVERNMENT HAS FOUGHT HARD. THE ISSUE HERE IS NOT DISCRETION BUT ABUSE, NOT INDEPENDENT CHARGING DECISIONS BUT LAW ENFORCEMENT MISCONDUCT, THE RACIAL PROFILING AND SELECTIVE PROSECUTION OF OVER ONE THOUSAND MINORITIES. THE TOTALITY OF THE GOVERNMENT'S CONDUCT CANNOT FIT WITHIN THEIR DISCRETIONARY FUNCTION WITHOUT DOING VIOLENCE TO EVERYTHING FOR WHICH OUR COUNTRY STANDS.

THE DISCRETIONARY FUNCTION EXCEPTION IMMUNIZES ONLY THE CONDUCT OF AGENTS EXERCISING JUDGMENT WITHIN THEIR LAWFUL DISCRETION. NO GOVERNMENT ACTOR HAS "DISCRETION" TO VIOLATE THE CONSTITUTION, STATUTES, REGULATIONS, OR RULES THAT BIND THEM. WHERE GOVERNMENT AGENTS TAKE ILLEGAL ACTIONS, THEY ACT OUTSIDE THEIR DISCRETION. WHEN THEIR ACTS VIOLATE THEIR CONSTITUTIONAL OBLIGATIONS, AS WHEN THEY RACIALLY PROFILE AND SELECTIVELY PROSECUTE ONLY MINORITIES, THEY ACT OUTSIDE OF THEIR DISCRETION. SOME TRUTHS, AS THEY SAY, ARE SELF EVIDENT. IF ANY CONCEPT IS FUNDAMENTAL TO OUR AMERICAN SYSTEM OF JUSTICE, IT IS THAT THOSE CHARGED WITH UPHOLDING THE LAW ARE PROHIBITED FROM DELIBERATELY BREAKING IT.

HERE THE A.T.F. AND UNITED STATES ATTORNEY'S OFFICE HAS A COMPLETE MONOPOLY ON THE TRUTH AND THE MEANS TO PROVE IT. THEIR CONCEALMENT ACTIVELY PREVENTED OTHERS FROM UNCOVERING SUCH TRUTH. AS THE RECORD REFLECTS, OVER THE LAST DECADE THE GOVERNMENT HAS PROTECTED SUCH INFORMATION AND STATISTICS, BY NOT DISCLOSING EXCULPATORY INFORMATION THEY HAVE ON DRUG STASH HOUSE STINGS CONDUCTED BY THE A.T.F. AS RELATES TO SELECTIVE ENFORCEMENT AND SELECTIVE PROSECUTIONS OF MINORITIES IN PREDOMINATELY MINORITY NEIGHBORHOODS. IN FACT, THE GOVERNMENT HAS JEALOUSLY GUARDED THE INFORMATION IN THEIR FILES AND THE A.T.F.'S FILES WHICH THEY KNOW ARE THE ONLY MEANS FOR THE DEFENDANT(S) TO DISCOVER THE INJUSTICE AND EXPOSE SUCH TO A COURT OF LAW. THEIR CONCEALMENT AND DECISION TO HIDE BEHIND THE SHIELD OF **ARMSTRONG** ACTIVELY PREVENTS NOT ONLY THE DEFENDANT(S), BUT ALSO THE COURT FROM UNCOVERING THE FACTS AND TRUTH IN THIS MATTER.

I EMPHASIZE THAT I NOT ONLY CHARGE THE GOVERNMENT WITH FAILURE TO ACT AGAINST SUCH SELECTIVE ENFORCEMENT AND SELECTIVE PROSECUTION, I CHARGE THEM WITH TAKING AFFIRMATIVE ACTION TO CONCEAL THE A.T.F.'S MISCONDUCT AND LATER BY INACTION, WHEN EVIDENCE SUGGESTED THAT A DISCRIMINATORY PATTERN EXISTED THAT SUPPORTED A **POTENTIAL BIAS** IN THE SELECTION, INVESTIGATION, ARREST, AND PROSECUTION OF MINORITIES IN 'DRUG STASH HOUSE STINGS'. THE UNITED STATES ATTORNEY'S OFFICE CANNOT BE LOOKED UPON AS A MERE LAW ENFORCEMENT AGENCY WHO WAS BOUND BY LAW TO PROSECUTE SUCH CASES. THEY MAY NOT HAVE STARTED THE STINGS, BUT THEY SUPERVISED THEM BY APPROVING THEM AND SEEKING APPROVAL FROM HIGHER UPS IN THE UNITED STATES ATTORNEY'S OFFICE IN NEWARK AND WASHINGTON, D.C. TO CONTINUE SUCH STINGS. THE GOVERNMENT APPROVED THE STINGS AND INCREASED THE

RISK OF HARM TO MINORITIES BY ALLOWING THE A.T.F. TO TARGET MINORITIES IN
MINORITY NEIGHBORHOODS, WITHOUT TAKING ADEQUATE STEPS TO CONTROL THE A.T.F.'S
UNLAWFUL APPLICATION OF THE STINGS TO ONLY MINORITY DEFENDANT(S) IN MINORITY
NEIGHBORHOODS.

TO THAT END, THE GOVERNMENT'S COURSE OF CONDUCT IN THIS CASE CANNOT BE
UNDERSTOOD BY ATOMIZING IT INTO SEPARATE INSTANCES OF FAILURE TO DISCLOSE. THE
GOVERNMENT'S AND A.T.F.'S SELECT TARGETING OF MINORITIES, AND WITHHOLDING OF
VITAL, RELEVANT, AND EXCULPATORY EVIDENCE WAS NOT A SEPARATE ACT OF RACIAL
PROFILING, SELECTIVE ENFORCEMENT, AND SELECTIVE PROSECUTION. HERE THE ACTIONS
OF BOTH LAW ENFORCEMENT AGENCIES WAS CLEARLY KNOWN AND MONITORED BY THE OTHER.
THEREFORE, THEY ACTED IN CONCERT WITH EACH OTHER.

IN 1928 IN **OLMSTEAD V. UNITED STATES**, 72 **L. ED** 944, **JUSTICE BRANDEIS**

STATED:

> "DECENCY, SECURITY AND LIBERTY ALIKE DEMANDED THAT
> GOVERNMENT OFFICALS SHALL BE SUBJECTED TO THE SAME
> RULES OF CONDUCT THAT ARE COMMANDS TO THE CITIZEN.
> IN A GOVERNMENT OF LAWS, EXISTENCE OF THE GOVERNMENT
> WILL BE IMPERILLED IF IT FAILS TO OBSERVE THE LAW
> SCRUPULOUSLY. OUR GOVERNMENT IS THE POTENT, THE
> OMNIPRESENT TEACHER. FOR GOOD OR FOR ILL, IT TEACHES
> THE WHOLE PEOPLE BY ITS EXAMPLE. CRIME IS CONTAGIOUS.
> IF THE GOVERNMENT BECOMES A LAWBREAKER, IT BREEDS
> CONTEMPT FOR THE LAW, IT INVITES EVERY MAN TO BECOME
> A LAW UNTO HIMSELF, IT INVITES ANARCHY. TO DECLARE
> THAT IN THE ADMINISTRATION OF THE CRIMINAL LAW THE
> END JUSTIFIES THE MEANS -- TO DECLARE THAT THE
> GOVERNMENT MAY COMMIT CRIMES IN ORDER TO SECURE THE
> CONVICTION OF A PRIVATE CRIMINAL -- WOULD BRING
> TERRIBLE RETRIBUTION. AGAINST THAT PERNICIOUS DOCTRINE
> THIS COURT SHOULD RESOLUTELY SET ITS FACE. **277 U.S. AT
> 485.**

FAILURE TO ANALYZE THE RACIAL DISPARITY IN CASES THAT A PROSECUTOR CHOSE
NOT TO PURSUE, DOES NOT IMPOSE A BURDEN UPON A DEFENDANT IF ITS IMPOSSIBLE TO
DETERMINE THE RACES OF THE INDIVIDUALS THAT POLICE OFFICER'S CHOSE NOT TO
INVESTIGATE. **CHAVEZ**, 251 **F3D AT** 640; **MCCRAY V. CITY OF DOTHAN**, 169 **F. SUPP. 2D**
1260 (11TH. CIR. 2001) ("**BROAD DISPARITY BETWEEN PERCENTAGES CREATE A GENUINE
ISSUE OF MATERIAL FACT WITH REGARD TO WHETHER DEFENDANT HAS DEMONSTRATED
DISCRIMINATORY EFFECT**").

IN LIGHT OF ALL THE LEGITIMATE FACTORS SUBMITTED, DICKEY ASKS THE COURT
TO DEFINE 'SIMILAR-SITUATED' PERSON FOR SELECTIVE PROSECUTION PURPOSES AS ONE
WHO IS CAPABLE OF ENGAGING IN THE SAME TYPE OF CRIMINAL CONDUCT AS DEFENDANT(S)
HAVE BEEN CHARGED WITH, WHICH MEANS THE COMPARATOR (WHITE CRIMINALS) ARE AS
CAPABLE OF COMMITTING THE SAME BASIC CRIME (DRUG STASH HOUSE STINGS) IN
SUBSTANTIALLY THE SAME MANNER AS THE DEFENDANT -- SO THAT ANY PROSECUTION OF
THAT CLASS OF INDIVIDUAL (WHITES) WOULD HAVE THE SAME DETERRENCE VALUE AND
WOULD BE RELATED IN THE SAME WAY TO THE GOVERNMENT'S ENFORCEMENT PRIORITIES
AND ENFORCEMENT PLAN.

DICKEY HAS SUBMITTED 'SOME EVIDENCE' THAT OTHERS (WHITES) WERE NOT TARGETED, INVESTIGATED, ARRESTED, AND PROSECUTED AT ALL, OR AT THE RATE OF MINORITIES AND/OR INDIVIDUALS OF SIMILAR NATURE.

DICKEY CONTENDS THAT "DRUG STASH HOUSE STINGS" SINGLE OUT A CERTAIN CLASS OF CITIZENS (MINORITIES) FOR A DISFAVORED LEGAL STATUS AND HARDSHIP BASED UPON RACE, AND THAT SUCH CLASSIFICATION DOES NOT BEAR A RATIONAL RELATIONSHIP TO AN INDEPENDENT AND LEGITIMATE END. AND THUS, BURDENS DEFENDANTS MINORITIES BASED ON RACE.

THE FOURTEENTH AMENDMENT PROMISE'S THAT NO LAW SHALL BURDEN A FUNDAMENTAL RIGHT, NOR TARGET A SUSPECT CLASS, AND THAT COURT'S SHOULD NOT UPHOLD SUCH CLASSIFICATION UNLESS IT BEARS A RATIONAL RELATION TO SOME LEGITIMATE END. SEE - HELLER V. DOE, 125 L.ED 2D 257 (1993). I CHALLENGE THE GOVERNMENT TO STEP UP TO THE PLATE AND PROVE THAT MINORITIES HAVE NOT BEEN SELECTIVELY PROSECUTED IN THESE 'DRUG STASH HOUSE STINGS! THE GOVERNMENT SHOULD STOP HIDING BEHIND THE "SHIELD OF ARMSTRONG", AND SUBJECT MY LEGAL ARGUMENT TO ADVERSARIAL TESTING IN THE INTEREST OF JUSTICE AND FUNDAMENTAL FAIRNESS TO SOCIETY AND THE DEFENDANT.

### CONCLUSION

THE FACT-INTENSIVE INQUIRY INVOLVED IN DETERMINING WHO CONSTITUTES A SIMILARLY SITUATED INDIVIDUAL BELIES THE GOVERNMENT'S ASSERTION THAT THE ISSUE IS INVARIABLY CRIMINAL LAW DOMINATED. SEE - UNITED STATES V. ARMSTRONG, 134 L. ED 2D 687 (1996) ("STATING THAT ALL FACTS MUST BE CONSIDERED TO DETERMINE WHO IS SIMILARLY SITUATED"); CORDI-ALLEN V. CONLON, 494 F.3D 245 (1ST. CIR. 2007)("EXPLICATING  SAME PROPOSITION IN CIVIL "CLASS OF ONE" EQUAL PROTECTION CASE"). HERE MOREOVER, ALL ROADS LEAD TO ROME; AS DICKEY HAS EXPLAINED, THE CONFIGURATION OF THE CLASS IS SUFFICIENTLY CLEAR-CUT THAT THE PRECISE STANDARD OF REVIEW FOR SIMILAR SITUATED STATUS MAKES NO DIFFERENCE IN THIS CASE.

DICKEY HAS APPROACHED THIS ASSERTION MINDFUL THAT FEDERAL PROSECUTORS ARE AFFORDED SUBSTANTIAL DISCRETION NOT ONLY IN DETERMINING WHETHER TO PROSECUTE A SUSPECTED VIOLATION OF FEDERAL LAW BUT ALSO IN DECIDING WHAT CHARGES SHOULD BE LODGED. SEE - ARMSTRONG, 517 U.S AT 464; WAYTE V. UNITED STATES, 84 L. ED 2D 547 (1985). ONCE MADE, THESE DECISIONS ENJOY A PRESUMPTION OF REGULARITY.  SEE - ARMSTRONG, 517 U.S. AT 464.

HOWEVER, THAT PRESUMPTION OF REGULARITY MAY BE DISCARDED BY A SHOWING OF SELECTIVE PROSECUTION, WHICH OF COURSE, WOULD UNDERCUT THE PRESUMPTION OF REGULARITY. THE ESSENCE OF SUCH A SHOWING IS THAT A PROSECUTOR HAS PURSUED

A CASE FOR A CONSTITUTIONALLY IMPERMISSIBLE REASON, SUCH AS THE DEFENDANT(S) RACE, RELIGION, OR OTHER CIRCUMSTANCES OR CHARACTERISTICS COGNIZABLE UNDER THE EQUAL PROTECTION CLAUSE AND PRINCIPLES. **WAYTE**, 470 **U.S.** **AT** 608.

THIS COURT MUST FIRST ELUCIDATE THE PROPER INTERPRETATION AND APPLICATION OF THE TERM **"SIMILARLY-SITUATED"**. ONLY THEN CAN THE COURT JUDGE THE RELEVANCY OF THE STATISTICAL PROFFER AND THE DEMOGRAPHICAL DATA PRESENTED BY DEFENDANT(S)

OUR THIRD CIRCUIT HAS NOT YET PROVIDED A DISTINCT DEFINITION OF THE TERM **"SIMILARLY-SITUATED"** IN THE SELECTIVE PROSECUTION CONTEXT, BUT CLASSIC EQUAL PROTECTION PRINCIPLES LIGHT OUR PATH AND LIMN THE ATTRIBUTES OF ONE WHO IS SIMILARLY SITUATED. **SEE - ARMSTRONG**, 517 **U.S** AT 465. A SIMILARLY-SITUATED OFFENDER IS ONE OUTSIDE THE PROTECTED CLASS WHO HAS NOT BEEN INVESTIGATED, ARRESTED, AND PROSECUTED UNDER THE SAME CIRCUMSTANCES, BUT WHO IS CAPABLE OF SUCH SELECTION, BUT AGAINST WHOM THE LAW HAS NOT BEEN ENFORCED. **SEE - ID. AT** **469.** IN CONFIGURING THE POOL OF SIMILARLY SITUATED OFFENDERS, **"NO FACT SHOULD BE OMITTED TO MAKE IT OUT COMPLETELY"**. **ID AT 466.** (**QUOTING - AH SIN V. WHITMAN**, **49 L. ED 1142 (1905).**

LASTLY, DICKEY SUBMITS THAT HE CANNOT EXPAND THE MEANING OF THE TERM **"SIMILAR-SITUATED"**, BECAUSE THAT TERM IS ELASTICAL AND FACT SPECIFIC IN EACH AND EVERY CASE THAT THE DEFENDANT IS ASKED TO SURMOUNT THE HURDLE AND BURDEN OF THE **"ARMSTRONG"** TWO PRONG PREREQUISITE. IN THIS CRIMINAL MATTER BASED UPON THE CIRCUMSTANCES AND FACTS OF THIS PARTICULAR CASE, DICKEY HAS MET THE **"THRESHOLD"** OF **"SOME EVIDENCE"** REQUIRING THE COURT TO EXPLORE FURTHER.

THE FOCUS OF AN INQUIRING COURT MAY NOT BE TOO NARROW. IN DETERMINING WHETHER A DEFENDANT AND OTHERS ARE **"SIMILARLY-SITUATED"** FOR PURPOSES OF A CLAIM OF SELECTIVE PROSECUTION AND SELECTIVE ENFORCEMENT, THE FOCUS BY THE COURT MUST BE ON FACTORS THAT ARE AT LEAST ARGUABLY MATERIAL TO THE DECISION AS TO WHETHER OR NOT TO INVESTIGATE, ARREST, AND PROSECUTE **"OTHERS"** (WHITES). A FACTOR WILL BE DEEMED MATERIAL IF IT HAS "SOME MEANINGFUL RELATIONSHIP" TO EITHER THE CHARGES AT ISSUE, OR TO THE ACCUSED, AND THEREFORE MIGHT BE CONSIDERED BY A REASONABLE PROSECUTOR. **SEE - UNITED STATES V. KHAN**, 461 **F.3D** 477 (4**TH**. **CIR.** 2006)("IN DEFERENCE TO EXECUTIVE DISCRETION, WE HAVE HELD THAT **DEFENDANT(S) ARE SIMILARLY SITUATED WHEN THEIR CIRCUMSTANCES PRESENT NO DISTINGUISHABLE LEGITIMATE PROSECUTORIAL FACTORS THAT MIGHT JUSTIFY MAKING DIFFERENT PROSECUTORIAL DECISIONS WITH RESPECT TO THEM". AS THE COURTS HAVE RECOGNIZED, [A] MULTIPLICITY OF FACTORS LEGITIMATELY MAY INFLUENCE THE GOVERNMENT'S DECISION TO PROSECUTE ONE INDIVIDUAL BUT NOT ANOTHER" -- FACTORS INCLUDING, "INTER ALIA, THE COMPARABILITY OF THE CRIMES, THE SIMILARITIES IN WHICH THE CRIMES WERE COMMITTED, THE RELATIVE EFFICACY OF EACH PROSECUTION AS A DETERRENT, AND THE EQUIVALENCY OF THE EVIDENCE AGAINST EACH PROSPECTIVE (EMPHASIS) DEFENDANT".** DEFENDANT REQUESTS A DETERMINATION IN HIS FAVOR.

# EXHIBIT - "C"

**********************************************************************

*DATA MENTIONED IN THIS EXHIBIT ONLY APPLIES TO THE MAP AND CITIES WHICH ARE
MENTIONED BELOW - OTHER MINORITY NEIGHBORHOODS AND CITIES HAVE NOT BEEN INCLUDED.



**STINGS TARGET A FEW SPOTS**
USA TODAY identified more than 600 of the suspects in ATF drug-house
stings. Most of the operations took place in a handful of major cities,
particularly around South Florida.

**The top 10 locations for number of arrests**

**Arrests in the remaining locations**

| City | Arrests | | City | Arrests |
|---|---|---|---|---|
| X Detroit | 12 | X | Cleveland | 4 |
| Travis County, Texas | 12 | | Collier County, Fla. | 4 |
| Tucson | 12 | X | Inglewood, Calif. | 4 |
| X Las Vegas | 10 | | Kane County, Ill. X | 4 |
| X San Diego | 9 | | Lake County, Ind. X | 4 |
| X Dayton, Ohio | 8 | | Napa County, Calif. X | 4 |
| X Fairfax County, Va. | 8 | | Polk County, Fla. | 4 |
| Billings, Mont. | 7 | | Shreveport, La. | 4 |
| X Fort Worth | 7 | | Webb County, Texas X | 4 |
| Allen County, Ind. | 6 | | DuPage County, Ill. | 3 |
| X Dallas | 6 | | Essex County, Mass. | 3 |
| X Fort Myers, Fla. | 6 | | Lake County, Ill. | 3 |
| Polk County, Iowa | 6 | | Menlo Park, Calif. X | 3 |
| X Atlanta | 5 | | Nashville X | 3 |
| Bloomington, Ind. | 5 | | Orange County, Fla. | 3 |
| X Camden County, N.J. | 5 | | Richland County, S.C. | 3 |
| X Memphis | 5 | | Rockford, Ill. | 3 |
| Naples, Fla. | 5 | | Yakima County, Wash. | 3 |
| X New York | 5 | X | Gainesville, Fla. | 2 |
| Pinellas County, Fla. | 5 | | Hammond, Ind. X | 2 |
| X Seattle | 5 | | Orange County, Calif. X | 2 |

Source USA TODAY research

**NOTE - ** "FACT"** - OUT OF FORTY TWO CITIES STATED ABOVE IN WHICH A.T.F. DRUG
STASH HOUSE STINGS WERE CONDUCTED IN, DEFENDANT HAS CONFIRMED
TWENTY EIGHT OF THOSE CITIES AS BEING MINORITY NEIGHBORHOODS.
THE OTHER FOURTEEN CITIES ARE PENDING VERIFICATION AT THE
TIME THIS EXHIBIT WAS COMPILED.

**(A) THE GOVERNMENT SHOULD NOT BE ALLOWED TO ARGUE THAT NO "PLAYBOOK" EXISTS OR THAT THERE IS NO SET OF RULES OR SCRIPT THAT AGENTS AND INFORMANTS ARE TRAINED TO USE IN CONDUCTING SUCH STINGS.**
==========================================================

DICKEY SUBMITS THAT THE GOVERNMENT CANNOT BE ALLOWED TO ARGUE THAT THE A.T.F. "DRUG STASH HOUSE STINGS" ARE NOT CONDUCTED PURSUANT TO A "PLAYBOOK" AND/OR SCRIPTED BEHAVIOR OR TECHNIQUES THAT THE AGENTS AND INFORMANT MUST ABIDE BY BECAUSE SUCH IS PART OF THE RULES SET UP BY A.T.F. LAWYER'S WHO CREATED AND DESIGNED HOW THE STINGS OPERATE.

DICKEY SUBMITS THAT IN **UNITED STATES V. ALEXANDER, CRIMINAL #**_____ THE GOVERNMENT SUBMITTED **'EX PARTE' A SIX PAGE EXCERPT OF AN ATF MANUAL THAT INCLUDES SOME PROVISIONS RELATED TO THE IDENTIFICATION OF TARGETS FOR THIS TYPE OF STING OPERATION.** IN SUCH CASE THE COURT REVIEWED THE DOCUMENT AND DECIDED THAT CERTAIN SECTIONS SHOULD BE DISCLOSED TO DEFENSE COUNSEL. SEE **UNITED STATES V. ALEXANDER, SUPRA.** (COURT MEMORANDUM AND ORDER).

DICKEY THEREFORE SUBMITS THAT THIS COURT SHOULD ALLOW DEFENDANT(S) TO VIEW THE COMPLETE ATF MANUAL ON HOW THESE STINGS ARE INITIATED AND CONDUCTED. PRIOR TO **UNITED STATES V. ALEXANDER, SUPRA.** , THE GOVERNMENT IN THIS CASE DENIED THAT SUCH DOCUMENTS EXISTED AND IN OPPOSITION TO DICKEY'S REQUEST FOR SUCH DOCUMENTS SAID THAT THEY DID NOT EXIST AND IF THEY DID THEY WOULD BE INTERNAL DOCUMENTS AND THUS EXEMPTED UNDER PRIVILEGE.

DICKEY RESPECTFULLY ASKS THAT THE COURT ORDER SUCH DOCUMENTS, AND REVIEW SUCH IN-CAMERA AND UPON SUCH REVIEW ORDER THEM RELEASED TO DEFENDANT(S) FOR DISCOVERY SUBJECTED TO A PROTECTIVE ORDER IF THE COURT DEEMS NECESSARY.

### LEGAL ARGUMENT

**(B) THE COURT SHOULD TAKE INTO CONSIDERATION THE PUBLIC STATEMENTS MADE BY ATF OFFICIALS TO USA TODAY REPORTER BRAD HEATH CONCERNING THE APPLICATION AND ACTIVATION OF "DRUG STASH HOUSE STINGS".**
==========================================================

DICKEY SUBMITS THAT THE ATF AGENCY **(EMPLOYEES - MIKE CAMPBELL, ATF SPOKESMAN; RICHARD MARIANOS, ASST. ATF DIRECTOR; SMITH, ATF SPECIAL OPERATION CHIEF)** HAVE ALL SPOKE WITH THE USA TODAY AND REPORTER - BRAD HEATH CONCERNING HOW THE RULES AND GUIDELINES OF THE PROGRAMS STING OPERATES.

IN THE USA TODAY REPORT **(SEE - EXHIBIT "A")** ATF OFFICIALS STATED THAT IT **"SEEKS TO LOCK UP THE "TRIGGER PULLERS" WHO MENACE SOME OF THE MOST DANGEROUS PARTS OF INNER-CITY AMERICA (EMPHASIS)", PAGE 2 OF 10).** THE ARTICLE AT PAGE 3 OF 10 PAGES STATES, **"THE ATF DISPATCHED AGENTS AROUND THE COUNTRY TO TEACH THE TECHNIQUE TO OTHER LOCAL AND FEDERAL POLICE AGENCIES, INCLUDING THE U.S. BORDER PATROL. AS DRUG-HOUSE OPERATIONS BECAME MORE COMMON**

THE AGENCY ISSUED A CONFIDENTIAL ORDER LAYING DOWN THE GROUND RULES FOR CONDUCTING THEM." THIS IS PROOF THAT THESE STASH HOUSE STINGS ARE DONE BY SCRIPTED CONDUCT WRITTEN BY JUSTICE DEPARTMENT LAWYERS.

AS TO WHO AND HOW TO CHOOSE THE TARGETS FOR THIS STING, **MR. RICHARD MARIANOS, THE ASSISTANT DIRECTOR FOR ATF "DRUG STASH HOUSE STINGS"** SAID TO REPORTERS AT THE USA TODAY, THAT **"MISCONDUCT BY INFORMERS IS NOT ALLOWED. "WE HAVE MANY OF THESE CASES WHERE WE'VE STOOD DOWN AND SAID WE'RE NOT GOING TO DO THIS BECAUSE THIS INFORMANT IS WAY OFF THE 'PLAYBOOK' (EMPHASIS) HERE"**, HE SAID. OTHER CASES WERE ABANDONED BECAUSE SUPERVISORS THOUGHT THE TARGETS WERE INAPPROPRIATE, HE SAID". PAGE 6 OF 10.

**ATF SPOKESMAN - MIKE CAMPBELL** SAID THE AGENCY HAS SINCE **UPDATED THE RULES. CAMPBELL SAID "THE AGENCY'S TACTICS HAVE BEEN APPROVED BY ATF LAWYERS AND FEDERAL PROSECUTORS; EACH OPERATION MUST ALSO BE REVIEWED BY FIELD SUPERVISORS AND SENIOR OFFICIALS IN WASHINGTON WHO CAN SHUT IT DOWN IF IT'S CLEAR TO THEM THE TARGETS AREN'T ARMED ROBBERS". CAMPBELL STATED - "WE LAY OUT THE SCENARIO. SO IF THEY'RE NOT CAREER ROBBERS, I'M NOT FOR THAT, SAID RICHARD MARIANOS, ASST. ATF DIRECTOR".** PAGE 4 OF 10. THE PROBLEM WITH THAT STATEMENT IS THAT NONE OF THE DEFENDANT(S) IN THIS CASE WERE EVER KNOWN BY THE INFORMANT OR THE ATF LAW ENFORCEMENT UNTIL THE DAY OF THEIR ARREST. SO ITS OBVIOUS THAT THERE WAS NO PROOF THAT DEFENDANT(S) **"WERE ARMED ROBBERS"!**

THIS IS WHY DICKEY ASKS THE COURT TO ORDER RELEASE OF THE GUIDELINES, RULES, SCRIPT, PLAYBOOK, ETC., ETC. . IT IS A GREAT POSSIBILITY THAT THE GUIDELINES AND RULES IN THIS CASE WERE NOT FOLLOWED **(IF WE ARE TO BELIEVE THE STATEMENTS MADE BY ATF OFFICIALS IN THE USA TODAY).** THEREFORE, DICKEY ASKS THAT YOU TAKE INTO CONSIDERATION THE ENCLOSED EXHIBITS WHICH INCLUDE THE NINTH CIRCUIT DECISION - UNITED STATES V. DUNLAP, CASE NO.#2:13-CR-00126 (ODW-3). **IN DECIDING** WHETHER TO GRANT DICKEY'S MOTION FOR DISCOVERY IN THIS SELECTIVE ENFORCEMENT AND SELECTIVE PROSECUTION CLAIM.

RESPECTFULLY SUBMITTED,

ANTHONY D. DICKEY - PRO SE

APRIL 16, 2014

# Judge: ATF stings may be targeting minorities

EXHIBIT-"E'

Brad Heath, USA TODAY      *6:23 p.m. EDT August 1, 2013*

*The chief federal judge in Chicago says controversial ATF stings that lure suspects with the promise of a huge payday from a fake drug robbery may be unfairly targeting minorities.*



*(Photo: Scott Eisen, AP)*

**SHARE**

**377**
**CONNECT**

**48**
**TWEET**

(https://twitter.com/intent/tweet?url=http://usat.ly/1edXp9P&text=Judge:%20ATF%20stin

Controversial federal sting operations that lure in suspects with the promise of a huge payoff for robbing a fake drug stash house may be unfairly targeting racial minorities, the chief federal judge in Chicago said this week.

U.S. District Court Judge Ruben Castillo said in an order filed late Wednesday (http://www.documentcloud.org/documents/745790-discovery-order.html) that there is "a strong showing of potential bias" in the robbery stings, which are run by the U.S. Bureau of Alcohol, Tobacco, Firearms and Explosives. He noted that, since 2011, federal agents have used such stings to lock up at least 26 people in the Chicago area and that all of them were either black or Hispanic.

The order comes a month after a USA TODAY investigation (http://www.usatoday.com/story/news/nation/2013/06/27/atf-stash-houses-sting-usa-today-investigation/2457109/) found that the ATF has quietly made fictional stash-house robberies a central feature of its effort to target violent crime, more than quadrupling the number of stings it conducted over the past decade. Although the stings are meant to target some of the nation's most dangerous criminals, they have routinely ensnared small-time crooks who jumped at the chance to score hundreds of thousands of dollars worth of drugs.

**INVESTIGATION: ATF uses fake drugs, big bucks to snare suspects (http://www.usatoday.com/story/news/nation/2013/06/27/atf-stash-houses-sting-usa-today-investigation/2457109/)**

Nationwide, the ATF has locked up more than 1,000 people in stash-house operations over the past decade. Still, the tactic has been widely criticized by federal judges and remains so controversial that some federal prosecutors refuse to allow it.

Castillo's two-page order instructed the government to turn over a list of all the people it had charged in stash-house cases in northern Illinois, as well as confidential ATF documents that outline how agents are supposed to conduct the operations, including any guidelines for selecting appropriate targets.

Castillo's order came in a case in which five men are charged with plotting to rob a non-existent drug stash house. As in most of the ATF's other operations, an informant introduced the men to an undercover agent posing as a disgruntled courier who would help them steal 15 to 20 kilograms of cocaine. Agents arrested them in August 2012 when they showed up allegedly to commit the robbery.

Depending on what the records reveal, Castillo's decision could arm defense lawyers to argue that he should throw out the case altogether on the grounds that the government selectively prosecuted racial minorities. They could raise more questions about a brand of undercover operation that has already drawn widespread criticism from federal courts for tactics that skirt the boundaries of entrapment.





Spokesmen for the U.S. Attorney's office in Chicago and the ATF declined to comment on the order or the allegations that officials profiled racial minorities. Prosecutors have said in court papers that there has been no evidence of "discriminatory effect or discriminatory intent" behind the stash-house operations.

Defense lawyers urged Castillo to scrutinize the ATF operations because, unlike cases in which police investigate crimes that have happened, the stings give law enforcement wide latitude to select their targets. "These are unique cases in that they exist only when the government creates the fiction that becomes the crime," public defenders Candace Jackson and Denise Hesler wrote in a July 22 court filing (http://www.documentcloud.org/documents/745987-reply.html).

Castillo, the first Hispanic to serve as chief judge in Chicago, said in the order that "history has shown a continuing difficult intersection between the issue of race and the enforcement of our nation's criminal laws."

Follow reporter @bradheath (http://twitter.com/bradheath) on Twitter

SHARE

377
CONNECT

48
TWEET
(https://twitter.com/intent/tweet?url=http://usat.ly/1edXp9P&text=Judge:%20ATF%20stings%20may%20be%20targeting%



USA NOW



**Best Opening Ceremonies moments ever | USA NOW**

# ATF uses fake drugs, big bucks to snare suspects



## TARGETING TRIGGER PULLERS

The U.S. Bureau of Alcohol, Tobacco, Firearms and Explosives has locked up more than 1,000 people using controversial sting operations that entice suspects to rob nonexistent drug stash houses. See how the stings work and who they target.

Brad Heath, John Hillkirk, Shannon Green, Keith Carter, Ben Dorger, Emaun Kashfipour, Cara Richardson, Tory Hargro, and Jerry Mosemak, USA TODAY

**Brad Heath, USA TODAY**   *11:26 a.m. EDT June 28, 2013*

*ATF stings that promise loads of easy money snared 1,000 would-be criminals, a USA TODAY investigation finds. These fake drug stashes have led to hard time, begging the question: Is this 'good law enforcement' or has the government gone too far?*



*(Photo: USA TODAY)*

**SHARE**     **2923**     **272**
CONNECT     TWEET

(https://twitter.com/intent/tweet?url=http://usat.ly/16CBs28&text=ATF%20uses%20fake%

ROMEOVILLE, Ill. — The three men in the back seat were supposed to be ready for battle.

They were waiting for a phone call that would launch a daring and dangerous crime, sending them charging through the front door of a Mexican drug ring's stash house to steal 50 pounds or more of cocaine from three armed guards. Their plan was to disguise themselves as police officers, tie up the guards, and slip away with a half-million dollars worth of drugs. If tying them up didn't work, they'd kill them all.

Only the small army of federal agents watching them knew that it was all a lie.

There was no house. No drugs.

And the only things waiting for them when the call came were a team of camouflaged federal agents with rifles and stun grenades, and the promise of a long prison sentence for a plot to steal and re-sell non-existent cocaine.



William Alexander, center, and two other suspects go over the details of a planned stash house robbery. Alexander doesn't know that the stash house doesn't exist and that he and his accomplices will soon be arrested as part of an ATF sting.(Photo: ATF)

The U.S. Bureau of Alcohol, Tobacco, Firearms and Explosives, the agency in charge of enforcing the nation's gun laws, has locked up more than 1,000 people by enticing them to rob drug stash houses that did not exist. The ploy has quietly become a key part of the ATF's crime-fighting arsenal, but also a controversial one: The stings are so aggressive and costly that some prosecutors have refused to allow them. They skirt the boundaries of entrapment, and in the past decade they have left at least seven suspects dead.

ATF uses fake drugs, big bucks to snare suspects

The ATF has more than quadrupled its use of such drug-house operations since 2003, and officials say it intends to conduct even more as it seeks to  lock up the "trigger pullers" who menace some of the most dangerous parts of inner-city America. Yet the vast scale of that effort has so far remained unknown outside the U.S. Justice Department.

To gauge its extent, USA TODAY reviewed thousands of pages of court records and agency files, plus hours of undercover recordings. Those records — many of which had never been made public — tell the story of how an ATF strategy meant to target armed and violent criminals has regularly used risky and expensive undercover stings to ensnare low-level crooks who jump at the bait of a criminal windfall.

In many cases, the records show the ATF accomplished precisely what it set out to do, arresting men outfitted with heavy weapons and body armor (http://www.documentcloud.org/documents/689815-chapa-luis-1-complaint.html#document/p4/a107033), and linked to repeated, and sometimes bloody (http://www.documentcloud.org/documents/675544-kemey-us-sentencing-memo.html#document/p4/a107034), crimes. In the process, however, the agency also scooped up small-time drug dealers and even people with no criminal records at all, including Army Rangers (http://www.documentcloud.org/documents/675509-lopez-carlos-complaint.html#document/p3/a107035). It has offered would-be robbers the chance to score millions of dollars of cocaine for a few hours of work. In at least one case, the ATF had to supply its supposed armed robbers with a gun.

The stings are the latest and perhaps clearest reflection of a broad shift by federal law enforcement away from solving crimes in favor of investigating people the government thinks are criminals. Such tactics are common in law enforcement's efforts to prevent terrorist attacks, but they are also becoming a staple of its fight against everyday street crime.

Critics, among them federal judges, say the ATF's operations are flawed. In an opinion last year (http://www.lb7.uscourts.gov/documents/10-3725op.pdf),  Judge Richard Posner of the Seventh Circuit Court of Appeals in Chicago dismissed the drug-house stings as a "disreputable tactic" that creates "an increased risk of entrapment because of the potential for the extensive use of inducements and unrealistic temptations to encourage the suspects' criminal conduct."

The stings work like this: When agents identify someone they suspect is ripping off drug dealers, they send in an undercover operative posing as a disgruntled courier or security guard to pitch the idea of stealing a shipment from his bosses. The potential score is almost always more than 5 kilograms of cocaine — enough drugs to fetch hundreds of thousands of dollars on the street, or to trigger sentences of 10 years or more in prison.

When the target shows up ready to commit the robbery, he and anyone else he brings with him are arrested and charged with a raft of federal crimes, the most serious of which is conspiring to sell the non-existent cocaine.

The arrests don't come cheap. A single case can go on for months and require dozens of federal agents and local police officers.

Former ATF supervisor David Chipman, who left the agency last year, said the public deserves to know more about how the ATF is using its resources. "There are huge benefits, and there are huge downsides," he said. "Do you want police to solve crimes, or do you want them to go out and prevent crimes that haven't occurred yet? What are the things you're willing to do so that your kid doesn't get shot?"

## A CRACK DEALER AND A BIG SCORE

William Alexander boasted that he was exactly the type of armed and dangerous criminal the ATF is after. He was an experienced drug robber, he told an undercover agent, and a chief of Chicago's notorious Four Corner Hustlers, who commanded 17 blocks on the city's west side and had men ready to kill at his command.

Alexander was 32 years old the afternoon in January 2011 when he first slid into the passenger seat of an undercover ATF agent's pickup in a 7-Eleven parking lot in Woodridge, Ill., one of the middle-class suburbs that sprawl out west of Chicago. Alexander, 5 feet tall, introduced himself as "Little." He was, by then, a career crack dealer and recent cosmetology school dropout, though he was also out of jail and off parole for the first time in his adult life.

And while his record was long, it hardly identified him as dangerous.

Most of the people the ATF arrested in drug-house stings last year — about 80% — already had criminal records that included at least two felony convictions before the agency targeted them. But 13% had never before been found guilty of a serious crime, and even some of those with long rap sheets had not been charged with anything that would mark them as violent.

ATF officials reject the idea that they should focus only on people with violent records. "Are we supposed to wait for him to commit a (obscenity) murder before we start to target him as a bad guy?" said Charlie Smith, the head of ATF's Special Operations Division, which is responsible for approving each sting. "Are we going to sit back and say, well, this guy doesn't have a bad record? OK, so you know, throw him back out there, let him kill somebody, then when he gets a bad record, then we're going to put him in jail?"

For all the times Alexander was arrested — court records list dozens — police never found him with a gun, and he was charged with a violent crime only once, after his girlfriend, Demonisha Winters, accused him of domestic battery. The charge was dropped a few weeks later, and Winters said in an interview that Alexander never hit her.

What he did do was sell crack, though seldom more than a gram or two at a time. When Alexander was 18, police in Kokomo, Ind., caught him trying to flush two baggies of crack (http://www.documentcloud.org/documents/717634-kokomo-arrest.html#document/p3/a107295) down an apartment toilet. Four years after that, Chicago police arrested him with a half-gram. The next year, they caught him with 10 baggies of crack. Two years later, they caught him carrying a gram of crack and a half-gram of heroin, worth about $40, according to police reports and court files.

The ATF was about to offer him something much bigger.



William Alexander, who told ATF agents he was a chief in Chicago's notorious Four Corner Hustlers gang, was arrested in an ATF sting. If convicted, he faces at least 25 years in prison. (Photo: ATF)

The undercover agent, Andrew Karceski, introduced himself as Joe. He pulled his truck around the corner, cut the engine and flipped a switch to show Alexander a hidden compartment, called a "trap," commonly used for running drugs. "They promise you one thing, and they (obscenity), they make all the money, and I take all the (obscenity) risk," he said in an exchange captured on a blurry hidden-camera video.

"They haven't paid me in two months now, and that's (obscenity)," he said. "It's just got to a point where I got to feed my kids, too, you know what I'm saying?"

"You're (obscenity) right," Alexander replied.

Then the agent laid out the basics of his proposal: Once a month, he said, his bosses had him pick up a load of cocaine from a house in the suburbs. They used a different house every time, always with two or three men inside, always armed. But the payoff would be big: "I know there's going to be (obscenity) in there. I know that," he said, a reference to drugs. "How much I can't guarantee, but I know there's going to be big (obscenity) in there. I've never seen cash, but I don't know."

Alexander said it wouldn't be a problem. "I got guys I could just say, 'Go in there and shoot everybody.' I got guys that I'll say they're smart enough to know go in there and lay everybody down without hurting anybody. I know (obscenity) that will get it done," he said.

"We'll plan it right," he promised. "We've got enough time."

**'I CALL THIS GOOD LAW ENFORCEMENT'**

The ATF's drug-house stings began in Miami in the early 1990s. Drug cartels were moving huge quantities of cocaine through South Florida, creating rich targets for criminals brazen enough to try to poach the shipments. The robberies were turning into shootouts — or, worse, attacks on innocent people when the robbers got the wrong address — and ATF agents wanted a way to stop them. At first, agents actually set up fake drug houses (http://www.documentcloud.org/documents/681527-wilson-reginald-trial-3-29-12.html#document/p21/a107039), loaded with fake cocaine. When that led to car chases and shootings (http://www.documentcloud.org/documents/681527-wilson-reginald-trial-3-29-12.html#document/p22/a107038) in residential neighborhoods, they adopted a fictional approach instead.

The stings proliferated over the past decade. Last year, the ATF said it arrested 208 people in drug-house operations, compared with 41 a decade earlier. Most of the operations took place in Miami, Chicago, Phoenix and a few other cities, though court records show the ATF has conducted them in at least 22 states.

At the same time, the ATF dispatched agents around the country to teach the technique to other local and federal police agencies, including the U.S. Border Patrol.

As drug-house operations became more common, the agency issued a confidential order laying down the ground rules for conducting them. Officials instructed agents to make sure Justice Department lawyers would be willing to prosecute "home invasion" cases, and told them to try other techniques first, including executing search warrants. Most of the rules covered the tactical details of safely arresting the suspects.

## ATF STASH HOUSE STINGS

USA TODAY identified more than 600 people prosecuted as a result of controversial ATF operations in which agents offered them the chance to rob nonexistent drug stash houses.



Sources: USA TODAY research     Credits: Brad Heath, Lisa Tucker, Juan Thomassie

 The undated manual, a copy of which was obtained by USA TODAY, included no guidelines for selecting appropriate targets. ATF spokesman Mike Campbell said the agency has since updated the rules; ATF would not provide a copy. He said the agency's tactics have been approved by ATF lawyers and federal prosecutors; each operation must also be reviewed by field supervisors and senior officials in Washington who can shut it down if it's clear to them the targets aren't armed robbers.

 "We lay out the scenario. So if they're not career robbers, I'm not for that," said Richard Marianos, an assistant ATF director who supervised some of the investigations when he led the agency's Washington field office.

Distinguishing drug robbers from loudmouths isn't easy. Drug dealers seldom report robberies to the police, so few of the robberies are investigated, let alone solved. Agents rely instead on scraps of intelligence gathered from informants (usually other criminals), convicts, 911 calls, neighborhood complaints and local police to identify and target robbery crews.

A year after the ATF arrested Alexander's crew, for example, one of its informants arranged a meeting at a Baltimore train station with two men whom city police believed to be "armed drug traffickers (http://www.documentcloud.org/documents/675593-barnes-corey-complaint.html#document/p4/a107040)." One of them, Edward Ellis, had been convicted a decade earlier of armed robbery; the other, Corey Barnes, had been convicted only of street-level drug sales. The informant told them they could score up to 15 kilograms (http://www.documentcloud.org/documents/675593-barnes-corey-complaint.html#document/p6/a107042) of cocaine (easily worth more than $300,000).

"You can't beat free money," Ellis replied, according to court records (http://www.documentcloud.org/documents/675593-barnes-corey-complaint.html#document/p5/a107043).

The informant warned them that the guards would be armed, but Ellis said they would be ready (http://www.documentcloud.org/documents/675593-barnes-corey-complaint.html#document/p5/a107045). "We got some artillery; it's just making sure you got the right artillery for the job," he said. "We ain't coming with just two handguns when a (obscenity) need more than that." But when it was time for the robbery two weeks later, none of the would-be robbers could find a car. They paid a friend to drive them. Two hand pistols; a third man showed up armed with a pellet gun, according to court records (http://www.documentcloud.org/documents/675593-barnes-corey-complaint.html#document/p10/a107044).

Ellis was sentenced in April to eight years and four months in federal prison. His lawyer, Tamara Theiss, told the judge that as the case unfolded, it had become clear that the men had to go out and find weapons to use during the robbery, suggesting that if they were robbers, they were not actually armed until after the ATF approached them. "This was simply an overwhelming temptation," she said, involving "a great deal of money … in a relatively easy way." The ATF's stings "are intended to ensnare the worst of the worst, the most dangerous people in society. It's clear that they ensnared someone very different," she said.

U.S. District Court Judge James Bredar cut her off.

"In our society, what we say is the touchstone of culpability is what's in your mind: what did you intend to do," he told Ellis. People who kill by accident generally aren't punished; people who plan to kill but don't are. "No actual crime was committed, nor could it have been," but Ellis nonetheless "demonstrated a propensity to commit a very serious offense," Bredar said.

"This is a city where violence is rampant and the government is bound to undertake operations like this to find and stop those who are predisposed to this," said Bredar. "I call this good law enforcement."

## A HALF-MILLION DOLLARS OF COCAINE

Alexander met the undercover agent again in early February 2011, climbing into the passenger seat of the agent's pickup in the parking lot of his apartment complex.

He had a plan: When the agent went inside to pick up his regular shipment of cocaine, Alexander and his crew would follow close behind him, guns drawn. They could tie up the guards, Alexander said. Or they could start shooting. "If you want us to get rid of 'em, (obscenity) get rid of them, too," he said. "It's whatever. ... You just said as long as we get in and get out we good, right?"

Right, the agent said — especially if they got to the house early, before other couriers had a chance to pick up their own shipments. "When I get there early, there's a stack. There's 20 — 20, 30 40 (kilos). There's a ton if I'm first," he said.

But to get it, the agent reminded him, they'd have to get past two or three armed men. "You were saying revolver, man," the agent said, turning the conversation back to the guns the robbers would need. "You get on anything else? You were talking you're trying to get something a little better than that. ... Find anything?"



William Alexander and his two accomplices were arrested with a single gun, a five-shot revolver that an ATF report concluded had been manufactured before 1918. The gun was unloaded; agents found ammunition in a van in which the suspects were transported after they were arrested, but the bullets were the wrong size for the gun. (Photo: ATF)

Alexander paused. "Tools? Nah," he said, referring to guns. But it wouldn't be a problem. A friend of his would be coming down to meet them in a few minutes, and he had the guns they needed, Alexander said. But he seemed more interested in talking about the money.

Alexander predicted he could unload 1-kilogram bricks of cocaine quickly for $20,000 to $22,000, putting the value of the heist at between $400,000 and $880,000. He said he could make even more by cooking it into crack and selling it on the street.

Alexander looked around and wondered what was taking his friend so long to show up. What happens if the police roll through and see them talking, he asked.

"Nothing against the law about talking," the agent said.

## DOES IT GO TOO FAR?

Federal courts have largely approved of the ATF stings, though some have also expressed unease.

A little more than three months after agents first approached Alexander, for example, a federal appeals court in Chicago called the stings "tawdry," saying the ploy "seems to be directed at unsophisticated, and perhaps desperate, defendants who easily snap at the bait." The judges faulted agents for violating their own rules about recording meetings, but ultimately rejected the idea that the stings amount to entrapment.

Entrapment is a narrow concept. The government can't pressure an innocent person to commit a crime. But it can — and routinely does — offer people who are predisposed to crime the opportunity to commit one. Police agencies have been conducting sting operations for decades to ensnare child abusers, drug dealers, even congressmen, though the drug-house stings rely more heavily on fiction than most.

"It wears me out when you hear people sit there and say, 'Well, you created the dope,' " Smith, ATF's special operations chief, said. "Yeah, you know what? In this scenario, we did. And thank God we did. Because you know what? Now because of the fact that we did create this, my home, the home next door to me ... isn't going to get their door kicked in looking for drugs that may have existed or maybe didn't exist because they had the wrong address. So when are we going to start sitting back and realizing, hey, if these guys have an opportunity and we can knock that off before it gets to that, it's better for us."



Still, the combination of the fictional nature of the crimes and the government's reliance on confidential informants to help entice prospective robbers has caused problems.

In one case, an ATF informant named David Villamonte testified (http://www.documentcloud.org/documents/690980-slowden-cassio-166-transcript.html#document/p20/a107046) that he targeted a Florida man named Cassio Slowden for a drug-house sting after parking next to him at a gas station and chatting about prison tattoos. "By his demeanor, I could tell he was young, and that he was involved in the elements," Villamonte said. When Slowden told him he had some marijuana to sell, Villamonte concluded he must have stolen it (http://www.documentcloud.org/documents/690980-slowden-cassio-166-transcript.html#document/p57/a107047). Slowden's lawyer argued that he had been entrapped; a jury acquitted him (http://www.documentcloud.org/documents/690979-slowden-cassio-154-judgment) of federal drug and weapons charges last year.



Another informant, Victor Bugarin, testified that he spoke to a suspected San Diego drug robber named Thomas Johnson only a few times before enticing him to participate in a 30-kilogram cocaine heist. Confronted with phone records showing he'd been making repeated phone calls to Johnson over more than four months, the informant admitted that his story (http://www.documentcloud.org/documents/717172-johnson-thomas-pages-from-tdj-vol-iv.html#document/p46/a107050) was "apparently not" true. Johnson said he went through with the robbery plan only because Bugarin said he needed the money to keep from being evicted. A jury last year acquitted him of all but one charge; the remaining count is on appeal.



The ATF's Marianos said such conduct is not allowed. "We have many of these cases where we've stood down and said we're not going to do this because this informant is way off the playbook here," he said. Other cases were abandoned because supervisors thought the targets were inappropriate, he said.

Acquittals are uncommon. USA TODAY was able to track 512 completed prosecutions; among those, juries acquitted 22 people, because jurors either thought that they had been entrapped or weren't convinced that they had been involved enough to be part of the conspiracy. At least 89 other prosecutions are still pending in federal court.

**'I WAS SUPPOSED TO BE PREPARED, MAN'**

The day before Alexander was to commit the robbery, the ATF agent pulled into the parking lot of his apartment building to go over the plan one more time.

Alexander asked him to come upstairs while he and a friend smoked marijuana. The agent declined. Then Alexander asked for a ride to a store so they could pick up some police costumes. Later, the agent said. Did they have the pistols all lined up, he asked? "Ah, yeah," Alexander replied and bit at his fingernails. "I'm gonna get on top of that today, though."

"I'm saying, man, if it's gonna be half-assed, let's just blow it off and not (obscenity) do it and wait," the agent said. "This is a one-time deal, dude."

Another man, Hugh Midderhoff, 18, sat in the back seat, wrapped in a checkered jacket and big black hat. Like Alexander, he had a criminal record, including an arrest for possessing his neighbor's stolen television (http://www.documentcloud.org/documents/717635-woodridge-charges.html#document/p1/a107294), but none of the charges were related to guns. "Hey, we can get another banger," he said to the agent. "That ain't going to be (obscenity)."

The agent told them he would know the next day where to pick up his drug shipment. They would meet again at lunchtime so they could be ready when the call came.

Nine minutes before noon the next day, Alexander called to say he still did not have enough guns. He was going to meet a friend to "grab the extra utensils," he said.

A half-hour later, Alexander called again. He couldn't get any more guns. "I was supposed to be prepared, man. I been waiting for this day all this time," he said. But he was undeterred. "I'm willing to go, man. I'll do it."



The agent was quiet for a minute. "Let me call you right back, man, and see what I can come up with," he said.

He called back a few minutes later. His cousin had another pistol they could borrow, the agent said. "He got one of those things," the agent said. "He could give it to you guys, and he'll just be in the car as you guys do your thing."



The robbery was on.

## 'POLICE. POLICE.'

The agent and another officer posing as his cousin picked Alexander up outside his apartment. Midderhoff and another accomplice, Devin Saunders, joined him. Saunders packed a revolver into a locked compartment in the back of the agents' pickup truck, next to the pistol that the ATF supplied, and the suspects piled into the back seat. Saunders pulled on a mask and gloves.

The agents drove them 6 miles to a parking lot in a tiny forest preserve sandwiched between warehouses and trucking companies where they said they could wait for the call that would tell them the location of the stash house. On the way, they went over the plan one last time; the agents confirmed that everyone knew what they were getting into, exchanges captured by a camera hidden on the dashboard.

When they got to the preserve, one of the agents said he needed to make sure his car was locked and disappeared. A minute later, the other answered his phone and climbed out into the parking lot to take the call.

Alexander sat in the back seat, talking on a cellphone with a girlfriend who was trying to follow them in a taxi. A few seconds later, he saw something and lowered the phone. "Police," he said softly and pointed out the window. "Police." Then came the boom of a pair of stun grenades that shook the truck as a team of agents in camouflage and olive body armor rushed toward them, rifles raised. "Out of the car," one yelled, as agents yanked the three men one at a time onto the asphalt. The process took less than 30 seconds.



William Alexander, left, and Devin Saunders put their hands up as a team of heavily armed ATF agents surrounds them at the conclusion of a sting operation.*(Photo: ATF)*

Those seconds are the most dangerous and costly step of a drug-house sting.

They are dangerous because, if everything goes the way agents expect, they will be confronting a crew of heavily armed men amped up to commit an especially violent crime. To deal with that risk, the ATF steers the takedowns to remote places such as forest preserves or warehouses where it's easier to take suspects by surprise and where stray bullets won't endanger the public. Then it assembles a small army of federal agents and local police officers. Smith said he recalled one pre-arrest briefing with 170 officers.

Court records show ATF agents and local police officers working with them have shot at least 13 people during takedowns in drug-house stings since 2004, killing at least seven of them. Six were killed by local police officers conducting sting operations as part of an ATF task force. Most came after suspects fired at police or tried to run them down with cars.

Four months after Alexander was arrested, a Miami-Dade Police Department SWAT team shot and killed four members of a robbery crew after they showed up at a house they thought was packed with marijuana. One of the dead was the police informant who arranged the phony robbery. "He did it out of his own good, and he got killed for it," his brother, Rudy Betancourt, said. "He planned his funeral."

**THE 15-YEAR MARK**

By the time agents had Alexander in handcuffs, the ATF had spent more than a month investigating him. It was clear by then the agents weren't the only ones who had been lying.

Despite his promises of a police-style raid, Alexander and the others had brought no police uniforms or handcuffs. And despite his boasts that he was a gang chief who had men ready to kill at his command, he and his accomplices had managed to come up with only a single gun, a rusted five-shot revolver with a broken handle, old enough that an ATF report (http://www.documentcloud.org/documents/717171-gun-report.html#document/p3/a107049) concluded it had been made sometime before World War I. The report confirmed the gun could have been lethal with the right kind of ammunition, but the men didn't have that, either. The six bullets they brought were the wrong size and, when loaded, would slide harmlessly out the front.

In court, though, none of that matters.

The drug-house stings are engineered to produce long prison sentences, and they typically do precisely that.

Using court records, USA TODAY identified 484 people convicted as a result of the stings, though there are almost certainly others. Two-thirds were sent to prison for more than a decade, a sentence longer than some states impose for shootings or robberies. At least 106 are serving 20-year sentences, and nine are serving life.

It's the drugs — though non-existent — that make that possible because federal law usually imposes tougher mandatory sentences for drugs than for guns. The more drugs the agents say are likely to be in the stash house, the longer the targets' sentence is likely to be. Conspiring to distribute 5 kilograms of cocaine usually carries a mandatory 10-year sentence — or 20 years if the target has already been convicted of a drug crime.

That fact has not escaped judges' notice. The ATF's stings give agents "virtually unfettered ability to inflate the amount of drugs supposedly in the house and thereby obtain a greater sentence," a federal appeals court in California said in 2010 (http://cdn.ca9.uscourts.gov/datastore/opinions/2013/04/08/11-50219.pdf). "The ease with which the government can manipulate these factors makes us wary." Still, most courts have said tough federal sentencing laws leave them powerless to grant shorter prison terms.

To the ATF, long sentences are the point. Fifteen years "is the mark," Smith said.

"You get the guy, you get him with a gun, and you can lock him up for 18 months for the gun. All you did was give this guy street creds," Smith said. "When you go in there and you stamp him out with a 15-to-life sentence, you make an impact in that community."

That emphasis has led to another significant shift for ATF. Over the past decade, the total number of people prosecuted in weapons cases as a result of its investigations has dropped by about 28%, according to records compiled by Syracuse University's Transactional Records Access Clearinghouse. The number of people charged by the agency with drug offenses jumped 26%. Prosecutors typically classify cases based on the charges likely to produce the longest sentence.

The ATF and federal prosecutors declined to comment on Alexander's case.

Unless he strikes a deal with prosecutors, Alexander is facing a minimum of 25 years in federal prison — and maybe more, based on the quantity of drugs he planned to steal and his long rap sheet. Saunders, whose participation in the plot lasted only a few hours, was sentenced to seven years and nine months in prison. He signed on, he said in an e-mail to USA TODAY, because "the money was tempting." Midderhoff has agreed to plead guilty and cooperate with the government; he won't be sentenced until Alexander's case is resolved. His lawyer, James Young, declined to comment.

Alexander's lawyer, Michael Falconer, said he wouldn't be opposed to the drug-house stings if he thought the ATF could make sure they were aimed only at people who were already ripping off drug dealers. "But on some level," he said, "it's Orwellian that they have to create crime to prevent crime."



*Contributing: Lisa Tucker in McLean, Va.*

Follow @bradheath (http://twitter.com/bradheath) on Twitter.

**SHARE**

2923
CONNECT

272
TWEET
(https://twitter.com/intent/tweet?url=http://usat.ly/16CBs28&text=ATF%20uses%20fake%20drugs,%20big%20bucks%20t0

Try brain training tested by dozens of researchers

lumosity    Start Training →

EXHibit "E"

3/19/14

# Judge blasts ATF stings for 'made-up crime'

## Operations offer payoff for robbing fake stash houses

**Brad Heath**
@bradheath
USA TODAY ★★★★



**William Alexander, center, and two other suspects are accused of planning a stash house robbery.**

A federal judge in Los Angeles blasted the U.S. Bureau of Alcohol, Tobacco, Firearms and Explosives for sting operations that he said unfairly enlist people in a "made-up crime" by offering them a huge payday for robbing a non-existent drug stash house.

Declaring those tactics "outrageous" and unconstitutional, U.S. District Court Judge Otis Wright took the unusual step last week of throwing out charges against a man arrested by ATF agents after one such sting.

"Society does not win when the Government stoops to the same level as the defendants it seeks to prosecute — especially when the Government has acted solely to achieve a conviction for a made-up crime," Wright wrote. He said the stings have done little to deter crime and instead are "ensnaring chronically unemployed individuals from poverty-ridden areas."

ATF has quietly made those fictional stash-house robbery cases a central feature of its efforts to target violent criminals, more than quadrupling the number of stings it conducted over the past decade. Although the stings are meant to target some of the nation's most dangerous criminals, a USA TODAY investigation last year found they routinely ensnare small-time crooks who jump at the chance to score hundreds of thousands of dollars from a few hours of work.

"The time has come to remind the Executive Branch that the Constitution charges it with law enforcement — not crime creation. A reverse-sting operation like this one transcends the bounds of due process and makes the Government the oppressor of its people," Wright wrote in a scathing 24-page order.

Spokesmen for ATF and the U.S. Attorney's Office in Los Angeles declined to comment. Prosecutors filed a notice Monday that they intend to appeal.

It is unclear what effect Wright's order could have on other ATF sting cases. Although some judges have expressed reservations about the government's tactics, most — including the 9th Circuit Court of Appeals, which covers California — have concluded that the stings are lawful.

Wright's order, filed March 10, instructed federal officials to release Antuan Dunlap, who was arrested during an ATF sting in Los Angeles last year. Wright said agents had no evidence that Dunlap had been involved in drug house robberies in the past or that he would have participated in one had an undercover ATF agent not offered him the chance to steal as much as 25 kilograms of non-existent cocaine. Wright criticized the government for basing the severity of the charges Dunlap faced on the "whims" of federal agents and questioned whether the investigations have done anything to benefit public safety.

"Zero. That's the amount of drugs that the Government has taken off the streets as the result of this case and the hundreds of other fake stash-house cases around the country. That's the problem with creating crime: the Government is not making the country any safer or reducing the actual flow of drugs," he wrote.

### (H) MANUFACTURED JURISDICTION OF FEDERAL ELEMENTS TO CREATE FEDERAL OFFENSE DOES NOT SATISFY THE REQUIREMENTS NECESSARY UNDER HOBBS ACT 1951(a).
===========================================================

PETITIONERS SUBMIT THAT WHEN THE FEDERAL GOVERNMENT RESPONDED TO THE STATE TASK FORCE (H.I.D.T.A.) REQUEST TO LEND THE AID OF FEDERAL LAW ENOFORCEMENT (A.T.F.) TO LOCAL LAW ENFORCEMENT OFFICIALS IN THE PROSECUTION OF CERTAIN CRIMES IT DID NOT CONFER JURISDICTION TO FEDERAL AUTHORITIES, THUS ALLOWING SUCH FEDERAL LAW ENFORCEMENT THEMSELVES TO SUPPLY THE INTERSTATE ELEMENT AND THUS ENSURE THAT AN INTERSTATE ELEMENT WOULD BE PRESENT. THIS CONDUCT BY THE FEDERAL AUTHORITIES LED TO THEM ARTIFICIALLY MANUFACTURING FEDERAL JURISDICTION.

WHEN JURISDICTIONAL REACH OF HOBBS ACT IS EXTENSIVE ALLOWING CONDUCT WITH ONLY MINIMAL OR POTENTIAL IMPACT UPON COMMERCE, COURT MUST BE CAREFUL NOT TO ALLOW OR CONFER FEDERAL JURISDICTION OVER STATE CRIMES THAT ARE MANUFACTURED, CREATED, AND DEVELOPED BY CONTRIVED OR PRETENSIVE MEANS TO FORM A NEXUS TO JURISDICTIONAL REQUIREMENT OF 18 U.S.C. 1951(a).

GOVERNMENT SPONSORED NEXUS TO INTERSTATE COMMERCE SHOULD BE VIEWED WITH CAUTION AND EXAMINED WITH GREATER THAN ORDINARY CARE, BECAUSE CONTRIVED ACTIVITY BY GOVERNMENT AGENTS MAY NOT SATISFY THE REQUIREMENTS NECESSARY UNDER 18 U.S.C. 1951(a). HERE THE GOVERNMENT FAILS TO ADDUCE EVIDENCE SUFFICIENT TO SHOW EVEN A DE MINIMIS CONNECTION BETWEEN DEFENDANT'S ALLEGED ACTIVITIES AND INTERSTATE COMMERCE. BECAUSE PETITIONERS HAVE NOT ENGAGED IN CRIMINAL ACTIVITY OF AN ECONOMIC NATURE, THIS COURT MUST EMPLOY A HEIGHTENED SCRUTINY THROUGHOUT THIS EXAMINATION. SEE - UNITED STATES V. MCCORMACK, 371 F.3D 22 (2004 1ST. CIR. CT. OF APPEALS). SEE - UNITED STATES V. GAMBINO, 566 F.2D 414 (2d Cir. 1977), UNITED STATE V. PETERSON, 236 F.3D 848 (2000 7TH. CIR. CT. OF APPEALS); UNITED STATES V. ARCHER, 486 F.2D 670 (2D CIR. 1973)(CT. OF APPEALS).

DEFENDANT CONTENDS THAT "INTERSTATE ACTIVITY" WAS NOT MEANT TO INCLUDE

CASES WHERE THE FEDERAL OFFICERS AND INFORMANT THEMSELVES SUPPLIED THE
INTERSTATE ELEMENT AND FURTHER ACTED TO ENSURE THAT AN INTERSTATE ELEMENT
WOULD BE PRESENT. MANUFACTURED FEDERAL JURISDICTION IS EVEN MORE OFFENSIVE
IN CRIMINAL PROCEEDINGS. AS THE LATE JUDGE FREEDMAN SAID WITH RESPECT TO
CIVIL ACTIONS IN MCSPARRAN V. WEIST, 402 F.2D 867 (3D. CIR. 1968) (EN BANC)
CERT. DENIED, 23 L.ED 2D 217 (1969), ("MANUFACTURED JURISDICTION IS A
REFLECTION ON THE FEDERAL JUDICIARY SYSTEM AND BRINGS IT INTO DISREPUTE").
THE COURT WENT FURTHER BY RULING THAT -- "JURISDICTION COULD NOT BE HAD
WHEN IT WAS ARTIFICIALLY CREATED BY THE USE OF A STRAW MAN".

HERE IN THE INSTANT MATTER, THE GOVERNMENT AGENT AND INFORMANT AT
THE BEHEST OF THE GOVERNMENT AND IN COMPLIANCE WITH THE GOVERNMENT CREATED
PLAYBOOK AND SCRIPT, UNILATERALLY SUPPLIED THE INTERSTATE ELEMENT IN AN
ATTEMPT TO TRANSFORM AN ALLEGED STATE ROBBERY INTO A HOBBS ACT VIOLATION.
THE LAW IS CLEAR IN 'ARCHER' THAT AN INTERSTATE ELEMENT IS UNACCEPTABLY
MANUFACTURED WHEN THE EVIDENCE SHOWS THAT THE AGENTS TOOK STEPS TO CAUSE
THE INTERSTATE ELEMENT TO EXIST "SOLELY FOR THE PURPOSE OF CONTRIVING AN
INTERSTATE NEXUS". ANY ACTION BY FEDERAL LAW ENFORCEMENT WHICH CREATES A
FEDERAL CRIMINAL ELEMENT THAT WOULD NOT EXIST IF NOT FOR THE CONDUCT AND
ACTIONS OF THE FEDERAL AGENT OR INFORMANT'S CONDUCT, REQUIRES THE COURT
TO SCRUTINIZE THE GOVERNMENT'S APPARENT REASONS FOR ITS ACTIONS AND FORBID
THE GOVERNMENT FROM MANUFACTURING FEDERAL ELEMENTS FOR THE SOLE PURPOSE
OF CREATING FEDERAL JURISDICTION THAT DEFENDANT'S CONDUCT DID NOT OR WOULD
NOT HAVE AMOUNTED TO HAD THE AGENT OR INFORMANT NOT CREATED SUCH. HERE THE
SOLE JURISDICTIONAL LINK WAS CONTRIVED BY THE GOVERNMENT FOR THE SPECIFIC
REASON OF ESTABLISHING AND CREATING FEDERAL JURISDICTION UNDER THE HOBBS
ACT. THE SOLE PURPOSE OF USING COCAINE AND THE MEXICAN CARTEL SCRIPT IN
THIS MATTER WAS TO CAUSE THE INTERSTATE ELEMENT OF THE OFFENSE TO EXIST
WITHOUT ANY MENS REA ON THE PART OF THE PETITIONERS.

HERE THE PRECISE ISSUE BEFORE THE COURT WHICH MUST BE REVIEWED IS :

WHETHER THE FACTS ARE THAT (1) A GOVERNMENT AGENT AND INFORMANT TOOK STEPS TO ENSURE THE EXISTENCE OF THE INTERSTATE ELEMENT OF THE OFFENSE, (2) SATISFACTION OF THE INTERSTATE ELEMENT WAS THE SOLE REASON FOR THE TAKING OF THOSE STEPS, AND (3) WHETHER THE DEFENDANTS VOLUNTARILY AND OF THEIR OWN FREE WILL DID THE ACT THAT CAUSED THE INTERSTATE ELEMENT TO EXIST. THE FIFTH CIRCUIT HAS EXPRESSED THE SIMILAR VIEW THAT FEDERAL JURISDICTION IN CRIMINAL PROSECUTIONS SHOULD NOT BE RECOGNIZED WHEN PATENTLY CONTRIVED BY MEANS ADOPTED SOLEY FOR THE PURPOSE OF CREATING A FEDERAL CRIME. SEE - UNITED STATES V. GARRETT, 716 F.2D 257, 263 (5TH. CIR. 1983). HERE THE ONLY REASON FOR THE GOVERNMENT'S SCRIPTED BEHAVIOR WAS SOLEY TO CREATE A FEDERAL CRIME OUT OF A STATE CRIME. THE FACTS ARE CLEAR THAT THE GOVERNMENT DID NOT HAVE PROOF OF THE PETITIONERS PREDISPOSITION TO COMMIT ANY FEDERAL CRIME PRIOR TO APPROACHING THEM, BECAUSE  THE RECORD ESTABLISHED THROUGH FEDERAL DOCUMENTS MAKE A CANDID ADMISSION THAT THE GOVERNMENT DID NOT DISCOVER WHO THE PETITIONER'S WERE UNTIL RIGHT BEFORE THEIR ARREST. THEREFORE, THE ONLY REASON THE SOLE JURISDICTIONAL LINK OCCURRED HERE WAS THAT IT WAS CONTRIVED BY THE GOVERNMENT TO ESTABLISH FEDERAL JURISDICTION ALONE. THE AGENT AND INFORMER DEVISED A SCHEME PROMOTED AND DESIGNED BY THE FEDERAL GOVERNMENT'S LEGAL DEPARTMENT TO ELICIT CRIMINAL BEHAVIOR FROM ANYONE WHO MIGHT BE INDUCED OR PROVOKED TO VIOLATE INTERSTATE ACTIVITY, WHETHER SUCH PERSONS HAD A PREDISPOSITION OR NOT. THE LAW IS CLEAR, "ARCHER" IS CONCERNED WITH VIRTUAL ENTRAPMENT BECAUSE IT IS OF IMPORTANCE WHETHER IT IS THE DEFENDANTS OR THE THE FEDERAL AUTHORITIIES (WHO) TOOK THE INITIATIVE ... BECAUSE SUCH MAKES A SUBSTANTIAL DIFFERENCE. COURTS HAVE REJECTED BASING FEDERAL JURISDICTION UPON INCIDENTAL, MARGINAL, OR UNFORESEEN ACTIVITY. SEE - UNITED STATES V. ISAACS, 493 F. 2D 1124 (7TH. CIR. 1974). GENERALLY, THE GOVERNMENT MAY NOT MANUFACTURE A CRIME FROM WHOLE CLOTH AND THEN PROSECUTE A DEFENDANT FOR BECOMING ENSNARED IN THE GOVERNMENT'S SCHEME.  THE GOVERNMENT

IN THIS CASE IS EXCESSIVELY INVOLVED WHEN IT "ENGINEERED AND DIRECTED
THE CRIMINAL ENTERPRISE FROM START TO FINISH". THE FACTS ARE PRESENT
AND THIS COURT CAN TAKE JUDICIAL NOTICE OF THE FACTS THAT THE GOVERNMENT
CREATED AND MANUFACTURED THE FEDERAL JURISDICTION IN THIS CASE. HERE THE
GOVERNMENT CREATED A VERTICALLY INTEGRATED CRIMINAL ENTERPRISE, WHICH IT
DIRECTED AND FOSTERED "FROM START TO FINISH". THE A.T.F. TOOK A SMALL
GROUP OF "BELIEVED TO BE CRIMINALS", AND WITH THE HELP OF AN INFORMANT
ATTEMPTED TO CREATE A "HOME INVASION CREW" THAT THE GOVERNMENT INTENDED
TO LOCK UP ONCE IT MANUFACTURED THE CRIME SUCH "CREW" WAS TO COMMIT.
HERE THE GOVERNMENT CONTROLLED THE WHOLE CRIMINAL ACTIVITY, THE AMOUNT,
THE PLACE, THE NATURE OF THE ACTIVITY, THE GEOGRAPHICAL LOCATION, THE
VEHICLE USED, ETC. ETC., THE A.T.F. NEVER PENETRATED OR INVESTIGATED
AN EXISTING CRIMINAL ENTERPRISE OF "HOME INVASION ROBBERS". THE GOVERNMENT
MADE PETITIONER'S "HOME INVASION ROBBERS" AND THEN PROSECUTED THEM AS IF
THEY HAD A PREDISPOSITION TO COMMIT THE OFFENSE THE GOVERNMENT CREATED
FROM WHOLE CLOTH. PETITIONERS DID NOT COME INTO THIS PLAN AS ACTIVE
CRIMINAL PARTICIPANTS, RATHER THE GOVERNMENT PURSUED THE PETITIONERS BY
AND THROUGH ITS OVERZEALOUS AGENT AND INFORMANT. PETITIONERS ASK THAT
THE COURT DISMISS THE INDICTMENT BECAUSE THE GOVERNMENT CREATED AND
MANUFACTURED THE JURISDICTION IN THIS MATTER BY ENGINEERING A "VERTICAL
INTEGRATED CRIMINAL ENTERPRISE" THAT LATER ENSNARED PETITIONERS TO ENGAGE
IN UNLAWFUL CONDUCT AND CREATED FEDERAL JURISDICTION THROUGH THE A.T.F.'S
SCRIPTED PLAYBOOK.

THE POLICY OF THE STATUTE CONFERRING JURISDICTION UPON THE DISTRICT
COURTS CALLS FOR ITS STRICT CONSTRUCTION. AS STATED BY JUSTICE FRANKFURTER:
"THE DOMINANT NOTE IN THE SUCCESSIVE ENACTMENT OF CONGRESS RELATING TO
JURISDICTION , IS ONE OF JEALOUS RESTRICTION, OF AVOIDING OFFENSE TO
STATE SENSITIVENESS, AND OF RELIEVING THE FEDERAL COURTS OF THE OVER-
WHELMING BURDEN OF BUSINESS. *** THAT INTRINSICALLY BELONGS TO THE STATE

(4)

COURTS, 'IN ORDER TO KEEP THEM FREE FOR THEIR DISTINCTIVE FEDERAL
BUSINESS. SEE - CITY OF INDIANAPOLIS V. CHASE NATIONAL BANK, 86 L. ED.
47 (1941).

HERE THE DEFENDANT'S ACTIONS MINUS THE GOVERNMENT'S INVOLVEMENT
IN MANUFACTURING, AND CREATING THE FEDERAL JURISDICTION DOES NOT
IMPLICATE INTERSTATE COMMERCE TO A DEGREE SUFFICIENT TO CREATE ANY
JURISDICTION UNDER THE HOBBS ACT. THE DEFENDANT'S WERE TARGETED BY
THE A.T.F. SPECIFICALLY FOR THE EXPRESS PURPOSE OF CREATING, INCITING,
AND MANUFACTURING THE JURISDICTIONAL NEXUS NECESSARY TO SATISFY THE
INTERSTATE COMMERCE REQUIREMENT. THE A.T.F. AGENT AND THE INFORMANT
PROVIDED ALL THE INGREDIENTS NECESSARY TO GET THE ALLEGED PLOT COOKING
AND THEREFORE, MUST BE HELD RESPONSIBLE FOR THE FERMENTATION OF THE
ALLEGED UNLAWFUL ACTIVITY. IT IS KNOWN LAW, THAT ONCE THE GOVERNMENT
CREATES JURISDICTION BY CONTRIVED OR PRETENSIVE MEANS, MOTIVE IS
IRRELEVANT IN THE ARTIFICIAL CREATION OF JURISDICTION. SEE JAFFE V.
PHILA. AND WESTERN R. CO., 180 F.2D 1010 (3D CIR. 1950); MECOM V.
FITZSIMMON DRILLING CO., 284 U.S. 183 (1931).

REQUEST THAT THE INDICTMENT BE DISMISSED BASED ON THE GOVERNMENT
SPONSORED MANUFACTURING OF FEDERAL JURISDICTION BY CONTRIVED AND
PRETENSIVE MEANS IN VIOLATION OF PETITIONER'S DUE PROCESS OF LAW.

LEGAL ARGUMENT

### (F) ISSUE OF MANDATORY MINIMUM SENTENCING ENTRAPMENT UNDER HOBBS ACT STING MUST BE DECIDED PRIOR TO TRIAL.

=============================================

ISSUE OF 841(b),(1) MANDATORY MINIMUM SENTENCE MANIPULATION BY GOVERNMENT IS ISSUE THAT MUST BE DECIDED BY COURT PRIOR TO TRIAL BECAUSE ONCE THE JURY MAKES ITS FINDING, THE COURT WOULD BE BARRED FROM MAKING ANY FINDING AS TO THE DEFENDANT'S CLAIM OF SENTENCE ENTRAPMENT BASED ON "BOOKER","BLAKELY","APPRENDI", IN WHICH THE SUPREME COURT BARS JUDGES FROM MAKING JUDICIAL FACT FINDINGS OF ELEMENTS OF THE CRIME THAT MUST BE SUBMITTED AND FOUND BY A JURY UNDER THE "BEYOND REASONABLE DOUBT STANDARD".

FEDERAL RULE CRIMINAL PROCEDURE - 12 SETS FORTH THE RULES GOVERNING PRETRIAL MOTIONS. FED. R. CRIM. P. 12(e), PROVIDES THAT A MOTION MADE BEFORE TRIAL SHALL BE DETERMINED BEFORE TRIAL UNLESS THE COURT FOR GOOD CAUSE, ORDERS THAT IT BE DEFERRED FOR DETERMINATION AT THE TRIAL OF THE GENERAL ISSUE OR UNTIL AFTER VERDICT, BUT NO SUCH DETERMINATION SHALL BE DEFERRED IF A PARTIES RIGHT TO APPEAL IS ADVERSELY AFFECTED.

DEFENDANT SUBMITS THAT BECAUSE A JURY FINDING UNDER 841(b),(A) MANDATE A MANDATORY MINIMUM OF TEN YEARS AND A MAXIMUM OF LIFE. THAT THE COURTS ONLY AVENUE TO ADDRESS A CLAIM OF SENTENCING ENTRAPMENT WOULD BE PRETRIAL BECAUSE SUCH CLAIM IS A ISSUE OF LAW (**ATTACK ON VALIDITY OF STATUTE AND THE GOVERNMENT'S INTERPRETATION OF STATUTE**), WHICH GRANTS THE COURT AUTHORITY UNDER FEDERAL RULES OF CRIMINAL PROCEDURE 12(B),(_), TO REVIEW.

WHEN A DECISION REQUIRES MORE THAN A DE MINIMIS REVIEW OF EVIDENCE RELEVANT TO THE GENERAL ISSUE BUT LESS THAN A SUBSTANTIALLY COMPLETE REVIEW OF SUCH EVIDENCE, THE TIMING OF THE DECISION IS IN THE SOUND DISCRETION OF THE COURT WHETHER OR NOT TO MAKE A SELF EXECUTING QUALITIVE TEST AND A QUANTITATIVE ASSESSMENT COMMITTED TO THE FACTUAL FINDINGS OF A

1.

<u>LEGAL ARGUMENT</u>

MANDATORY SENTENCING SCHEME THAT MAY BE VIOLATIVE OF A DEFENDANT'S
CONSTITUTIONAL DUE PROCESS RIGHTS BY WAY OF UNLAWFUL SENTENCING ENTRAPMENT
OR MANIPULATION BY THE GOVERNMENT.

DEFENDANTS FURTHER SUBMIT THAT BECAUSED THEY LACKED THE INTENT TO
STEAL THE QUANTITY OF DRUGS THAT THE UNDERCOVER SAID EXISTED THAT THEY
ARE "<u>VICTIMS</u>" OF SENTENCING ENTRAPMENT/SENTENCING FACTOR MANIPULATION. THE
CONCEPT OF SENTENCING ENTRAPMENT ALSO KNOWN AS SENTENCING FACTOR MANIPU-
LATION ARISES OUT OF THE FACT THAT SENTENCES FOR DRUG-RELATED OFFENSES
ARE OFTEN KEYED TO THE AMOUNT OF DRUGS OR, IN THE CASE OF REVERSE-STING
OPERATION, THE AMOUNT OF FICTITIOUS DRUGS.

BECAUSE THE CAPABILITY PRONG OF THE PREDISPOSITION ANALYSIS IS BOTH
LESS RELEVANT AND MORE EASILY MANIPULATED IN THE CONTEXT OF A FICTITIOUS
STASH HOUSE ROBBERY, A DEFENDANT NEED ONLY SHOW A LACK OF INTENT OR A
LACK OF CAPABILITY TO ESTABLISH SENTENCING ENTRAPMENT. THIS IS SO BECAUSE,
FICTITIOUS STASH HOUSE ROBBERIES ALLOW THE GOVERNMENT [THE] VIRTUALLY
UNFETTERED ABILITY TO INFLATE THE AMOUNT OF DRUGS SUPPOSEDLY IN THE
HOUSE, AND TO ALSO MINIMIZE THE OBSTACLES THAT A DEFENDANT MUST OVERCOME
TO OBTAIN THE DRUGS. THE CAPABILITY TO STEAL A PARTICULAR QUANTITY OF
DRUGS IS AN AMORPHOUS CONCEPT. THEORETICALLY, NEARLY ANY PERSON IS CAPABLE
OF THEFT. ONCE A THIEF GAINS ACCESS TO THE DRUGS, HE IS JUST AS CAPABLE
OF CARRYING OFF ONE KILOGRAM AS TEN. THUS, THE QUANTITY OF DRUGS HAS NO
RELATION TO CAPABILITY. THE ONLY MEANINGFULLY MEASURABLE CAPABILITY IS
TYPICALLY THE CAPABILITY TO PERFORM THE ROBBERY, WHICH HAS LITTLE RELEVANCE
TO DETERMINING A DEFENDANT'S PREDISPOSITION TO DEAL IN A GIVEN QUANTITY
OF DRUGS. IN THE CONTEXT OF THEFT, THE CHOSEN AMOUNT OF DRUGS IS DIVORCED
FROM CAPABILITY, ALLOWING THE GOVERNMENT TO EFFECTIVELY OFFER AN INORDINATE
AMOUNT FOR FREE.

DEFENDANTS SUBMIT THAT UNDER THIER CLAIM FOR SENTENCING ENTRAPMENT

2.

THAT SUCH CLAIM BY THIS COURT SHOULD ONLY FOCUS ON A DEFENDANTS PREDISPO-
SITION WHICH IS DISTINCT FROM A DUE PROCESS CLAIM OF OUTRAGEOUS GOVERNMENT
MISCONDUCT. SEE - **UNITED STATES V. SEARCY**, 233 **F.3D** 1096 (8TH. CIR. 2000).
A DEFENDANT WHO IS NOT PREDISPOSED TO COMMIT A MORE SERIOUS CRIME WILL
USUALLY HAVE DONE SO ONLY BECAUSE OF GOVERNMENT INDUCEMENT, AND THE ACT
OF INDUCING A DEFENDANT TO COMMITT A CRIME HE IS NOT PREDISPOSED TO
COMMIT IS NECESSARILY OUTRAGEOUS ANYWAY!

    IF DEFENDANT DOES NOT HAVE THIS ISSUE REVIEWED PRE-TRIAL, DEFENDANT
WOULD BE BARRED FROM RAISING SUCH CLAIM LATER UNDER THE PRINCIPAL OF
"RES JUDICATA", OR "COLLATERAL ESTOPPEL", BASED ON THE JURIES FINDING OF
GUILT BEYOND A REASONABLE DOUBT (**IF SUCH FINDING WAS MADE**), OR UNDER THE
BANNER THAT SUCH ISSUE WAS NOT RAISED PURSUANT TO FED. R. 12(B),(  ),(  ).
THUS, FORECLOSING THE ISSUE.

    IN SUM, ONCE A COURT HAS DECIDED THAT A MOTION MAY BE RAISED PRIOR
TO TRIAL UNDER 12(b), THAT AN ISSUE IS SUFFICIENTLY CAPABLE OF DETERMINA-
TION WITHOUT THE TRIAL OF THE "GENERAL ISSUE" FOR LEGAL REASONS; IT MAY
THEN FIND NO "GOOD CAUSE" FOR DEFERRING A RULING UNDER 12(e), SINCE TO
DO SO WOULD ADVERSELY AFFECT THE DEFENDANTS RIGHT TO APPEAL SUCH ISSUE
AFTER TRIAL AND VERDICT.

    DEFENDANT SUBMITS THAT THE EVIDENCE AT STAKE CONSTITUTES "SUBSTANTIAL"
PROOF OF A FACT MATERIAL TO THE PROCEEDINGS, AND THAT THE PROOF RELEVANT
TO THE ISSUE IS ENTIRELY SEGREABLE FROM THE EVIDENCE TO BE INTRODUCED AT
TRIAL, AND IF THERE IS A OVERLAPP, THE OVERLAPP IS ANYTHING MORE THAN
DE MINIMIS.

    THIS REQUEST WOULD NOT UNDULY BURDEN THE COURT AND IT WOULD ASSURE
THAT THE DEFENDANTS WOULD NOT BE BOOTSTRAPPED TO A MANDATORY MINIMUM
TERM THAT IT RULED AFTER TRIAL WAS OBTAINED BY AND THROUGH SENTENCING
MANIPULATION OR ENTRAPPMENT. WITHOUT THE COURT MAKING FINDINGS PRE-TRIAL
THE COURT WOULD BE BOUND BY THE JURY'S VERDICT AND THE MANDATORY PROVISIONS

OF 21 U.S.C. 841 (B),(1).

PETITIONERS SUBMIT THAT THIS MATTER MUST BE DECIDED PRE-TRIAL SINCE THE ISSUE INVOLVES QUESTIONS OF STATUTORY CONSTRUCTION AND CONSTITUTIONAL LAW. THE RELEVANT FACTOR HERE IS THAT PETITIONERS WERE NOT PREDISPOSED TO COMMIT ANY OFFENSE, AND YET WERE INDUCED TO COMMIT A GREATER OFFENSE, THAT SUBJECTED THEM TO GREATER PUNISHMENT BY WAY OF THE GOVERNMENT'S MANIPULA-TION OF THE AMOUNT OF DRUGS ALLEGED IN THE FICTITIOUS DRUG HOUSE. HERE THE GOVERNMENT MANIPULATED THE **CAPABILITY ELEMENT** (EMPHASIS).

AS A RESULT OF SUCH MANIPULATION, IT MAKES NO SENSE AT ALL TO REQUIRE THAT A DEFENDANT ESTABLISH BOTH A LACK OF INTENT AND LACK OF CAPABILITY IN THE CONTEXT OF A FICTITIOUS STASH HOUSE ROBBERY. SUCH DISTINCTION IS MADE BECAUSE THE EASE WITH WHICH THE GOVERNMENT CAN MANIPULATE THESE FACTORS SHOULD MAKE THE COURT CONCERNED ABOUT SUCH OPERATIONS IN GENERAL, AND INCLINED TO TAKE A HARD LOOK TO ENSURE THAT THE PROPOSED STASH HOUSE ROBBERY WAS WITHIN THE SCOPE OF THE DEFENDANT'S AMBITION AND MEANS. THUS, ONCE PETITIONER'S SHOW A LACK OF INTENT OR LACK OF CAPABILITY **(EMPHASIS)**, TO DEAL IN THE QUANTITIES OF DRUGS CHARGED OR TO EFFECTUATE THE ROBBERY (THEFT) DEFENDANT HAS MET HIS BURDEN.

PETITIONERS SUBMIT THAT THE PREDISPOSITION-CAPABILITY FACTOR IS NOT PRESENT IN THIS MATTER, BECAUSE THE GOVERNMENTS PROOF THAT THE DEFENDANTS INTENDED OR WHERE CAPABLE OF CARRYING OUT THE ROBBERY BY FORCE IS NOT ONLY LACKING, BUT IS NON-EXISTENCE. PETITIONERS HAD NO WEAPONS, NO HANDCUFFS, NO BULLET PROOF VESTS TO GO UP AGAINST A VIOLENT MEXICAN CARTEL THAT THE UNDERCOVER AGENT SAID HAD A SHOTGUN AND FIREARM, AND WHERE MUSCULAR BUILT. ITS NOT PLAUSIBLE THAT DEFENDANTS WERE GOING TO COMMIT A ROBBERY OF THESE FICTITIOUS CARTEL MEMBERS BY SIMPLY WALKING THROUGH THE FRONT DOOR OF THE DRUG STASH HOUSE UNARMED. SUCH A CONTENTION DEFIES RATIONAL AND LOGICAL INFERENCES OR PRESUMPTIONS NOT ONLY IN LAW, BUT IN COMMON SENSE. THE CUMULATIVE EVIDENCE SHOWS THAT A CAPABILITY TO COMMIT ROBBERY WAS NOT EVEN

4.

A REMOTE POSSIBILITY. WHILE AN IMPOSSIBILITY DEFENSE IS NOT A DEFENSE
IN LAW UNDER 846, THE GOVERNMENT CANNOT DENY THE DEFENDANTS THE RIGHT
TO ARGUE FACTS OF LAW AS SUCH **"IMPOSSIBILTY"** CLAIM IS ONLY DIRECTED TO
THE CAPABILITY PRONG OF THE PREDISPOSITION ANALYSIS BEING LESS RELEVANT
AND MORE EASILY MANIPULATED IN THE CONTEXT OF A FICTITIOUS STASH HOUSE
ROBBERY. HERE DEFENDANTS ONLY PROFFER PROOF THAT THERE WAS A LACK OF
INTENT AND A LACK OF CAPABILITY TO COMMIT THE ROBBERY AND TO STEAL
FIFTEEN KILOS OF COCAINE.

WHILE PETITIONERS HAVE PRESENTED A PORTION OF THEIR EVIDENCE AND
FACTS SUPPORTING THEIR POSITION IN THIS MATTER, PETITIONERS SUBMIT THAT
THE "SUBSTANTIAL EVIDENCE" AWAITS ORAL ARGUMENT OR REPLY BY BRIEF AFTER
THE GOVERNMENT'S RESPONSE IS RECEIVED. SHOULD THE GOVERNMENT CONCEDE
TO PETITIONERS ARGUMENT, PETITIONER REQUESTS THAT THE COURT ISSUE A
RULING THAT THE 841 (B),(1), MANDATORY SENTENCING PROVISIONS WILL NOT
APPLY IN THIS CASE.

FOR THE REASONS ADMITTED HEREIN, PETITIONER ASKS THAT THE COURT
CONDUCT A HEARING OF THIS MATTER PRE-TRIAL.

EXHIBIT - "I"

**FOR PUBLICATION**

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

| | |
|---|---|
| UNITED STATES OF AMERICA,<br>*Plaintiff-Appellee*,<br><br>v.<br><br>JORGE CORTES,<br>*Defendant-Appellant.* | No. 12-50137<br><br>D.C. No.<br>3:10-cr-03617-BEN-1<br><br><br>OPINION |

Appeal from the United States District Court
for the Southern District of California
Roger T. Benitez, District Judge, Presiding

Argued and Submitted
June 5, 2013—Pasadena, California

Filed October 9, 2013

Before: Sidney R. Thomas, Barry G. Silverman,
and Raymond C. Fisher, Circuit Judges.

Opinion by Judge Silverman

JC

## SUMMARY[*]

### Criminal Law

The panel reversed a conviction for conspiracy to possess with intent to distribute 5 kilograms or more of cocaine, remanded for a new trial on that count, and affirmed the balance of the judgment in a case in which the defendant was arrested in an undercover reverse sting operation.

The panel held that in instructing the jury on an entrapment defense, the district court erred in its characterization of the holding of *United States v. Spentz*, 635 F.3d 815 (9th Cir. 2011), by eliminating the drugs or any profit from the sale of those drugs as a potential basis for the inducement. The panel explained that the district court should have told the jury that the amount of drugs or the profit that would be derived from their sale cannot on its own establish an inducement supporting entrapment.

The panel held that sentencing entrapment must be tried to a jury where the defendant's argument and the evidence raise the possibility of changing the applicable statutory maximum or minimum sentences. The panel explained that if the defendant presents such evidence in his new trial, he will be entitled to a jury instruction on sentencing entrapment.

The panel suggested instructions for both the entrapment defense and sentencing entrapment.

---

[*] This summary constitutes no part of the opinion of the court. It has been prepared by court staff for the convenience of the reader.

The panel rejected the defendant's argument that Hobbs Act robbery or extortion is limited to the stealing of lawful property and excludes contraband such as illegal drugs.

## COUNSEL

Gary P. Burcham (argued), Burcham & Zugman, San Diego, California, for Defendant-Appellant.

Laura E. Duffy, United States Attorney for the Southern District of California, Bruce R. Castetter, Assistant United States Attorney, Chief, Appellate Section, Criminal Division, and Timothy D. Coughlin (argued), Assistant United States Attorney, San Diego, California, for Plaintiff-Appellee.

## OPINION

SILVERMAN, Circuit Judge:

Defendant-Appellant Jorge Cortes was arrested in an undercover reverse sting operation executed by the Bureau of Alcohol, Tobacco, Firearms and Explosives. ATF agents fabricated a scheme to steal 100 kilograms of cocaine from a stash house and arrested the conspirators before the home invasion occurred. Cortes was ultimately convicted of conspiracy to possess with intent to distribute 5 kilograms or more of cocaine in violation of 21 U.S.C. §§ 841(a)(1) and 846 (Count 1), conspiracy to affect commerce by robbery and extortion, in violation of the Hobbs Act, 18 U.S.C. § 1951(a) (Count 2), and possession of a firearm in furtherance of a crime of violence and aiding and abetting, in violation of 18 U.S.C. § 924(c)(1)(A)(i) and 18 U.S.C. § 2 (Count 3).

On appeal, Cortes argues that the district court erred in modifying the entrapment defense instruction to reflect the holding of *United States v. Spentz*, 653 F.3d 815, 818–20 (9th Cir. 2011), *cert. denied*, 132 S. Ct. 1600 (2012), refusing to instruct the jury on sentencing entrapment, denying Cortes the opportunity to impeach the confidential informant's credibility, denying a motion to dismiss the Hobbs Act charge, and sentencing him to an allegedly unreasonable total of 240 months. We hold today that the district court erred in its characterization of the *Spentz* holding. Accordingly, we reverse the Count 1 conviction and remand for a retrial. We further hold that under certain circumstances a sentencing entrapment instruction must be given to the jury and offer suggested entrapment and sentencing entrapment instructions that we believe will provide greater clarity on these exceedingly subtle points of law. We also affirm the Hobbs Act conviction, rejecting the argument that the Hobbs Act is limited to the stealing of lawful property and excludes contraband. We do not reach the remaining challenges, which are moot in light of the remand.

## I.  **Background**

On August 23, 2010, undercover ATF Special Agent Richard Zayas met up with a confidential informant who introduced him to an individual known as "the juvenile" or alternatively as "Abel." Zayas told the juvenile that he was a "disgruntled courier of six to seven kilograms of cocaine for an organization." And he informed the juvenile that he would soon be collecting the drugs from a stash house that contained approximately 100 kilograms of cocaine and was guarded by two individuals, one of whom would be armed. Zayas explained at trial that the drug quantity used in the story was selected based on the region of operation to enhance the

plausibility of the scheme: "It's more likely a hundred kilograms of cocaine wouldn't be in a stash house in a small town in Iowa as opposed to San Diego." According to Zayas, ATF targeted the juvenile because the confidential informant led them to believe that the juvenile "was involved with individuals involved in this type of crime." The juvenile informed Zayas that he had an associate with a crew who could pull off the robbery and had done jobs like this before.

Zayas met that associate, Cortes, the following day, August 24, 2010. He reiterated the details of the stash house, including the quantity of drugs inside, underscoring that the house would only contain drugs, not money.    Cortes announced that the drugs would be split half and half between Zayas and his group. Zayas told Cortes that he was motivated to steal the cocaine, because he believed his boss was not paying him enough and had been sleeping with his wife.

The next day, Zayas met up with Cortes and other individuals who had been assembled for the job. There were ten people present, plus the confidential informant. Cortes described the plan and introduced Zayas to the other individuals, so they would know not to hurt him during the robbery. Cortes instructed Zayas not to speak to the crew members. Zayas nevertheless informed them that the house contained 100 kilograms of cocaine, and Cortes scolded him for speaking to the rest of the crew against his wishes. They drove to and assembled in a garage, the staging area for the robbery. Zayas pretended to receive a call from the stash house, at which point a tactical team created a distraction using flash-bangs and arrested the entire crew, including Cortes.

6    UNITED STATES V. CORTES

  At trial, Cortes testified that he attended the meeting on August 24, 2010, simply because he wanted to help the juvenile, and that he was not in desperate need of money. He testified that he was also motivated to participate because of Zayas's story about his wife's infidelity. Cortes says he was sympathetic to that tale of woe because the same had happened to him a few months back. He, however, denied that any dire financial straits had driven him to participate in the heist. Additionally, he maintained that he did not have a crew, had no experience with home invasions, and had basically lied for the sake of helping his friend, the juvenile.

  Cortes filed a motion to dismiss the Hobbs Act count, arguing that it did not apply to the robbery or extortion of contraband; the motion was denied. He also filed motions *in limine* to secure entrapment and sentencing entrapment instructions. The court appears to have concluded that sentencing entrapment would simply be subsumed within any entrapment instruction and deferred ruling on whether that instruction should be given. Ultimately, the court gave the model entrapment instruction (Ninth Circuit Criminal Jury Instruction 6.2), which it modified to reflect the then-new holding of *United States v. Spentz*, 653 F.3d 815, 818–20 (9th Cir. 2011). In *Spentz*, which concerned a similar drug stash house robbery sting, we said that the defendants could not merely point to the typical fruits of their crime to establish governmental inducement: "The drugs and money they would recover from the robbery were not an alternative, non-criminal motivation; they were the prototypical criminal motivation for robbery." *Id.* at 819. The instruction in this case ultimately read as follows:

    Now Defendant Jorge Cortes contends that he was entrapped by a government agent. The

government has the burden of proving beyond a reasonable doubt that the Defendant Jorge Cortes was not entrapped. The government must prove either, one, that the Defendant Jorge Cortes was predisposed to commit the crime before being contacted by a government agency; or two, that Defendant Jorge Cortes was not induced by the government agents to commit the crime.

When a person independent of and before government contact is predisposed to commit the crime, it is not entrapment, even if government agents merely provide an opportunity to commit the crime.

In determining whether the defendant was predisposed to commit the crime before being approached by government agents, you may consider the following: one, whether the defendant demonstrated reluctance to commit the offense; two, the defendant's character and reputation; three, whether the government agents initially suggested the criminal activity; four, whether the defendant engaged in the criminal activity for profit; and five, the nature of the government's inducement or persuasion. *However, the amount of drugs or the profit that would be derived from their sale does not constitute an inducement supporting entrapment.*

In determining whether Defendant Jorge Cortes was induced by government agents to

> commit the offense, you may consider any government conduct creating a substantial risk that an otherwise innocent person would commit an offense, including persuasion, fraudulent representations, threats, coercive tactics, harassments, promise of reward or pleas based on need, sympathy, or friendship.

The italicized sentence above (emphasis added by us) is the modification derived from *Spentz*.

The jury returned a guilty verdict on all three counts. Cortes was sentenced to 180 months for Count 1, a concurrent term of 60 months for Count 2, and a consecutive term of 60 months for Count 3, for a total of 240 months. Judgment was entered on May 19, 2012, and Cortes timely appealed.

## II. Jurisdiction and Standard of Review

We have jurisdiction pursuant to 28 U.S.C. § 1291 and 18 U.S.C. § 3742. In reviewing jury instructions, "the standard of review varies based on the nature of the alleged error." *United States v. Keyser*, 704 F.3d 631, 641 (9th Cir. 2012). We review the language and formulation of a jury instruction for an abuse of discretion. *United States v. Peppers*, 697 F.3d 1217, 1220 (9th Cir. 2012), *cert. denied*, 133 S. Ct. 1477 (2013). However, "[w]hen jury instructions are challenged as misstatements of law, we review them *de novo*." *United States v. Gonzalez-Torres*, 309 F.3d 594, 600 (9th Cir. 2002).

"A criminal defendant is entitled to jury instructions related to a defense theory so long as there is 'any foundation

in the evidence'" and the instruction is "supported by law." *United States v. Doe*, 705 F.3d 1134, 1144 (9th Cir. 2013) (quoting *United States v. Burt*, 410 F.3d 1100, 1103 (9th Cir. 2005)). "When there is a 'question whether the district court's instructions adequately presented the defendant's theory of the case,' the 'district court's denial of a proposed jury instruction' is reviewed de novo." *United States v. Mincoff*, 574 F.3d 1186, 1192 (9th Cir. 2009) (citation omitted); *see also United States v. Chao Fan Xu*, 706 F.3d 965, 988 (9th Cir. 2013) ("Whether the instructions, taken as a whole, adequately cover the defense theory is a question of law reviewed *de novo*."); *United States v. Castagana*, 604 F.3d 1160, 1163 n.2 (9th Cir. 2010) ("We review de novo the denial of a jury instruction based on a question of law."). "The denial of a defendant's jury instruction due to an inadequate factual basis is reviewed for an abuse of discretion." *Chao Fan Xu*, 703 F.3d at 988.

"An error in criminal jury instructions requires reversal unless there is no reasonable possibility that the error materially affected the verdict or, in other words, that the error was harmless beyond a reasonable doubt." *United States v. Pierre*, 254 F.3d 872, 877 (9th Cir. 2001) (citation, quotation marks, and alteration omitted). Where the error is the wholesale failure to give an instruction, we must reverse if the evidence supports giving the instruction: "[a] criminal defendant is entitled to jury instructions related to a defense theory so long as there is 'any foundation in the evidence.'" *Doe*, 705 F.3d at 1144 (quoting *Burt*, 410 F.3d at 1103); *see also United States v. Washington*, 819 F.2d 221, 225 (9th Cir. 1987) ("[A] defendant is entitled to an instruction concerning his theory of the case if the theory is legally sound and evidence in the case makes it applicable, even if the evidence

is weak, insufficient, inconsistent, or of doubtful credibility.").

We review the denial of a motion to dismiss an indictment de novo. *United States v. Haynes*, 216 F.3d 789, 796 (9th Cir. 2000).

Finally, while we review the substantive reasonableness of a sentence for abuse of discretion, *United States v. Carty*, 520 F.3d 984, 993 (9th Cir. 2008) (en banc), we review a sentence de novo for any claimed Eighth Amendment violation, *United States v. Meiners*, 485 F.3d 1211, 1212 (9th Cir. 2007) (per curiam).

## III.     Discussion

### 1.  Entrapment

Cortes first argues that the district court erred by modifying the Ninth Circuit Pattern Jury Instruction on entrapment to add the language inspired by *Spentz*.

"The entrapment defense has two elements: (1) the defendant was induced to commit the crime by a government agent, and (2) he was not otherwise predisposed to commit the crime." *Spentz*, 653 F.3d at 818 (citations and quotation marks omitted). "Inducement can be any government conduct creating a substantial risk that an otherwise law-abiding citizen would commit an offense, including persuasion, fraudulent representations, threats, coercive tactics, harassment, promises of reward, or pleas based on need, sympathy or friendship." *United States v. Williams*, 547 F.3d 1187, 1197 (9th Cir. 2008) (citation and quotation marks omitted). "An inducement consists of an opportunity

*plus* something else—typically, excessive pressure by the government upon the defendant or the government's taking advantage of an alternative, non-criminal type of motive." *United States v. Poehlman*, 217 F.3d 692, 701 (9th Cir. 2000) (citation and quotation marks omitted).

As to the second requirement, the defense of entrapment fails "[i]f the defendant is predisposed to commit the crime." *United States v. Smith*, 802 F.2d 1119, 1124 (9th Cir. 1986). We have identified five factors to determine whether a defendant was predisposed:

> [T]he character or reputation of the defendant, including any prior criminal record; whether the suggestion of the criminal activity was initially made by the Government; whether the defendant was engaged in the criminal activity for profit; whether the defendant evidenced reluctance to commit the offense, overcome only by repeated Government inducement or persuasion; and the nature of the inducement or persuasion supplied by the Government.

*United States v. Busby*, 780 F.2d 804, 807 (9th Cir. 1986) (citation omitted). "Although none of these factors is controlling, the defendant's reluctance to engage in criminal activity is the most important." *Id.*

Here, the court granted Cortes's request to instruct the jury on the entrapment defense. However, the court modified the model Ninth Circuit instruction to eliminate the drugs or any profit from the sale of those drugs as a potential basis for the inducement. In 2011, we said in *Spentz* that defendants

12                UNITED STATES V. CORTES

could not rely on the "potentially large reward" as governmental inducement to commit a robbery, because that was "the product of the crime they agreed to commit." 653 F.3d at 819. "The drugs and money they would recover from the robbery were not an alternative, non-criminal motivation; they were the prototypical criminal motivation for robbery." *Id.* To comply with *Spentz*, the district court instructed the jury that "the amount of drugs or the profit that would be derived from their sale does not constitute an inducement supporting entrapment."

Cortes argues *Spentz* contradicts our prior cases that *did* allow an entrapment instruction to go to the jury even when the purported inducement to commit the crime was a pecuniary reward. In *United States v. Kessee*, 992 F.2d 1001 (9th Cir. 1993), we held that the district court should have given an entrapment instruction where the defendant faced "repeated suggestions" by the undercover informant to sell drugs and only caved after he "lost both his jobs, and did not know where he would get the money for rent and food for his family." *Id.* at 1003–04. *Kessee* concerns what is minimally necessary to require giving an entrapment instruction to the jury, while *Spentz* concerns what the jury may *not* find constitutes entrapment. They are distinguishable. In *Spentz*, "the only evidence of inducement that defendants offer[ed] [was] the size of the potential pay-out from the robbery," *i.e.* the typical fruits of a robbery, without any additional motivation or evidence of inducement. 653 F.3d at 820. In *Kessee*, the defendant presented such additional evidence, including repeated government entreaties to sell drugs and the defendant's dire financial straits. 992 F.2d at 1003–04.

In *United States v. Sotelo-Murillo*, 887 F.2d 176 (9th Cir. 1989), where we reversed the district court and required an

entrapment instruction be given, the defendant, a prospective cocaine buyer, offered to negotiate the sale of heroin to undercover DEA informants. *Id.* at 177–78. He arranged the delivery of heroin to undercover DEA agents and was arrested and convicted for distribution. *Id.* At trial, the defendant argued the DEA's undercover informant, Correa, entrapped him, and he was induced to commit the crime in an attempt to recoup money he had previously loaned Correa. *Id.* at 178. According to Sotelo, Correa had strung him along, promising him that he was working a variety of jobs in order to pay him back. *Id.* The government's informant engaged in repeated entreaties, *id.* at 180–81, and, according to the defendant, finally overcame his resistance:

> Sotelo also contends that Correa later approached him with the story that he had some friends who were big Colombian sellers. Correa allegedly asked Sotelo to pose as a purchaser of drugs. Sotelo testified that he initially refused, but ultimately relented when informed that it was the only way to get his money back.

*Id.* at 178. Sotelo claimed that Correa wanted to stage a fake drug transaction so he could pocket a $25,000 advance commission and use that to repay him. *Id.* at 180. Granted, the alleged motivation was to profit from the drug transaction, but other factors distinguish this from *Spentz*, including: (1) repeated pressure by a government agent or informant that overcame alleged resistance; (2) a series of proposals made by the informant; and (3) a non-criminal motivation of reimbursement, such that the typical criminal motivation (obtaining the drugs) was not the sole basis for the claimed impermissible inducement. We concluded that the

JC

14          UNITED STATES V. CORTES

jury could have reasonably found the government had "tak[en] advantage of an alternative, non-criminal type of motive." *Poehlman*, 217 F.3d at 701 (citation and quotation marks omitted). In this way, *Spentz* can be reconciled with prior precedent.

Where does this leave us? A defendant arguing entrapment must put forward evidence of inducement that is above and beyond ordinary criminal motivation. An entrapment instruction may remind the jury that it cannot rest a finding of inducement *solely* on the hope of reaping the typical fruits of the crime. That is the teaching of *Spentz*. However, evidence of inducement can include government pressure or persuasion in whatever form it takes. This is our longstanding entrapment law. *See Williams*, 547 F.3d at 1197; *Busby*, 780 F.2d at 807.

We do not envy the district court's task here. Our decisions in this area have not been a model of clarity. In principle, a *Spentz* instruction was proper, but the actual phrasing erred in stating the holding. Again, the district court instructed the jury that "the amount of drugs or the profit that would be derived from their sale does not constitute an inducement supporting entrapment." This language slightly overstated *Spentz*'s holding. Instead, the court should have told the jury that the amount of drugs or the profit that would be derived from their sale *cannot on its own establish* an inducement supporting entrapment. We believe the instruction can be further clarified and offer the following guidance on how to communicate this exceedingly subtle point of law to the jury. We suggest supplementing the model entrapment instruction roughly along the following lines:

Case 2:13-cr-00171-JHS   Document 134   Filed 06/23/14   Page 55 of 75

It is not entrapment if a person is tempted into committing a crime *solely* on the hope of obtaining ill-gotten gain; that is often the motive to commit a crime. However, in deciding whether a law enforcement officer *induced* the defendant to commit the crime, the jury may consider all of the factors that shed light on how the officers supposedly persuaded or pressured the defendant to commit the crime.[1]

Accordingly, we **REVERSE and REMAND** for a retrial on Count 1.

## 2. Sentencing Entrapment

Cortes next argues that the district court erred in refusing to instruct the jury on sentencing entrapment, which is a separate affirmative defense to the quantity element of the drug charge under 21 U.S.C. § 841. "Sentencing entrapment occurs where 'a defendant, although predisposed to commit a minor or lesser offense, is entrapped in committing a greater offense subject to greater punishment.'" *United States v.*

---

[1] As this suggested instruction makes clear, we do not believe that *Spentz* excludes from consideration the proceeds of a crime. Cortes, however, appears to argue that the district court's *Spentz*-modified entrapment instruction violated the Due Process Clause. We review this vague contention for plain error because it was raised for the first time on appeal. *United States v. Davenport*, 519 F.3d 940, 943 (9th Cir. 2008). We will affirm unless "(1) there has been an error in the proceedings below; (2) that error was plain; (3) it affected substantial rights; and (4) it seriously affected the fairness, integrity, or public reputation of judicial proceedings." *Id.* There was no plain due process error. *United States v. Olano*, 507 U.S. 725, 734 (1993).

JC

*Briggs*, 623 F.3d 724, 729 (9th Cir. 2010) (quoting *United States v. Staufer*, 38 F.3d 1103, 1106 (9th Cir. 1994)). "[I]t is impermissible for the government to 'structure sting operations in such a way as to maximize the sentences imposed on defendants' without regard for the defendant's culpability or ability to commit the crime on his own." *United States v. Schafer*, 625 F.3d 629, 640 (9th Cir. 2010) (quoting *Staufer*, 38 F.3d at 1107). "[A]ctive government involvement" or undue government pressure is required to establish this defense. *Id.* "In those cases where sentencing entrapment occurs, the amount of drugs used in calculating the defendant's sentence should be reduced by the amount that 'flow[s] from [the] entrapment.'" *Briggs*, 623 F.3d at 729 (quoting *United States v. Naranjo*, 52 F.3d 245, 250 (9th Cir. 1995)).

  We have never held that sentencing entrapment is a jury question, but the Supreme Court's precedent and our own make clear that it must be. *See United States v. Williams*, 478 F. App'x 364, 366 (9th Cir. 2012) (Silverman, J., dissenting). "[W]e have held that drug types and quantities triggering higher statutory maximum sentences under 21 U.S.C. § 841(b) are jury questions under *Apprendi v. New Jersey*, 530 U.S. 466, 120 S. Ct. 2348, 147 L.Ed.2d 435 (2000)." *Id.* (citing *United States v. Buckland*, 289 F.3d 558, 568 (9th Cir. 2002) (en banc)). It therefore stands to reason that any *defenses* to those drug types and quantities must be submitted to the jury as well, when the proffered defense has the potential to change the statutory maximum or minimum sentences.

  The origins of sentencing entrapment lie in cases that pre-date *Apprendi*, and that explains why it was typically addressed during sentencing. In *Staufer*, we wrote that

"[s]entencing entrapment or 'sentence factor manipulation' occurs when 'a defendant, although predisposed to commit a minor or lesser offense, is entrapped in committing a greater offense subject to greater punishment.'"  38 F.3d at 1106 (quoting *United States v. Stuart*, 923 F.2d 607, 614 (8th Cir. 1991)).    Following *Apprendi*, however, "sentencing entrapment" is a bit of a misnomer, since the drug quantity is an element of the offense, not a sentencing enhancement or factor.  A jury must decide whether the defendant would have sold, bought, or robbed that quantity but for the government manipulation or pressure.[2]

The Sentencing Guidelines contain guidance for the judge on "sentencing entrapment" but these instructions come into play only insofar as the Guidelines calculations are concerned, not as to substantive statutory elements that must be tried to a jury or in a bench trial.  In drug offense cases under 21 U.S.C. § 841, the drug quantity is an element of the offense that must be tried to the jury, but if the jury rejects the sentencing entrapment defense, the now-advisory Guidelines will nevertheless allow the court in its discretion to factor in governmental manipulation in its calculation of the applicable sentencing range.  Application Note 12 to United States Sentencing Guidelines Manual (2011) § 2D1.1 addresses governmental manipulation of the *quantity* of drugs involved in a reverse sting operation in which the defendant is either the seller or buyer:

---

[2] The government argues that *United States v. Carranza*, 289 F.3d 634 (9th Cir. 2002), stands for the proposition that sentencing entrapment is not an affirmative defense that must be submitted to the jury, but that case is wholly inapposite.  *Carranza* merely held that the prosecution does not have to prove that the defendant *knew* of the type and quantity of the controlled substance and noted that *Apprendi* did not change that longstanding rule.  *Id.* at 643–44.

JC

18          UNITED STATES V. CORTES

> If . . . the defendant establishes that the
> defendant did not intend to provide or
> purchase, or was not reasonably capable of
> providing or purchasing, the agreed-upon
> quantity of the controlled substance, the court
> shall exclude from the offense level
> determination the amount of controlled
> substance that the defendant establishes that
> the defendant did not intend to provide or
> purchase or was not reasonably capable of
> providing or purchasing.

Along similar lines, Application Note 14 to United States
Sentencing Guidelines Manual (2011) § 2D1.1 addresses
governmental manipulation of the *price* of the drugs involved
in a reverse sting operation in which the defendant is the
buyer:

> If, in a reverse sting (an operation in which a
> government agent sells or negotiates to sell a
> controlled substance to a defendant), the court
> finds that the government agent set a price for
> the controlled substance that was substantially
> below the market value of the controlled
> substance, thereby leading to the defendant's
> purchase of a significantly greater quantity of
> the controlled substance than his available
> resources would have allowed him to
> purchase except for the artificially low price
> set by the government agent, a downward
> departure may be warranted.

In this case, Cortes proposed the following sentencing entrapment instructions that tracked Application Notes 12 and 14:

> If the government fails to prove beyond a reasonable doubt that Mr. Cortes was reasonably capable of purchasing 5 or more kilograms of cocaine, then you cannot return a finding that the applicable quantity of cocaine . . . was 5 or more kilograms.

> If you find that the government agents set a price for the controlled substance that was substantially below the market value of the controlled substance, thereby leading to Mr. Cortes' agreement to acquire 5 or more kilograms of cocaine when his available resources would not have allowed him to purchase 5 or more kilograms of cocaine except for the artificially low price set by the government agents, then you cannot return a finding that the applicable quantity of cocaine . . . was 5 or more kilograms.

However, these proposed instructions were clearly inapposite: Cortes was not accused of purchasing drugs but of conspiring to *steal* drugs.

The court denied Cortes's request for a sentencing entrapment instruction.        Confronted with the novel application of this defense in the context of a fictitious drug stash house reverse sting, the court did not yet have the benefit of *United States v. Yuman-Hernandez*, 712 F.3d 471 (9th Cir. 2013), which was decided over a year after Cortes's

JC

trial. While the run-of-the-mill drug sting ensnares a defendant who is selling or buying, in *Yuman-Hernandez* we noted that sentencing entrapment *is* cognizable in a reverse sting operation involving a drug stash house robbery. *Id.* at 474–75. *Yuman-Hernandez* did not address whether *Apprendi* requires sentencing entrapment be given to the jury, but we wrote that sentencing entrapment in this context forces the factfinder to ask whether the defendant had "the capability to steal a particular quantity of drugs," an admittedly "amorphous concept." *Id.* at 474. Writing for the panel, Judge Goodwin explained as follows:

> Theoretically, nearly any person is capable of theft. And once a thief gains access to the drugs, he or she is just as capable of carrying off one kilogram as ten. Thus, the quantity of drugs has little relation to capability; in general, the only meaningfully measurable capability is typically the capability to perform the robbery. But the capability to commit the robbery has little relevance to determining a defendant's predisposition to deal in a given quantity of drugs. In the context of theft, the chosen quantity of drugs is divorced from capability, allowing the government to effectively offer an inordinate amount for free. In essence, the government can easily manipulate the capability element in cases of fictitious robbery.
>
> As a result, it makes little sense to require that a defendant establish both a lack of intent and lack of capability in the context of a fictitious stash house robbery. . . . Thus, in the case of

> fictitious stash house robberies, the defendant
> need only show a lack of intent *or* lack of
> capability to deal in the quantity of drugs
> charged.

*Id.* at 474–75 (footnote omitted). Not only does sentencing entrapment provide a defendant with a partial defense when the complete defense of entrapment fails, but the test is satisfied in the fictitious stash house context with either a lack of capability *or* a lack of intent. In the wake of *Yuman-Hernandez*, we now know that when sentencing entrapment is raised in this context, a proper instruction will ask the jury to decide whether the defendant had the capability *and* the intent to deal in that fabricated quantity of drugs.[3]

A criminal defendant is entitled to present his sentencing entrapment defense to the jury if the success of that defense would result in a lower statutory sentencing range. That is, if there is some foundation in the evidence that he would be subject to a lesser statutory minimum or maximum sentence if his sentencing entrapment defense were to succeed, then he is entitled to a jury instruction on that defense. The statutory range for the charged offense in this case, conspiracy to possess with intent to distribute 5 kilograms or more of cocaine, is 10 years to life imprisonment. 21 U.S.C. § 841(b)(1)(A). The middle quantity range, from 500 grams to just shy of 5 kilograms of cocaine, exposes a defendant to a mandatory minimum of 5 years and a statutory maximum

---

[3] We note that a market-value sentencing entrapment instruction based on Application Note 14 above likely would not make much sense here since this was not a drug transaction but a conspiracy to take the drugs by force. There is no evidence that Zayas or anyone else informed Cortes of the price or value of the cocaine.

JC

of 40 years. *Id.* § 841(b)(1)(B). Finally, an unspecified
amount of cocaine bears no mandatory minimum and exposes
a defendant to a 20-year statutory maximum. *Id.*
§ 841(b)(1)(C).

Cortes was convicted of 21 U.S.C. § 841(b)(1)(A) and
therefore faced a 10-year mandatory minimum and a statutory
maximum of life. Had the jury considered Cortes's
sentencing entrapment defense and found that he was
entrapped as to the amount, the maximum sentence could
have dropped to 40 years or 20 years, depending on the jury's
finding, and crucially the mandatory minimum could have
dropped to 5 years or none whatsoever. Cortes was
ultimately sentenced to 180 months or 15 years, less than the
20-year statutory maximum for an unspecified amount of
cocaine. However, the refusal to instruct on sentencing
entrapment may have been prejudicial had the jury agreed he
was entrapped as to the quantity, because the court might
have had to apply a lower mandatory minimum or none at all,
depending on the quantity the jury found to have been
improperly inflated. On June 17, 2013, in *Alleyne v. United
States*, 133 S. Ct. 2151 (2013), the Supreme Court overruled
*Harris v. United States*, 536 U.S. 545 (2002), which declined
to extend *Apprendi* to mandatory minimum sentences. The
Court stated:

> *Apprendi*'s definition of "elements"
> necessarily includes not only facts that
> increase the ceiling, but also those that
> increase the floor. Both kinds of facts alter the
> prescribed range of sentences to which a
> defendant is exposed and do so in a manner
> that aggravates the punishment. 530 U.S., at
> 483, n. 10; *Harris, supra*, at 579 (Thomas, J.,

> dissenting). Facts that increase the mandatory
> minimum sentence are therefore elements and
> must be submitted to the jury and found
> beyond a reasonable doubt.

*Alleyne*, 133 S. Ct. at 2158.  Accordingly, we hold that
sentencing entrapment must be tried to a jury where the
defendant's argument and the evidence raise the possibility of
changing the applicable statutory maximum or minimum
sentences.

The record demonstrates that Cortes introduced evidence
supporting a sentencing entrapment *defense* under the
standard for reverse stings involving a drug stash house
robbery scheme.  Under *Yuman-Hernandez*, he need only
establish either "a lack of intent *or* lack of capability to deal
in the quantity of drugs charged."   712 F.3d at 475.
Additionally, under *Briggs*, the sentencing entrapment
defense can also succeed if he shows the government
"inflate[d] the amount of drugs supposedly in the house" in
order to "obtain a greater sentence for the defendant."
623 F.3d at 729.  At trial, Agent Zayas testified that the 100
kilogram amount was selected to make the set-up believable
for the geographic area in which the reverse sting was to
occur, not to ratchet up the defendants' sentencing exposure.
The factfinder could discredit that testimony and conclude
that the drug quantity was set at an "arbitrarily high level" in
order to maximize punishment.

However, the sentencing entrapment defense needs to be
presented to the *jury* only if that reduction would affect
Cortes's mandatory minimum or statutory maximum
sentence. *See Alleyne*, 133 S. Ct. at 2155; *Apprendi*, 530 U.S.
at 489. Therefore, there must be evidence from which the jury

Jc

could find that Cortes lacked the intent or capability to deal even in *5 kilograms* – the amount charged in the indictment – or that the government inflated the amount of drugs to 100 kilograms to trigger the statutory minimum or maximum. *See* 21 U.S.C. § 841(b)(1)(A)(ii). If Cortes presents such evidence in his new trial, he will be entitled to a jury instruction on sentencing entrapment.[4] We express no judgment as to whether Cortes's defense will prevail on these grounds, only that he may be entitled to the jury instruction.

Because the court may have to give a sentencing entrapment instruction next time around, separate from the entrapment instruction, we offer the following as a suggested instruction for this particular drug stash house robbery context:

> Defendant Jorge Cortes also argues that he was specifically entrapped as to the *quantity of the drugs* involved in the staged robbery. This is a separate and distinct defense from the entrapment defense I have just described to you and you *must* reach this question if you reject Defendant Cortes's entrapment defense. You must decide whether Defendant Cortes had *both* the intent *and* the capability to steal

---

[4] If no such evidence is presented, Cortes's sentencing entrapment defense will be cognizable only during sentencing. Notably, Cortes did argue below that his Sentencing Guidelines range should be reduced based on sentencing entrapment by the government. Although the district court credited Agent Zayas's explanation for why selecting 100 kilograms was appropriate, it also observed that "for purposes of sentencing, it seems to me like it's a little high." The district court therefore gave Cortes a variant sentence, although it did not recalculate his Guidelines based on a reduced drug quantity.

the *charged* quantity of the controlled substance, which is at least 5 kilograms. You must also decide whether the government inflated the quantity of drugs to make Cortes's punishment more severe. Finally, if you find that Defendant Cortes was specifically entrapped as to the quantity of drugs involved, you must decide what quantity was *not* a result of that entrapment.

You will be asked to answer the following questions:

(1) Did Defendant Cortes lack the intent to steal that *quantity* of the controlled substance? If yes, what *quantity* did he have the intent to steal?

(2) Did Defendant Cortes lack the capability to steal that *quantity* of the controlled substance? If yes, what *quantity* did he have the capability to steal?

(3) Did the government's agents inflate the quantity of drugs in the scheme to make Defendant Cortes's punishment more severe? If yes, what *quantity* was not inflated?

If the jury answers any of those three questions in the affirmative, the district court shall sentence the defendant under the appropriate statutory provision for the quantity the jury found did not stem from sentencing entrapment.

### 3. Hobbs Act

JC

We reject Cortes's argument that Hobbs Act robbery or extortion is limited to the stealing of lawful property and excludes contraband such as illegal drugs. Nothing in 18 U.S.C. § 1951(a) so limits the scope of this statute; nor does anything in the definitions of "robbery," *id.* § 1951(b)(1), or "extortion," *id.* § 1951(b)(2). The Supreme Court has stated Congress intended the Hobbs Act to be broadly construed. *See United States v. Culbert*, 435 U.S. 371, 380 (1978) ("Our examination of the statutory language and the legislative history of the Hobbs Act impels us to the conclusion that Congress intended to make criminal all conduct within the reach of the statutory language."); *see also United States v. Lynch*, 437 F.3d 902, 908 (9th Cir. 2006) (en banc) (noting "the very broad scope of the Hobbs Act"). It covers illegal activities that "in any way or degree" affect "any article or commodity" that travels in commerce. 18 U.S.C. § 1951(a). We agree with the Second Circuit, which in *United States v. Gotti*, 459 F.3d 296 (2d Cir. 2006), deemed "untenable" the proposition that "one can never 'extort,' under the Hobbs Act, illegal property (such as narcotics) because such property cannot be legally used, sold, or transferred." *Id.* at 325–26. And a number of cases have already established that interference with illegal interstate commerce fulfills the interstate nexus requirement of the Hobbs Act. *Lynch*, 367 F.3d at 1156–57 (citing additional cases).

Congress modeled the Hobbs Act after the New York Penal Code and the Field Code, a 19th Century model penal code. *Scheidler v. Nat'l Org. for Women, Inc.*, 537 U.S. 393, 403 (2003). Contrary to Cortes's argument, New York law recognized that robbery included the taking of contraband and *McCord v. People*, 46 N.Y. 470 (1871) (per curiam), does not stand for a contrary proposition. In *McCord*, a police

detective was convicted of obtaining money under false
pretenses after falsely telling a man that he had a warrant for
his arrest, which prompted the man to give him a gold watch
and diamond ring. *Id.* at 471. The court reversed the
conviction, reasoning that the law was not meant "to protect
those who, for unworthy or illegal purposes, part with their
goods." *Id.* at 472–73 (citation omitted).

But this rule applied only to larceny by false pretenses,
not to robbery. New York's highest court later recognized
that "the rule as to larceny by false pretense and by trick or
device" announced in *McCord* differed from "the
common-law rule that stealing property from a thief is the
same as stealing from the true owner." *People v. Tompkins*,
79 N.E. 326, 327 (N.Y. 1906) (citation omitted). Indeed, in
defining "personal property" under the larceny statutes, the
Field Code cited to, *inter alia, Commonwealth v. Rourke*,
64 Mass. 397 (1852), which held that money acquired by the
illegal sale of liquor may be the subject of larceny.
4 Commissioners of the Code, Proposed Penal Code of the
State of New York § 584 (1865) (reprint 1998).

Other state laws were in accord. Though the California
Supreme Court once held that the robbery of liquor during
Prohibition was not punishable, *People v. Spencer*, 201 P.
130, 131 (Cal. 1921), that decision was overruled less than
nine years later, *People v. Odenwald*, 285 P. 406, 407 (Cal.
Ct. App.), *cert. denied*, 286 P. 161 (Cal. 1930), and well
before the Hobbs Act was enacted in 1946. The California
Supreme Court recognized that California had been "the only
jurisdiction" to adhere to the rule that robbery of contraband
was not subject to penal sanction, and since *Spencer*'s
overruling, "the rule is universal that by prohibiting
possession of an item, the government does not license

JC

criminals to take it by force or stealth from other criminals."
*People v. Dillon*, 668 P.2d 697, 704 n.5 (Cal. 1983)
(concerning robbery of marijuana); *People v. Otis*, 139 N.E.
562, 562 (N.Y. 1923) (rejecting the position that the theft of
contraband cannot constitute larceny).

Moreover, Congress's enactment of a statute, 18 U.S.C.
§ 2118, prohibiting the robbery of controlled substances does
not, as Cortes argues, reflect "Congress' intent to protect only
individuals who lawfully possess controlled substances." The
legislative history indicates § 2118 was enacted, at least in
part, to address concerns that the Department of Justice was
not prosecuting robberies of pharmacists under the Hobbs
Act. H. Rep. No. 98-644, at 2-4 (1984). Nothing about its
passage suggests Congress intended to shield people who
robbed illegal narcotics dealers from punishment under the
Hobbs Act.

Accordingly, we hold that the Hobbs Act criminalizes
robbery and extortion even when the property at issue is
contraband.

### 4. Attempted Impeachment of the Confidential Informant

We need not review this evidentiary ruling because we
are remanding for a new trial on Count 1.

### 5. Sentencing

Finally, Cortes claims his 20-year combined sentence is
substantively unreasonable and violates the Eighth
Amendment. Because we are vacating his conviction and
sentence as to Count 1 and remanding for a retrial on Count

1, which earned Cortes a 180-month term (his longest, consecutive term), his total sentence may well change after any retrial and resentencing. Therefore, Cortes's appeal of his 20-year sentence is moot at this juncture.

## IV.   Conclusion

We **REVERSE and REMAND** for a new trial on Count 1. The balance of the judgment is **AFFIRMED**.

**(A) INDICTMENT MUST BE DISMISSED DUE TO OUTRAGEOUS GOVERNMENT MISCONDUCT AND SELECTIVE ENFORCEMENT IN PROSECUTION OF DEFENDANT.**

====================================================

THIS MOTION TO DISMISS THE ~~SUPERSEDING~~ INDICTMENT AS TO DEFENDANT IS SUBMITTED PURSUANT TO RULE - 12(B), FEDERAL RULES OF CRIMINAL PROCEDURE. UNITED STATES V. PITT, 19 F.3D 751, 760 (3D CIR. 1999); UNITED STATES V. NGUYEN, 250 F.3D 643, 645-646 (8TH. CIR. 2001). THE ISSUE IS A QUESTION OF LAW TO BE DECIDED BY THE COURT. UNITED STATES V. HUDSON, 982 F.2D 160, 163 (5TH. CIRCUIT 1993). OUTRAGEOUS CONDUCT DEFENSE REQUIRES "NOT ONLY GOVERN- MENT OVERINVOLVEMENT IN THE CHARGED CRIME BUT A PASSIVE ROLE BY THE DEFENDANT AS WELL". UNITED STATES V. EVANS, 941 F.2D 267, 271 (5TH. CIR. 1991), CITING UNITED STATES V. ARTEGA, 807 F.2D 424, 427 (5TH. CIR. 1986).

GOVERNMENT AGENTS HAVE PREVIOUSLY ON NUMEROUS OCCASIONS EMPLOYED KNOWN INFORMANTS TO HUNT AND FIND PEOPLE WHOM THEY COULD CONVINCE TO PARTICIPATE IN STAGED AND FICTITIOUS ROBBERIES OF NARCOTICS AND DRUG STASH HOUSES. THAT IS EXACTLY WHAT THE FEDERAL AGENTS DID IN THIS CASE. THE PLAN IS SIMPLE. THE INFORMANT TELLS PEOPLE THAT HE HAS A FRIEND (THE UNDERCOVER AGENT) WHO IS A COURIER OF DRUGS TO AND FROM A STASH HOUSE. THE "FRIEND" IS UPSET WITH HIS PEOPLE WITHIN THE STASH HOUSE AND WISHES TO STEAL THE DRUGS AND NEEDS HELP. HIS PLAN IS TO HAVE PEOPLE GO WITH HIM TO THE STASH HOUSE, ENTER THE STASH HOUSE AFTER THE "FRIEND" IS INSIDE, AND STEAL THE DRUGS. THE DRUGS WOULD BE DIVIDED THEREAFTER. "EVEN WHEN A DEFENDANT IS PREDISPOSED TO COMMITT AN OFFENSE, HIS CONVICTION MAY BE OVERTURNED IF THE GOVERNMENT IS SO INVOLVED IN THE CRIMINAL ENDEAVOR THAT IT SHOCKS OUR SENSE OF JUSTICE AND VIOLATES DUE PROCESS". SEE - UNITED STATES V. RUSSELL, 411 U.S. 423, 431 (1978). THERE AN AGENT OF THE DRUG ENFORCEMENT AGENCY (DEA) SOLICITED A FORMER FELON TO OPEN A DRUG LABORATORY. THE AGENT PROVIDED TWENTY PERCENT OF THE CHEMICALS, ARRANGED FAVORABLE SUPPLY TERMS FOR ADDITIONAL CHEMICALS, DIRECTED THE OPERATION OF THE LABORATORY, LOCATED A PRODUCTION SITE AND SOLVED THE TECHINICAL PROBLEMS. THE THIRD CIRCUIT HELD THAT TWIGG'S CONVICTION WAS "TAINTED BY THE CONDUCT OF THE DEA AGENTS AND THAT FUNDAMENTAL FAIRNESS REQUIRES REVERSAL". ID AT 382. THE TWIGG DECISION CITED THE OPINION OF JUDGE HASTIE IN UNITED STATES V. WEST, 511 F.2D 1083 (3D CIR. 1975), WHERE THE COURT "REVERSED A CONVICTION PRIMARILY ON FUNDAMENTAL FAIRNESS GROUNDS". ID AT 1085. JUDGE HASTIE WROTE:

> "BUT WHERE THE GOVERNMENT'S OWN AGENT HAS SET
> THE ACCUSED UP IN ILLICIT ACTIVITY BY SUPPLYING
> HIM WITH NARCOTICS AND THEN INTRODUCING HIM TO
> ANOTHER GOVERNMENT AGENT AS A PROSPECTIVE BUYER,
> THE ROLE OF GOVERNMENT HAS PASSED THE POINT OF
> OF TOLERATION. MOREOVER, SUCH CONDUCT DOES NOT

( 1 )

FACILITATE DISCOVERY OR SUPPRESSION OF ONGOING
ILLICIT TRAFFIC IN DRUGS. IT SERVES NO JUSTI-
FYING SOCIAL OBJECTIVE. RATHER, IT PUTS THE
LAW ENFORCEMENT AUTHORITIES IN THE POSITION OF
CREATING NEW CRIME FOR THE SAKE OF BRINGING
CHARGES AGAINST A PERSON THEY HAD PERSUADED TO
PARTICIPATE IN WRONGDOING.

## ID. AT 1085.

ALTHOUGH HAMPTON V. UNITED STATES, 48 L.ED 2D 113 (1976), "MAY HAVE
ATTENTUATED WEST'S APPLICABILITY IN CASES INVOLVING SIMILAR FACTS, WE
BELIEVE THAT THE PRINCIPLES ENUNCIATED BY JUDGE HASTIE REMAIN SOUND TODAY".
UNITED STATES V. TWIGG, SUPRA. AT 379.

JUDGE ROSENN'S MAJORITY OPINION IN UNITED STATES V. TWIGG HAD NO
TROUBLE FINDING THAT THE GOVERNMENT'S INVOLVEMENT IN THE CRIMINAL ACTIVITIES
IN THAT CASE RESULTED IN "A DEMONSTRABLE LEVEL OF OUTRAGEOUS", ID AT 380.
ALTHOUGH THE TWIGG CASE IS IN A DIFFERENT SETTING, THE ACTIONS OF THE
GOVERNMENT THROUGH AND WITH THE GOVERNMENT'S INFORMANT AND THE GOVERNMENT'S
OWN ACTIONS STRIKE A VIVID SIMILARITY TO THE ACTIONS OF THE GOVERNMENT
THROUGH AND WITH ITS INFORMANT CS#____ AND THE ACTIONS OF THE GOVERNMENT
UNDERCOVER AGENT UC-___ IN THE INSTANT CASE. IN THE INSTANT CASE THE GOVERN-
MENT PROVIDED THE ONLY ITEM THROUGH ITS INFORMANT - THE VEHICLE. THERE WAS
NOTHING ELSE TO PROVIDE BECAUSE NOTHING ELSE EXISTED, NOTHING ELSE WAS REAL.
IT WAS ALL CONTRIVED BY THE GOVERNMENT AGENTS. THE GOVERNMENT PROVIDED THE
ONLY NECESSARY ITEM - THE IDEA AND THE FICTION ABOUT THE "STASH HOUSE", THE
DEALERS, THE DRUGS, ALL SUPPLIED BY THE GOVERNMENT.

| UNITED STATES V. TWIGGS | UNITED STATES V. WASHINGTON |
|---|---|
| KUBICA WAS A CONVICTED FELON WILLING TO ASSIST LAW ENFORCEMENT. | THE CI#___ WAS A CONVICTED FELON WILLING TO ASSIST LAW ENFORCEMENT. |
| KUBICA COMMUNICATED WITH DEFENDANT NEVILLE. | CS#____ SEARCHED POTENTIAL INDIVIDUALS AND CAME UPON A PERSON HE KNEW FROM THE NEIGHBORHOOD. |
| KUBICA OFFERED THE ESTABLISHMENT OF A SPEED LABORATORY TO DEFENDANT NEVILLE. | CS#____ OFFERED THE ROBBERY OF FICTITIOUS DRUG STASH HOUSE TO DEFENDANTS AND LATER INTRODUCED TO THE GOVERNMENT AGENT UC-___. |
| THE GOVERNMENT GRATUITOUSLY SUPPLIED ABOUT 20% OF THE GLASSWARE AND THE INDISPENSABLE INGREDIENTS, AND MADE ARRANGEMENTS WITH CHEMICAL SUPPLY HOUSES TO FACILITATE THE PURCHASES OF THE REST OF THE MATERIALS. | THE CS#____ AND THE UC-___ WERE THE ONES WHO DESCRIBED THE ACTIONS OF THE FICTITIOUS DRUG DEALERS IN THE STASH HOUSE, THE MADE UP QUANTITIES OF THE COCAINE, THE POSSESSION OF WEAPONS OF THE DRUG DEALERS, AND HIS DUTIES AS THE DRUG COURIER. |

( 2 )

| | |
|---|---|
| THE GOVERNMENT SUPPLIED THE SPEED PRODUCTION SITE WHEN PROBLEMS AROSE IN FINDING A SUITABLE SITE. | UC-    AND THE GOVERNMENT SUPPLIED THE FICTITIOUS STASH HOUSE AND THE CREW WITHIN IT. |
| AT ALL TIMES DURING THE PRODUCTION PROCESS KUBICA WAS COMPLETELY IN CHARGE AND FURNISHED THE LABORATORY EXPERTISE. | UC-    AND THE GOVERNMENT WAS AT ALL TIMES IN CHARGE OF THE OF THE STASH HOUSE ROBBERY OPERATION, DESCRIBING IN DETAILS ON HOW TO CARRY IT OUT, HIS ACTIONS, THE ACTIONS OF THE DEFENDANTS, AND DIRECTED THE ENTIRE OPERATION. |
| THE THIRD CIRCUIT'S JUDGEMENT FOUND THAT THE ONLY EVIDENCE THAT NEVILLE WAS PREDISPOSED TO COMMIT THE CRIME WAS HIS RECEPTIVITY TO KUBICA'S PROPOSAL. | THE GOVERNMENT'S INVESTIGATION HERE WAS NOT INTERESTED IN AN EXISTING DRUG STASH HOUSE. THIS WAS A FICTITIOUS, NON-EXISTING STASH HOUSE. |
| THE ILLICIT PLAN FOR THE SPEED LABORATORY DID NOT ORIGINATE WITH THE TWIGG DEFENDANTS. | THE ILLICIT PLAN TO ROB THE DRUG STASH HOUSE DID NOT ORIGINATE WITH WASHINGTON OR THE OTHER DEFENDANTS. |

ASKIA WASHINGTON BECAME A DEFENDANT IN THIS CASE AS A RESULT OF SHOWING UP AT A MEETING TO HEAR A DISCUSSION ABOUT A CRIME. THE DEFENSE OF OUTRAGEOUS GOVERNMENT CONDUCT, DENIAL OF DUE PROCESS AND OVERREACHING IS A DEFENSE AVAILABLE TO HIM UNDER THESE CIRCUMSTANCES. THE THIRD CIRCUIT RECOGNIZED THAT FUNDAMENTAL FAIRNESS WILL NOT BAR THIS DEFENSE TO ANYONE INVOLVED IN THE CRIMINAL PROCEEDING EVEN THOUGH THAT DEFENDANT WAS NOT DIRECTLY BROUGHT IN OR INDUCED BY THE GOVERNMENT AGENT. UNITED STATES V. TWIGG, SUPRA. AT 381-382. "WHEN THE GOVERNMENT PERMITS ITSELF TO BECOME ENMESHED IN CRIMINAL ACTIVITY, FROM BEGINNING TO END, TO THE EXTENT WHICH APPEARS HERE, THE SAME UNDERLYING OBJECTIONS WHICH RENDER ENTRAPMENT REPUGNANT TO AMERICAN CRIMINAL JUSTICE ARE OPERATIVE". UNITED STATES V. TWIGG, SUPRA. AT 379, CITING UNITED STATES V. GREENE, 454 F.2D 783, 787 (9TH CIR. 1971).

THIS GOVERNMENTAL PLAN AND SCHEME WERE SIMPLE AND VERY BENEFICIAL TO THE INFORMANT IN THIS CASE. THE INFORMANT MAY HAVE BEEN PAID MONEY FOR HIS HELP, COOPERATION, AND PARTICIPATION. THE GOVERNMENT HAS BEEN ABLE TO CONVINCE DOZENS OF MINORITY DEFENDANTS TO PARTICPATE IN THIS BOGUS SCHEME, AND HAS EXECUTED THIS SAME MULTIPLE TIMES ACROSS THE UNITED STATES ONLY IN MINORITY NEIGHBORHOODS USING MINORITY INFORMANTS. THE TWO TIMES THAT THE GOVERNMENT DID USE WHITE INFORMANTS, THEY (WHITE INFORMANTS) WERE DIRECTED TO GO TO THE MINORITY NEIGHBORHOODS FOR ALLEGED PARTICPANTS.

OUTRAGEOUS GOVERNMENT CONDUCT CLAIMS FOCUS UPON THE CONDUCT OF THE GOVERNMENT'S AGENTS RATHER THAN THE PREDISPOSITION OR INTENT OF THE DEFENDANT TO COMMIT THE CRIMINAL ACT. UNITED STATES V. RUSSELL, SUPRA.; UNITED STATES V. GRAVES, 556 F.2D 1319, 1321 (5TH. CIR. 1977). THE DEFENSE REQUIRES PROOF OF (1) GOVERNMENT OVER-INVOLVEMENT IN THE CHARGED CRIME, AND (2) THE DEFENDANT'S

( 3 )

CONTINUED .....

PASSIVE ROLE OR CONNECTION TO THE GOVERNMENT ORCHESTRATED AND IMPLEMENTED CRIMINAL ACTIVITY. UNITED STATES V. EVEANS, 941 F.2D 267, 271 (5TH. CIR. 1991); UNITED STATES V. ARTEAGA, 807 F.2D 424, 427 (5TH. CIR. 1986).

IN THIS CASE THERE CAN BE NO QUESTION THAT THE GOVERNMENT THROUGH ITS INFORMANT AND UNDERCOVER SOURCE WERE OVERLY INVOLVED IN, AND DEVELOPED THE ENTIRE FICTITIOUS EVENT.

ASKIA WASHINGTON HAD NO ROLE OR CONNECTION WITH THE ENTIRE SCENARIO, EXCEPT TO BE AT THE SCENE WHEN THE ARREST WERE MADE, AND EVEN THEN HE WAS EXITING THE SCENE WITH A FEMALE DRIVER WHEN ARRESTED. HERE, IN SO FAR AS IT EFFECTS WASHINGTON, HE IS ENTITLED TO DISMISSAL ON THE BASIS OF THE OUTRAGEOUS GOVERNMENT CONDUCT.

DEFENDANT SUBMITS THAT THE COURT IN ASSESSING THIS OUTRAGEOUS GOVERN- MENT CONDUCT CLAIM THIS COURT SHOULD BE GUIDED BY THE CRITERIA OUTLINED IN UNITED STATES V. DUNLAP, CASE#2:13-CR-00126(ODW-3). THE NINTH CIRCUIT COURT BEGAN WITH THE ASSESSMENT OF WHETHER THE DEFENDANT HAD A CRIMINAL BACK- GROUND OR PROPENSITY THE GOVERNMENT KNEW ABOUT WHEN IT INITIATED ITS STING OPERATION. HERE THAT FACT WAS UNKNOWN BY THE A.T.F. BECAUSE DEFENDANT WASHINGTON WAS FNU/LNU (FIRST NAME UNKNOWN, LAST NAME UNKNOWN) UP UNTIL THE DATE OF HIS ARREST. THE FEDERAL LAW ENFORCEMENT NEVER KNEW WHO WASHINGTON WAS UNTIL IDENTIFICATION WAS MADE AFTER HIS ARREST. AS THE COURT IN 'DUNLAP' MADE CLEAR - "IT MAKES LITTLE SENSE TO JUSTIFY THE GOVERNMENT'S STASH HOUSE SCHEME AT ITS INCEPTION BY WHAT IT LATER LEARNED ABOUT DUNLAP". ID. AT PAGE 10 - SECOND PARAGRAPH. THE COURT CONCLUDED THAT "THE GOVERNMENT CANNOT BOOT- -STRAP ITS POST HOC KNOWLEDGE TO JUSTIFY THE SCHEME FROM THE BEGINNING". AS A MATTER OF FACT, WHEN THE INFORMANT WAS ASKING ABOUT WASHINGTON'S ABILITY TO ROB A DRUG STASH HOUSE, THE CODEFENDANT(S) MAKE IT CLEAR THAT "WASHINGTON DOES NOT DO THAT", HE IS JUST A GUNMAN". SEE GOVERNMENT TAPES AND DISCOVERY DATED _____, CD #_____.  THEREFORE, THE GOVERNMENT IN THIS MATTER TARGETED MR. WASHINGTON WITHOUT ANY KNOWLEDGE OR SUSPICION THAT HE HAD COMMITTED SIMILAR CONDUCT IN THE PAST. THE COURT IN DUNLAP CONDEMNED SUCH ACT AS A "WHOLE FISHING EXPEDITION". DECLINING THE INVITATION TO ENDORSE A "NAB-FIRST-ASK-QUESTIONS-LATER" APPROACH. ID. AT PAGE 11, SECOND PARAGRAPH.

USING THE FACTORS AS OUTLINED IN UNITED STATES V. BLACK, 733 F.3D 294, 313, THE DISTRICT COURT AGREED THAT HAD THE GOVERNMENT HAD ACTUAL KNOWLEDGE THAT A PARTICULAR PERSON HAD ENGAGED IN SIMILAR CONDUCT IN THE PAST - OR AT LEAST HAD SUSPICION BASED ON IDENTIFIABLE FACTS - THEN THE GOVERNMENT WOULD HAVE HAD FREE REIN, CONSISTENT WITH CONSTITUTIONAL RESTRICTION, TO GO AFTER THOSE INDIVIDUALS. SEE 733 F.3D AT 304. HERE THE GOVERNMENT DID NOT KNOW ANYTHING ABOUT THE INDIVIDUALS THEY WERE PURSUING UNTIL AFTER THEIR ARREST. THUS THE OUTRAGEOUS GOVERNMENT CONDUCT FINDING WEIGHS IN WASHINGTON'S FAVOR.

**CONTINUED** .....

THE GOVERNMENT ALSO DID NOT HAVE ANY INDIVIDUALIZED SUSPICION OF THE DEFENDANT WASHINGTON'S WRONGDOING BEFORE THEY CONDUCTED THEIR UNDERCOVER INVESTIGATION OF HIM. AS A MATTER OF FACT, THE GOVERNMENT DID NOT POSSESSE KNOWLEDGE THAT WASHINGTON WAS PREVIOUSLY INVOLVED OR EVEN SUSPECTED OF BEING INVOLVED IN STASH HOUSE ROBBERIES. THE RECORD IS CLEAR THAT THE GOVERNMENT DID NOT INFILTRATE AN ONGOING CRIMINAL ENTERPRISE, BUT CREATED A "HOME INVASION CREW" WHICH IT LATER PROSECUTED.

THE SUPREME COURT HAS DRAWN A LINE ON MANUFACTURING CRIME. THE COURT HAS STATED THAT THE "FUNCTION OF LAW ENFORCEMENT IS THE PREVENTION OF CRIME AND THE APPREHENSION OF CRIMINALS" MANIFESTLY, THAT FUNCTION DOES NOT INCLUDE THE MANUFACTURING OF CRIME". SHERMAN V. UNITED STATES, 356 U.S 369, 372 (1958). IN THIS INSTANT MATTER, WASHINGTON BROUGHT NOTHING TO THE TABLE. HE DID NOT TAKE AN INDEPENDENT ROLE IN PLANNING THE CRIME. HE MERELY SHOWED UP AT THE ALLEGED MEETING PLACE (UNARMED AND IN A SEPARATE VEHICLE FROM HIS CODEFENDANTS) TO AT BEST -- HEAR THE INFORMANT'S STORY. BECAUSE DEFENDANT WASHINGTON WAS ONLY RESPONDING TO THE GOVERNMENT'S SCRIPT WHICH WAS A TOTAL FALSITY CONCOCTED BY THE A.T.F. THE COURT SHOULD ALSO WEIGH SUCH FINDINGS IN FAVOR OF DISMISSAL OF THE INDICTMENT.

DEFENDANT FURTHER SUPPORTS DISMISSAL OF THIS INDICTMENT BASED ON THE ECONOMIC COERCION INHERENT IN A FAKE STASH HOUSE CASE LIKE THIS. THE RECORD SHOWS THAT THE GOVERNMENT ONLY TARGETED PEOPLE WHO WERE POOR AND LIVED IN MINORITY NEIGHBORHOODS. THE STATISTICAL DATA SHOWS SUCH FACT AND THE MANUAL UPON WHICH THE A.T.F. OFFICER'S WERE TRAINED CLEARLY INDICATES HOW SUCH STING IS TO BE CONDUCTED, AND THE PLACE THAT THE INFORMANTS SHOULD LOOK FOR SUCH TARGETS TO BE USED IN THE STINGS. THE DUNLAP COURT STATED THAT ANY DEFENDANT WHO WAS POOR AND JOBLESS WOULD BE VULNERABLE BASED ON THEIR DEPRESSED ECONOMIC CIRCUMSTANCES. THIS FACTOR THEREFORE WEIGHS IN FAVOR OF AN OUTRAGEOUS GOVERNMENT CONDUCT DETERMINATION. IN ASSESSING WHETHER THE GOVERNMENT HAS ENGAGED IN OUTRAGEOUS CONDUCT, THE FOCUS IS SOLELY ON ITS (GOVERNMENT) ACTIONS NOT THE DEFENDANT WASHINGTON'S ACTS. AS STATED IN DUNLAP, **"IT IS THEREFORE ERRONEOUS TO JUSTIFY THIS FAKE STASH-HOUSE SCHEME BASED ON WHAT DEFENDANTS DID OR DID NOT DO". (EMPHASIS).**

THE GOVERNMENT'S PARTICIPATION IN THE OFFENSE CONDUCT IS WHAT MAKES THEM PARTICULARLY REPUGNANT TO THE CONSTITUTION. ALL FACTORS WHICH DETERMINE THE SENTENCE, THE WEAPONS, AND HOW MANY PEOPLE TO BRING ALONG FOR THE STING IS BASED UPON THE INFORMATION FROM THE INFORMANT AND UNDERCOVER AGENT TO THE ALLEGED STASH HOUSE ROBBERS. THEREFORE, THE A.T.F. HAS TAKEN AWAY THE RIGHT OF THE COURT TO DETERMINE AN APPROPRIATE SENTENCE SHOULD A DEFENDANT GO TO TRIAL AND BE FOUND GUILTY, BECAUSE THE A.T.F. AGENTS DECIDE WHAT AMOUNT TO TELL THE ALLEGED STASH HOUSE ROBBERS THAT THE FICTITIOUS DRUG DEALERS ARE IN POSSESSION OF IN THE FICTITIOUS STASH HOUSE.

( 5 )

DEFENDANT ASKIA WASHINGTON REQUESTS THAT THIS HONORABLE COURT FIND THAT THE CONDUCT OF THE A.T.F. AND OTHER LAW ENFORCEMENT OFFICIALS IN THIS MATTER AMOUNTS TO GOVERNMENT MISCONDUCT THAT IS OUTRAGEOUS AND MUST LEAD TO THE DISMISSAL OF THE INDICTMENT IN THE INTEREST OF JUSTICE AND FUNDAMENTAL FAIR-NESS.