# IN THE UNITED STATES DISTRICT COURT

## FOR THE EASTERN DISTRICT OF PENNSYLVANIA

UNITED STATES OF AMERICA      :

     v.               :        CRIMINAL NO.   13-171-2

ASKI WASHINGTON,         :
     a/k/a "Ski,"

## GOVERNMENT'S TRIAL MEMORANDUM

## I.  THE INDICTMENT

The indictment in this case alleges that in or around February 2012, through on or about March 15, 2013, in Philadelphia, in the Eastern District of Pennsylvania defendant Askia Washington, a/k/a "Ski," along with three others, committed the following offenses:   conspiracy to commit Hobbs Act robbery, in violation of 18 U.S.C. § 1951 (Count One); attempted Hobbs Act robbery, in violation of 18 U.S.C. § 1951 (Count Two); conspiracy to possess with the intent to distribute 5 or more kilograms of cocaine, in violation of 21 U.S.C. § 846 (Count Three); attempted possession with intent to distribute 5 kilograms or more of cocaine, in violation of 21 U.S.C. § 846 (Count Four); carrying a firearm during and in relation to a crime of violence and to a drug trafficking crime, in violation of 18 U.S.C. § 924(c)(1)(A) (Count Five); and possession of a firearm by a convicted felon, in violation of 18 U.S.C. § 922(g)(1) (Count Six).

Trial in this matter is scheduled to begin on February 23, 2015.   Defendant Washington is the only defendant remaining as the other three charged defendants have entered guilty pleas.

## II.  FACTUAL BACKGROUND

On February 18, 2013, at approximately 3:50 p.m., Dwight BERRY met with a Bureau of Alcohol, Tobacco, Firearms and Explosives (ATF) reliable confidential informant (CI) at the

McDonald's parking lot on the 100 block of South 52nd Street in West Philadelphia.   This meeting was electronically monitored and recorded.   During the meeting, BERRY discussed with the CI the prospect of conducting a home invasion robbery of kilogram quantities of cocaine, which BERRY had previously asked the CI to set up.   During the conversation, the CI explained to BERRY that he has a friend who is a drug courier for a drug organization in New York.   The CI further explained that his friend makes frequent trips to Philadelphia to pick up kilograms of cocaine from a stash location maintained by a drug supplier.   BERRY immediately expressed an interest in committing a robbery of the stash location and was willing to meet with the CI's "Folks" (ATF undercover agent (UC) posing as the drug courier) to further discuss the details of the robbery.   During the conversation with the CI, BERRY further discussed plans to divide the kilos of cocaine that he expects to steal during the intended home invasion robbery.

On February 20, 2013, the CI and the UC met with BERRY on the 4000 block of City Avenue, Philadelphia, PA.   This meeting was electronically monitored and recorded.   The purpose of the meeting was to further discuss the planning of the intended home invasion robbery. During the meeting the UC explained to BERRY that he is a drug courier who picks up kilogram quantities of cocaine from a drug stash house in Philadelphia and transports the kilograms of cocaine to New York.   The UC explained to BERRY that in the past when he has picked up the kilograms of cocaine from the stash house he has observed in excess of 10 kilograms of cocaine at the location.   The UC further told BERRY that no money is kept at the location.   BERRY immediately expressed interest in committing a home invasion robbery of the stash location. When the UC informed BERRY that there are two males guarding the stash house and they are both armed with firearms, BERRY was not phased and stated over and over, "it's a go," meaning that he was interested in doing the home invasion robbery.

2

As BERRY, the CI and the UC continued to discuss the occupants of the stash house, BERRY indicated a willingness to shoot the intended robbery victims, stating, "we ain't gotta shoot nobody unless we have to .... if they get crazy, we ready though."   As the meeting continued, BERRY made it clear that he has a team that will commit the robbery with him and that he is the boss. BERRY stated, "I'm the head of the n****s I run around with."

On February 26, 2013, the CI met with BERRY to discuss the plan to commit the robbery. This meeting was electronically monitored and recorded.   During the meeting, BERRY and the CI further discussed the intended robbery and the breakdown of the kilograms of cocaine that BERRY expects to steal.

On March 4, 2013, the CI and UC met with BERRY, ASKIA WASHINGTON and an unknown male on the 4000 block of City Avenue, Philadelphia, PA.   This meeting was electronically monitored and recorded.   BERRY, WASHINGTON and the unknown male arrived at the meeting together.   BERRY introduced the two males as the individuals who will be committing the robbery with BERRY, however he did not refer to them by name or nickname. During the meeting, WASHINGTON and the unknown male expressed their desire to take part in the robbery.   During the conversation they discussed the details of the robbery including their willingness to harm the men guarding the stash house if necessary.   WASHINGTON stated, "I ain't gonna hit you (referring to the UC), but say if I come there ... I hit him from the rip.   I ain't gonna kill him, but I hit him just make him to know that I ain't fucking playing no games."   Later during the conversation, WASHINGTON also stated "I'm walking in with my gun out."   The unknown male also participated in the discussion, he inquired about the occupants of the stash house and asked the UC the "best way" to enter the stash house to commit the home invasion robbery.

During the meeting, the UC explained to BERRY, WASHINGTON and the unknown male that they will have to be able to distribute the kilograms of cocaine after the intended home invasion robbery is complete.   BERRY also added there is another "head" (meaning another person who will be involved in the robbery who will be the driver.)   BERRY further told the UC that "it's gonna get done," (referring the home invasion robbery).   BERRY added, "however it go down, that shit's gotta go down."

On March 5, 2013, at approximately 6:00 p.m., the UC and BERRY met to further discuss the details of the intended home invasion robbery.   This meeting was electronically monitored and recorded.   While discussing the robbery, BERRY again discussed his intention of utilizing firearms to commit the robbery and the possibility that they may have to shoot someone during the robbery.   BERRY stated, "we are going to have two n****s with the guns, one n**** gonna being tying the n**** up."   BERRY further explained that if BERRY and his conspirators, "gotta let some shots off before the cops get there, we can still get away ... ."

During the meeting, the UC expressed his concern whether WASHINGTON had experience in committing home invasion robberies.   BERRY responded that WASHINGTON is a "gun" and "puts work in," (meaning that WASHINGTON is a proven shooter).   During the conversation about the intended robbery, BERRY told the UC, "this is what I do."   The UC then questioned BERRY whether the planned home invasion was BERRY's first, BERRY responded, "fuck no!"

On or about March 12, 2013, the CI called BERRY to inform BERRY that the UC received his instructions that the cocaine would be ready for pick up at a location that would be determined on March 15, 2013.   During the call, the CI and BERRY discussed distributing the 10 or more kilograms of cocaine they intend to steal.   BERRY stated the current rate for a kilogram of

4

cocaine is "40" ($40,000).   Later the same day, BERRY called the CI and stated "everybody is a go;" meaning that BERRY's team is prepared to commit the robbery as planned on Friday March 15, 2013.

On March 15, 2013, at approximately 8:10 a.m., BERRY, WASHINGTON, ELLIS, and JOHNSTON met with the UC in a parking lot of the Hilton Hotel on Island Avenue, in Philadelphia, Pennsylvania, for the UC to provide the robbers with the address of house to be robbed.   A total of five individuals met the UC at that location in two vehicles.   WASHINGTON arrived with his girlfriend in a Chrysler.   The CI drove a Minivan with BERRY, ELLIS and JOHNSTON.   The UC drove in a separate vehicle.

Once in the Hilton parking lot, WASHINGTON, ELLIS, JOHNSTON, BERRY and the UC got into the minivan.   Once all were inside, BERRY instructed the UC to review the details of the planned robbery with everyone.   At BERRY'S direction, the UC explained, again, that the target of the robbery was a house at which ten kilograms of cocaine would be found; that the building would be guarded by a man at the door, who carried a firearm; that a second man further inside the home would also be armed; that the second man would have control of the drugs; that the drugs would be stored in a white cooler; and that there would be no money found in the house. The men then discussed their plan of action; that they would all drive to a staging area closer to the target; that when they made their assault on the drug house, two of them would be the first to enter the house; that they would be armed; that they would likely bind the people inside the house; that they would treat the UC, who would be in the house, as if he were another victim to evade the suspicion by the drug dealers.   From the hotel, the UC and the five member crew proceeded to a parking lot in Southwest Philadelphia where they were arrested.   When ATF initiated the arrest, WASHINGTON, ELLIS and JOHNSTON were immediately taken into custody.   BERRY fled

on foot and was subsequently located hiding in an attempt to avoid apprehension.   He was removed from his hiding place and placed under arrest.

After the defendants were arrested, ATF Special Agents recovered two firearms, ammunition, gloves and zip ties from one of the vehicles.   From a second vehicle, Agents recovered gloves, a mask, and lighter fluid.   The firearms that were recovered are identified as follows:

1) A Haskell, model JHP45, 45 caliber semi-automatic pistol, serial number X4134949, loaded with nine live rounds of ammunition; and

2) A Charter Arms, model Police Bulldog, .38 caliber revolver with an obliterated serial number, loaded with six live rounds of ammunition.

Prior to the events discussed above, defendant ASKIA WASHINGTON was convicted of a felony offense punishable by more than one year imprisonment, therefore he was a prohibited person.   Also, the firearms described above were both manufactured outside the Commonwealth of Pennsylvania therefore by virtue of their presence in Philadelphia on the date of this incident, they traveled through the channels of interstate commerce.

Post Arrest Statements

After their arrests, all four defendants were brought to ATF and advised of the Miranda warnings.   ASKI WASHINGTON invoked his right to remain silent however the other three defendants, including BERRY, ELLIS, and JOHNSTON waived Miranda and gave full confessions admitting their involvement and implicating each other in the planned robbery.   Also, each of the defendants indicated that they were aware that the cocaine would be sold after the robbery to generate cash.

<u>Subsequent Search Warrants</u>

ATF subsequently obtained search warrants for Berry's home and the cell phones recovered from the defendants at the time of their arrest.   Nothing of evidentiary value was recovered from Berry's home, however from the phones, ATF obtained call logs, contact lists and text messages.

**III.    <u>APPLICABLE STATUTES AND ELEMENTS OF OFFENSES</u>**

    **A.  Counts One and Two - Hobbs Act Conspiracy and attempted Hobbs Act robbery Title 18 United States Code, Section 1951.**

In order prove the defendant guilty of conspiracy to commit Hobbs Act robbery, as charged in Count One, the government must prove beyond a reasonable doubt each of the following four elements:

        1.      That two or more persons agreed to commit an offense against the United States, as charged in the indictment;

        2.      That the defendant was a party to or member of that agreement;

        3.      That the defendant joined the agreement or conspiracy knowing of its objectives to commit an offenses against the United States and intending to join together with at least one other alleged conspirator to achieve those objectives; that is, that Hobbs Act Robbery and at least one other alleged conspirator shared a unity of purpose and the intent to achieve a common goal(s) or objective(s), to commit an offense(s) against the United States; and

        4.      That at some time during the existence of the agreement or conspiracy, at least one of its members performed an overt act in order to further the objectives of the agreement.

In order to prove the defendant guilty of attempting to interfere with interstate commerce by robbery as charged in Count Two, the government must prove the following three essential elements beyond a reasonable doubt:

        1.      That the defendant attempted to take from another the property described the indictment;

    2.       That the defendant did so knowingly and willfully by robbery; and

    3.       That as a result of the defendant's actions, interstate commerce was, or could have been, obstructed, delayed, or affected.

**B.  Counts Three and Four - Conspiracy to Possess with the Intent to Distribute and Attempted Possession with the Intent to Distribute 5 Kilograms or More of Cocaine Title 21, United States Code, Section 846**

<u>Conspiracy</u>

In order to prove the defendant guilty of a conspiracy to possess with intent to distribute cocaine, the government must prove the following:

    1.       That two or more persons agreed to distribute a controlled substance, in this case 5 or more kilograms of cocaine;

    2.       That each defendant was a party to or member of that agreement; and

    3.       That the defendant joined the agreement or conspiracy knowing of its objective(s) to distribute a controlled substance and intending to join together with at least one other alleged conspirator to achieve that those objective(s); that is, that the defendant and at least one other alleged conspirator shared a unity of purpose and the intent to achieve that (those) objective(s).

<u>Attempt</u>

In order to prove the defendant guilty of attempted possession with intent to distribute cocaine, the government must prove the following:

    1.       That the defendant intended to possess a controlled substance, in this case 5 or more kilograms of cocaine;

    2.       The defendant intended to distribute the 5 or more kilograms of cocaine;

    3.       A substantial step was taken toward completion of the crime.

**C. Count Five - Using and Carrying Firearm in Relation to a Crime of Violence and Drug Trafficking Offense, Title 18, United States Code, Section 924(c) and Aiding and Abetting, Title 18, United States Code, Section 2**

In order to prove the defendant guilty of possessing a firearm in furtherance of a crime of violence and/or a drug trafficking crime, the government must prove each of the following two elements beyond a reasonable doubt:

  1. That the defendant committed the crime of Hobbs Act Robbery and 846 as charged the indictment; and

  2. That the defendant knowingly possessed a firearm in furtherance of these crimes.

**D. Count Six – Convicted Felon in Possession of a Firearm, Title 18, United States Code, Section 922(g)(1) and Aiding and Abetting, Title 18, United States Code, Section 2**

In order to prove the defendant guilty of a violation Title 18, United States Code, Section 922(g)(1), the government must prove the following:

  1. The defendant was previously convicted of a crime punishable by imprisonment exceeding one year;

  2. The defendant knowingly possessed a firearm; and

  3. The firearm was possessed in interstate or foreign commerce.

**Aiding and Abetting**

In order to prove the defendant guilty of aiding and abetting, the government must prove each of the following elements beyond a reasonable doubt:

  1. That a defendant committed the offenses charged by committing each of the elements of the offenses charged;

  2. That the defendant knew that the offenses charged were going to be committed or were being committed by the other defendants;

3. That the defendants knowingly did some act for the purpose of aiding, assisting, soliciting, facilitating, encouraging, the other defendants in committing the specific offenses charged and with the intent that the defendants commit those specific offenses; and

4. That the defendant's acts did, in some way, aid, assist, facilitate, encourage, the defendants to commit the offenses.

## IV.    ANTICIPATED TRIAL WITNESSES

The government will provide a list of its trial witnesses prior to jury selection unless directed by the Court to provide it sooner.

## V.    ANTICIPATED TRIAL EXHIBITS

The government will provide a list of its trial exhibits prior to jury selection unless directed by the Court to provide it sooner.

## VI.    ANTICIPATED LEGAL ISSUES

### A.  Self-Authenticating Records.

The government has filed a motion for a preliminary determination, as authorized by Federal Rule of Evidence 104, of the admissibility of certain evidence under F.R.E.803(6) (business records exception to hearsay) and 902(11) (self-authentication of certified domestic records of regularly conducted activity).   The purpose of this motion will be to seek the admission of business records, namely phone records, including call detail records, concerning two telephones seized on March 15, 2013 from Dwight Berry and Antonio Ellis.   The aforementioned phone records were obtained from T-Mobile and Sprint by the government pursuant to grand jury subpoenas.   Each phone company provided a certificate of authenticity with the records which demonstrate that the records comply with F.R.E. 803(6).   Therefore, it is the government's position that these records are self-authenticating certified domestic records of a regularly

conducted activity, and pursuant to F.R.E. 902(11) they are admissible without the necessity of calling a witness to authenticate them.

**B.  Interpretation of Coded and/or Incident Related Language.**

The cases agent, John Bowman, and the undercover agent (UC), Patrick Edwards, are both expected to testify about the investigation and evidence in this case.    It is expected that they will present an overview of the investigation and the various investigative techniques used in the course of the investigation, including the use of a confidential informant and the undercover agent to make recorded conversations with the defendants, including Askia Washington.    One or both of the agents will testify about the process that was employed to record conversations between the CI, UC and the defendants.    The agents will explain how they listened in during virtually all such recorded conversations and meetings, and that they reviewed the recordings and prepared transcripts of the recorded conversations which they then reviewed for accuracy.    Both agents became familiar with the voices of the various defendants during the course of the investigation as well as the terminology used during the discussions.

The government intends that the agents will testify about the audio and video recordings made by the CI and UC.    After playing a recorded conversation for the jury, the government intends to have the agents testify as to their understanding of certain terminology used in the conversations, an explanation that will be based on their knowledge and experience in this case as well as other such investigations.    The government contends that all of this is proper.

Rule 701 permits a lay witness to offer an opinion that is "rationally based on the witness's perception, is helpful to determining a fact in issue, and is not based on scientific, technical, or other specialized knowledge within the scope of Rule 702."    As the Third Circuit has observed, "[w]hen a lay witness has particularized knowledge by virtue of her experience,

11

she may testify – even if the subject matter is specialized or technical – because the testimony is based upon the layperson's personal knowledge rather than on specialized knowledge within the scope of Rule 702."   *Donlin v. Philips Lighting North America Corp.*, 581 F.3d 73, 81 (3d Cir. 2009).   Thus, testimony that is based on personal observations made during investigations may be properly admitted under Rule 701.   Many not precedential decisions are consistent with this view.   See *United States v. Barrett*, 394 F. App'x 866, 870 (3d Cir. 2010) (police officer's testimony that evidence recovered from apartment, including drug residue and packaging materials, reflected a large-scale drug operation was permissible lay opinion testimony, as it did not reflect any particular expertise, but involved the sort of conclusion that any reasonable layperson could have reached based on the evidence); *United States v. Rampersad*, 380 F. App'x 117, 119 (3d Cir. 2010) (police officer's lay opinion that a marijuana seedling was a plant so long as the seedling had an intact root structure was admissible under Rule 701 based on his perception, personal knowledge, and experience).   *See also United States v. Valdivia*, 680 F.3d 33, 50-51 (1st Cir. 2012) (testimony of investigator regarding the method in which drug traffickers conceal phone accounts, based on knowledge gained as a drug enforcement agent, was admissible under Rule 701).

Although courts have concluded that Rule 701 allows a witness to interpret coded or "code-like" conversations, they have held that the interpretation of unambiguous conversations is not helpful to the jury, and thus is not admissible under Rule 701.   *See United States v. De Peri*, 778 F.2d 963, 977-78 (3d Cir. 1985).   In *De Peri*, the court nonetheless found that the agent's interpretation testimony was permissible under Rule 701 because the language on the tapes was "sharp and abbreviated, composed with unfinished sentences and punctuated with ambiguous references to events that are clear only to Martin and his audience," and thus were the equivalent

of coded conversations, and the agent's opinions were based on his direct perceptions and were not speculative.

Here, the testimony of the agents about the content of the recorded conversations is based on their knowledge and experience gained in the course of this investigation and is permissible lay opinion testimony.

**C.  Coconspirator Statements.**

The evidence against Washington at trial will include audio and video recordings of conversations that the CI and the UC had with Washington and his coconspirators during the course of the investigation.   The statements made on the recordings by Washington, Berry and the other defendants are admissible as non-hearsay, coconspirator statements pursuant to Fed. R. Evid. 801(d)(2)(E), because at the time the statements were made, a conspiracy existed and the statements were made in furtherance of this conspiracy.

Federal Rule of Evidence 801(d)(2)(E) provides that "a statement made by a coconspirator of a party during the course and in furtherance of that conspiracy" is not hearsay and may be admitted as evidence against a co-conspirator.   In order for a court to admit the co-conspirator statements, the government must prove by a preponderance of the evidence: (1) that a conspiracy existed; (2) that the declarant and the defendant were both members of the conspiracy; (3) that the statements were made in the course of the conspiracy; and (4) the statements were made in furtherance of the conspiracy.   *United States v. Bourjaily*, 483 U.S. 171, 175 (1987); *United States v. Weaver*, 507 F.3d 178 (3d Cir. 2007); *United States v. McGlory*, 968 F.2d 309, 333-34 (3d Cir. 1992); *United States v. Gambino*, 926 F.2d 1355, 1360 (3d Cir. 1991).

The premise of the law is that "[d]eclarations of one conspirator may be used against the other conspirator not present on the theory that the declarant is the agent of the other, and the admissions of one are admissible against both under a standard exception to the hearsay rule applicable to the statements of a party."   *Lutwak v. United States*, 344 U.S. 604, 617 (1953).

The co-conspirator rule, first recognized by the Supreme Court in *United States v. Gooding*, 12 Wheat. 460, 6 L. Ed. 693 (1827), is "steeped in our jurisprudence."   *Bourjaily v. United States*, 483 U.S. 171, 183-84 (1987).   In fact, the Supreme Court has explained that co-conspirator statements are viewed as superior in trustworthiness than testimony by the same declarant at trial.   "Because they are made while the conspiracy is in progress, such statements provide evidence of the conspiracy's context that cannot be replicated, even if the declarant testifies to the same matters in court. . . . [C]o-conspirator statements derive much of their value from the fact that they are made in a context very different from trial, and therefore are usually irreplaceable as substantive evidence.   Under these circumstances, 'only clear folly would dictate an across-the-board policy of doing without' such statements."   *United States v. Inadi*, 475 U.S. 387, 395-96 (1986), quoting Advisory Committee's Introductory Note on the Hearsay Problem, quoted in Westen, The Future of Confrontation, 77 Mich. L. Rev. 1185, 1193 n.35 (1979).   "The admission of co-conspirators' declarations into evidence thus actually furthers the Confrontation Clause's very mission which is to advance the accuracy of the truth-determining process in criminal trials."   *Inadi*, 475 U.S. at 396 (internal quotation marks and citations omitted).

All that matters, then, is whether the particular requirements set forth in Rule 801(d)(2)(E) are met, a determination that will be made by this Court as the trial progresses.   In making a preliminary factual determination that the conspiracy existed and that the defendant

14

participated in it, courts may consider the offered coconspirator statement itself.   *Bourjaily*, 483 U.S. at 180-81.   "[T]here is little doubt that a co-conspirator's statements could themselves be probative of the existence of a conspiracy and the participation of both the defendant and the declarant in the conspiracy."   *Id.* See also *McGlory*, 968 F.2d at 334.   Moreover, the district court may consider the totality of the circumstances when deciding the admissibility of such evidence.   "The circumstances surrounding the statement, such as the identity of the speaker, the context in which the statement is made, or evidence corroborating the contents of the statement," should be considered by the trial court.   See Fed. R. Evid. 801(d)(2) (Advisory Committee Notes).   Furthermore, the existence of the conspiracy and the party's participation in that conspiracy need only be proved by a preponderance of the evidence to establish admissibility.   *Bourjaily*, 483 U.S. at 175.

The "in furtherance" requirement is to be given a broad interpretation.   *United States v. Gibbs*, 739 F.2d 838, 845 (3d Cir. 1984); *United States v. DePeri*, 778 F.2d 963, 981 (3d Cir. 1985).   Although the "during the course of" and "in furtherance" requirements do not overlap entirely, they are closely related.   *United States v. Ammar*, 714 F.2d 238, 253 (3d Cir. 1983). In determining whether a particular statement was made during and in furtherance of the conspiracy, the trial court should examine the circumstances under which the statement was made.   *See United States v. Traitz*, 871 F.2d 368, 399 (3d. Cir. 1989).   Moreover, for statements to be deemed "in furtherance of the conspiracy," they need not "further" the conspiracy; rather, it is sufficient that a statement was intended to promote the conspiracy even if it did not actually do so.   See *United States v. Williams*, 989 F.2d 1061, 1068 (9th Cir. 1993); *United States v. Mayes*, 917 F.2d 457, 464 (10th Cir. 1990).   "Statements between conspirators which provide reassurance, serve to maintain trust and cohesiveness among them, or inform each

other of the current status of the conspiracy further the ends of the conspiracy. . . ."   *United States v. Weaver*, 507 F.3d 178, 182 (3d Cir. 2007), quoting *United States v. Ammar*, 714 F.2d 238, 252 (3d Cir. 1983).   Therefore, even a statement appearing to be a mere narrative of past events may be in furtherance of the conspiracy if it informs the listener of the status of the conspiracy, providing information the listener needs to know in order to further the conspiracy. See *Gibbs*, 739 F.2d at 845 ("statements made by one conspirator to keep other conspirators informed about the progress of the scheme do satisfy the 'in furtherance' requirement.").

In this case, the government will show that a conspiracy existed and that Washington was a member of it, as were Berry, Ellis and Johnston.   In addition, the government will show that the statements made during the recorded conversations were made during and in furtherance of the conspiracy.

### D.  The Admissibility of The Statements of the Informant in the Recordings Does Not Present a Confrontation Clause Issue.

In *United States v. Hendricks*, 395 F.3d 173 (3d Cir. 2005) the Court made clear that "party admission and coconspirator portions" of disputed tape recordings are "non-testimonial and thus, assuming compliance with the Federal Rules of Evidence, are admissible."   *Id.* at 183-184.   In addition, "[a]s recognized by the Crawford Court, the Confrontation Clause likewise 'does not bar the use of testimonial statements for purposes other than establishing the truth of the matter asserted.'"   United States v. Hendricks, 395 F.3d at 183, citing Crawford v. Washington, 124 S. Ct. at 1369 n.9 and United States v. Trala, 386 F.3d 536, 544-45 (3d Cir. 2004).   Thus, in Hendricks, the Court noted that, since the government was not seeking to introduce statements of an informant for their truth, those statements, recorded along with party admission and coconspirator statements, would not present any hearsay problem.   Id. at 183-84.

16

In the present case, the statements of the CI will not be offered for their truth.   Instead, they will be offered to give context to the defendant's statements and to the statements of his coconspirators.   Accordingly, the entirety of the recordings are admissible.

**VII.   <u>STIPULATIONS</u>**

The parties have not yet reached any agreement as to stipulated facts to be offered at the time of trial.

Respectfully submitted,

ZANE DAVID MEMEGER
United States Attorney

_____

SALVATORE L. ASTOLFI
Assistant United States Attorney

Date:   February 9, 2015

17

## **CERTIFICATE OF SERVICE**

I hereby certify that a true and correct copy of the Government's Proposed Jury

Instructions has been served by electronic filing on this date upon:

Jarvis Law Associates, P.C.
20 North Third Street
Suite 402a
Philadelphia, Pa 19106

Attn: Roland Jarvis, Esquire
Attorney for Askia Washington

SALVATORE L. ASTOLFI
Assistant United States Attorney

Dated:   February 9, 2015

18