IN THE UNITED STATES DISTRICT COURT

FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA** | : | |
| v. | : | **CRIMINAL NO. 13-171-2** |
| **ASKIA WASHINGTON** | : | |

## O R D E R

AND NOW, this ____ day of _____, upon consideration of the government's Motion for Reconsideration and Correction of Misstated Facts in Court Opinion of April 12, 2016, IT IS HEREBY ORDERED that the government's motion is GRANTED. This Court will issue a Superseding Opinion correcting the misstated facts and withdraw the Opinion of April 12, 2016. The Order of April 12, 2016, denying the defendant's motion for a new trial shall stand.

BY THE COURT:

_____
HONORABLE JOEL H. SLOMSKY
UNITED STATES DISTRICT JUDGE

IN THE UNITED STATES DISTRICT COURT

FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | : | |
| v. | : | CRIMINAL NO. 13-171-2 |
| ASKIA WASHINGTON | : | |

### MOTION FOR RECONSIDERATION AND CORRECTION OF MISSTATED FACTS IN COURT OPINION OF APRIL 12, 2016

The United States of America, by and through Zane David Memeger, United States Attorney for the Eastern District of Pennsylvania, and Eric B. Henson, Assistant United States Attorneys for the District, hereby moves this Honorable Court to reconsider and correct the misstated facts in its Opinion of April 12, 2016, for the reasons set forth below.

**I.      PRELIMINARY STATEMENT**

On April 12, 2016, following extensive and protracted post-trial litigation, this Court issued an Order (Doc. No. 269) and Opinion (Doc. No. 268), denying the defendant's motion for a new trial.   The government agrees that the Court correctly denied defendant's motion for a new trial, however, we assert that, in doing so the Court made a mistake in fact and made an incorrect finding, that "Agent [ John] Bowman was not in compliance with the ATF policy that 'Investigations should only be pursued that target individuals who show a propensity of doing harm to the public through violent behavior, armed robberies and whose activities have been documented either through criminal history, criminal reputation or self-incrimination.'   . . . [D]efense counsel's argument that Defendant was targeted in violation of ATF policy was accurate . . ." Opinion at 19.   This erroneous finding of fact, which was suggested by trial counsel's effective, although misleading, cross-examination strategy, does not affect the Court's remaining findings, nor its conclusion that counsel was effective. For the reasons discussed below, the

government respectfully requests that the Court modify the Order and correct the erroneous statement of fact and finding concerning the actions of Agent Bowman, which are not supported by the record.

To be clear, the government agrees with the Court's ruling on defendant's motion for a new trial. The government thus does not request that the Court reconsider its ruling. It seeks only a superseding Opinion making clear that Agent Bowman did not, in fact, violate ATF policy, as was suggested by trial counsel's strategy. A superseding Opinion would reflect that defendant's trial counsel diligently attempted, unsuccessfully, to persuade the jury that the ATF agents in this case violated their own policies concerning the targeting of individuals, effectively using the ATF policy in formulating his questions toward making this point, and then strenuously argued to the jury that the ATF agent had violated the agency's policy. Counsel's success in making this false suggestion was, of course, constitutionally effective representation, as the Court found, for multiple reasons.

## II. PROCEDURAL BACKGROUND

On March 15, 2013, defendant Askia Washington, along with three others, was charged by Criminal Complaint with violating 18 U.S.C. §§ 1951 and 924(c), following his participation with his confederates in a plan to rob a drug stash house and to thereafter sell 10 kilograms of cocaine that they expected to steal during the armed robbery. On April 11, 2013, a grand jury returned a six-count indictment charging Washington and the others with conspiracy to commit Hobbs Act robbery, in violation of 18 U.S.C. § 1951 (Count One); attempted Hobbs Act robbery, in violation of 18 U.S.C. § 1951 (Count Two); conspiracy to possess with the intent to distribute 5 kilograms or more of cocaine, in violation of 21 U.S.C. § 846 (Count Three); attempted possession with intent

to distribute 5 kilograms or more of cocaine, in violation of 21 U.S.C. § 846 (Count Four); carrying a firearm during and in relation to a crime of violence and to a drug trafficking crime, in violation of 18 U.S.C. § 924(c)(1)(A) (Count Five); and possession of a firearm by a convicted felon, in violation of 18 U.S.C. § 922(g)(1) (Count Six). On February 19, 2015, the grand jury returned a superseding indictment charging the same offenses.

Washington was the only defendant who proceeded to trial. His trial commenced on June 1, 2015, at the conclusion of which the jury found him guilty of Counts One, Two, Three, and Four. The jury acquitted Washington on Count Five, which would have carried a statutory mandatory minimum 5-year term of imprisonment consecutive to any other sentence imposed. The government chose not to proceed on Count Six.

Following his conviction, the defendant wrote a letter to the Court requesting that new counsel be appointed to assist him in his post-conviction proceedings, including sentencing. The Court granted his request and on October 6, 2015, Mark S. Greenberg, Esquire was appointed to represent Washington. At Mr. Greenberg's request, the Court held an evidentiary hearing on November 9, 2015, during which the defendant and government's trial counsel testified. On December 29, 2016, defendant filed a motion for a new trial alleging instances of ineffectiveness on the part of his trial counsel. On January 29, 2016, the government filed its response and on April 12, 2016, the Court issued its ruling denying defendant's motion of a new trial.

**III. FACTS**

The government will not repeat the facts developed during the trial of this matter. Instead, the government refers the Court to its response to defendant's motion for a new trial (Doc. No. 263.) for a summary of those facts, some of which will be referred to below.

## IV. **DISCUSSION**

The purpose of a motion for reconsideration "is to correct manifest errors of law or fact or to present newly discovered evidence." Harsco Corp. v. Zlotnicki, 779 F.2d 906, 909 (3d Cir. 1985). This matter presents "the need to correct a clear error of law or fact or to prevent manifest injustice." North River Ins. Co. v. CIGNA Reinsurance Co., 52 F.3d 1194, 1218 (3d Cir. 1995). That is because as a matter of fact, contrary to the Court's finding, Special Agent Bowman did not fail to comply with ATF Policy.

In its April 12, 2016 Opinion, in which the Court denied Washington's motion for a new trial, the Court painstakingly set forth detailed facts supporting its conclusion that Washington's motion should be denied. In doing so, however, the Court erred when it found that "Agent [John] Bowman was not in compliance with the ATF policy that 'Investigations should only be pursued that target individuals who show a propensity of doing harm to the public through violent behavior, armed robberies and whose activities have been documented either through criminal history, criminal reputation or self-incrimination.'" Opinion at 19. The Court further erred when it made the related finding that ". . . defense counsel's argument that Defendant was targeted in violation of ATF policy was accurate, and was supported by the fact that Defendant had no record of robberies or other violent crimes." Id.

As noted by the Court, at the start of trial, trial counsel was successful in arguing for the admission of portions of written ATF guidelines concerning sting operations. The record is clear that trial counsel made effective use of those guidelines when cross examining ATF agents and strenuously argued that those guidelines were not followed in this case. The Court relied in part upon these facts in finding that Washington had failed to meet his burden under Strickland v.

4

Washington, 466 U.S. 668 (1984), that his trial counsel was ineffective. It was not, however, necessary to this conclusion for the Court to find that Agent Bowman had in fact violated ATF policy, nor is it correct that trial counsel was accurate when he claimed that Washington was "targeted" in violation of ATF policy. These findings are erroneous and not supported by the record.

> The ATF policy statement at issue here reads as follows:
>
> Target Identification.   Investigations should only be pursued that target individuals who show a propensity of doing harm to the public through violent behavior/armed robberies and whose activities have been documented either through criminal history, criminal reputation or self-incrimination.   Violent crime is defined as an offense that involves force or threat of force, murder, rape, forcible rape, robbery, aggravated assault and arson.

Trial Transcript, June 3, 2015, p. 54.   The agents did not sidestep this policy in any respect.

The testimony of Special Agents Bowman and Patrick Edwards made clear that this policy statement was complied with in this investigation.   The investigation began in February 2013 when they met with and debriefed a Confidential Informant (CI) about his prior relationship and conversations with Dwight Berry, and Berry's desire to commit home invasion robberies.   Trial Testimony, June 3, 2015, p. 71-77; June 4, 2015, p. 164-165.   Thus, at the outset, Berry was the target of their investigation.   Id. p. 74-75.   Thereafter, on February 18 and 26, 2013, Berry met with the CI and continued to discuss his intention of committing a home invasion, and on February 20, 2013, Special Agent Edwards, acting in an undercover capacity participated in a meeting with Berry and the CI.   All of the meetings were recorded.   During this meeting Berry informed Agent Edwards, that he had a team that will commit the robbery with him and that he is the boss. Specifically, Berry stated, "they run under me, they gonna do what I tell them to do…;" "I'm the head of these n****s I run around with;" "…they gonna do what I say…;" "it ain't even no

5

question about it;" "they gonna be on go;" and "I just make sure I use some smart n*****s…" Clearly that Berry intended to bring a "crew" along with him to participate in the robbery. Id. 159-160.

Although it was evident at this point that Berry had a "crew," ATF did not then know who they were. In fact, Special Agent Edwards did not meet Washington until March 4, 2013 when he and another unidentified male showed up at a meeting with Berry. Id. Washington was thus not initially "targeted" by ATF at all but was recruited by his co-conspirator Dwight Berry to participate in this conspiracy. Only after the March 15, 2013 take down, moreover, was ATF able to identify Washington and the others. Id., p. 70-72; Trial Testimony, June 8, 2015, p. 67.

The earliest date on which Washington could have been "targeted" by ATF was after March 4, 2013 when he appeared for the very first time with Berry to meet with the CI and UC (Special Agent Edwards). This meeting took place a full two weeks after ATF began properly to actively target Dwight Berry in this investigation. Had Berry not brought Washington to the March 4, 2013 meeting, Washington would never have been known to ATF. Once Washington surfaced, however, as an eager participant in Berry's robbery scheme, ATF appropriately began to focus on him in addition to Berry. This was completely consistent with ATF policy, as Washington immediately and unequivocally demonstrated "a propensity for doing harm to the public through violent behavior." Moreover, his "activities [had] been documented … through … self-incrimination,"[1] as the March 4, 2013 meeting was both video and audio recorded. All of

---

[1] The Court's statement, "defense counsel's argument that Defendant was targeted in violation of ATF policy was accurate, and was supported by the fact that Defendant had no record of robberies or other violent crimes[,]" suggests that having a criminal history which includes robberies or other violent crimes was the only way ATF could target an individual. This is incorrect, as evidenced by the language in the policy, "…whose activities have been documented either through criminal history, criminal reputation or self-incrimination." Clearly, three categories may be considered, any one of which will suffice when targeting an individual. Washington was recruited by Berry and properly targeted by ATF because of his self-incriminating participation in Berry's scheme.

6

Washington's criminal conversations were captured on tape.  During his first meeting, Washington boasted about his intended role and quite clearly incriminated himself as he and Berry discussed their plan for the armed home invasion robbery.  This was proved at trial by the playing of the audio recording and video from the March 4th meeting, along with the testimony of Special Agent Edwards.  Trial Testimony, June 3, 2015, p. 62-163; June 4, p. 5-62.  The following facts, originally set forth in the government's response to defendant's motion for a new trial, and proven at trial, clearly showed that Washington was a deserving target and that targeting him was consistent with, and not a violation of ATF Policy.

On March 4, 2013, the CI and UC met with Berry, Washington, and an unknown man. Berry, Washington and the unknown man arrived together.  Berry introduced the two men, without giving their names, as the individuals who would commit the robbery with him, that is, as the robbery team he had boasted about in an earlier meeting.  Washington and the unknown man emphatically expressed their desire to take part in the robbery.  As the UC gave details about the stash house, Washington was heard repeatedly in the recording stating, "Mm-Hmm," taking it all in and affirming each detail of the discussion.  When the UC finished describing the layout and the scenario, Washington asked, "Being that jaun is so safe like that, what about the outside?  Like you know, nobody going to be watching the jawn from the outside or nothing?"  Tellingly, this was the same question that Berry had asked during a previous meeting.  When the UC told Washington that he never saw anyone outside the home, Washington replied, "That's good. Alright, well we got it."  He continued to probe for details of the robbery plan: "Alright, so on the tip, you walking in there … we walking in behind you;" "… When you go in there, you lock the door behind yourself;" "So you want me to be in there with you …when you go in there, you

7

want us to come in there;" and "How many guns you think is in that joint?"  Each of Washington's questions demonstrated conclusively that he was preparing himself for the armed robbery.

The robbery team's scheme extended to their willingness to harm the men guarding the stash house if necessary.  Washington stated, "I ain't gonna hit you (referring to the UC), but say if I come there ... I hit him from the rip.  I ain't gonna kill him, but I hit him just make him to know that I ain't fucking playing no games."  Later, Washington also stated "I'm walking in with my gun out;" and "Yeah cause I'm gonna hit him cause I know he got a gun.  So I got no choice.  But I'm not gonna just play.  I don't play with them when it comes to this shit."  Washington repeatedly made it unmistakably clear that he was going to commit the armed robbery and that he understood his role in the plan.  Washington stated, for example, "Everybody should be love at the end of the day.  The way you explained it … I shouldn't even have to hit this n****.  Cause I'm so sharp on the draw."  "Once you open the door, I got you."  "… We are just gonna be shooting the fuck out of this joint, but you got to be out of the way."  "You know what I'm saying? We trying to make it as safe as possible for you."  "I'm walking in with my gun out." "So I got him and he ain't going to risk getting his head blew off and start shooting on everybody."

During the meeting, the UC explained to Berry, Washington, and the unknown man that they will have to divide the kilograms of cocaine for distribution after the intended home invasion robbery.  The UC explained that he "can't take the cocaine to NY."  Washington agreed stating, "Yeah you can't take the shit back."  Washington offered to help sell the UC's portion of the stolen cocaine, stating, "So what, you want it sold or what…?"  "I can get it moved yo, but i don't like fucking with n****s.  See I don't fuck with coke."  "Alright, well i got n******s who I can

8

do it and get this shit off." "See, and for me, if I get this thing and this shit go down right, I'm not serving none of these n****s in the city period … you know i'm saying? because n****s be telling and then it be a whole bunch of shit … so i try to keep my shit as lo-key as I can." "You know what I'm saying? "So I wouldn't fuck with them. They got to be somebody I really trust. Like all right buy this jawn I just came up on." "Buy this jawn real quick so … you can most likely, you can get your shit out before you leave. You know what I'm saying?" As the conversation ended, Berry told the UC that "it's gonna get done," referring to the home invasion robbery. Berry added, "However it go down, that shit's gotta go down." Washington agreed and added tellingly, "I know we can do it. That shit sounds super sweet."

     Once Washington surfaced in this investigation it was immediately and strikingly clear that he intended to participate in the armed home invasion robbery that was being planned. He actively participated in the planning discussion and made clear his intent to use violence to carry out their plan. It would have been not only contrary to common sense but irresponsible not to have targeted Washington when he volunteered eagerly to arm himself and commit a violent armed robbery. The ATF agents complied with ATF's policy concerning the targeting of individuals who have demonstrated a propensity for violence. Clearly Special Agent Bowman did not violate ATF policy, nor did any other member of ATF. Trial counsel's scurrilous allegations against the agents were insupportable but were a viable strategy to attempt to discredit the agents and sway the jury. Therefore this strategy was not a betrayal of his client's interest in effective advocacy.

     As the Court concluded, trial counsel performed effectively. The Court, however, should correct the erroneous suggestion that counsel insinuated into the record before the jury that any

ATF agent had violated the agencies policy respecting these sting operations.

### III. <u>CONCLUSION</u>

For these reasons, the government respectfully requests that this Court reconsider the misstated facts in its Opinion of April 12, 2016, withdraw that Opinion, and issue a Superseding Opinion that does not include those comments.   While relying on the superseding, corrected opinion, the Court's order denying defendant's motion for a new trial should remain the same.

                                          Respectfully yours,

                                          ZANE DAVID MEMEGER
                                          United States Attorney


                                          /s Eric B. Henson
                                          ERIC B. HENSON
                                          Assistant United States Attorneys


                                           /s Peter F. Schenck
                                          PETER F. SCHENCK
                                          Assistant United States Attorney
                                          Chief, Criminal Division

CERTIFICATE OF SERVICE

I hereby certify that this pleading has been served on counsel identified below through the Electronic Case Filing (ECF) system:

Mark S. Greenberg, Esquire
920 Lenmar Drive
Blue Bell, PA   19422
Greenberg@markgreenberg.com

/s Eric B. Henson
ERIC B. HENSON
Assistant United States Attorney
Deputy Chief, Violent Crimes and Firearms

DATED: April 20, 2016