IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

UNITED STATES OF AMERICA

v.

ASKIA WASHINGTON,

                    Defendant.

CRIMINAL ACTION
NO. 13-171-2

## SUPERSEDING OPINION

**Slomsky, J.**                                                    **May 3, 2016**

### I.      INTRODUCTION

Before the Court is the counseled Motion for a New Trial of Defendant Askia Washington.  (Doc. No. 262.)  On June 9, 2015, following a jury trial, Defendant was convicted of conspiracy to interfere with interstate commerce by robbery in violation of 18 U.S.C. § 1951, attempted robbery which interferes with interstate commerce in violation of 18 U.S.C. § 1951, conspiracy to possess with the intent to distribute 5 kilograms or more of cocaine in violation of 21 U.S.C. § 846, and attempted possession with intent to distribute 5 kilograms or more of cocaine in violation of 21 U.S.C. § 846.  The convictions stem from a sting operation carried out by agents of the Bureau of Alcohol, Tobacco and Firearms which was designed to catch individuals conspiring to commit robberies of drug stash houses.

In the Motion, Defendant argues that he should be granted a new trial because his trial lawyer's consumption of alcohol during pretrial preparation and at trial caused him to be constitutionally ineffective in regard to two decisions he made during the trial.  (Doc. No. 262 ¶ 9.)  The Government has responded to the Motion (Doc. No. 264), and Defendant has replied to the Response (Doc. No. 266).  For reasons that follow, the Court will deny Defendant's Motion for a New Trial.

## II.     BACKGROUND[1]

### 1.  Events Leading to Defendant's Trial

On February 19, 2015, the Government filed a Superseding Indictment against Defendant Askia Washington and three others, charging them with crimes involving a plan to rob a drug stash house and then to sell the 10 kilograms of cocaine that they expected to take during the robbery.  (Doc. No. 184.)  Defendant Washington was the only Defendant who went to trial. (Doc. No. 264 at 2.)  He was charged with the following six offenses: conspiracy to interfere with interstate commerce by robbery in violation of 18 U.S.C. § 1951 (Count One); attempted robbery which interferes with interstate commerce in violation of 18 U.S.C. § 1951 (Count Two); conspiracy to possess with the intent to distribute 5 kilograms or more of cocaine in violation of 21 U.S.C. § 846 (Count Three); attempted possession with intent to distribute 5 kilograms or more of cocaine in violation of 21 U.S.C. § 846 (Count Four); possession of a firearm in furtherance of a crime of violence and drug trafficking in violation of 18 U.S.C. § 924(c)(1)(A) (Count Five); and being a convicted felon in possession of a firearm in violation of 18 U.S.C. § 922(g)(1) (Count Six).  (Doc. No. 184.)

The crimes in this case arose from the sting operation undertaken by Bureau of Alcohol, Tobacco, Firearms and Explosives ("ATF") agents that targeted individuals whom ATF believed were involved in planning robberies of drug stash houses.  In 2012, a confidential informant referred to at trial as "Roc" alerted ATF that Dwight Berry, who became another defendant and co-conspirator in the case, had asked Roc if he knew anyone Berry could rob for drugs.  ATF subsequently began an investigation of Berry led by Special Agent John Bowman.

---

[1]  The factual background is taken from the Superseding Indictment (Doc. No. 184), the trial transcripts (Doc. Nos. 242-46), Defendant's Motion for a New Trial (Doc. No. 262), and the Government's Response in Opposition (Doc. No. 264).

On February 18, 2013, Roc met with co-conspirator Berry to discuss the prospect of conducting a robbery of a drug stash house.  (Doc. No. 264 at 2.)  The meeting was electronically recorded.  (Id.)  During the meeting, Roc and Berry discussed plans to carry out a home invasion robbery of a drug stash house.  Roc told Berry he had a friend who is a drug courier in New York who frequently made trips to Philadelphia to pick up kilograms of cocaine from a drug stash house maintained by a drug supplier.  This drug courier was, in reality, Special Agent Patrick Edwards, an undercover agent (the "UC").  Berry expressed interest in robbing the stash house and discussed plans to divide the kilograms of cocaine and money that they would steal during the robbery.

On February 20, 2013, during another recorded meeting, Berry, Roc, and the UC posing as the drug courier further discussed the stash house robbery.  The UC told Berry that, while picking up cocaine from the stash house, he had seen over ten kilograms of cocaine inside a cooler.  During the conversation, Berry expressed a willingness to shoot the intended robbery victims if necessary, and explained that he knew others who would participate in the robbery.  (Id. at 3.)

On March 4, 2013, Roc and the UC met with Berry, Defendant Washington, and an unknown man.  The meeting was electronically recorded.  The Government accurately describes the meeting as follows based on the evidence introduced at trial:

> Berry, Washington and the unknown man arrived at the meeting together.  Berry introduced the two men, without giving their names, as the individuals who would commit the robbery with Berry, that is, as the robbery team he had boasted about in an earlier meeting.  Washington and the unknown man emphatically expressed their desire to take part in the robbery.  As the UC provided details about the stash house, Washington was heard repeatedly in the recording stating, "Mm-Hmm," taking it all in and affirming each detail of the discussion.  When the UC finished describing the layout and the scenario, Washington asked, "Being that jaun is so safe like that, what about the outside?  Like you know, nobody going to be watching the jawn from the outside or nothing?"  Interestingly, this was the same

question that Berry had asked during a previous meeting. When the UC told Washington that he never saw anyone outside the home, Washington replied, "That's good. Alright, well we got it." He continued to ask for details of the robbery plan. Washington asked, "Alright, so on the tip, you walking in there . . . we walking in behind you;" ". . . When you go in there, you lock the door behind yourself;" "So you want me to be in there with you . . . when you go in there, you want us to come in there;" and "How many guns you think is in that joint?" . . . During this conversation the robbery team discussed the details of the robbery including their willingness to harm the men guarding the stash house if necessary. Washington stated, "I ain't gonna hit you (referring to the UC), but say if I come there . . . I hit him from the rip. I ain't gonna kill him, but I hit him just to make him to know that I ain't fucking playing no games." Later, Washington also stated "I'm walking in with my gun out;" and "Yeah cause I'm gonna hit him cause I know he got a gun. So I got no choice. But I'm not gonna just play. I don't play with them when it comes to this shit." . . . [Washington also stated,] "Everybody should be love at the end of the day. The way you explained it . . . I shouldn't even have to hit this n----r. Cause I'm so sharp on the draw." "Once you open the door, I got you." ". . . We are just gonna be shooting the fuck out of this joint, but you got to be out of the way." "You know what I'm saying? We trying to make it as safe as possible for you." "I'm walking in with my gun out." "So I got him and he ain't going to risk getting his head blew off and start shooting on everybody."

During the meeting, the UC explained to Berry, Washington, and the unknown man that they will have to be divide [sic] the kilograms of cocaine for distribution after the intended home invasion robbery. The UC explained that he "can't take the cocaine to NY." Washington agreed stating, "Yeah you can't take the shit back." Washington offered to help sell the UC's portion of the stolen cocaine, stating, "So what, you want it sold or what . . .?" "I can't get it moved yo, but I don't like fucking with n-----rs." "See I don't fuck with coke." . . . "They got to be somebody I really trust. Like all right buy this jawn I just came up on." "Buy this jawn real quick so. . . you can most likely, you can get your shit out before you leave. You know what I'm saying?" As the conversation ended, Berry told the UC that "it's gonna get done," referring to the home invasion robbery. Berry added, "However it go down, that shit's gotta go down." Washington agreed and added . . . "I know we can do it. That shit sounds super sweet."

(Doc. No. 264 at 4-6.)

Recorded phone calls from March 4 to March 15, 2013 showed that Berry and Defendant spoke frequently about the plan to rob the stash house. In these calls, they planned the robbery for March 15, 2013 and decided to use a van that had doors on both sides. During this time, Berry continued to meet with Roc and the UC to discuss the details of the robbery.

The Government further summarizes the events on the day of the robbery from the trial record:

The day began with a text message between Washington and Berry, both saying that they were "Ready for work." Shortly thereafter, the men met at Berry's mother's home where Berry retrieved two guns, secreted them in an Eggo Waffle box, and handed them to Jermau Johnston, who had joined the conspiracy and was seated in Berry's car. Berry and Johnston then drove to a grocery store with Washington and Antonio Ellis [another conspirator] following in the rented Chrysler driven by Washington's girlfriend. Johnston and Ellis bought gloves to use in the robbery then everyone drove to the Hilton Hotel on Island Avenue, in Philadelphia, Pennsylvania, where they met with the UC and [Roc]. The purpose of this final meeting was for the UC to provide the robbers with the address of [the] house to be robbed and review the plan once again. This was the first time both Ellis and Johnston participated in a meeting with [Roc] and/or [the] UC. Prior to this date, the government was not aware of either man. A total of five individuals met the UC at that location in two vehicles, including Washington's girlfriend, who arrived along with Washington in a rented Chrysler. [Roc] drove Berry, Ellis, and Johnston in a minivan, as previously requested by Berry and Washington. The UC drove in a separate vehicle.

Once in the Hilton parking lot, Washington, Ellis, Johnston, Berry, and the UC got into the minivan with [Roc] in the driver's seat. Washington was immediately heard in the recording complaining about Johnston and Ellis going to the grocery store to buy gloves, Washington repeatedly complained that the men could have been observed on video tape purchasing the gloves. [FN 1: Washington was right. The men were caught on the store's surveillance system and the video played for the jury at trial, as was the recording of the conversations inside the minivan and numerous other recordings.] Washington also told the men, "If y'all would have told me you ain't had that shit [referring to the gloves], I would have got it already." . . .

Once all of the men were inside the van, Berry instructed the UC to review the details of the planned robbery with everyone. At Berry's direction, the UC explained, again, that the target of the robbery was a house at which 10 kilograms of cocaine would be found; that the building would be guarded by a man at the door, who carried a firearm; that a second man further inside the home would also be armed; that the second man would have control of the drugs; that the drugs would be stored in a white cooler; and that there would be no money found in the house. The men then discussed their plan of action; that they would all drive to a staging area closer to the target location; that when they made their assault on the drug house, two of them would be the first to enter the house; that they would be armed; that they would likely bind the people inside the house; that they would treat the UC, who would be in the house, as if he were another victim to evade the suspicion by the drug dealers. . . . During the conversation, Washington asked the

UC if he got the address yet and requested that he text it to him and the other robbers when he did, so they could circle the block before the robbery. . . . A search of Washington's iPhone revealed that on March 15, 2013, at 3:00 a.m. he downloaded a police scanner app.

From the hotel, the UC and the five member robbery crew drove to a parking lot in Southwest Philadelphia where the robbery conspirators were arrested. Washington, Ellis, and Johnston were immediately taken into custody, but Berry fled on foot and was found hiding in an attempt to evade apprehension. He was removed from his hiding place and placed under arrest.

After the defendants were arrested, ATF Special Agents recovered from inside the minivan two firearms secreted inside the Eggo Waffle box, ammunition, gloves, and zip ties. From the Chrysler, Agents recovered a backpack, gloves, a mask, a lighter, and lighter fluid. According to the testimony of Washington's coconspirator, Washington intended to burn down the stash house if things went bad.

(Doc. No. 264 at 7-10.)

### 2. Defendant's Trial

Before trial, Defendants Berry, Ellis, and Johnston pled guilty to their involvement in the conspiracy. Defendant went to trial on June 3, 2015. At the beginning of trial, defense counsel requested that the Court require the Government to provide defense counsel with ATF manuals with guidelines on sting operations so that defense counsel could use the manuals in cross-examination of Government witnesses. The Court ordered the disclosure of pertinent portions of the guidelines at trial, and defense counsel used them during cross-examination of Agent Bowman. Defense counsel stressed that, while ATF guidelines prohibit targeting individuals based on race, all of the targets of Agent Bowman's ATF stash house investigations were African-American. (Doc. No. 245 at 65-67.) During his opening argument, defense counsel quoted the following from the ATF policy manuals:

Target identification. Investigations should only be pursued that target individuals who show a propensity of doing harm to the public through violent behavior, armed robberies and whose activities have been documented either through criminal history, criminal reputation or self-incrimination. Violent crime is

defined as an offense that involves force or threat of force, murder, rape, forcible rape, robbery, aggravated assault and arson.

(Doc. No. 242 at 54.)  As defense counsel later informed the jury, Defendant had no criminal history for violent crimes.  (Doc. No. 245 at 67-68.)

Throughout trial, defense counsel argued that the ATF investigation was defective, and that the whole crime was "created by the Government, for the Government."  (Doc. No. 242 at 60.)  He criticized ATF for creating a fake stash house scenario, while there were plenty of real stash houses in Philadelphia that could have been utilized.  (Doc. No. 242 at 60.)  He argued that because the cocaine to be taken during the robbery did not actually exist, the Government could not prove an essential element of a Hobb's Act robbery, 18 U.S.C. § 1951, that is, that the stolen product had been moving in interstate commerce.  (Doc. No. 242 at 60-61.)

Defense counsel's theory of defense was that ATF created stash house robbery setups in order to target poor, unintelligent, and desperate African Americans who otherwise were not involved in criminal activity.  The following are excerpts from his closing argument:

> The Government has created these scenarios that are impacting, not real criminals, not known criminals, but stupid individuals who are hungry, poor, broke, and invariably lacking in education . . .

> The question is, why isn't ATF focusing on doing something about getting drugs off the street as opposed to putting the idea of drugs in the minds of people who are so hungry and broke that they're willing to even consider the idea of doing something like that? . . .

> Why is it the African Americans are the only ones that are being prosecuted for these crimes.  Is it because African Americans are the only ones that are violent?  Animals that have to be taken off the street, is that where we are? . . .

> We don't know about Agent Bowman.  Other than the fact that he testified that he was involved in these type of cases before.  And what?  All of them involved African Americans.   What's the inference there?  And there is a risk in targeting African Americans, or the minorities that are poor, economically and socially challenged.  The government would create these criminal enterprises that would not have come into existence but for the temptation of a big payday.

7

(Doc. No. 245 at 165, 174, 182, 185.)

After a five-day trial, the jury convicted Defendant on June 9, 2015 on Counts One, Two, Three, and Four (conspiracy to interfere with interstate commerce by robbery in violation of 18 U.S.C. § 1951, attempted robbery which interferes with interstate commerce in violation of 18 U.S.C. § 1951, conspiracy to possess with the intent to distribute 5 kilograms or more of cocaine in violation of 21 U.S.C. § 846, and attempted possession with intent to distribute 5 kilograms or more of cocaine in violation of 21 U.S.C. § 846). The jury acquitted him on Count Five (possession of a firearm in furtherance of a crime of violence and drug trafficking in violation of 18 U.S.C. § 924(c)(1)(A)), which had a mandatory minimum sentence. The Government withdrew Count Six (being a convicted felon in possession of a firearm in violation of 18 U.S.C. § 922(g)(1)). (Doc. No. 215.)

### 3. Post-Trial Procedural History

On September 17, 2015, Defendant wrote a letter to the Court requesting the appointment of new counsel, in part because defense counsel "has an alcohol problem and needs help." (Doc. No. 262 at 2.) The Court granted Defendant's request and appointed Mark Greenberg, Esquire, to represent him at sentencing. (Doc. No. 249.) A telephone conference with Greenberg and Government counsel, Salvatore Astolfi, Esquire, was held on October 16, 2015. During the telephone conference, Greenberg requested that the Court hold an evidentiary hearing so that Astolfi and Defendant could testify to their observations regarding defense counsel's alleged alcohol use before and at trial. Astolfi did not oppose the request. Greenberg subsequently contacted trial counsel to provide him with an opportunity to testify at the hearing, but trial counsel declined, stating: "I have denied [the] allegations and will not testify regarding this matte [sic]. My performance [is] on the record. It speaks for itself." (Doc. No. 262, Ex. A.)

The evidentiary hearing was held on November 9, 2015.  At the hearing, Astolfi and Defendant both testified that defense counsel's conduct at trial was unusual.  According to Astolfi, defense counsel checked each microphone in the courtroom, a task normally performed by courtroom personnel.  (Transcript of November 9, 2015 Hearing ("Tr.") at 18-19.)  Astolfi also testified that he smelled alcohol on defense counsel's breath on the morning of June 3, 2015, the first day evidence was presented at trial.  (Tr. at 13.)  During the lunch break that day, Astolfi asked defense counsel whether he had consumed alcohol.  Defense counsel responded that he had had "one" at lunch.  (Tr. at 16.)  Astolfi testified that he did not smell alcohol on defense counsel's breath again.  (Tr. at 20.)

Defendant testified that his trial attorney had "liquor on his breath" at least three times during pre-trial visits with him at the Federal Detention Center ("FDC").  When he asked defense counsel about the smell, his lawyer replied that "a shot after work ain't gonna hurt nothing."  (Tr. at 23.)  Defendant testified that he saw defense counsel eat peppermint candies, which Defendant believed were used to cover up the smell.  (Tr. at 24.)  Defendant further testified that, at one point during trial, his lawyer "snapped" at a deputy marshal regarding what Defendant was allowed to wear at trial.  (Tr. at 26.)  Like Astolfi, Defendant testified that the only day that he smelled alcohol and peppermints was on June 3, and after that he did not smell them again.  (Tr. at 27.)

On January 29, 2015, Defendant filed a Motion for a New Trial, alleging ineffective assistance of trial counsel due to his lawyer's alcohol consumption prior to and during trial.[2]

---

[2]  Federal Rule of Criminal Procedure 33 (New Trial) provides:

    **(a) Defendant's Motion.** Upon the defendant's motion, the court may vacate any judgment and grant a new trial if the interest of justice so requires. If the case was

(Doc. No. 262.)   In the Motion for a New Trial, Defendant points to two actions of defense counsel which he attributes to the alcohol consumption.

Defendant first argues that he would have been acquitted of all counts had his lawyer not elicited his drug conviction in front of the jury.  (Doc. No. 264 at 6.)  According to Defendant:

> By referencing Mr. Washington's drug conviction on cross-examination of Agent Bowman, which opened the door for the government to elicit defendant's drug conviction a second time during its re-cross, [defense counsel] eviscerated his theory of defense that defendant was an innocent minority unfairly targeted and racially profiled by ATF.  [Defense counsel] repeatedly told the jury that ATF concocted these stash house robbery scenarios in order to racially target innocent

tried without a jury, the court may take additional testimony and enter a new judgment.

**(b) Time to File.**

**(1) Newly Discovered Evidence.** Any motion for a new trial grounded on newly discovered evidence must be filed within 3 years after the verdict or finding of guilty. If an appeal is pending, the court may not grant a motion for a new trial until the appellate court remands the case.

**(2) Other Grounds.** Any motion for a new trial grounded on any reason other than newly discovered evidence must be filed within 14 days after the verdict or finding of guilty.

Fed. R. Crim. P. 33.

The Government argues that the Court should dismiss Defendant's Motion as untimely under Rule 33(b)(2).  The Court finds, however, that the unique facts of this case weigh in favor of finding excusable neglect by Defendant.  See Federal Rule of Criminal Procedure 45(b)(1)(B) (a court may extend the 14-day time limit under Rule 33(b) due to excusable neglect); see also United States v. Kennedy, 354 F. App'x 632, 636 (3d Cir. 2009) (factors that guide the excusable neglect analysis include: "(1) the danger of prejudice to the non-moving party; (2) the length of the delay and its potential impact on judicial proceedings; (3) the reason for the delay and whether it was within the 'reasonable control' of the movant; and (4) whether the movant acted in good faith.").  Defendant acted in good faith given the circumstances, and the delay in the filing and disposing of the Motion for a New Trial is not unreasonable considering that new counsel was appointed in October 2015.  Moreover, there is no prejudice to the Government in having the Motion adjudicated at this time.  Therefore, the Court will excuse the untimeliness of Defendant's Motion, even though Defendant had knowledge before trial that defense counsel consumed alcoholic drinks.

African-Americans who otherwise had no involvement in criminal activity because they were "poor," "stupid," or "desperate."

(Id. at 4.)  Defendant quotes portions of defense counsel's closing argument in which he stated that the Government targets "not real criminals, not known criminals, but stupid individuals" and asked the jury, "Is it because African Americans are the only ones that are violent?  Animals that have to be taken off the street, is that what we are?"  (Doc. No. 245 at 165, 174.)

Next, Defendant argues that defense counsel was ineffective because on cross-examination he elicited from Special Agent Edwards that Roc had been terminated as an informant.  Prior to the cross-examination, Astolfi had informed defense counsel that Roc had been shot at during the investigation, and suggested that defense counsel not pursue that line of questioning.  At trial, defense counsel elicited that Roc had received threats and was relocated for his safety on cross-examination of Agent Edwards.  According to Defendant, eliciting this information "only served to make the informant a sympathetic figure in the eyes of the jury and destroy [defense counsel's] closing argument to the contrary."  (Doc. No. 262 at 7.)  Ultimately, Defendant argues that defense counsel's alcohol use before and during trial "directly contributed to his ineffectiveness" and warrants a new trial.  (Doc. No. 262 at 9.)

For reasons that follow, the Court will deny Defendant's Motion.

## III.    DEFENSE COUNSEL WAS NOT CONSTITUTIONALLY INEFFECTIVE

Alcohol use by an attorney does not, by itself, indicate ineffective assistance of counsel. See, e.g., Hernandez v. Wainwright, 634 F. Supp. 241, 245 (S.D. Fla. 1986) aff'd, 813 F.2d 409 (11th Cir. 1987) ("an attorney's indulgence in alcohol is not in itself enough to constitute a *per se* Sixth Amendment violation," rather the inquiry is "whether, regardless of the cause, [counsel's] representation of Petitioner was deficient and whether this deficiency prejudiced the Petitioner."); Berry v. King, 765 F.2d 451, 454 (5th Cir. 1985) ("under Strickland the fact that an

attorney used drugs is not, *in and of itself,* relevant to an ineffective assistance claim."). Therefore, in order to prove his counsel was ineffective, Defendant must show that under Strickland v. Washington, 466 U.S. 668 (1984), his trial counsel's performance was unreasonable under prevailing professional standards and that this performance prejudiced his case. Accordingly, the Court will analyze Defendant's arguments under the Strickland prejudice standard outlined more thoroughly below.

**1. The Ineffective Assistance of Counsel Standard**

In evaluating a defendant's claims of ineffective assistance of counsel in violation of the Sixth Amendment, the Court must consider the two-prong test enunciated by the Supreme Court in Strickland v. Washington, 466 U.S. 668 (1984). Under this test, trial counsel is presumed to have acted reasonably and effectively unless Defendant can show that: (1) trial counsel's "representation fell below an objective standard of reasonableness[;]" and (2) there was a "reasonable probability that, but for [trial counsel's] unprofessional errors, the result of the proceeding would have been different." Id. at 687–88, 694. "Judicial scrutiny of counsel's performance must be highly deferential . . . [and] a court must indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance[.]" Id. at 689.

Under the first prong, Defendant must show that defense counsel fell short of "reasonably effective assistance" by overcoming the presumption that defense counsel's decisions were "sound trial strategy." Id. at 686. The appropriate measure of attorney performance is reasonableness under prevailing professional norms. Id. There is a strong presumption that counsel rendered adequate assistance and that all significant decisions were made while exercising reasonable professional judgment. Id.

12

Under the second prong, Defendant must show "that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." Id. at 687, 689, 694.  A reasonable probability is a probability sufficient to undermine confidence in the outcome.  Id. at 694.  Defendant must show that counsel's error caused more than just some conceivable effect on the outcome of the proceeding.  Id. at 693.

"A court need not first determine whether counsel's performance was deficient before examining the prejudice suffered by the defendant as a result of the alleged deficiencies.  If it is easier to dispose of an ineffectiveness claim on the ground of lack of sufficient prejudice, that course should be followed."  Id. at 668.  "Judicial scrutiny of counsel's performance must be highly deferential . . . [and] a court must indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance[.]"  Id. at 689.  The Court will now turn to whether the instances of defense counsel's challenged conduct amount to ineffective assistance under the Strickland standard.

### 2.  Cross-Examination of Agent Bowen Regarding Defendant's Criminal History

First, Defendant contends that defense counsel was ineffective because he opened the door to allowing the Government to elicit on redirect examination of Agent Bowman that Defendant had a prior drug conviction.  During cross-examination of Agent Bowman by defense counsel, the following exchange occurred:

> Q: Okay.  But as it stands right now, 100 percent of the individuals that you've been involved in prosecuting have been African American?
>
> A: In this type of investigation, yes.
>
> Q: Yeah.  That's what I'm talking about.  I'm not going outside of the stash house investigation.  Okay?
>
> A: Correct.

Q: All right.  Now we know that you didn't use – they didn't have my client identified before he was arrested.  You knew him as Ski, or some other name, right?

A: Correct.

Q: So you didn't know if he had a prior criminal history, right?

A: No, not during the investigation.

Q: All right.  And you found out after the arrest and some checking, you found out that my client doesn't have a history for robbery, right?

A: (No verbal response)

Q: And he doesn't have a history for drugs, does he?

A: I don't recall.

Q: If he did, you would recall, sir, wouldn't you?  Isn't that fair?

A: I don't want to misstate, but I'm pretty sure he had a—

Q: If you're not sure, you probably shouldn't say—

A: —drug arrest.

Q: —you probably shouldn't say, you're not sure.  I've had his record, and I can say, I didn't see a robbery conviction.

A: I don't think there's a robbery conviction, no.

Q: And I have his record, I didn't see a drug conviction.

A: I don't recall.

(Doc. No. 245 at 67-68.)

Defense counsel's cross-examination of Agent Bowman "opened the door to Mr. Astolfi bringing Mr. Washington's prior drug conviction to the jury's attention on re-direct examination."  (Doc. No. 262 at 3.)  The following exchange occurred on re-direct examination:

Q: [Defense counsel] asked you some questions about Mr. Washington's criminal history.

14

A: Yes.

Q: You said you weren't sure when he asked you specific questions about whether he had a drug conviction, whether he had a robbery conviction, whether he had a violent crime conviction.  You said, I don't recall—

[DEFENSE COUNSEL:] Objection, Your Honor.  I didn't ask about a violent crime conviction.  I said robbery and drugs.

MR. ASTOLFI: Okay.  I'll keep it to robbery and drugs.

Q: You said you weren't sure, correct?

A: Correct.

Q: I want to take a moment and show you Government's Exhibit 403, 404 and 405 . . . Did you review these exhibits?

A: Yes.

Q: And after reviewing them, are you sure whether or not Mr. Washington has a prior drug conviction.

A: He does have a prior drug conviction.

(Doc. No. 245 at 99-100; Doc. No. 262, Ex. B.)

Based on this testimony, Defendant argues that defense counsel destroyed his theory of defense that Defendant was an innocent minority unfairly targeted by ATF.  (Doc. No. 262 at 4.) According to Defendant, "Once defendant's prior drug conviction was brought to the jury's attention, [defense counsel's] claim that defendant had been racially profiled or stereotyped as an 'animal' to be taken off the street was empty rhetoric which only served to accentuate the testimony of ATF agents who testified that they complied with the rules and regulations governing stash house sting operations."  (Doc. No. 262 at 5.)

As noted previously, when examining a claim of ineffective assistance of counsel, "[a] court need not first determine whether counsel's performance was deficient before examining the

prejudice suffered by the defendant as a result of the alleged deficiencies. If it is easier to dispose of an ineffectiveness claim on the ground of lack of sufficient prejudice, that course should be followed." Strickland, 466 U.S. at 668.   In order to determine whether defense counsel's questions involving Defendant's prior drug conviction rendered his performance ineffective, the Court will first analyze whether this conduct prejudiced Defendant to the point that there was a "reasonable probability that, but for [defense counsel's] unprofessional errors, the result of the proceeding would have been different." See Strickland, 466 U.S. at 694.   In this regard, Defendant argues that the jury would have acquitted him on all counts had defense counsel not elicited the testimony about his prior drug conviction.[3]  (Doc. No. 262 at 6.)

---

[3]   Defendant also contends that defense counsel was wrong to argue to the jury that Defendant was not yet committed to the robbery when he drove to the stash house, because there was "evidence of Mr. Washington's chatter that could be considered incriminating both on and before March 15, 2013."   Defendant quotes a portion of defense counsel's closing argument in which he stated, "I submit to you that Mr. Washington was on yellow.   Caution.   That's why he was criticizing those boys about those things.   He was on caution.   He had that girl there because he was ready to get out of there.   Otherwise if he was committed, he'd be like, okay, Baby, you go ahead, I got this.   Right?   That didn't happen."  (Doc. No. 245 at 183-84.)   Any argument that Defendant was not fully committed to the robbery was consistent with the theory that Defendant was not guilty, because Defendant never reached a point where he "attempted" to commit a crime.   Attempt was part of the charged offenses filed against him and defense counsel's argument was strategically designed to enhance Defendant's chance of acquittal.

 In addition, Defendant argues that the acquittal of Defendant on Count Five (possession of a firearm in furtherance of a crime of violence and drug trafficking) does not undermine his claim that he was prejudiced by defense counsel's consumption of alcoholic drinks.   He claims that his acquittal on Count Five was due to a lack of evidence implicating Defendant, rather than defense counsel's advocacy.   Defense counsel at trial pointed out to the jury that Defendant may not have even had knowledge that the gun was in the car.  (See Doc. No. 245 at 88 (eliciting on cross-examination that Agent Bowman had no way of knowing whether Defendant knew the firearms were in the car).)  While Defendant argues that his acquittal on Count Five does not mean he was not prejudiced by defense counsel's actions, it is too speculative to draw this conclusion based on the evidence in this case.

In this case, the error of defense counsel in opening the door to allowing the Government to elicit the prior drug conviction did not create a situation where there was a reasonable probability that the result of the proceeding would have been different. Therefore, despite Defendant's argument regarding the introduction of his prior conviction, Defendant fails to establish the second element of the <u>Strickland</u> test to establish ineffective assistance of counsel.[4]

There is no prejudice as formulated under <u>Strickland</u> for the following reasons: (1) the ATF guidelines on sting operations require that investigations only target individuals who show a propensity of doing harm to the public through violent behavior, and a drug conviction does not indicate such a propensity; (2) the kind of drug conviction was not disclosed and Agent Bowman testified that "during the investigation," he did not know whether Defendant had a criminal record; (3) Astolfi did not refer to the prior drug conviction at trial after it was introduced; and (4) the evidence was so overwhelming against Defendant that testimony about the prior drug conviction by itself did not create a situation where there was a reasonable probability that the result of the trial would have been different.

First, after successfully arguing for the admission of pertinent portions of written ATF guidelines on sting operations, defense counsel continuously referred to the manuals to argue that ATF policies were violated because Defendant was not known to be a violent criminal. He quoted the following portion from the guidelines in his opening statement:

---

[4]   On the record, during his cross-examination of Agent Bowman, defense counsel said, "And I have his record, I didn't see a drug conviction," when in fact, Defendant's criminal record reflected a drug conviction. (Doc. No. 245 at 68.) A lawyer does not make a strategic decision in the best interest of a client if he opens the door for the admission of prejudicial evidence that for some reason he overlooked. <u>See</u> <u>Mason v. Hanks</u>, 97 F.3d 887, 893 (7th Cir. 1996) (stating that when counsel "omits (without legitimate strategic purpose) 'a significant and obvious issue,'" his performance is deficient). Thus, it does not appear on this record that defense counsel's conduct with respect to Defendant's prior drug conviction was based on sound trial strategy.

> Target identification.  Investigations should only be pursued that target individuals who show a propensity of doing harm to the public through violent behavior, armed robberies and whose activities have been documented either through criminal history, criminal reputation or self-incrimination.   Violent crime is defined as an offense that involves force or threat of force, murder, rape, forcible rape, robbery, aggravated assault and arson.

(Doc. No. 242 at 54.)   Moreover, defense counsel focused his cross-examination of Agent Bowman on the failure of ATF agents to follow the ATF procedures laid out in the policy manuals used by ATF.[5]  (Doc. No. 243 at 75.)  In doing so, he questioned Agent Bowman about improperly targeting Defendant even though he lacked the "propensity [to do] harm to the public through violent behavior, including home invasion robberies . . ."  (Id. at 75.)

Second, Agent Bowman specifically testified on cross-examination that he did not know during the investigation if Defendant had a prior criminal history.  Defendant argues that, "Once defendant's prior drug conviction was brought to the jury's attention, [defense counsel's] claim that defendant had been racially profiled or stereotyped as an 'animal' to be taken off the street was empty rhetoric which only served to accentuate the testimony of ATF agents who testified that they complied with the rules and regulations governing stash house sting operations."  (Doc. No. 262 at 5.)  Defense counsel's elicitation of the prior arrests did not render his argument "empty rhetoric," however, because in doing so he also elicited the fact that Agent Bowman was

---

[5]  The following exchange occurred:

> Q: Isn't it true, sir, that the guidelines require that investigations should only be pursued that target persons who show a propensity of doing harm to the public through violent behavior, including home invasion robberies that have been documented somehow?  Isn't that what the guidelines say?

> A: Yes, it does.

(Doc. No. 243 at 75.)

not aware of Defendant's criminal history during the investigation.   The following exchange

occurred, in relevant part:

> Q: All right.   Now we know that you didn't use – they didn't have my client
> identified before he was arrested.  You knew him as Ski, or some other name,
> right?
>
> A: Correct.
>
> Q: So you didn't know if he had a prior criminal history, right?
>
> A: No, not during the investigation.

(Doc. No. 245 at 67.)

Therefore, based on the evidence, defense counsel could argue that Agent Bowman was

not in compliance with the ATF policy that "Investigations should only be pursued that target

individuals who show a propensity of doing harm to the public through violent behavior, armed

robberies and whose activities have been documented either through criminal history, criminal

reputation or self-incrimination."  (Doc. No. 242 at 54.)  Regardless of any prior drug conviction

of Defendant, defense counsel's argument that Defendant was targeted in violation of ATF policy

was a viable one for the jury's consideration, and was supported by the fact that Defendant had

no record of robberies or other violent crimes.   In addition, defense counsel sought to juxtapose

Defendant's prior convictions with those of Roc, the confidential informant who worked for ATF,

by asking Agent Bowman about Roc's prior gun convictions immediately after asking about

Defendant's prior conviction.  (See Doc. No. 245 at 68-69.)

Third, Astolfi did not refer to Defendant's prior conviction in his closing argument or his

rebuttal argument.   The only time that the jury heard about the prior conviction was during Agent

Bowman's testimony.   It was never referred to again at trial.   Moreover, the jury heard only that

Defendant had a "prior drug conviction."  (Doc. No. 264 at 22.)  The jury was never informed of

19

the nature of the conviction.  Thus, the prior drug conviction did not have an affirmative role in the Government's presentation to the jury.

Finally, Defendant faced a mountain of evidence against him.  Numerous recordings were played to the jury in which Defendant enthusiastically participated in planning the robbery.[6]  In view of the substantial evidence of guilt, even if defense counsel had not referred to the drug conviction on cross-examination, there is no indication that "the result of the proceeding would have been different."  See Strickland, 466 U.S. at 694; see also United States v. Schake, 57 F. App'x 523, 526 (3d Cir. 2003) (defense counsel's deficient advice to his client regarding an entrapment defense did not prejudice defendant, and thus could not amount to ineffective assistance, given overwhelming evidence of defendant's guilt); Ruezga v. Yates, 330 F. App'x 656 (9th Cir. 2009) (finding no prejudice where defense counsel opened the door to the introduction of evidence of gang involvement); Johnson v. Tennis, No. CIV. A 05-778, 2006 WL 4392562, at *8 (E.D. Pa. May 18, 2006), report and recommendation adopted as modified, No. CIV. A. 05-778, 2007 WL 789179 (E.D. Pa. Mar. 12, 2007), aff'd, 549 F.3d 296 (3d Cir. 2008) (defense counsel's failure to call character witnesses was not prejudicial where the evidence was "too strong to be overcome by character evidence, if it had been presented.").

Therefore, Defendant has failed to meet his burden of showing defense counsel was constitutionally ineffective with regard to questions about his prior conviction.

---

[6]  Prior to the attempted robbery, Defendant was recorded in meetings with the UC making statements such as: "I ain't gonna hit you [referring to the UC], but say if I come there . . . I hit him from the rip.  I ain't gonna kill him, but I hit him just to make him to know that I ain't fucking playing no games;"  "I'm walking in with my gun out;"  "Yeah cause I'm gonna hit him cause I know he got a gun.  So I got no choice.  But I'm not gonna just play.  I don't play with him when it comes to this shit;"  "Everybody should be love at the end of the day.  The way you explained it . . . I shouldn't even have to hit this n----r.  Cause I'm so sharp on the draw;"  ". . . We are just gonna be shooting the fuck out of this joint, but you got to be out of the way;"  and "I'm walking in with my gun out."  (Doc. No. 264 at 4-6.)

### 3.  Eliciting Information About Threats Against Roc

Next, Defendant argues that defense counsel was ineffective when he elicited from Agent Edwards that Roc—the informant who defense counsel argued planted the idea of a stash house robbery in the mind of Defendant—had been terminated as an informant because he had been threatened.  (Doc. No. 262 at 6.)  According to Defendant, defense counsel's examination of Agent Edwards "only served to make the informant a sympathetic figure in the eyes of the jury and destroy [defense counsel's] closing argument to the contrary."  (Doc. No. 262 at 7.)  During cross-examination of Agent Edwards, defense counsel asked why Roc was no longer an informant.  Astolfi objected to the relevance of the question, and the Court sustained the objection.  Shortly afterwards, the Court held a side-bar conference during which the following exchange occurred:

> THE COURT: The – the questions [sic] I sustained the objection to was – I believe it was, why did you stop using the – Mr. Roc as a confidential informant?
>
> [DEFENSE COUNSEL]: Uh-huh.
>
> THE COURT: I've thought further about that question.  I'm going to reverse my ruling and allow it if you want to re-ask the question.
>
> MR. ASTOLFI: I don't know that he knows the answer, but he was shot at during–
>
> THE COURT: Huh?
>
> MR. ASTOLFI: He was shot at as a result of his cooperation.  Do you want to bring that out?
>
> [DEFENSE COUNSEL:] Well, it's – that's not an explanation as to why he's no longer an informant.
>
> MR. ASTOLFI: Well, actually, there's more to it.  Yeah, that's – I'm just letting you know that you're walking on – down that road.
>
> [DEFENSE COUNSEL:] All right.

MR. ASTOLFI: And if that's the road you want to elicit to –

THE COURT: I'm going to allow the question if you want to –

MR. ASTOLFI: Okay.  That's fine.

THE COURT: —if you want to ask it.

MR. ASTOLFI: But just keep that in mind.

[DEFENSE COUNSEL:] Okay.  No problem.

MR. ASTOLFI: I don't know what he's going to say but –

[DEFENSE COUNSEL:] That's fine.

(Doc. No. 243 at 111-112.)  Following the side-bar conference, Defense counsel continued the

cross-examination of Agent Edwards as follows:

Q: And the question related to Mr. Roc and his status today as no longer being a
confidential informant.   Do you know why he's no longer a confidential
informant?

A: He was deactivated because he received numerous threats.  We relocated him
several times.  So for his safety, we relocated him and we deactivated him.  We
didn't want him to be involved in any type of investigation anymore.  So for his
safety and the safety of his family.

Q: Okay.  And with respect to the other things to accommodate to him, did you
have – you or your agency have Mr. Roc's criminal history expunged?

A: No, sir.

Q: Well, you look perplexed.

A: That's not something we would do.

(Doc. No. 243 at 112.)

Later, on re-cross-examination, defense counsel asked the following:

Q: Agent Edwards, we – we know from your – your previous testimony that you
have no idea how much money Mr. Roc received in this case?

A: In this case, no, I do not.

22

Q: That was your testimony, I understand, but you also testified that he was relocated by ATF, I believe?

MR. ASTOLFI: Objection.  I didn't raise this in my redirect Your Honor.  It's beyond the scope.

THE COURT: Overruled.

A: Yes, sir, he was.

Q: And when you say "relocated by ATF," just tell me what that means.  Tell us what that means.

A: That means in response to threats to his safety, we provided money so that he could relocate himself and his family and/or temporary housed them also until he could do so.

Q: And that happened in this case?

A: Yes, sir, it did.

Q: And is his housing and everything still being paid for by ATF?

A: We didn't pay for his housing, we paid for him to be relocated.  And no, it is not.

Q: Okay.  Well, explain to members of the jury what paying for his relocation is.

A: It means we provide him funds to enable him to move on his own with his family members.

Q: And how much – how much was that?

A: That I don't know, sir.

Q: You have no idea?

A: No, sir, I was not involved in that part.

Q: And finally, in an investigation like this with the tactical team, you, the vehicle and everything, the recording devices and everything, that could be expensive, can't it?

A: Yes.  Yes, sir.

Q: You get paid for your work, right?

A: Yes, sir.

Q: Roc got paid for his, right?

A: Roc got paid as an informant.  Yes, he did get paid.

(Doc. No. 243 at 135-137.)

Defendant argues that, by eliciting this information about Roc, defense counsel "ma[de] the informant a sympathetic figure in the eyes of the jury and destroy[ed defense counsel's] closing argument to the contrary."  (Doc. No. 262 at 7.)  According to Defendant, bringing out this evidence was "contrary to [defense counsel's] portrayal of [Roc] as a manipulator who was motivated only by money."  (Id.)

Beginning again with the second prong of Strickland, the prejudice element, defense counsel's actions regarding Roc were not so serious as to create a "reasonable probability that, but for [trial counsel's] unprofessional errors, the result of the proceeding would have been different."  See Strickland, 466 U.S. at 694.

As discussed above, it is clear from the record that the evidence in this case was overwhelming.  Among the evidence presented to the jury were numerous incriminating recorded conversations in which Defendant voiced his eagerness to commit the robbery.  Even if defense counsel's questions regarding Roc had the effect of evoking sympathy from the jury, in light of the overwhelming evidence establishing guilt, Defendant has not met his burden of showing that defense counsel prejudiced his trial.  See Padilla v. Kentucky, 559 U.S. 356, 371 (2010) ("Surmounting Strickland 's high bar is never an easy task."); Strickland, 466 U.S. at 693 ("Attorney errors come in an infinite variety and are as likely to be utterly harmless in a particular case as they are to be prejudicial."); see also United States v. Shabazz, No. CIV. A. 10-

3882, 2011 WL 2453496, at *14 (E.D. Pa. June 20, 2011) (where evidence of petitioner's guilt was overwhelming, the court held that "[e]ven if Petitioner's claims of unprofessional conduct were arguable, which they are not, Petitioner cannot establish the severe prejudice required by the second prong of *Strickland*.").

In addition, turning to the deficient performance element of the Strickland test, Defendant has failed to establish that defense counsel's actions fell below prevailing professional norms.  In order to establish this, Defendant needed to overcome the presumption that defense counsel's decisions were "sound trial strategy."  To overcome the presumption of sound trial strategy, Defendant "must show either that: (1) the suggested strategy (even if sound) was not in fact motivating counsel or, (2) that the actions could never be considered part of a sound strategy." Thomas v. Varner, 428 F.3d 491, 499 (3d Cir. 2005).

As noted above, defense counsel's theory of defense was that ATF created stash house robbery stings in order to target poor and desperate African Americans in violation of its own policies and procedures.  To support this theory, defense counsel sought to tarnish Roc's credibility by eliciting testimony that Roc had previously been incarcerated himself, and that he had met Berry, the principal Defendant in this case, in prison.[7]  (Doc. No. 245 at 68-69.)

---

[7]  In his cross-examination of Agent Bowman, immediately after asking about Defendant's prior convictions, defense counsel asked the following about Roc:

Q: Okay.  Now Roc, on the other hand, he had a record for a number of things, didn't he?  Or doesn't he?

A: Yes, he does.

Q: Huh?

A: Yes.

Q: Tell the members of the jury about Roc's criminal history.

Through cross-examination of co-Defendant Jermau Johnston, defense counsel suggested to the jury that Roc planted the idea of a stash house robbery in the minds of the Defendants,[8] and later suggested that Roc did so because he knew he would be compensated.  (Doc. No. 245 at 184.)

---

A: I don't – I don't recall his criminal history.  I haven't reviewed it.  I know he had a Federal firearms arrest – prior Federal firearms arrest.

Q: Um-hum.  Go ahead, keep going.

A: I don't know – I don't recall Mr. Roc's criminal history as I sit here.

Q: Well we know, we've heard your testimony not only here but also from the grand jury about how Roc and Berry met, right?

A: Yes.

Q: It wasn't on the streets of Philadelphia where they met, right?

A: It was in prison.

(Doc. No. 245 at 68-69.)

[8]  On cross-examination of co-Defendant Johnston, defense counsel elicited the following:

Q: So you were going on somebody else's word, and that somebody was Roc, wasn't it?

A: I didn't hear it from Roc.  I heard it from Dwight Berry first.

Q: And Berry heard it from Roc, right?

A: Yes.

Q: This opportunity for this stash house, right?

A: Yes.

Q: And Berry told you that Roc had approached him and told him that there was a stash house that could be robbed, right?

A: Yes.

26

In his closing argument, defense counsel suggested that Roc had something to hide by not testifying at trial.  Defense counsel made the following arguments regarding Roc in his closing argument:

> . . . I submit to you that any inferences that should be drawn in this case is the inference that CI Roc, CI-59 is so incredible that if he took the stand he would not even have been able to withstand my cross-examination.
>
> He would of [sic] broke down and started crying under the weight of the evidence.  It's an inference that would have happened, because why?  He wasn't called by the Government.   My client's not required to testify, he has a presumption of innocence, he'd like to stand on that.  He's not taking it for granted.
>
> He doesn't want to offend you by that, but the law says you can't hold that against him.  CI Roc, on the other hand, he knew what he was getting into when he signed up.  He knew that [he] was not only going to have to make cases, he knew that he was going to have to do what?  Come to testify.
>
> He's going to have to man up, not hide behind these tapes that the Government wants you to buy into.  They want you to convict my client on the basis of his tape-recorded conversations with parties that they didn't even present to you in this trial.  Reasonable doubt.  Doubt that makes you hesitate.  Did the violation of these policies and protocols get Agent Bowman in trouble?
>
> . . .
>
> We know that [sic] got money for this case.  And we know that he got money for other cases.  And we now know that, although he's available, you don't have, nor do we have the benefit of his testimony.
>
> . . .
>
> . . . In this instance, members of the jury, ATF was not infiltrating a suspected crew of home invasion robbers.  That's not what this case is about.
>
> They weren't involved in seducing persons known to have actually engaged in such criminal behavior.  That's not what this case is about.  This case is about CI-59, the Roc, being a troll, going out, paid by ATF, looking for individuals to plant the seed of doing these robberies in the minds of.

(Doc. No. 245 at 171-72, 185.)

---

(Doc. No. 244 at 77.)

Eliciting the fact that Roc was moved for safety concerns is not inconsistent with defense counsel's theory that ATF violated its own protocols in conducting the stash house robbery sting. According to defense counsel, Roc's role in this sting was to set up innocent and desperate African American men at any cost, and he did so because he knew he would get paid for his assistance and relocation.  In doing so, he risked threats by those he betrayed.  This is not, as Defendant argues, "contrary to [defense counsel's] portrayal of him as a manipulator who was motivated only by money," because it could cause the jury to believe Roc was so motivated by money that he was willing to risk the safety of himself and his family.  (Doc. No. 262 at 8.) Because the questions concerning Roc's receipt of money from the Government could be considered part of a sound strategy, they do not constitute deficient performance under Strickland.  See Thomas v. Varner, 428 F.3d 491, 499 (3d Cir. 2005).  Thus, Defendant has failed to show that defense counsel was constitutionally ineffective regarding questions about safety concerns and threats to Roc which caused his relocation by ATF.

Finally, and most importantly, there is no evidence in this record that defense counsel's questions regarding Defendant's prior drug conviction and Roc's relocation due to threats and safety concerns were caused by, or associated with, alcohol consumption.  With the one exception relating to the drug conviction, defense counsel's advocacy in this case was within the bounds of professional responsibility.  Defense counsel was a zealous advocate on behalf of Defendant, even to the point where the jury acquitted Defendant on a serious gun charge that carried a mandatory minimum sentence that would have run consecutive to sentences imposed on other Counts.  No conclusion can be drawn that what appears to be moderate consumption of alcohol in any way contributed to the conviction of Defendant.

**IV.    CONCLUSION**

For the foregoing reasons, Defendant Askia Washington's Motion for a New Trial (Doc.

No. 262) will be denied.

An appropriate Order follows.