UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF PENNSYLVANIA


UNITED STATES OF AMERICA,    )  13-CR-171-2
                             )
                             )
    vs.                   )
                             )
                             )
ASKIA WASHINGTON,          )
a/k/a SKI,                )  Philadelphia, PA
                             )  June 13, 2016
              Defendant.    )  10:17 a.m.


TRANSCRIPT OF SENTENCING HEARING
BEFORE THE HONORABLE JOEL H. SLOMSKY
UNITED STATES DISTRICT JUDGE

APPEARANCES:


For the Government:        ERIC B. HENSON, ESQUIRE
                        UNITED STATES ATTORNEY'S OFFICE
                        615 Chestnut Street
                        Suite 1250
                        Philadelphia, PA  19106-4476


For the Defendant:         MARK S. GREENBERG, ESQUIRE
                        13 Terrace Road
                        Plymouth Meeting, PA  19462


Audio Operator:           INNA GOLDSTHEYN


Transcribed by:           DIANA DOMAN TRANSCRIBING, LLC
                        P.O. Box 129
                        Gibbsboro, New Jersey  08026-0129
                        Office:  (856) 435-7172
                        Fax:     (856) 435-7124
                        Email:   dianadoman@comcast.net


Proceedings recorded by electronic sound recording, transcript produced by transcription service.

1                              I N D E X

2    STATEMENT:                              PAGE

3    Patricia Jones                           29

4    Rashida Clover                           31

5    ARGUMENT:                               PAGE

6      By Mr. Greenberg                     37, 51

7      By Mr. Henson                          46

8    STATEMENT OF THE DEFENDANT:             PAGE

9      By Askia Washington                    52

10   DECISION OF THE COURT:                  PAGE

11     By Judge Slomsky                       57

12

13

14

15

16

17

18

19

20

21

22

23

24

25

Colloquy                                                                3

1              (The following was heard in open court at 10:17

2       a.m.)

3              THE COURT:   Please be seated.

4              (Pause)

5              THE COURT:   This is the case of United States versus

6       Askia Washington, Criminal Number 13-171-2.

7                 Mr. Washington is represented by Mark Greenberg,

8       Esquire.

9              MR. GREENBERG:   Good morning, Your Honor.

10             THE COURT:   Welcome.   And I note the presence of Mr.

11      Washington in court today.   Welcome.

12             THE DEFENDANT:   Good morning.

13             THE COURT:   And the Government is represented by

14      Eric Henson, the Assistant U.S. Attorney.   And seated with you

15      at counsel table is Jason Santos, a special agent with

16      Alcohol, Tobacco and Firearms.

17             MR. HENSON:   Thank you, Your Honor.

18             THE COURT:   You're welcome.

19             We are here today for sentencing.   On June 10th,

20      2015, about a year ago, the defendant was found guilty by a

21      jury on Counts 1, 2, 3 and 4 of the superseding indictment and

22      we are here for sentencing today.

23             Count 1 charged conspiracy to commit robbery which

24      interfered with interstate commerce.

25             Count 2 was the attempted robbery which interferes

Colloquy                                                    4

1    with interstate commerce and aiding and abetting.

2            Count 3 was the attempted possession with intent to

3    distribute.  I'm sorry, conspiracy to possess with intent to

4    distribute five kilograms or more of cocaine.

5            And Count 4 was the attempted possession with intent

6    to distribute the five kilograms or more of cocaine.

7            So those are the four offenses and we're here for

8    sentencing today.

9            And, Mr. Greenberg, any reason why we should not

10   proceed to sentencing?

11           MR. GREENBERG:  No, Your Honor, I see no reason why

12   not.

13           THE COURT:  Mr. Henson?

14           MR. HENSON:  Nor I, Your Honor.

15           THE COURT:  All right.  Let's place Mr. Washington

16   under oath.

17           COURTROOM DEPUTY:  You can remain seated and pull up

18   the mike, please, to you.

19           Please state your full name for the record and spell

20   your name for the record.

21           THE DEFENDANT:  Askia Washington, A-S-K-I-A,

22   W-A-S-H-I-N-G-T-O-N.

23           COURTROOM DEPUTY:  Please raise your right hand.

24           ASKIA WASHINGTON, DEFENDANT, SWORN

25           THE COURT:  All right.  Mr. Washington, do you

1    understand you're here for sentencing today?

2                    THE DEFENDANT:  Yes.

3                    THE COURT:  And before I continue let me just say

4    that before I came to court I reviewed the revised presentence

5    report dated September 10th, 2015.

6                    I read the defendant's sentencing memorandum which

7    is Document 273 in the -- in the docket.  And attached to that

8    memorandum was a letter that Mr. Greenberg had sent to the

9    probation officer objecting to the two -- two points -- two

10   point enhancement for the possession of a dangerous weapon.

11                   Also attached was a -- a list of the classes

12   attended by -- the certificates received by Mr. Washington

13   while he's been incarcerated.  It's now three years at the

14   Federal Detention Center.  And two of those awards were awards

15   of distinction were -- or three of them were attached.  And I

16   note that one was an anger management class.

17                   I've also reviewed the defendant's supplemental

18   sentencing memorandum which is Document Number 275 in the --

19   in the record.

20                   And I've also read the defendant's second -- second

21   supplemental sentencing memorandum which is Document 277 in

22   the record.

23                   And attached to this memorandum is a letter from

24   Rashida Clover who is Mr. Washington's sister.  I have read

25   that letter.

Colloquy                                                    6

1        And also two other certificates of completion that

2    Mr. Washington attained while incarcerated.

3        I've also read the defendant's third supplemental

4    sentencing memorandum.  This one attaches the information with

5    the charge of aggravated assault and I have read the -- that

6    memorandum.

7        And I've also read the Otero case that's cited

8    therein at 502 F.3rd, 331, a 2007 case from the Third Circuit.

9        I've also read the -- the Government's amended

10   sentencing memorandum which is Document Number 281 in the

11   record.

12       And I've read Document 282 also which is the

13   Government's amended supplemental sentencing memorandum.  And

14   I'm not considering at all the prior sentencing memorandums of

15   -- filed by the Government, 274 and 276, in the docket.

16       Has anything else been submitted that I -- I haven't

17   referred to?

18       MR. GREENBERG:  Not on behalf of Mr. Washington,

19   Your Honor.

20       MR. HENSON:  Nor on behalf of the Government, Your

21   Honor.  We did not respond to the final submission that the

22   defendant made.

23       THE COURT:  I understand.

24       Now, Mr. Washington, do you understand you have the

25   sentencing today?

Colloquy                                         7

1              THE DEFENDANT:  Yes.

2              THE COURT:  Have you had enough time to discuss

3    sentencing with your attorney?

4              THE DEFENDANT:  Yes.

5              THE COURT:  If you need more time you can have it.

6    Do you need more time?

7              THE DEFENDANT:  No.

8              THE COURT:  Is there any reason why we should not

9    proceed?

10             THE DEFENDANT:  No.

11             THE COURT:  All right.  Now, have you reviewed the

12   revised presentence report dated September 10th, 2015?

13             THE DEFENDANT:  I'm not sure.

14             (Pause)

15             THE DEFENDANT:  Oh, yes.

16             THE COURT:  And you read it?

17             THE DEFENDANT:  Yes.

18             THE COURT:  And have you reviewed the report with

19   your attorney?

20             THE DEFENDANT:  Yes.

21             THE COURT:  And did you attorney explain to you

22   what's in the report and what it means?

23             THE DEFENDANT:  Yes.

24             THE COURT:  And did he answer any and all questions

25   you may have had about the presentence report?

Colloquy                                                        8

1          THE DEFENDANT:  Yes.

2          THE COURT:  Do you need any additional time to talk

3    to your attorney about the report?

4          THE DEFENDANT:  No.

5          THE COURT:  All right.  Now, with respect to that

6    report I might say that there's an objection made to the

7    specific offense characteristic in paragraph 28 and that's the

8    addition of two levels because a dangerous weapon was

9    possessed.

10         And does counsel have any argument on that?  From

11   what I could see it doesn't affect the Guidelines and he did

12   not possess that -- he was acquitted of the gun charges or at

13   least on one charge.  The other was dismissed.  And that --

14   that gun was in an Echo box in a van according to the

15   evidence.  Apparently the jury believed that it was not --

16   that firearm at the time was not used by Mr. Washington, but

17   I'll hear from counsel.

18         MR. GREENBERG:  Your Honor, you're correct on both

19   counts.

20         THE COURT:  Huh?

21         MR. GREENBERG:  You're correct on both counts.  The

22   fact of the matter is is that it does not affect the offense

23   level and the Guideline range and Mr. Washington was acquitted

24   of that count.

25         And even by a preponderance of the evidence there

1    was insufficient evidence to connect Mr. Washington to that

2    firearm.  I would remind the Court that factually the firearm

3    was picked up by Mr. Berry and Mr. Johnson independently of

4    Mr. Washington and there's no evidence in the record that Mr.

5    Washington was present when those two individuals picked up

6    the gun at the home of Dwight Berry's mother.

7              I think that under all the circumstances of this

8    case it would be appropriate not to include that two level

9    upward enhancement.

10             THE COURT:  All right.  Mr. Henson?

11             MR. HENSON:  Your Honor, the PSR, the probation

12   officer is correct that that enhancement under the Sentencing

13   Guidelines should apply.  The acquittal does not control.

14             The enhancements are to be found by a preponderance

15   and the evidence is that this defendant came to this -- what

16   he believed was going to be a home invasion robbery for drugs

17   and guns knowing that there would be guns there and intending

18   to use them.

19             So I believe that based on the evidence that was

20   presented at trial the Probation Office has correctly found

21   that by a preponderance that enhancement applies and we ask

22   that it remain.

23             THE COURT:  The -- the jury acquitted him of

24   carrying a firearm in relation to a crime of violence and the

25   Government withdrew the count of him being a convicted felon

Colloquy                                                  10

1    in possession of a firearm.

2              And based upon all of the evidence presented at the

3    trial there is a question as to whether he possessed it.  He

4    may have known about the presence of a firearm, but whether he

5    possessed these specific weapons is a question that was raised

6    at trial and from all indications it appeared that the jury

7    did not believe that he possessed it.  He certainly didn't

8    carry it.

9              So I will find that the preponderance of the

10   evidence standard is not met and that -- not met in this case,

11   so I will ask the -- I will strike the two level enhancement

12   that's noted in paragraph 28.  I'll ask the probation officer

13   to make that change in the presentence report.

14             Now, is there any other objection to the presentence

15   report in terms of departures or factual corrections?

16             MR. GREENBERG:  No, Your Honor.

17             THE COURT:  All right.  Mr. Henson?

18             MR. HENSON:  The statutory mandatory minimums are

19   incorrectly stated as to Counts 3 and 4 on page two.

20             The statutory mandatory minimum on Count 3 is 20

21   years to lifetime imprisonment.  And, accordingly --

22             THE COURT:  Okay.

23             MR. HENSON:  -- later in the report the defendant's

24   liability for supervision in paragraph 87 should be a

25   mandatory 10 years to lifetime supervision.

Colloquy                                          11

1              THE COURT:  10 years?

2              MR. HENSON:  Yes, Your Honor.

3              THE COURT:  Not five?

4              MR. HENSON:  Not five.  It's 10 years.

5              THE COURT:  10.  All right.  I know this is his

6     second conviction, so I'll ask the probation officer to make

7     those changes and --

8              MR. GREENBERG:  Your Honor.

9              THE COURT:  Yes.

10             MR. GREENBERG:  Before you go on.

11             THE COURT:  Yes.

12             MR. GREENBERG:  As the Court knows, in one of my

13    supplemental sentencing memorandums I objected to the increase

14    in the statutory mandatory minimum sentence by virtue of the

15    fact that this is not the type of case that really justifies

16    or was envisioned by Congress to justify an increase from a

17    mandatory minimum of 10 years to a mandatory minimum of 20

18    years on a number of levels, including the fact that frankly

19    this is a case where the Government aren't -- officially set

20    the amount of cocaine that was involved in this artificial

21    stash house robbery.

22             And to allow the Government to increase a

23    defendant's sentencing exposure as dramatically as it has in

24    this case and to manipulate the amount of cocaine to attain

25    that mandatory minimum I think provides the Government with

1    unbridled discretion to manipulate sentences and was not

2    envisioned by Congress to warrant a doubling of the mandatory

3    minimum sentence.

4         The information that was filed in this case

5    conceitedly was filed in advance of the trial, so time wise

6    the information was timely filed and I'm talking about the

7    information under 21, U.S.C., Section 851 that was the

8    information that triggers the mandatory -- or the doubling of

9    the mandatory minimum sentence.

10        But as the Court well knows in this case I would --

11   I would have to imagine that when Congress passed the law to

12   increase a mandatory minimum sentence from 10 to 20 years it

13   was addressing major drug dealers, people who are the kingpins

14   of drug distribution.

15        It was not envisioning a situation where the

16   Government creates a crime like it created here of a stash

17   house robbery and then was able to artificially set the amount

18   of cocaine that was involved.  If this case involved a half a

19   kilogram of cocaine that induced Mr. Washington, Mr. Berry,

20   the others, to commit the crime there would be no mandatory

21   minimum sentence at all.

22        If the amount of cocaine was between one and five

23   grams there would be a five year mandatory minimum that would

24   be increased to 10 assuming there's a prior drug conviction.

25        The problem in this case and the reason why the

Colloquy                                          13

1    Court should not accede to the Government's request to impose

2    a 20 year mandatory minimum sentence is that from soup to nuts

3    this case was a contrived case.  And I use that word not in --

4    in a disparaging way, but also in a factual way.

5              It is dangerous and is reflective of why member --

6    many members of our community don't feel that the system is

7    fair where you have a situation that the Government can set

8    the bar as to what the mandatory sentence is going to be by

9    their discretion by saying, okay, on this particular day we're

10   going to set the level at a half of kilogram of cocaine.

11             Or next week we're going to set the level at two and

12   a half kilograms of cocaine.

13             And then two months down the road we're going to set

14   the level at 10 kilograms of cocaine.

15             That is not the type of scenario that 851 was

16   designed to address.  That's not the type of scenario that the

17   mandatory minimum was designed to address.

18             The mandatory minimum is designed to address real

19   drugs that are possessed with the intent to distribute by a

20   defendant, by people who deserve to get 20 years in jail

21   mandatory for -- for their activity here.

22             So I would ask the Court, given the fact that under

23   all these circumstances that you not consider this to be a

24   mandatory sentence of 20 years.

25             I would also remind the Court that the Court has

1    disregarded the Government's sentencing submission that

2    brought that to the attention of the Court.  Ms. Maier in her

3    presentence report set the mandatory minimum at 10 years

4    imprisonment.

5           It was only after Mr. Astolfi filed his supplemental

6    memorandum did the Court now have the information that the

7    sentence should now go up to 10 years -- or 20 years mandatory

8    minimum.

9           THE COURT:  Has Mr. Henson filed?

10          MR. GREENBERG:  No, he did not.

11          So in light of the fact that the Court has not

12   considered -- and you stated on the record that you were not

13   going to consider Government counsel's submission that were

14   submitted by counsel prior to Mr. Henson, I would ask the

15   Court not to impose a mandatory -- 20 year imprisonment

16   mandatory minimum by virtue of the fact that the Government

17   has not properly objected to the presentence report as set

18   forth by Ms. Maier.

19          Had Mr. Henson timely filed that request or adopted

20   Mr. Astolfi's request, which as a practical matter was not

21   timely filed, I would remind the Court then under those

22   circumstances and the unique circumstances of this case I

23   would ask that you not adopt the Government's request for a

24   mandatory minimum of 20 years.

25          MR. HENSON:  Your Honor, please.

Colloquy                                    15

1            THE COURT:  Mr. Henson?

2            MR. HENSON:  Document 281 filed and signed by me on

3    behalf of the United States at page two of seven correctly

4    states the statutory mandatory minimum penalty.

5            There is absolutely nothing in the statute that

6    requires the Government, once it has filed as we did here the

7    Section 851 notice, to do anything further to oblige the Court

8    to impose the statutory mandatory minimum penalty.

9            The Government has properly and timely in terms of

10   this litigation brought to the Court's attention the statutory

11   mandatory minimum that applies.

12           There is no basis to set it aside and we would ask

13   for, as we will argue later, a Guideline sentence, but the

14   statutory mandatory minimum remains as stated in the

15   Government's filing in Document 281 which was submitted by me

16   to the Court with the Court's both permission and direction.

17           THE COURT:  All right.  Mr. Henson, you've also

18   filed Document Number 282.  And the way I read it it's even

19   more specific as to what the Government's position is.

20           MR. HENSON:  Yes, Your Honor.

21           THE COURT:  It goes into this in more detail.  Do

22   you have that in front of you?

23           MR. HENSON:  I have it here, but it's in a whole

24   group of documents.  It will take a moment.  Yes, Your Honor.

25   This Document 282, again, filed with the Court's permission

1    explains why the statutory mandatory minimum applies and must

2    be imposed in this case.

3              THE COURT:  All right.  The -- what -- what also has

4    to guide the Court is, and, again, I have to follow the law as

5    a Judge.  What also guides the Court -- the Court is that in

6    the jury verdict form, which is Document 215 in the record,

7    containing the findings of the jury on Counts 3 and 4 the jury

8    specifically answered an interrogatory, "Do you unanimously

9    find that the Government proved beyond a reasonable doubt that

10   the weight of the mixture and substance containing cocaine

11   that Askia Washington conspired to possess with intent to

12   distribute was five kilograms or more?"

13             And the jury said, "Yes".

14             Now, I recognize the argument made by Mr. Greenberg.

15   Certainly there is a -- there is certainly an aspect here of

16   the Government setting the bar, so to speak, in terms of the

17   -- the amount of cocaine that Mr. Washington thought would be

18   obtained when he engaged in this conspiracy to engage in the

19   robbery of the cocaine.

20             The Court is bound to follow the law.  When I became

21   a Federal Judge I took an oath to follow the law and the law

22   is that if you have a second conviction for these offenses,

23   conspiracy to -- attempted possession with intent to

24   distribute five kilograms or more of cocaine, the mandatory

25   minimum is 20 years.

Colloquy                                    17

1           The -- the jury so found and set the quantity and I

2     don't see how I have the authority to ignore what the law is

3     and what the jury has said.

4           So at the very least based upon the facts of this

5     case and the charges and what the jury found the Court is

6     bound by the statutory mandatory minimum and certainly it's an

7     argument that can be considered in the future.

8           And certainly the nature of the charge or the way

9     that the case was prosecuted as a sting operation has some

10    influence on what would be an appropriate sentence on Counts 1

11    and 2, the robbery charges.

12          But I could not, Mr. Greenberg, do what you're

13    asking me to do.  I just don't think the law would in any way

14    support it and so that -- that I could not do.

15          Now, I notice there's a lot of people in court and I

16    want everyone here to understand just some of the factors that

17    guides a Judge in the Federal Court in sentencing someone.

18          Sentencing is never an easy -- easy decision to

19    make.  Everyone is entitled to individual consideration who

20    comes before the Court convicted of a crime and we do have a

21    law.  It's set forth in Title 18, United States Code, Section

22    3553(a) and I refer to that sometimes as our sentencing law.

23          And these are the -- it lists all the factors that a

24    Judge has to consider in determining what's an appropriate

25    sentence in a given case.

Colloquy                                    18

1          I have to consider the nature and circumstances of

2     the offense.

3          I have to consider the history and characteristics

4     of a defendant, of the person in front of me.

5          A Court is imposed -- is required to impose a

6     sentence sufficient, but not greater than necessary, to comply

7     with other factors that are listed in the law.

8          That is a sentence should reflect the seriousness of

9     the offense, promote respect for the law, afford deterrence,

10    protect the public from further crimes by a defendant.

11         Provide a defendant with needed educational and

12    vocational training and other correctional treatment in the

13    most effective manner.

14         Consider the kinds of sentences that are available.

15         I also have to consider ranges that are contained in

16    what we call our Sentencing Guidelines manual.  And I have to

17    consider any pertinent policy statements that are in the

18    manual that have been written by the Sentencing Commission

19    that's part of our law.

20         And I have to consider the need to avoid unwarranted

21    sentence disparities among defendants with similar records who

22    have been found guilty of similar conduct.

23         And I also have to consider the need to provide

24    victims with restitution and that doesn't come into play in

25    this case.

1          But, you know, I mention the Federal Sentencing

2     Guidelines and these Guidelines were enacted in 1987.  And

3     before they -- before we had Sentencing Guidelines if somebody

4     was convicted of a crime and let's say the Congress set the

5     penalty at between zero and 10 years imprisonment a Judge had

6     a discretion to impose whatever sentence the Judge felt was

7     appropriate between zero and 10 years.

8          And if you had -- if two defendants were sentenced

9     by different Judges and they were convicted of the same crime

10    and they were otherwise alike in terms of their prior record,

11    perhaps some other factors, one Judge might give somebody

12    probation, another Judge might give somebody three years in

13    jail and it was not considered fair and it is unfair.  People

14    should be treated the same.

15         So Congress created a Sentencing Commission to

16    establish Guidelines for Judges and these Guidelines were

17    enacted in 1987.  In many ways they are a product of a lot of

18    study and a lot of data that has been submitted to make sure

19    the Guidelines are fair and up-to-date.

20         And I can assure you that back in 1987 this book was

21    not as big as it is and over the years it's been amended many

22    times.

23         And until 2005 the law was that these Guidelines

24    were mandatory.  A Judge had no discretion.  If somebody was

25    in a certain -- had an a certain offense level, oh, I'll just

Colloquy                                    20

1    throw out one for the sake of argument, let's say level 36.

2    And then we -- and that's the offenses -- every offense --

3    Federal offense is rated and there are offense characteristics

4    that may enhance it, may lower it, et cetera.

5                 But if a person had a certain offense level that was

6    applicable to their case and then they -- the chart goes

7    across the page and we look at the criminal history category

8    of a defendant.

9                 Depending on how -- his prior record, so I forget

10   what I said, I think I said let's take level 36 -- offense

11   level 36.

12                If you have no prior criminal history and this would

13   be the first time you're convicted of a crime the offense --

14   the Guidelines would recommend a sentence of incarceration of

15   188 to 235 months.  If you have an offense level 36 you've

16   committed a very serious offense.

17                And if you go across the page, if you're in Criminal

18   History Category VI, which meant you have a lot of prior

19   convictions, you'd be in a range of 324 to 405 months.

20                So the -- the Guidelines were mandatory until 2005.

21   A Federal Judge had no discretion.  Whatever Guideline range

22   you were in the Judge had to sentence you within that range.

23                There are ways to be taken out of the Guidelines,

24   but, for example in this case, there are -- there are none

25   applicable that I can see.

1          So in 2005 the Supreme Court said if these

2    Guidelines were to be constitutional they're only advisory.

3    They're just guidelines.  They're not mandatory.

4          So these Guidelines are just one factor among all

5    those factors that I mentioned to you that a Federal Judge has

6    to consider in determining what's an appropriate sentence in a

7    case.

8          And Judges were required initially to -- at

9    sentencing to calculate the applicable Guideline that would

10   apply to a defendant's case and then to see whether there's

11   any departures that would apply to that Guideline that we find

12   all within what's in this book.

13         And then after we do that we ultimately hear from

14   the parties on whether there should be a variance from the

15   final Guidelines -- from those Guidelines calculated after the

16   original Guidelines set by the Court -- found by the Court and

17   any departures are considered.

18         And that's where a lot of these factors that I've

19   mentioned to you that a Judge has to consider come into play.

20         But, again, sentencing someone is -- is not rocket

21   science, but Judges try to use their best discretion, their

22   best judgment, in determining, based upon all of the

23   information before a Judge, what's an appropriate sentence.

24         Now, given everything I've said I've already made a

25   ruling on one thing that's in the presentence report in terms

Colloquy                                    22

1   of the Guidelines, but is -- there's nothing else being

2   objected to the presentence report, Mr. --

3              MR. GREENBERG:  No, Your Honor.

4              MR. HENSON:  No, Your Honor.

5              THE COURT:  All right.  And the changes that Mr.

6   Henson has requested I'll ask the probation officer to make.

7              Now, let me -- let me calculate the Guidelines as

8   they're set forth in the presentence report.

9              The defendant has been convicted by a jury on Counts

10  1, 2, 3 and 4.

11             And Counts 1 and 2 are the conspiracy to commit the

12  robbery and Count 2 is the attempted robbery.

13             And Counts 3 and 4 are the conspiracy to possess

14  with intent to distribute the five kilograms or more of

15  cocaine.  And Count 4 was the attempted possession with

16  attempt to distribute the five kilogram -- kilograms or more

17  of cocaine.

18             We have what we call grouping rules within the

19  Guidelines.

20             Counts 1 and 2 group because the substantive

21  offense, that is the attempt offense, was the sole object of

22  the conspiracy.

23             And Counts 3 and 4 group, again, for the same reason

24  because the substantive offense was the sole object of the

25  conspiracy and this is set forth in paragraph 24 of the

Colloquy                                    23

1    presentence report.

2            Counts 1, 2, 3 and 4 also group together because one

3    of the counts embodies conduct that is treated as a specific

4    offense characteristic -- in or other adjustment to the

5    Guideline applicable to another of the counts.  Specifically

6    Counts 1 and 2 group with Counts 3 and 4 because the defendant

7    made a credible threat to use violence.

8            So that when we consider all this the grouping

9    requirements in the Guidelines requires us to consider the

10   highest offense level of the counts that group.

11           And, as noted in paragraph 27 of the presentence

12   report, the Guideline for a violation of 21, United States

13   Code, Section 846, that is the 846 offenses which are the drug

14   offenses, is found in Guideline Section 2D1.1(c)(5) which

15   provides that an offense involving more than five, but less

16   than 15, kilograms of cocaine has a base offense level of 30.

17           The -- in count -- paragraph 29, a specific offense

18   characteristic is that two levels are added pursuant to

19   Guideline Section 2D1.1(b)(2) because the defendant made a

20   credible threat to use violence.

21           So that the adjusted offense level is 32, as noted

22   in paragraph 33, and I'll ask the probation officer to make

23   that change.

24           Now, under another provision in this book, the

25   Guideline book, we call it Chapter 4, there is enhancement --

Colloquy                                      24

1   an enhancement when a defendant was at least 18-years-old at

2   the time of the instant offense of conviction and I've gone

3   over the instant offense of conviction.

4            And if the instant offense of conviction is a

5   felony, that is either a crime of violence and a controlled

6   substance offense, and the defendant has at least two prior

7   felony convictions of at least a crime of violence or a

8   controlled substance offense, then the defendant is labeled as

9   what we call a career offender and the offense level for a

10  career offender is 37.

11           Unfortunately for Mr. Washington, he has prior

12  convictions.

13           As noted in paragraph 40 of the presentence report

14  he was convicted at age 23 -- and I realize he's age 36 as he

15  sits before me today -- of criminal conspiracy, aggravated

16  assault, carrying firearms without a license, carrying

17  firearms in a public street place, et cetera.  And it's all

18  noted in paragraph 40 of the presentence report.  He was

19  sentenced to 12 to 24 months imprisonment and two years

20  consecutive probation.

21           And in paragraph 41, at age 24, he was found guilty

22  of -- or pled guilty or found guilty of manufacturing,

23  delivering and possessing with intent to manufacture or

24  deliver a controlled substance and for that he was sentenced

25  to three to years imprisonment.

1          So for each of those offenses under the Guidelines

2     he would be given three points, for a total of six points, but

3     when a -- and in looking at his -- his prior record score and

4     the fact that he committed the instant offense in front of me

5     while on State parole he would have a total criminal history

6     score of 11 which would put him in a Criminal History --

7     History Category of V, but because he is a career offender

8     he's placed in a Criminal History Category of VI.

9          Now, with a -- so based upon the fact that he is a

10    career offender he is automatically placed in an offense level

11    of 37, so that the -- as noted in paragraph 34, so that the

12    total offense level is 37.

13         The Guideline for offense level 37, Criminal History

14    Category VI, is 360 months to life, so that is the finding of

15    the Court with respect to the -- to the Guidelines.

16         Now, with respect to departures, I think we've dealt

17    with the -- with the -- I'm not sure if this is a departure or

18    a variance argument, Mr. Greenberg, but -- on the 20 year

19    mandatory minimum, but the Court would have to impose at least

20    a 20 year mandatory minimum on Count -- Counts 3 and 4.

21         Now, the question is what would be an appropriate

22    sentence on Counts 1 and 2?

23         Now, there's -- there's no other request for a

24    departure.  We're dealing with a variance at this point, is

25    that correct?

Colloquy                                    26

1           MR. GREENBERG:  Yes, Your Honor.

2           THE COURT:  Mr. Henson?

3           MR. HENSON:  We ask for no departures, Your Honor,

4    and we --

5           THE COURT:  You'll argue --

6           MR. HENSON:  -- advocate a Guideline sentence.

7    Thank you.

8           THE COURT:  All right.  Why don't I hear from Mr.

9    Greenberg first?

10          MR. GREENBERG:  Thank you, Your Honor.

11          Your Honor, before I make my remarks I would be

12   remiss if I did not take the time to identify the people who

13   have come today on behalf of Mr. Washington.

14          As the Court well knows this is the second time that

15   many of these folks have come.  The first time the case  --

16   the sentencing hearing was aborted, but nonetheless, these

17   folks have taken the time to come back because they love and

18   support Askia Washington.

19          And what I would like to do is just read their

20   names.  Once I read your name I would ask the Court if they

21   will be allowed to stand up.  I know two of the individuals,

22   Mr. Washington's mother and sister, would like to address the

23   Court.

24          And I know that there are some folks here who were

25   not here the last time and I would ask them to stand up as

Colloquy                                    27

1   well.  I think it's important for them as part of the

2   community, in addition to Mr. Washington's family, that they

3   be acknowledged if the Court has no objection.

4            THE COURT:  I have no objection.

5            MR. GREENBERG:  Thank you, sir.

6            Ms. Patricia Jones is Mr. Washington's mother.

7   Would you please stand up?  She was here the last time, Your

8   Honor, as the Court recalls.

9            Monifa Munson (phonetic).  She was also here the

10  last time, Your Honor.  Mr. Munson is Mr. Washington's wife.

11           Natasha Jones (phonetic) is his sister.  Is she here

12  today?  Yes.  She was also here the last time, Your Honor.

13           Rasheed Clover (phonetic) is his nephew.  Mr. Clover

14  was here also the last time.

15           Coleman Budd (phonetic) is his step-father.  Mr.

16  Budd was also here the last time.

17           Rashida Clover was also here, Your Honor.  She is

18  Mr. Washington's sister.

19           And Markeisha Clover (phonetic).  Is he (sic) here,

20  Mr. Clover?

21           THE DEFENDANT:  Markeisha.

22           MR. GREENBERG:  Markeisha Clover.  Yes.  She is the

23  niece of Mr. Washington.

24           Your Honor, there are some additional folks who are

25  here and if I could just call out your names and would you

1    please stand up.

2              Keana McClain (phonetic) is Mr. Washington's niece.

3              Zarea Weddington (phonetic) is his great niece.  Ms.

4    Weddington, are you here?  Okay.  There she is.

5              Jordan James is a friend, Your Honor.  Mr. James,

6    thank you for coming, sir.

7              Nathaniel Ortiz (phonetic) is another friend of Mr.

8    Washington's.  He is here, Your Honor.

9              And Milan Clover (phonetic) is a niece.

10             Now, I know there's some young ladies who are here

11   who were not here the last time and I did not call out your

12   name.  Would you ladies please stand up?  Thank you three for

13   coming.

14             Sir, were you here the last time?  Did I call your

15   name?  Would you please be good enough to stand up.  Thank

16   you.

17             Your Honor, in addition to the people I have called

18   there are four additional people who are here.  I would ask

19   the Court to take that into consideration in reflecting the

20   love and care that Mr. Washington enjoys which is going to be

21   a factor in the Court's sentencing consideration by virtue of

22   the fact that his -- his people -- his family, his friends,

23   will be there for him upon his release and that is going to

24   be an incredibly important factor when Mr. Washington

25   integrates back into society after the service of his

Statement of Patricia Jones                              29

1    sentence.

2              I know, Your Honor, that Ms. Jones, Mr.

3    Washington's mother, and Ms. Clover, his sister, would like

4    to say something.

5              I would ask Ms. Jones just to step up, ma'am,

6    please, first if you'd like to say something.

7              (Pause)

8              COURTROOM DEPUTY:  Right up here.  Right to the

9    podium.  Just pull the mike down.  I have to swear you.

10             Please -- please state your full name for the

11   record and spell your name for the record.

12             THE WITNESS:  Patricia A. Jones.

13             COURTROOM DEPUTY:  Spell your last name for the

14   record.

15             THE WITNESS::  J-O-N-E-S.

16             COURTROOM DEPUTY:  Please raise your right hand.

17             PATRICIA JONES, WITNESS, SWORN

18             COURTROOM DEPUTY:  Thank you.

19             THE COURT:  Ms. Jones.

20             THE WITNESS:  Good morning, Your Honor.

21             THE COURT:  Good morning.

22             THE WITNESS:  I'm really nervous.  I'm here on

23   behalf of my son.  I'm nervous.

24             THE COURT:  All right.  Take your time.  Take your

25   time.

1            THE WITNESS:  Your Honor, you know, Askia -- Askia

2     haven't been a great son in the world, but I know he's

3     changed and --

4            (Pause)

5            MR. GREENBERG:  How has he changed, Ms. Jones?

6            THE WITNESS:  As far as when he was released from

7     prison the first time he was out doing the right thing.  He

8     was really doing really good.  He had acquired a business of

9     his own.

10           He's good with children taking them to baseball

11    games, you know.  He was doing a lot of good things and how

12    he got caught up in that situation is beyond me.

13           But I know he's been incarcerated for three years

14    and I know in my heart I know he learned and changed.  I know

15    he has.

16           And I'm just asking -- I know he might have do some

17    time, but if you can be as lenient as possible.

18           As far as how far he would be sent away from his

19    family, some of us might not be able to go visit him if he's

20    sent away too far.  He has a grandmother who is older and

21    hasn't seen him in quite some time.  It would really be

22    difficult for her to visit him.

23           I can't think of nothing else.

24           MR. GREENBERG:  Thank you, Ms. Jones.

25           THE WITNESS:  You're welcome.

1         MR. GREENBERG:  Thank you for taking the time.

2         THE WITNESS:  Yes.

3         THE COURT:  All right.  Thank you.

4         THE WITNESS:  Thank you, Your Honor.

5         THE COURT:  Thank you.

6         MR. GREENBERG:  Thank you, Your Honor.

7         May I call Ms. Clover?

8         THE COURT:  Yes.

9         (Pause)

10        THE COURT:  I did read a letter also from Natasha

11   Jones which was attached.

12        I know this is Ms. Clover.  And I did refer to the

13   letter from Rashida Clover and this is Rashida Clover.

14        MR. GREENBERG:  It is indeed, Your Honor.

15        THE COURT:  Right.

16        COURTROOM DEPUTY:  Please state your full name for

17   the record and spell your full name for the record.

18        THE WITNESS:  Rashida Clover, R-A-S-H-I-D-A,

19   C-L-O-V-E-R.

20        COURTROOM DEPUTY:  Please raise your right hand.

21        RASHIDA CLOVER, WITNESS, SWORN

22        COURTROOM DEPUTY:  Thank you.

23        THE WITNESS:  Hi, Your Honor.

24        So, as you know, I sent you a couple of letters in

25   regards to my brother, our upbringing, so I won't bore you

1   with that information again.

2              I did feel that it was important that in addition

3   to what I sent you that you knew what my brother kind of had

4   to go through.  I've been here watching this court hearing --

5   all of these hearings since they started.

6              I've been a part of Askia's life, you know, since

7   we were, you know, kids watching how he's been robbed of

8   everything since he's been a baby.

9              He's been robbed of his father before he could even

10  know his father's name.

11             My mother, and this is not to bring my mother down,

12  or to come at my brother or anybody else because of what they

13  were not able to deal with in their past, but I've been on my

14  own since 12-years-old.

15             As a teenage I had to take care of my brother, my

16  -- his other brother that was not able to be here and my

17  sister as a teenager.  I was not equipped with what I had to

18  take care of though.  I did not have the education to do it

19  and I didn't have the resources to do it.

20             You're sentencing somebody whose been deprived,

21  neglected.  There are days that I had to go and watch him cry

22  because he was hungry which led me to have to get him and

23  take care of them just being a teenager myself.

24             So I know what he's been through and I know why

25  he's angry and I know why he was out here.  My brother has

1   been through hell.  We all have.  There's so much more that I

2   probably can't share here, but he's been through a raw deal.

3           I did not have a lot of time with my brother after

4   he was arrested for years and so the last time that he came

5   out I had three good encounters with my brother.

6           I have since been able to get my education, get the

7   resources that I need, get the people in place that I need.

8   I have a Master's degree.  I'm a clinician.

9           The day that my brother was arrested for the final

10  time that morning I called him as soon as I got up because I

11  was going to have that conversation with him to go back to

12  school and let him know that I would help him with whatever

13  it was he needed because he was trying.

14          He came out and because he knows how I tough I am

15  on them and because he's one of the only men in our family

16  that even my son looks up to I wanted him to make it.

17          So when I got up that morning I called my brother

18  and I didn't get an answer, but I was going to tell him that

19  anything he needed I was going to be there to help him make

20  it.

21          I watched my brother be dragged through this court

22  system, given a raw deal.  Not only was he deprived in not

23  getting what he needed as a kid, but we're taking resources

24  from our communities where we have children who don't have

25  education like my brother.  He's undereducated.  He has no

1    diploma.  He has never had a chance to get one.

2          You take somebody who has lived in poverty with no

3    education, have people from a program or an organization,

4    with degrees, with the resources, that they're using in our

5    communities to pay other drug dealers to find people who are

6    like my brother, who are limited with resources, don't have

7    any education, to entrap them and manipulative them into a

8    situation like this.

9          Now, Your Honor, I'm not going to go through the

10   whole court proceeding because we all were here, but my

11   brother had a drunk attorney who didn't listen to anything

12   anybody was trying to tell him.

13         We heard my brother say on the video that they were

14   showing, I don't even do this.  And when he said that he

15   meant it.  He does not do this.  He's been out of it.  I've

16   been on him.  I have been on him so he does not do it.

17         Half of the proceeding my brother didn't even pay

18   attention because he's undiagnosed with adult ADHD.  He's had

19   it since he's been a kid.  He has not had the resources to

20   take care of that.  He has not had anybody to help him get

21   behavior -- behavioral management treatment or anything like

22   that.

23         I see that he did that in court -- while he was in

24   jail, but had he had all of these resources in place before

25   this happened it would have been more helpful.  That same

1   money that we're paying drug dealers to manipulative people

2   who in their own documents are supposed to be gang members or

3   people who are organized and do these things, that's who they

4   were supposed to be looking for.  That's who they said that

5   they were looking for.  That's what their guideline book says

6   that they're supposed to be looking for.  Not piecing

7   together individuals like my brother who are not out here

8   doing what they're accusing him of doing right now.  They

9   manipulated these boys into doing that.

10          He said he does not do that.  Where in your

11  guidelines does it say once a defendant say they don't do

12  this that you pull away from them, not keep enticing them to

13  keep doing it?

14          So not only he is given -- given an unfair trial,

15  but his drunk attorney failed to object when the jury even

16  came back and asked you what was the definition of

17  entrapment?  He mentioned it.  He was drunk and he was joking

18  about it, but he mentioned it.

19          But they objected to it and you upheld that, but he

20  did mention that and they should have been allowed to hear

21  that.  And if they had been allowed to hear that they would

22  have seen -- because they seen it, just like everybody else

23  that has been watching this -- seen that this is entrapment.

24          Instead of doing this to these uneducated,

25  impoverished boys and men, give that money to somebody that

1   can help them.  Give it to a therapist, a clinician or

2   programs that can help them.  I am willing to open one --

3   anything.

4         20 years?  My brother is already -- he's already

5   spent half of his life in jail.  He knows what that is about.

6   That's not doing anything.  It's not helping him.  It's not

7   rehabilitating him.  It's not helping him.  What he needs is

8   education and an opportunity.

9         Your Honor, I respect anything that you're doing.

10  I respect whatever decision that you make.  I understand that

11  you have guidelines to go by, but in that book I can't

12  imagine that that Guideline book said for this organization

13  to go out and entrap young men who are not organized in

14  organized crime and sentence people for fake drugs and put

15  their own limitations on the amount of the drugs just to give

16  them a maximum 20 years sentence or more.

17        MR. GREENBERG:  Minimum.

18        THE WITNESS:  Minimum sentence.

19        I hardly think whoever created that book meant for

20  this to happen.  I feel like the system is being manipulated

21  by that.  And it's an -- it's embarrassing and it's hurtful

22  because a lot of people are being affected by this.  This is

23  not just my brother.  It's not just about my brother.  This

24  is about a lot of people in our communities that are affected

25  by this.  They really are.  And it's hurtful to sit here and

 1    watch this.  Thank you.

 2              MR. GREENBERG:  Thank you, Ms. Clover.

 3              THE COURT:  All right.  I thank Ms. Clover for her

 4    comments.  Obviously, they're a product of a lot of thought

 5    and a lot of concern.

 6              MR. GREENBERG:  Your Honor, I've been a lawyer

 7    since 1981.  I'm a part of the system.  I have never heard a

 8    more eloquent indictment of the system than what I just

 9    heard.

10              Before I continue with my remarks I just want to

11    point out two things.

12              The fact is that in this courtroom today are

13    members of the community -- our community.  There might be 20

14    of them here.  You took the time to explain to the members of

15    our community what sentencing is about and what the process

16    is about and how it works.  You are to be commended for what

17    you said, so -- to give our community a sense of

18    understanding what the system is.  You represent what's best

19    in the system.

20              I also want to give an acknowledgment to Mr.

21    Astolfi because Mr. Astolfi did a brave thing.  And the brave

22    thing that Mr. Astolfi did was to point out the fact that Mr.

23    Washington's lawyer was drinking on the day of his trial.  It

24    took a lot of courage for Mr. Astolfi to come to this court

25    on the first day of trial and say there's something remiss

1    here.  It took a lot of courage for Mr. Astolfi to go back to

2    his supervisor, bring her to court and confront defense

3    counsel with his drinking.  That took a lot of courage and I

4    think Mr. Astolfi has to be acknowledged for that.

5          But I've got to tell you, with the exception of you

6    and with the exception of Mr. Astolfi's courage in bringing

7    out the fact of Mr. -- prior defense counsel's intoxication,

8    this case is the poster child for what is wrong with the

9    system and why members of our community have no trust in the

10   system.

11         The fact of the matter is, Judge, is that there was

12   no cocaine involved in this case, there was no stash house

13   involved in this case.

14         The only people who are investigated by ATF in

15   connection with stash house robberies where scenarios like

16   this are created are minorities, members of the community who

17   don't have power, members of the community who don't have

18   education and that's just not -- that's just not my opinion.

19   That's the fact that was stated by the ATF agents in this

20   case who told this Court and the jury that of the 13 stash

21   house artificial creations that were investigated by ATF 12

22   involved African Americans and one involved a Hispanic.

23         So the fact of the matter is is that is there any

24   wonder why African Americans and Hispanics might not have

25   confidence in a system that targets them?  I don't want to

1    get into the whole sociological aspect of it, but the fact of

2    the matter is, Your Honor, is that whether or not it deals

3    with crack cocaine and the mass incarceration that flowed

4    from a 10-to-1 ratio or 100-to-1 ratio of crack to power

5    cocaine, there has been a mass incarceration and a focus on

6    minority members of the community that give them reason to

7    mistrust the system and this case is emblematic of that.

8              Ms. Clover is right.  There are real drug dealers

9    out there on the street.  There are real robbers out there on

10   the street.  ATF should be devoting its resources to getting

11   the individuals who actually go out and without any

12   suggestion or without any contrivance actually commit stash

13   house robberies.

14             When Ms. Clover tells this Court that Mr.

15   Washington said, no, she's supported by the trial transcript

16   -- she's supported by the transcript in this case where I

17   direct this Court to page 11 of the March 4th, 2013

18   transcript where Mr. Washington says, I can get it moved, yo,

19   but I don't like fucking with niggers.  See, I don't fuck

20   with coke.  What is he telling the agent?  He's not a drug

21   dealer.

22             Now, yes, he was convicted of attempted possession

23   with the intent to distribute 10 kilograms -- five kilograms

24   or more of cocaine.  Yes, he was convicted of conspiracy.

25   Something that was contrived by the Government where he says

1    he is not involved in it.

2            Is it true that there were words that were said

3    that belied that?  Yes, it is true.

4            Is it technically a crime to talk about that?  Yes.

5            But, Your Honor, is it any wonder why members of

6    our community don't have confidence in the system where they

7    hear Mr. Washington on tape say I don't fuck with coke?

8            We have a system where fortunately lawyers are

9    appointed to represent people who are charged with crimes,

10   but in this case the lawyer was drinking.

11           The lawyer visited his client on a case that was

12   looking at a mandatory 20 years in jail, an enormous amount

13   in jail, and he came to court the first day with alcohol on

14   his breath.

15           Would prepare the case by going down to see him at

16   the FDC on three occasions with alcohol on his breath and

17   just jesting, well, you know, there's nothing wrong with

18   taking a shot at the end of the day.

19           Or telling the supervisor of Mr. Astolfi, yeah, I

20   had one at lunch.

21           What kind of system is that?  Is there any wonder

22   why people don't have confidence in the system?  Or have any

23   confidence in a system where the lawyer who has been drinking

24   brings out from the agent that this man has a prior drug

25   conviction?

1          The Government argues in its memorandum that that

2    was a brilliant move.  Why?  Because if he had a prior

3    conviction -- prior drug conviction that means he didn't have

4    a crime of violence, so, therefore, it was the right move

5    with respect to the Hobbs Act prosecution.

6          But that brings me to the second point.  The fact

7    of the matter is is that it's the drug statute that is

8    driving this case, not the Hobbs Act statute.

9          He's looking at a mandatory minimum sentence of 20

10   years in jail based upon the drug statutes and only a maximum

11   of 20 years in jail with respect to the Hobbs Act.

12         So as a practical matter the most disastrous thing

13   the other lawyer could have done is to bring out the fact

14   that Mr. Washington had a prior drug conviction which could

15   only be used by the jury to show propensity on behalf of Mr.

16   Washington to be involved in drugs and sure enough the man

17   was convicted of two drug counts and now faces 20 years in

18   jail minimum.

19         What does that tell you about how certain members

20   of our community feel about the system?  I dare say it only

21   justifies and verifies their skepticism of fairness in the

22   system with respect to them.

23         It's a disgrace that this man had to go to trial

24   with a lawyer who was drinking.  Now, he might not have been

25   drunk and maybe there wasn't this prejudice that was

1   established, but it sure doesn't make the system look good,

2   does it?  And now he's facing a Guideline sentence of 30 to

3   life.  30 years to life.

4           And the thing that is so -- another example of what

5   is wrong here is that one of the predicate offenses that the

6   Court told this community is that Mr. Washington is looking

7   at 30 to life because he's a career offender by virtue of

8   that aggravated assault conviction.

9           The members of this community should know that Mr.

10  Washington was convicted of felony in the second degree

11  aggravated assault which is less serious than felony of the

12  first degree aggravated assault.

13          The members of this community should know that if

14  Mr. Washington had been convicted of felony of the first

15  degree aggravated assault he would not be facing a career

16  offender designation.

17          It is only because he was convicted of a less

18  severe offense of felony second degree aggravated assault

19  which does not have a recklessness component to it is he

20  facing 30 to life.  So is it any wonder that the members of

21  our community don't have trust in the system?

22          THE COURT:  I know, Mr. Greenberg, you've -- you've

23  pointed out in your third supplemental sentencing memorandum

24  that had he been convicted of the first degree aggravated

25  assault --

1          MR. GREENBERG:  He would not be a career offender.

2          THE COURT:  -- he would not be a career offender

3    and his Guideline then would be 235 to 293 months.

4          MR. GREENBERG:  Correct.

5          THE COURT:  Which would be a Criminal History

6    Category V and an offense level of 34, but go ahead.

7          MR. GREENBERG:  You're absolutely right.

8          Not only that, Your Honor, but who was the leader

9    of this particular enterprise?  It was Dwight Berry.  And

10   what did Dwight Berry get?

11         Dwight Berry was the one who was in contact with

12   the confidential informant.

13         Dwight Berry was the one who was in contact in

14   negotiating with the undercover agent.

15         Dwight Berry was the one who supplied the weapons

16   for the particular day in question, March 15th.

17         Dwight Berry was a ring leader.

18         And what did he get?  This Court gave him 15 years

19   in jail.

20         This man's looking at 30 to life.

21         Is there any wonder why our community questions the

22   legitimacy of the system?

23         Not only that, but every defendant who was

24   convicted in this case through their plea of guilt was

25   convicted of a firearm offense, a 924(c) offense, everyone of

1    them, including Mr. Berry.

2              Mr. Washington, by contrast, was acquitted of the

3    924(c) offense and this Court has already made a

4    determination on the record that the Government hasn't proven

5    by a preponderance of the evidence that he knew that there

6    was a gun in those cars.

7              Now, he's still looking at 30 to life even though

8    the ring leader in this case who was involved with the guns

9    and suppling the guns only got 15 years.

10             And I just want to take the time to remind myself

11   as to what the actual sentence was with Mr. Berry.  Mr. Berry

12   got 180 months incarceration.  He got 90 months on Counts 1

13   through 4 and a consecutive 90 months on Count 5, the 924(c)

14   count.

15             THE COURT:  Say that again.

16             MR. GREENBERG:  Mr. Berry got a total of 180 months

17   in this case.  A total of 15 years.  Of that 15 years, 90

18   months or seven a half years was on Counts 1 through 4 and 90

19   months on Count 5.

20             THE COURT:  Again, that was a -- he pled guilty.

21             MR. GREENBERG:  He did.

22             THE COURT:  He didn't go to trial.

23             MR. GREENBERG:  And did not cooperate.

24             THE COURT:  He didn't cooperate.  And that was a

25   negotiated guilty plea with the Government.  That was an

1    agreed upon sentence.

2                MR. GREENBERG:  And -- and which this --

3                THE COURT:  And the Court has to make a decision in

4    that under the law as to whether or not it's in the interest

5    of justice to accept that guilty plea.

6                MR. GREENBERG:  And you decided it was and they

7    decided in the first instance that that's all this case

8    warranted with respect to Dwight Berry which was 90 months on

9    the substantive counts.

10               They're now going to come up and tell you, because

11   Mr. Henson has already told you he's going to tell you, that

12   we're looking for 360 months minimum, which is 270 months

13   more than Mr. Berry got for being the ring leader here.  For

14   being the one with the guns.  For being convicted of the

15   guns.  Is it any wonder why members of our community don't

16   have confidence in the system?

17               Look, you're a man of the law.  You heard Ms.

18   Clover say that she respected you.  You heard Ms. Clover be

19   here and has seen the way you have comported yourself.  She

20   lauded you.

21               You have an opportunity here, Your Honor, to make

22   sure that the system, even though it deserves indictment in

23   this case, does not run totally amok.

24               You have a chance to sentence Mr. Washington to 240

25   months which is the mandatory minimum 20 year sentence.

1          And even I would say to you, Your Honor, that

2     that's greater than necessary to achieve the purposes of

3     Section 3553(a) because isn't that what the purpose of

4     sentence is, to give a sentence that is sufficient, but not

5     greater than necessary to achieve the purposes of the

6     Sentencing Act?

7          I just want you to think in the back of your head

8     when Mr. Henson gets up here and starts swinging for the

9     fences about sending this man -- man to jail for 30 years

10    that his office made a decision to send the ring leader of

11    this jail -- of this -- of this case to jail for only 90

12    months on the counts of conviction that Mr. Washington was

13    found guilty of.

14         I say to you, Your Honor, you have a chance to

15    prevent an egregious -- extra egregious travesty in this case

16    by sentencing Mr. Washington to any more than 20 years in

17    jail.

18              THE COURT:  Mr. Henson.

19              MR. HENSON:  Your Honor, please.  You've heard two

20    impassioned arguments and I will not be swinging for the

21    fences.  I'm asking for a Guideline sentence.

22         As Your Honor pointed out the Guidelines have

23    decades of experience behind them.  They've been modified

24    over time.  They've been correctly calculated in this case

25    and permit a sentence of life imprisonment.  We are not

1   swinging for the fences.

2           We are asking, as we ordinarily do, in cases in

3   which the defendant insists on going to trial and the whole

4   of his conduct is at issue that the Court impose a Guideline

5   sentence.  We're not asking for a life sentence.  We're not

6   asking for a sentence above 360 months.

7           Let me address, first, the nature of the

8   investigation.

9           My experience too in the justice system goes back

10  some years.  It began in 1968 when I was an intern for the

11  Law Student Civil Rights Research Council.  It has been in

12  Philadelphia.

13          Since I began observing closely our justice system

14  we have failed repeatedly to protect the people who are the

15  victims of home invasions.  These are not privileged people.

16  These are not people who have high degrees.  These are people

17  who are especially vulnerable and a system which has unjust

18  acquittals or is unable to convict and punish those who

19  offend against our weakest and least protected is failing and

20  that is where the civil rights violation is.

21          Those of us with experience in the justice system

22  on both -- in Philadelphia on both the defense side and

23  prosecution side and in the agencies have learned over this

24  time that there is a special difficulty with these home

25  invasion robberies.

1          We, a decade ago, adopted numerous firearms cases

2   because local authorities were unable to prove the home

3   invasion in which the firearms were used.

4          Over time ATF, by the book, has responded to this

5   inadequacy of our justice system by the investigations, one

6   of which is before Your Honor and by a series of prosecutions

7   of home invasions that have been developed in other ways.

8          For example, a number of those were developed

9   because, unlike Mr. Washington, home invaders, drug stash

10  house robbers, agree to cooperate and make historical cases

11  of home invasion robberies in which they participated before

12  they agree to participate in the sting operations.  The

13  investigation was a righteous one.  It was conducted by the

14  book.

15         I had the opportunity in arguing <u>Whitfield</u>, which

16  is a Third Circuit case, to consider these stings, to read

17  all of the cases nationwide.

18         I am proud of what ATF here did.  I honor the

19  agents who were responsible for the investigation.  They did

20  not violate any policy.  They did not commit any kind of

21  invidious discrimination.  They undertook the prosecution of

22  people who had impunity before they began these

23  investigations.

24         And to accuse Agent Edwards of being a race-based

25  bigot is a canard and a calumny and it cannot be the basis

1    for sentencing this defendant.

2              You've heard emphasized that this defendant was no

3    drug dealer.  He was involved in this because he was a gun

4    totter as his criminal record shows and as Berry said.

5              He said Washington has a gun and puts in word.

6    This is referring to paragraph 14 of the presentence

7    investigation report.

8              And Washington himself -- himself said, I'm walking

9    in with my gun out.  This man is here because of his

10   willingness, demonstrated again and again, to use guns in a

11   violent way.

12             At the age of 21 he was convicted and he's still on

13   parole for having fired three shots from a firearm at a

14   complainant.

15             This is not a person who is privileged.  This is

16   not a person who doesn't require the justice system to step

17   up and provide the protection that she can't afford without

18   the justice system.

19             He fired three shots at Pamela Jones and he was

20   still on parole for that.  This is how much he learned about

21   his own responsibility.

22             His aggravated assault conviction, yes, it was an

23   F2, but what did he did -- do?  He had fired a gun which

24   brought the police to him.  He hid the gun in the glove box

25   and then he attempted to drive over the policeman.  He is a

1    career offender in the most just way.

2              And, finally, with 21.5 grams of crack he is armed

3    as a drug dealer and is convicted of that offense.

4              I understand why the sentence that is required, 240

5    months, might be considered harsh by those who have love for

6    this defendant, but he has the advantage of that love and he

7    has betrayed them just as he betrayed our society and our

8    justice system by this repeated gun toting criminality.

9              So we have someone who is justly, firmly within the

10   career offender category.  He is not a victim.  He stood into

11   a sting operation because he was known as and had

12   demonstrated himself to be somebody willing to use a firearm

13   violently.

14             Finally, all of these things point to a need for

15   the general deterrent affect of a sentence in this sort of

16   case because these schemes are so difficult to uncover and

17   when they are uncovered so difficult to prosecute it is

18   especially important that the justice system demonstrate by

19   not a harsh sentence, but a Guideline sentence, that this

20   conduct will not be tolerated when it is prosecutable.

21             We are asking not for vengeance, not for the

22   punishment of somebody who is without family support.  He

23   himself, as the presentence investigation shows, commended

24   his mother for the efforts she made on his behalf to civilize

25   him and make him someone worthy of respect.

1            He has betrayed his family as well as the justice

2    system.  And the justice system in the investigation and in

3    Mr. Astolfi's conduct of this prosecution has been by the

4    book and appropriate and has done nothing that should

5    mitigate his sentence.  Thank you.

6            THE COURT:  Mr. Greenberg, do you have anything

7    further before I address Mr. Washington and ask him if he has

8    anything to say on his own behalf?

9            MR. GREENBERG:  I do not, Your Honor.

10            THE COURT:  All right.  Mr. Washington, do you have

11   anything you want to say to the Court before I sentence you?

12            THE DEFENDANT:  Yes.

13            (Pause)

14            MR. GREENBERG:  Your Honor, before -- the answer is

15   I do have something I'd like to add and then Mr. Washington

16   can allocute.

17            As the Court may know there is a case in front of

18   the United States Supreme Court called the Taylor case and

19   that case involves whether or not in a Hobbs Act prosecution

20   stash house robberies would qualify to meet the threshold for

21   affecting interstate commerce.  That case has not yet been

22   decided.

23            Whatever that case -- impact has on Mr.

24   Washington's case we just wanted to -- the Court to know that

25   that case is out there.  It may or may not have an impact on

1    Mr. Washington's case.  He wants to avoid a situation where

2    it might by him not mentioning it to the Court might waive

3    any consideration of it at some future time, so we're just

4    bringing it to the Court's attention.

5              THE COURT:  All right.  I understand.  Okay.  But

6    until the U.S. Supreme Court makes a decision it's -- it's

7    not the law, but I understand that that decision is pending.

8              Mr. Washington, I'll hear from you.

9              THE DEFENDANT:  Yes.

10             THE COURT:  If you could speak into the mike.

11             THE DEFENDANT:  I want to apologize to my family

12   first and foremost, the Courts and the victims that never was

13   going to be.  There was never gonna be a victim in this case.

14   I'm the victim.

15             And he brought up to the Court's attention about

16   how many operations that they ran, none of them was White.

17   None of them.

18             And you only use the minority areas to do these

19   sting operations.  There's not one case in America that you

20   can say you went to the suburban area and target any of them.

21   Anybody with a meth lab or any type of pills or anything.

22   They only came to our neighborhoods.

23             Why is that?  He said he wasn't biased.  I can't

24   tell.  The numbers show.  There's not one White person got

25   charged for this.  I've got 25 -- a motion with 25 White

Statement of the Defendant                          53

1    brothers that got wrong robberies, home invasions,

2    kidnapings.  Third Circuit, et cetera.  None of them was

3    targeted.  Not none -- none of them.  And they're back and

4    forth in and out of jail.

5            I never robbed nobody in my life.  I sold drugs.

6    And he mentioned Pamela Anderson.  That was a made-up case.

7    I didn't do nothing to her, but it's just a fact that you

8    think you know me.

9            THE COURT:  Was that Pamela Jones?

10           THE DEFENDANT:  Pamela Jones.  I don't even know

11   this lady.  It wasn't -- I took a deal.  I was a kid.  18

12   months probation.  If I shot at her don't you think I would

13   have went upstate prison for shooting at a female?

14           But he knows me?  You don't know me.  I didn't hurt

15   you.  I hurt my family.  Of course I did.  But this case

16   never was going to be.  There was never going to be no drugs

17   sold.  I don't even sell drugs.

18           I do pest control.  That's what I do.  I don't sell

19   no drugs.  That was a skit.  This whole case was a -- it was

20   a movie skit and they found characters to play.

21           And they paid a confidential informant to go out to

22   Black neighborhoods and get paid whatever they get and to set

23   you up for no jail time.

24           Why not set people up with jobs?  Why you got to

25   set people up and take them away for nothing?  For nothing

1    that never was going to happen.  Berry don't rob nobody.

2    That other guy, I don't know them other guys, but they don't

3    rob nobody.  They came to -- came to this guy with a $600 an

4    hour payout.  Who's not going to take it?

5              He mentioned the <u>Whitfield</u> case.  A CO jumped on

6    that case -- his correction officer.  He took the bait at a

7    $600 an hour payout.  Who wouldn't do it when you're broke?

8    You come from a broke home.

9              I took care of my little sisters and everything

10   when I was a kid myself too.  She ain't mention that part,

11   but I did by any means.

12             I didn't grow up with no father, but I ain't use

13   them for no excuse.  I was a man when I was 13-years-old.

14             When I went upstate prison I never got in trouble.

15   Had a thousand certificates.  No write-ups.  No nothing.

16             Since I've been in FDC 39 months no write-ups.

17   Never been in the hole.  Never seen a hole in my life since

18   I've been incarcerated.

19             I made this decision to take care of my family, but

20   you see nothing was to happen.

21             Judge Irenas, Third Circuit, he passed, may he rest

22   in peace.  He sentenced somebody I know, a friend of mine,

23   Terrence Hardy, eight years.  He was a career offender.  360

24   months to life they all -- they was trying to give him.  He

25   went to trial.  No 924(c) or 922 (g).  He won the same charge

Statement of the Defendant                         55

1    as me.  Record way worse than mine.  He got eight years.

2    Eight years imprisonment.  Third Circuit.

3              THE COURT:  Did he have the drug convictions?

4              THE DEFENDANT:  Yes, he did.

5              THE COURT:  With mandatory minimum?

6              THE DEFENDANT:  It's right here.

7              THE COURT:  With mandatory minimum?

8              THE DEFENDANT:  Yes.  He sentenced him to eight

9    year imprisonment.  Same case.  Same scenario.  Only thing

10   they had a White CI instead of a Black one on their case and

11   that was in Jersey.

12             I'm pretty sure you seen the -- and I sent you this

13   motion which Mr. Jarvis failed to submit anything that I

14   asked him to do.  I asked him to put in a sentence on

15   entrapment.  The jury instructions.  He never put them in.

16   He did nothing I asked him to do.

17             I sent him stuff and he would bring it to me and

18   open it in front of me in the FDC.  He never was going over

19   my case.

20             Somebody else just fired him that had -- that had

21   him too.  He got the drinking problem.  They just took him

22   off the case.  He messed my case up.

23             I wanted to get on the stand, but he opened the

24   door already when he brung up my drug history, so he let the

25   jury know that I had a drug conviction, so it basically made

1    me look like I still sell drugs.

2              Then he brought up the fact that Rock, the CI that

3    didn't come to testify, something happened to him and he knew

4    that, but he brung it to the jury attention that he was shot

5    at.  He was shot at.  I'm in prison.  He been shot at, so his

6    family moved again and they're getting threats.  He made it

7    look like it came from me when he set up at least 10 other

8    crowds, so he made me look bad in court.

9              I ain't the bad guy in this.  I did choose to

10   cooperate and -- and take -- partake in a crime that wasn't

11   going to happen, but when I said that I don't do robberies or

12   sell drugs they were supposed to let me go right there.

13             And they made a -- he made a -- the UC made a call

14   and asked Muff, what's up with the tall boy?  He don't do

15   robberies?  No, he don't do no robbery put in word.

16             Berry is younger than me.  I grew up with his

17   brothers and his cousins.  He never seen me do nothing or

18   even hold a gun in his life, so that was -- he was just

19   talking so he can get the job.  That's all he was doing.

20   That's all everybody on the case was doing.  They was hungry.

21   Every last one.  Even the one's who cooperated.  They don't

22   know me, but they cooperated so they could less time as they

23   can.

24             And here I go.  They threatened me to take a deal

25   or they was going to 851 me, so that's why I'm a career --

1    that's why they put the career offender in -- in the motion

2    because I operated my rights and went to trial.

3              So I just want to say at the end of the day I can't

4    clean up spilled milk, but there's going to be a second

5    trial.  That's all I have to say.

6              THE COURT:  Does anyone else have anything they

7    want to put on the record at this point?  Mr. Henson?

8              MR. HENSON:  No, Your Honor.  Thank you.

9              THE COURT:  Mr. Greenberg?

10             MR. GREENBERG:  No, Your Honor.

11             THE COURT:  All right.  The Court will adopt the

12   factual statements and the new Guideline findings and the

13   Guideline applications as contained in the presentence report

14   and take all that information into account in determining

15   what's an appropriate sentence.

16             I've also considered the arguments of counsel which

17   have been, both sides, quite eloquent, quite compelling.

18             I've considered what Mr. Washington has just said

19   and the testimony of his mother and sister who were also

20   quite eloquent and certainly speaking from the heart.

21             And I also note the presence of so many relatives

22   of Mr. Washington and friends in court, his stepfather too.

23             And it seems to me, Mr. Washington, despite the

24   condition he finds himself in, is -- certainly has a lot to

25   be thankful for.

The Court - Decision                               58

1           I've seen many cases where people who are in this

2    situation the family doesn't give the kind of support that

3    one deserves and everyone is to be commended here for being

4    so supportive of Mr. Washington.

5           And I realize, and I know Mr. Washington realizes,

6    that despite what he says about how he was prosecuted just by

7    showing up he let his family down to some extent and you

8    didn't want to let your family down and you didn't want to

9    let your mother down.

10          And certainly your sister has been a rock in your

11   family that is amazingly commendable -- quite commendable.

12          So I -- what I see in front of me are a lot of good

13   people that have questions, perhaps can't understand what's

14   going on to some extent and it's -- it's understandable.

15          I will say that this case does involve an element

16   of distribution of drugs.  As much as it appears more to be

17   about a robbery or a home invasion it does involve an element

18   of distribution of drugs certainly from the evidence I've

19   heard in this case and I presided at the trial.

20          Mr. Washington would know that had there been drugs

21   and had it been seized as a result of this robbery that those

22   drugs would have been sold to somebody else perhaps in

23   quantities and those drugs would have been distributed on the

24   streets of our communities -- Philadelphia and other

25   communities.

The Court - Decision                                    59

1         And we all know, and it's well documented, as to

2    the affects of drugs on society.  Families are broken, people

3    are destroyed, lives are destroyed when people get addicted

4    and abuse drugs.

5         I know I see a lot of wonderful people in this

6    courtroom perhaps in their teenage years or in their 20's,

7    maybe in their 30's.  I know Mr. Washington would not want to

8    see one person in this courtroom become a drug abuser.  I

9    know there's some history of drug abuse in his family.  It --

10   he knows first -- firsthand what the affects of drug abuse

11   are.

12        But yet I get many cases in front of me where

13   defendants are involved in the distribution of illegal,

14   illicit drugs.  They wouldn't want their own family to -- to

15   use it, but it's okay for it to be distributed on the streets

16   to other people and other families, even to teenagers and who

17   know who else.

18        Drugs are a very serious problem in this society.

19   We haven't solved it by any means.  I don't know what the

20   future holds about it, but certainly to obtain drugs for re-

21   distribution through robbery of other drug dealers who might

22   have a stash house is not something that law enforcement --

23   you've heard Mr. Henson speak -- will accept.

24        Certainly there's arguments on both sides of the

25   equation as to whether or not these kinds of sting operations

1   are acceptable.  As a Judge I have to follow the law.  I'm

2   not here to sit in judgment of certain prosecutorial tools.

3   If people have complaints about that then perhaps coming to

4   the Executive branch of Government or the Legislative branch

5   of Government and voicing concerns might be appropriate.

6           As a Judge in a District Court we have -- we have

7   to follow the law and thus far from my perspective the law

8   has allowed the Government -- permitted the Government to

9   investigate crime using these kinds of sting operations.

10          Mr. Washington walked into it from the evidence

11  voluntarily despite the -- what was dangling in front of him.

12  I heard the tape recordings that were made and I heard the

13  evidence, as did the jury, and the jury returned a verdict.

14          And as a Judge on the trial while I am bound to --

15  by the jury's verdict, I can't substitute my notion of guilt

16  or innocence for what the jury has found and the jury has

17  found that a certain quantity of drugs was involved in this

18  case and they found Mr. Washington guilty of these crimes.

19          I have done my levelheaded best to follow the law.

20  If there are disagreements, obviously, Mr. Washington can

21  pursue appeals to the United States Court of Appeals for the

22  Third Circuit which we all expect, but I've done my

23  levelheaded best to make sure he gets a fair trial and that

24  the law is followed.

25          Be that as it may, I want to refer and do what I

1    have to do and that is to consider the -- the factors that I

2    have to consider.

3              I have to consider the nature and circumstances of

4    the offense.  This offense involved four individuals who

5    conspired to rob what they believed would be a location where

6    quantities of drugs would be found.

7              On the tape recordings they obviously knew they'd

8    have to use drugs (sic) to perpetrate the crime because the

9    persons in the stash house purportedly had firearms too to

10   protect what they were holding.  This is a serious offense

11   under any circumstances and I have to consider that factor.

12             I also have to consider the history and

13   characteristics of Mr. Washington.  Mr. Washington is 36

14   years of age.

15             I accept what his sister said so eloquently about

16   their upbringing.  Based upon what's in the presentence

17   report she has described the family situation accurately.

18             I -- I realize the deprivations that Mr. Washington

19   had growing up, as did his two sisters and a brother, and

20   certainly all of us wish it were otherwise.  People should

21   have loved ones who are there for them, should have the

22   ability to be afforded a decent education.

23             If they're having a mental or emotional problem

24   should be able to get the kind of professional help that

25   would guide them so that they can achieve educational,

1    occupational, statuses in life so that they can be productive

2    citizens.   Everyone should be a productive citizen and,

3    unfortunately, in some situations that doesn't happen.

4           Certainly from what I can say -- see Mr. Washington

5    is a classic case study on how a person can go wrong and not

6    respect the law based upon the fact that his father I believe

7    was shot and killed at a very early age in his life or

8    probably I think before he was even born if I'm not mistaken,

9    but I could be wrong on that regard, but it was in his very

10   young life.

11          His mother who I really credit for having the

12   emotional makeup to come before the Court today to speak on

13   his behalf her -- herself has a history of abusing drugs.

14          Certainly his sister moved out of the house in

15   order be in a better environment and Mr. Washington had

16   tremendous responsibility for his family even as young as age

17   13.

18          Mr. Washington, I -- I realize to a large extent

19   what influenced you, what brought you here, but I do note

20   that there are so many loved ones here that it's just a -- a

21   very wonderful thing for a Judge to see.

22          And as far as I'm concerned I can only hope that in

23   the future when you're released from custody that your being

24   -- wanting to be with the loved ones given what you've been

25   through not only in this case, but in many other cases in the

1    criminal justice system, will compel you not to violate the

2    law again, but that's going to be up to you -- that's going

3    to be up to you.

4                You did not have to be where you were on the date

5    of your arrest and on prior occasions when you went with Mr.

6    Berry.  You made your own choice to be there and those are

7    the choices that have resulted in you being in court today

8    for sentencing.

9                I do know that you have four prior convictions and

10   you have served -- served time in the past.

11               You have a revocation of probation at -- at age 21

12   that you were sentenced to two to four years imprisonment.

13               Age 23, 12 to 24 months imprisonment.

14               Age 24, three to six years imprisonment.

15               And at the time you committed -- or were involved

16   in the instant offense you were still on State parole so that

17   it's difficult to believe that even if I had the authority to

18   release you tomorrow that the first thing you would probably

19   try to do was possess a firearm and/or somehow think that by

20   selling drugs you can put money in your pocket.  Actions

21   speak louder than words.

22               And in this case it's -- as difficult as the

23   parties here see this conviction there is a danger here that

24   you would engage in that kind of conduct.

25               The Court notes that you don't have a high school

1    education.  I am going to recommend to the United States

2    Bureau of Prisons that you receive and participate in

3    whatever programs are available to help you get a GED degree

4    and take your education further.

5              I'm also going to recommend to the United States

6    Bureau of Prisons that you get mental health counseling.  The

7    -- somebody said you had some deficit in that regard here

8    today in court.

9              And I'm most pleased that you took a course in

10   anger management while you were at the FDC, the Federal

11   Detention Center, but you can take it another step, notch it

12   up and try to understand more about yourself and what made

13   you show up on those occasions in this case and that has

14   brought you to court today.

15             You didn't report any history of -- of medical

16   disorders, although you do have an occasion where you were

17   shot in the right forearm in 1997/1998.

18             And you were involved in a serious motorcycle

19   accident in 2011.

20             The -- again, I note your -- your presentence

21   report says you didn't report a history of diagnosed mental

22   illness or treatment, but I believe it was your sister that

23   did -- did state you had some mental health deficit that

24   should be dealt with.

25             I note that there is some indication, not a lot, of

1   abuse of controlled substances.  And the presentence report

2   says while you have not received any drug treatment in the

3   community you did participate in a therapeutic community

4   program while incarcerated at Chester County.  But I think

5   you have to take that also a further step and I'm going to

6   recommend that you participate in the -- any drug treatment

7   the Bureau of Prisons will afford you.

8            The United States Bureau of Prisons has very

9   professional counselors in all these areas to try to help

10  people and -- but the degree of success depends upon the

11  person who participates in the program.  So I'm hoping that

12  you are motivated, despite what you say about this case and

13  despite other things that may be going on in his life, to

14  participate in -- in these programs.

15           You do have a history from what I can see of good

16  conduct and participating in programs while incarcerated and

17  I have every -- every indication from that that you will take

18  it a step further and get whatever counseling is necessary in

19  the areas I've discussed.

20           The Court also has to take into account other

21  factors in imposing a sentence sufficient, but not greater

22  than necessary, to comply with the provisions of the

23  Sentencing Act.

24           I have to consider the need for the sentence to

25  reflect the seriousness of the offense.  In my opinion to a

1   large extent we're already there with it, 20 year mandatory

2   minimum, but these offenses are serious and there has to be a

3   sentence on the robbery counts too.

4           The Court also has to impose a sentence that

5   promotes respect for the law.

6           For a long time, or at periods in Mr. Washington's

7   life, he did not respect the law and he was brought to court

8   and involved in the criminal justice system, but he and

9   others have to know by the sentence that respect for the law

10  is required.

11          Also the Court has to consider the need to afford

12  deterrence not only to Mr. Washington, but to other people --

13  to deter other people from engaging in the same kind of

14  conduct.

15          I also have to consider the need to protect the

16  public from further crimes by the defendant and certainly the

17  period of incarceration, plus 10 years supervised release,

18  will achieve that.

19          I also have to consider the need to provide the

20  defendant with educational, vocational training and other

21  correctional treatment in the most effective manner and I've

22  already discussed the kinds of programs I'm going to

23  recommend to the United States Bureau of Prisons.

24          I also have to consider the kinds of sentences

25  available.

The Court - Decision                                67

1          I need to make sure that incarceration, obviously,

2     is warranted here.

3          And I also have to consider the ranges recommended

4     in the Sentencing Guidelines.  We have Guidelines here of 360

5     months to life.

6          In my opinion those Guidelines are higher than

7     would be necessary to impose a sentence sufficient and -- but

8     not greater than necessary under the circumstances so that a

9     variance is warranted based upon everything I've learned

10    about Mr. Washington's family life and the presence of so

11    many friends and family in court and the support he has and

12    the letters I've received.

13         And from what I can see his willingness in prison

14    to engage in programs that would afford him to be a better

15    person.  I think all of that is most commendable.

16         I also have to consider any pertinent policy

17    statements issued by the Sentencing Commission, but I don't

18    see any of them applying.

19         And I also have to consider the need to avoid

20    unwarranted sentence disparities among defendants with

21    similar records who have been found guilty of similar

22    conduct.  In many ways the Guidelines tell us what those

23    should be.

24         And I note another reason for a variance and that

25    is what Mr. Greenberg has brought to my attention with

The Court - Decision                                    68

1   respect to what the Guidelines would be had Mr. Washington

2   been convicted of first degree aggravated assault the

3   Guidelines would be lower than they are now.  Not

4   significantly lower, but lower than they are now, but he was

5   convicted of second degree felony aggravated assault.

6        And I note that there has been no substantive

7   challenge for what Mr. Greenberg has brought to my attention,

8   but we do try to treat people fairly under the law and this

9   is apparently a dichotomy that exists in the law.

10       I also have to consider the need to provide victims

11  with restitution, but there is no need for that.

12       Having said everything I've said I am prepared to

13  impose sentence.  And, again, I have no choice with respect

14  to that mandatory minimum sentence.

15       Pursuant to the Sentencing Reform Act of 1984 it is

16  the judgment of the Court that the defendant, Askia

17  Washington, is hereby committed to the custody of the Bureau

18  of Prisons to be in prison for a term of 24 months on each of

19  Counts 1 and 2 to be served concurrently to each other and a

20  term of 240 months on each of Counts 3 and 4 to be served

21  concurrently to each other, but consecutively to the term

22  imposed on Counts 1 and 2 to produce a total sentence of 244

23  months.

24       Upon release from imprisonment -- I'm sorry 264

25  months.  Upon release from imprisonment the defendant shall

1   be placed on supervised release for a term of 10 years.  This

2   term consists of three years on each of Counts 1 and 2 and 10

3   years on each of Counts 3 and 4.  All such terms shall be

4   served concurrently to each other.

5          Within 72 hours of release from the custody of the

6   Bureau of Prisons the defendant shall report in person to the

7   Probation Office in the district to which the defendant is

8   released.

9          While on the supervised release the defendant shall

10  not commit another Federal, State or local crime.

11         Shall be prohibited from possessing a firearm or

12  other dangerous device.

13         Shall not possess an illegal controlled substance.

14         And shall comply with the other standard conditions

15  that have been adopted by this Court.

16         The defendant must submit to one drug test within

17  15 days of commencement of supervised release and at least

18  two tests thereafter as determined by the probation officer.

19         The defendant shall cooperate in the collection of

20  DNA as directed by the probation officer.

21         In addition, the defendant shall comply with the

22  following special conditions.

23         The defendant shall provide the U.S. Probation

24  Office with full disclosure of his financial records to

25  include yearly income tax returns upon the request of the

1    U.S. Probation Office.

2              The defendant shall cooperate with the probation

3    officer in the investigation of his financial dealings and

4    shall provide truthful monthly statements of his income.

5              The defendant shall be -- is prohibited from

6    incurring any new credit card charges or opening additional

7    lines of credit without the approval of the probation officer

8    unless the defendant is compliance with a payment schedule

9    for any fine obligation.

10             The defendant shall not encumber or liquidate

11   interest in any assets unless it is in direct service of the

12   fine obligation or otherwise has the express approval of the

13   Court.

14             It is further ordered that the defendant shall pay

15   to the United States a fine of $1,500.

16             The Court finds that the defendant lacks the

17   ability to pay a fine within the Guideline range.  There is a

18   Guideline range for the fine which is much, much higher.  The

19   fine is due immediately.

20             It is recommended that the defendant participate in

21   the Bureau of Prisons Inmate Financial Responsibility program

22   and provide a minimum payment of $25 per quarter towards the

23   fine.

24             In the event the fine is not paid prior to the

25   commencement of supervision the defendant shall satisfy the

1    amount due in monthly installments of not less than $50 to

2    commence 30 days after release from confinement --

3    confinement.

4          The defendant shall notify the United States

5    Attorney for the district -- this district within 30 days of

6    any change of mailing address or residence that occurs while

7    any portion of the fine remains unpaid.

8          It is further ordered that the defendant shall pay

9    to the United States a total special assessment of $400 which

10   shall be due immediately.

11         I'll recommend to the United States Bureau of

12   Prisons that Mr. Washington be afforded educational

13   opportunities and -- and drug and mental health treatment.

14         That is the sentence of the Court.

15         I've also considered in terms of a variance the

16   sentence imposed on Mr. Berry of 15 years and, again, the

17   other factors that I mentioned here.

18         Is there anything -- any questions about the

19   sentence of the Court?

20         MR. HENSON:  No, Your Honor.

21         MR. GREENBERG:  No, Your Honor.

22         THE COURT:  All right.  Mr. Washington, you have 14

23   days to appeal the sentence either -- either from today or

24   when the judgment is filed in your case.  The judgment is the

25   sentence reduced to writing that I just imposed.

1            The -- the -- probably the judgment will be filed

2       if not today or by tomorrow, so you have 14 days from then to

3       file -- file the notice of appeal to the United States Court

4       of Appeals to the Third Circuit.

5            And if you can't afford to pay the filing fee let

6       the Clerk of the Court know and the Clerk will file the

7       notice of appeal on your behalf.

8            And, Mr. Greenberg, you remain in the case, so I

9       don't know whether you'll be filing the notice of appeal.

10           MR. GREENBERG:  Your Honor, you were thoughtful

11      enough to appoint me counsel to represent Mr. Washington

12      under the Criminal Justice Act.  I think my obligation

13      pursuant to local rules in the Third Circuit requires me to

14      continue my representation of Mr. Washington.

15           I can assure the Court that consistent with my

16      responsibilities I will file a notice of appeal within 14

17      days of the date the judgment is entered.

18           THE COURT:  All right.  All right.  Anything

19      further?

20           Why don't I do this?  Let me -- do you want me to

21      recommend a place of incarceration?

22           MR. GREENBERG:  Your Honor, the answer is yes,

23      within close proximity to -- in Pennsylvania ideally.  I know

24      the Bureau of Prisons has a policy of incarcerating people

25      within 500 miles of where they reside, but I think in this

1   particular case I think the recommendation by Your Honor that

2   maybe the incarceration take place in Pennsylvania would be

3   that much more helpful.

4              THE COURT:  I'll recommend to the U.S. Bureau of

5   Prisons that Mr. Washington be incarcerated at a Federal

6   institution as close to the Philadelphia area as possible,

7   all right, where his home is.

8              THE DEFENDANT:  Thanks.

9              THE COURT:  Okay.

10             MR. GREENBERG:  Yes, Your Honor.

11             THE COURT:  All right.  Anything further?  Ms.

12  Gallagher wants to point out here's a notice of forfeiture.

13             Is there -- the Government has -- I don't think

14  anything -- I don't know if anything was filed?  But there's

15  a notice of forfeiture attached to the indictment with

16  respect to forfeiting the firearms that were seized, the

17  Hi-Point gauge P45, .45 caliber semi-automatic pistol with

18  serial numbers given and the Chester Arms revolver, .38

19  caliber revolver.

20             MR. HENSON:  Yes, Your Honor.  We would ask for

21  that order in this case as it's been entered with respect to

22  each of the defendant's charge.

23             THE COURT:  Okay.  Is there any objection to the

24  forfeiture?

25             MR. GREENBERG:  No, Your Honor.

1           THE COURT:  All right.  So why don't you file the

2    appropriate papers.  I'll order the forfeiture of those

3    firearms.  All right.

4           MR. HENSON:  Thank you very much.

5           THE COURT:  All right.  We'll stand in recess.

6           (Proceedings concluded at 12:25 p.m.)

7                          * * *

8

9              C E R T I F I C A T I O N

10

11

12           I, Joan Pace, court approved transcriber, certify

13    that the foregoing is a correct transcript from the official

14    electronic sound recording of the proceedings in the above-

15    entitled matter.

16

17

18

19    _____     August 12, 2016

20    JOAN PACE

21    DIANA DOMAN TRANSCRIBING, LLC